**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  16-20549**

**UNITED STATES OF AMERICA**

**vs.**

**PHILIP ESFORMES,**

                    **Defendant.**

_____/

**GOVERNMENT'S OPPOSITION TO DEFENDANT PHILIP ESFORMES' MOTION TO REVOKE DETENTION ORDER**

On August 4, 2016, Magistrate Judge Edwin G. Torres, in a well-reasoned decision, ordered Defendant Philip Esformes ("Defendant") detained pending trial, finding that:  1) he presented a risk of flight; and 2) that he presented a serious risk of obstruction of justice.  (DE 68) (18 U.S.C. § 3142(f)).  Defendant filed the instant Motion to Revoke Detention Order (DE 87), and the United States respectfully moves the Court pursuant to the Bail Reform Act to deny Defendant's Motion.

**I.      BACKGROUND**

For more than a decade, Defendant masterminded and executed sophisticated health care fraud and money laundering conspiracies through a network of skilled nursing facilities and assisted living facilities that he owned or operated (the "Esformes Network").  Defendant and his co-conspirators not only caused Esformes Network facilities to submit false and fraudulent bills to Medicare and Medicaid, they also sold access to the Medicare and Medicaid beneficiaries who resided in these facilities, soliciting and extracting kickbacks from pharmacies, home health agencies, and other providers that then illegally billed these government-sponsored programs for services purportedly provided to Esformes Network beneficiaries.  Defendant and his co-

conspirators used elaborate means to hide their illicit transactions, disguising kickbacks as (among other things) payments to escorts, charitable donations, and a basketball coach to provide private instruction to Defendant's son.

From 2009 through 2016 alone, this conspiracy resulted in the submission of approximately $1 billion in false and fraudulent claims to Medicare and Medicaid, including approximately $221 million paid by Medicare just to the Esformes Network skilled nursing facilities in Miami-Dade County.  Defendant also amassed significant personal wealth – self reported as $78 million in August 2014 – and, due to the enormous loss from his criminal activities, he faces a potential term of life imprisonment under the Sentencing Guidelines.  Defendant, moreover, has already obstructed justice and demonstrated that he would flee in the face of criminal charges:  cooperating witnesses and recorded conversations establish that he previously attempted to fund the flight of a defendant charged in a separate case and stated his intention to do the same if he were charged. As such, the Government respectfully submits that no condition or combination of conditions of release will reasonably assure the appearance of Defendant or prevent him from obstructing justice.  *See* 18 U.S.C. § 3142(e)(1).

A.      **Indictment and Charges**

On July 21, 2016, a grand jury sitting in the Southern District of Florida returned a 28-count indictment charging Defendant, as well as co-defendants Odette Barcha and Arnaldo Carmouze, with numerous offenses stemming from an expansive and long-running health care fraud and money laundering scheme.  (DE 1)  Specifically, Defendant is charged with one count of conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349; two counts of health care fraud, in violation of 18 U.S.C. § 1347; one count of conspiracy to defraud the United States and to pay and receive health care kickbacks, in violation of 18 U.S.C. § 371;

two counts of receipt of kickbacks in connection with a federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A); six counts of payment of kickbacks in connection with a federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); seven counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and two counts of obstruction of justice, in violation of 18 U.S.C. § 1503.  The Indictment also seeks forfeiture of various assets pursuant to 18 U.S.C. § 982.

   **B.      The Medicare Program & the Esformes Network[1]**

   For more than 14 years, Defendant operated the Esformes Network to enrich himself through false and fraudulent billings to Medicare and Medicaid for thousands of beneficiaries residing in Esformes Network facilities (the "Esformes Network beneficiaries").  The Esformes Network is comprised of approximately twenty residential facilities across South Florida, including both skilled nursing facilities ("SNFs") and assisted living facilities ("ALFs").  Notably, Medicare coverage for the services offered by these types of facilities differs significantly.

   Medicare Part A covers a beneficiary's stay in a SNF where a physician (or other qualified licensed provider) has certified that, among other things, the beneficiary requires daily skilled nursing or skilled rehabilitation services in an inpatient setting.  But to qualify for the SNF benefit, the beneficiary must have an inpatient hospital stay of at least three consecutive days within 30 days of the admission to the SNF.  And, because SNF services are intended to be short term, Medicare pays for only 100 days of skilled nursing care after each three-day hospital stay.  A beneficiary who is discharged from the SNF at the end of the 100-day period can become eligible

---

[1] For purposes of this motion, the Government proffers the facts contained herein.  The Government is prepared to offer testimony at a hearing at the Court's discretion.  *See United States v. Gaviria*, 828 F.2d 667, 669 (11th Cir. 1987).

for another 100-day SNF benefit period only if (a) she spends 60-days outside the SNF and (b) is admitted to the hospital for another three-day qualifying inpatient stay.

Medicare offers no comparable benefit for ALFs, which are state-licensed facilities that provide housing, meals, personal care services, and supportive services to older persons and disabled adults who require assistance with activities of daily living.  ALFs are intended to be an alternative to more restrictive, institutional settings (such as hospitals) for individuals who do not need 24-hour nursing supervision, physical therapy, or skilled care.  Medicare does not pay for any services provided by an ALF; rather, patients pay out of pocket or, on some occasions, Medicaid covers services.  Physicians, however, may enter an ALF, visit a beneficiary residing there, and then bill Medicare Part B for an office visit.  Similarly, other providers may bill Medicare for services provided to beneficiaries residing in ALFs.  For example, pharmacies may submit claims under Medicare Part D for medications and home health agencies may submit claims under Medicare Part A for services provided to beneficiaries in ALFs.

### C.     The Fraudulent Scheme

Defendant engaged in a long-running fraudulent scheme involving a complex array of corrupt relationships between the Esformes Network and various physicians, hospitals, and other health care providers who paid for access to thousands of Medicare and Medicaid beneficiaries under Defendant's control. Analysis of Medicare claims data revealed that there were more than 14,000 beneficiaries in the Esformes Network, having resided in an ALF or SNF owned or controlled by Defendant, during the conspiracy period.  Through his control of the Esformes Network, Defendant and his co-conspirators cycled Medicare and Medicaid beneficiaries through SNFs, hospitals, and ALFs – without regard to the beneficiaries' medical needs – to maximize Defendant's financial benefit.  And Defendant, by retaining tight control over access to the

Esformes Network, ensured that these beneficiaries received services not from providers who the beneficiaries actually needed services from, but from any provider willing to pay Defendant kickbacks.

Defendant's fraudulent scheme had two primary aspects, designed to allow Defendant to profit both through direct billing to Medicare and Medicaid and from kickbacks paid by other subscribers for access to the Esformes Network beneficiaries. *First*, by controlling access to Esformes Network beneficiaries and paying kickbacks to physicians and physician assistants ("PAs"), Defendant maintained a pipeline of beneficiaries into Esformes Network SNFs, allowing the SNFs to bill Medicare for Defendant's financial benefit. In particular, because Medicare would cover SNF services only after a three-day hospitalization and after a doctor certifies the medical need for the services, Defendant and his co-conspirators paid kickbacks to physicians and PAs to induce them to admit beneficiaries to the hospital and to refer beneficiaries for skilled nursing or rehabilitation services they were not medically necessary. Through this scheme, after a beneficiary spent three days in the hospital, the beneficiary would not go to a SNF of his or her choice, but instead the physician or PA would refer the beneficiary to a SNF within the Esformes Network. At or around the end of the 100-day benefit period, the beneficiary would be discharged and moved to an Esformes Network ALF. After the required 60-day waiting period between consecutive admissions to an SNF, a physician or physician assistant would readmit the beneficiary to the hospital, re-initiating the cycle.

*Second*, Defendant monetized Esformes Network beneficiaries in ALFs – which could not bill Medicare directly – by providing access to Esformes Network beneficiaries to any health care provider willing to pay a kickback. Defendants' co-conspirators, particularly his "lieutenants" Guillermo and Gabriel Delgado (collectively the "Delgado Brothers"), entered into kickback

arrangements with a number of Medicare providers, including pharmacies, home health agencies, partial hospitalization programs, laboratories, and diagnostic companies (the "Kickback Providers"). Physicians and PAs to whom Defendant paid kickbacks referred Esformes Network beneficiaries to the Kickback Providers, which, in turn, billed Medicare for services purportedly provided to the beneficiaries. Many of these services, however, were not medically necessary or were never provided. The Delgado Brothers paid Defendant half of the proceeds from the arrangements with the Kickback Providers.

By relying on intermediaries to arrange kickbacks with physicians and Kickback Providers, Defendant attempted to conceal his illegal conduct and to distance himself from the fraudulent scheme, while reaping the financial rewards. Defendant, for example, funneled payments to physicians and PAs through co-defendant Barcha and the Delgado Brothers. In order to provide money to the Delgado Brothers to fund kickbacks to physicians, Defendant caused Esformes Network SNFs to pay inflated invoices for durable medical equipment ("DME") sold to the SNFs by Diversified Medical Group, a DME company controlled by the Delgado Brothers. In addition, Defendant disguised kickbacks to physicians as paychecks for sham medical director jobs and the ability to bill Medicare under the physicians' provider numbers for services purportedly rendered to Esformes Network beneficiaries.

At the direction of Defendant, the Delgado Brothers entered into kickback arrangements with the Kickback Providers – often disguised as sham "consulting" agreements between the provider and a shell company owned by the Delgado Brothers. The Delgado Brothers passed half of these kickbacks to Defendant in forms designed to conceal their true purpose, including (1) cash payments; (2) payments for escorts; (3) travel expenses; (4); payments for services, such as a

basketball coach to provide private instruction to Defendant's son; and (5) donations to charities selected by Defendant, including one controlled by Defendant's father.

Due to the expansive and long-running nature of the conspiracy orchestrated by Defendant, the loss to Medicare and Medicaid was extreme. Sophisticated analysis of available claims data shows that, between 2009 and 2016, providers that participated in the fraud – including Esformes Network SNFs, hospitals, physicians, and Kickback Providers – submitted approximately $1 billion for Esformes Network beneficiaries purchased through kickbacks. As a result, Defendant is facing the possibility of life in prison. Of the $1 billion submitted to Medicare as part of this scheme, over $450 million was billed by Esformes Network SNFs alone. Furthermore, during these years, Medicare actually deposited more than $221 million into accounts of the Esformes Network SNFs located in Miami-Dade County.[2] Defendant profited handsomely, paying himself not only from the kickbacks negotiated by the Delgado Brothers, but also from the Medicare and Medicaid money his SNFs and ALFs received. Defendant found a variety of ways to line his pockets with taxpayer dollars, using the profits to pay himself purported "management fees" and dividend checks. To date, preliminary bank analysis reveals that Defendant paid himself over $24 million from his SNFs alone between 2010 and 2016.

While Defendant benefitted extraordinarily from the scheme, the beneficiaries did not. On July 22, 2016, when agents executed a search warrant on one of the ALFs owned by Defendant – Eden Gardens – a beneficiary approached an agent and told the agent that she/he was punched in the stomach when she made a complaint about the poor services rendered at the facility. Defendant also tried to put a stop to complaints about his facilities in less violent ways. For example, he

---

[2] These figures are based on available data from 2009 to 2016, and exclude claims submitted during other years in the conspiracy period and claims submitted to Medicaid. Therefore, the ultimate loss figure may be far larger.

instructed the Delgado Brothers to bribe a state regulator in order to obtain copies of issues and complaints a state agency intended to investigate at Esformes Network facilities. This allowed Defendant to modify and falsify files at his facilities before state regulators inspected the facilities.

Medical professionals have also come forward and told agents that Defendant's SNFs resembled shelters for the indigent instead of facilities treating patients with the skilled services for which they billed Medicare. Indigent patients were lured there by the promise of narcotics, which were sometimes doled out to patients without any corresponding treatment from a physician. For example, patient S.J., named in the Indictment, told agents that she was offered a bed at one of Defendant's SNFs – Oceanside Extended Care – because she was homeless and looking for a place to stay. S.J. did not get or even need the skilled nursing services that were billed to Medicare on her behalf by Oceanside Extended Care.   Instead, the Esformes Network fed her narcotic addiction in order to use S.J. as a pawn to steal from Medicare.

**D.    Obstruction of Justice**

In addition to conspiracy and substantive charges arising from Defendant's orchestration of this fraudulent scheme, Defendant has been charged with two counts of obstruction of justice based on his prior efforts to impede a health care fraud prosecution against the Delgado Brothers. After the Delgado Brothers' arrests, Defendant repeatedly discussed funding Guillermo Delgado's flight from the United States to Israel to avoid trial.   During these conversations, which were consensually recorded by the Delgado Brothers, Defendant explained in granular detail his plan to inflate renovation costs at Esformes Network SNFs to obtain Department of Housing and Urban Development ("HUD") loans, which he could then divert to Guillermo Delgado to fund his flight from justice. In attempting to carry out this plan, Defendant wrote checks to Guillermo Delgado

to fund his flight from prosecution, and he encouraged Gabriel Delgado to "blame the empty chair" that that would be created by Guillermo's flight to secure Gabriel's acquittal at trial.

Recordings also capture conversations in which Defendant demanded that the Delgado Brothers sign affidavits falsely stating that Defendant played no role in the conduct that resulted in their indictment, refusing to provide Guillermo Delgado with money to flee the country until the Delgado Brothers signed these false affidavits.  In reality, Defendant was the mastermind of the health care fraud, kickback, and money laundering conspiracies centered on the Esformes Network, and he relied on the Delgado Brothers to execute them.

### E.    Defendant's Conduct After Detention

As the Court is aware, the United States filed a civil action under 18 U.S.C. § 1345 (the "Civil Action") to restrain Defendant's assets up to the amount of the fraud *(United States v. Esformes*, 16-cr-23418-KMW).  On July 22, 2016, as part of the Civil Action, Judge Kathleen M. Williams issued a Temporary Restraining Order ("TRO") enjoining Defendant from:  "alienating, withdrawing, transferring, removing dissipating, or otherwise disposing of, in any matter, assets, real or personal, . . . in which Defendant has an interest."  *See* Exhibit B (Temporary Restraining Order).  Counsel for Defendant accepted service of the TRO in the Civil Action on July 22, 2016, shortly before Defendant's initial appearance in duty court.

Nevertheless, without notice to the government, Defendant transferred his interest in 16 skilled nursing facilities ("SNFs") and assisted living facilities ("ALFs") named in the indictment to his father and uncle from FDC Miami on August 12, 2016.  *See* Exhibit C.  Despite previously representing to a bank that his interest in these ALFs and SNFs was worth over $21 million in August 2014, Defendant signed this interest away to his family members for free.  This transfer occurred just days after Defendant's father appears to have lined up a potential buyer for

Defendant's SNFs.  On August 9, 2016, an attorney representing a potential purchaser of SNFs named in the Indictment called counsel for the United States and stated that Defendant's father contacted her to arrange the potential sale of the facilities to her client.  Counsel for the Government immediately contacted the relevant parties upon learning of the transfer and is working with counsel for the facilities (Intervenors in the Civil Action) to undo the transfers and place Defendant's interests in trust pending the outcome of the criminal case.

Defendant also failed to mention to the United States that he and his business partner were attempting to sell off the $1.6 million Ferrari they own together.  Again, the United States was made aware of the potential transaction by the business partner's attorney and not the Defendant.  Further, Defendant's SNFs are currently asking the Centers for Medicare and Medicaid ("CMS") to reconsider its decision to suspend certain Medicare payments.  The requested payments include "management fees" and "lease payments" related to the operation of these companies.  Information provided from the Interim Manager, however, revealed that these management fees are payments to Defendant, his father, his aunt, his cousin, his uncle, and a company named after his children.  And these lease payments are payments to companies that Defendant and his father own.  Defendant failed to voluntarily disclose this information to the United States.  Despite the TRO, Defendant has continued to seek to extract money from the Esformes Network and to transfer assets.

## II.    PRODUCEDURAL HISTORY

### A.    Detention Hearing

On July 22, 2016, the United States filed a Motion For Pre-Trial Detention, arguing that Defendant was a risk for flight because of the wide-ranging and serious nature of the offense, the

overwhelming weight of the evidence, the significant financial resources available to the Defendant, and the fact that the Defendant was caught on a recording discussing how to fund his indicted co-conspirator's flight out of the country to avoid trial (DE 9).  At the detention hearing on August 1, 2016, Judge Torres instructed the United States to produce copies of the recording to the Court and the Defendant, which the United States did that same day.

On August 4, 2016, after listening to the two hour recording between Defendant and the indicted co-conspirators, Guillermo and Gabriel Delgado, Judge Torres held that the Defendant should be detained because he was a risk of flight and presented a serious risk of obstruction of justice (DE 68).  Judge Torres stated in open court that the recording demonstrated "prima facie evidence of a possible intent to commit obstruction of justice."  *See* Exhibit A at 22-23 (Transcript of August 4, 2016 Detention Hearing).  According to Judge Torres, "[u]sually we don't have direct evidence of an intent to commit obstruction."  *See id*. at 22.  Based on this evidence, Judge Torres held that there was "clear and convincing evidence" that Defendant obstructed justice.  *Id*. at 23.  Judge Torres additionally found that Defendant posed a risk of flight and should be detained on that basis as well.  *Id*. at 25.  Further, Judge Torres noted that less culpable defendants in the same scheme were detained.  *Id*. at 23.  According to Judge Torres, there was no bond condition – including around the clock monitoring by police, as suggested by Defendant – that would prevent Defendant from fleeing, tampering with witnesses, or obstructing justice.  Judge Torres therefore granted the United States' Motion for Pre-Trial Detention (DE 68).

**B.      Defendant's Motion for Reconsideration of Order of Detention**

On August 15, 2016, Defendant filed a motion to reconsider Judge Torres' detention order, citing a number of additional signatories on a $1 million corporate surety bond (DE 80).  The very next day, Judge Torres denied Defendant's motion.    Judge Torres found that, although the

corporate surety bond might "ameliorate the risk of flight" if Defendant satisfied Nebbia conditions, the Court's previous decision was also premised on the serious risk of obstruction of justice. (DE 83) Judge Torres noted that "obstruction of justice is a well-established exception to the presumption that an individual charged with a serious crime is entitled to reasonable bail under the Eighth Amendment." *Id.* (citing *Carbo v. United States,* 82 S. Ct. 662, 7 L.Ed.2d 769, 776 (1962) (Douglas, J.,) ("Keeping a defendant in custody during the trial 'to render fruitless' any attempt to interfere with witnesses or jurors . . . may, in the extreme or unusual case, justify denial of bail."), *rev. denied,* 369 U.S. 868 (1962). Judge Torres reiterated that Defendant stated on the recording that he would "flee or kill himself" if he was in the same position as his indicted co-conspirator, Guillermo Delgado (DE 83). As a result, Judge Torres denied Defendant's Motion for Reconsideration of Order of Detention. *Id.*

## III.    <u>ARGUMENT</u>

The Bail Reform Act empowers the Court to detain a defendant pending trial upon a finding that the defendant is a risk of flight or if there is a serious risk that the defendant will obstruct or attempt to obstruct justice. *See* 18 U.S.C. § 3142(f)(2); *see also* 18 U.S.C. § 3142(e)(1) (pretrial detention authorized where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community"); *see also United States v. Rodriguez*, 897 F. Supp. 1461, 1463 (S.D. Fla. 1995) ("Proof of both flight risk and danger to the community is unnecessary."). A finding that a defendant represents a danger to the community must be supported by clear and convincing evidence, while a finding of risk of flight need only be supported by a preponderance of the evidence. *See* 18 U.S.C. § 3142(f); *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990); *United States v. King*, 849 F.2d 485, 489 (11th Cir. 1988). Courts also determine whether a defendant presents a risk of obstructing

justice by a preponderance of the evidence.  *US v. Friedman*, 837 F.2d 48, 49 (2nd Cir. 1988); *US v. Mehanna*, 669 F.Supp. 2d 160 (D. Mass. 2009); *US v. Eaton*, No. 05-100, 2005 WL 1939891, at *2 (S.D. Ind. Aug. 2, 2005); *see also US v. Hagerty*, No. 08-00317, 2009 WL 920617, at *1 (E.D. Ark. Apr. 2, 2009).

In determining whether detention pending trial is appropriate, the Court must consider the following factors:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).  Here, these factors indicate that Defendant has the means and incentive to flee the jurisdiction and is prepared to do so.

When reviewing a magistrate judge's pre-trial detention order, a district court must review the case *de novo*, however the court need not conduct a *de novo* hearing.  *See United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987).  The district court must, however, review all the facts presented to the magistrate.  *King*, 849 F.2d at 490-91.

### A.     The Nature and Circumstances of the Offenses Charged

The sophisticated nature of Defendant's charged crimes, his past efforts to conceal the fraudulent scheme, and his exposure to a lengthy term of imprisonment demonstrate that he poses a substantial flight risk.  Defendant played a leadership role in a wide-ranging and complex conspiracy involving more than twenty Esformes Network facilities, at least two hospitals, and numerous other health care providers, which billed Medicare for services purportedly provided to over 14,000 beneficiaries during the 14-year conspiracy period.  Through a multifaceted fraudulent scheme, Defendant enriched himself not only through the direct submission of false and fraudulent Medicare claims by facilities he controlled, but also by extracting kickbacks from other providers,

13

which submitted false and fraudulent claims under Medicare Parts A, B, and D.  As a result of Defendant's participation in this fraudulent scheme, the Indictment charges that Defendant conspired to commit health care fraud and wire fraud, conspired to defraud the United States and to pay and receive health care kickbacks, and conspired to launder money.  Defendant is also charged with substantive counts of health care fraud, paying and receiving kickbacks and money laundering in connection with kickbacks paid and received through this scheme.  The serious crimes charged in the Indictment weigh in favor of detention.

Furthermore, the charged offenses demonstrate that the Defendant possesses a sophisticated ability to deceive authorities and conceal fraud.  The fraud pervading the Esformes Network depended on Defendant's creation of a network of co-conspirators to assist in organizing and disguising his fraudulent conduct.  To hide his personal involvement in the fraud, Defendant used others, especially the Delgado Brothers and co-defendant Barcha, to negotiate, coordinate, and act as middlemen in kickback arrangements with physicians and other health care providers. Defendant, with his co-conspirators, also disguised these arrangements by using sham contracts or by paying kickbacks with cash or in the guise of payments for escorts, charitable donations, payments for services, and inflated purchases of DME.

In sum, due to his lengthy prison exposure – an effective lifetime sentence -- and history of sophisticated deception and concealment, Defendant poses a serious flight risk.

**B.    The Weight of the Evidence**

The charges against Defendant are supported by substantial evidence.   Cooperating witnesses confirm Defendant's critical role in the fraudulent scheme, making clear that Defendant wielded control over access to the Esformes Network beneficiaries to enrich himself and obtain kickbacks in exchange for selling patients – that trusted him with their care – to the highest bidder.

14

As witnesses explain, Defendant directed co-conspirators to send Esformes Network beneficiaries to particular facilities and providers based on the kickback arrangements he entered.  In addition, the cooperating witnesses – which include numerous co-conspirators – describe Defendant's payment and receipt of kickbacks and his use of sham agreements and intermediaries to facilitate kickbacks paid for Defendant's ultimate benefit.

Law enforcement also recorded conversations that directly evidence Defendant's participation in the fraudulent scheme and his obstruction of justice.  Among other things, these recordings capture Defendant negotiating a sham medical director position to conceal kickbacks to a physician and discussing kickbacks paid to Defendant in the guise of payments for escorts.  With respect to the obstruction of justice charge, the recordings reveal that Defendant's attempt to fund Guillermo Delgado's flight from the United States was a carefully considered and detailed plan.  Defendant, for example, told Guillermo that he must flee to a country without an affiliation with America and instructed Guillermo that he could never return.

Extensive documentary evidence further corroborates the cooperating witnesses.  Corporate and bank records reflect Defendant's ownership and control of numerous SNFs and ALFs.  In an October 2013 financial statement that Defendant submitted to a bank, for example, he listed himself as the owner of more than 20 SNFs and ALFs, which he claimed had a fair market value totaling over $27 million.  Bank records also show kickback payments made as part of the fraudulent scheme.  These records include checks from Defendant's SNFs to Diversified Medical Group – the Delgado Brothers' DME company used as a conduit for Defendant's kickbacks – and checks from Diversified Medical Group to co-defendant Carmouze and other kickback recipients.  And inflated and falsified invoices from Diversified Medical Group provide additional evidence of its use as a pass-through for kickbacks from Defendant.  These invoices corroborate information

from cooperating witnesses that, each month, Diversified Medical Group prepared an original invoice based on legitimate DME actually sold to Esformes Network facilities and later prepared an inflated invoice for the same month to cover kickbacks to be paid to physicians.  Finally, Medicare claims data confirm that beneficiaries were cycled between Esformes Network facilities, hospitals, and other providers involved in the fraudulent scheme.

Accordingly, the strong evidence of Defendant's guilt weighs heavily in favor of pretrial detention.

### C.   The Defendant's History and Characteristics

Defendant's tremendous financial resources, past travel practices, and long history of fraudulent conduct make it highly unlikely that any combination of conditions will reasonably assure his presence at future proceedings.

*1.   Financial Resources.*  Defendant's significant financial resources, including the millions of dollars in proceeds he derived from the fraud at Esformes Network facilities, make Defendant an especially high flight risk.  In a personal financial statement dated August 31, 2014 that Defendant submitted to a bank, Defendant reported assets in excess of $78 million, including more than $3.5 million in cash on hand and in banks and $12 million in real estate.  *See* Attachment A (Personal Financial Statement of Philip Esformes).  Defendant would likely be able to liquidate a significant portion of these assets:  he reported no liabilities on the statement, and none of the real estate the he reported owning was encumbered by mortgages or liens.[3]

Defendant's self-reported worth likely represents only a limited portion of his true financial resources.  Indeed, between 2009 and 2016, Medicare deposited approximately $221 million into

---

[3] Additionally, Defendant's father, who is also his business partner, has a significant net worth of his own.

accounts for SNFs that Defendant controlled in Miami-Dade County alone.  And many of Defendant's assets likely have not yet been located by law enforcement.  The Government subpoenaed bank records from approximately 47 financial institutions in this investigation, and, to date, identified approximately 200 accounts affiliated with Defendant across 28 institutions. The Government's analysis of these records is ongoing, but, based on the analysis available at this time, approximately 100 of these accounts contained amounts totaling over $10 million as of the most recent date for which the Government has records.  Moreover, although the Government obtained a TRO under 18 U.S.C. § 1345, the substantial complexity of Defendant's finances and the sophisticated steps that he took to conceal the kickbacks he received frustrate the Government's efforts to identify and preserve Defendant's assets.  In short, Defendant has ample financial means to flee.

Financial analysis to date has revealed that Esformes is significantly funded by his fraudulent Medicare business.  Our analysis has revealed that monies traced directly to Medicare accounts have allowed Esformes to withdraw cash of over $4.8 million, lease private jets in the amount of $2.1 million, lease luxury vehicles in the amount of $2.4 million, purchase watches in the amount of $360,000 and $600,000, respectively, and paid over $8.9 million in credit card bills.

2.     *Travel Practices.*  The Defendant has travelled abroad by private jet.  It is more difficult for the Government to monitor the travel of passengers on private jets than it is to monitor travel on commercial planes.  The Government is likely unable to prevent Defendant from leaving the country on a private jet.  Defendant's past travel practices therefore present a serious risk that he could successfully flee.

3.     *History of Criminal and Fraudulent Conduct.*  Defendant is charged with engaging in massive health care fraud, kickbacks, and money laundering schemes from approximately 2002

17

through 2016.  Thus, while it is technically true that the Defendant has no criminal record, the grand jury found probable cause that Defendant engaged in continuing criminal conduct for more than 14 years.

Moreover, although the Defendant avoided criminal punishment during this period, he faced civil penalties for defrauding Medicare and Medicaid, yet continued to engage in the same fraudulent conduct.  *See United States v. LeClercq*, No. 07-80050-CR, 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13, 2007) (unpublished) (considering finding of the defendant's civil liability for fraud in determining that she posed a flight risk).  In 2006, Defendant settled a civil action by the United States alleging that Defendant paid kickbacks to induce the admission of Medicare and Medicaid beneficiaries to a Miami-based hospital for medically unnecessary treatment and services.  *See* Settlement Agreement Binder, *United States v. Michel* ("False Claims Act Action"), No. 04-21579-CIV-JORDAN/TORRES (S.D. Fla.), annexed hereto as Attachment B.  Defendant and his co-defendants in the False Claims Act Action agreed to pay $15.4 million to resolve this suit.  *Id.*  Even after paying a multi-million dollar settlement, Defendant's fraudulent conduct – including the payment of kickbacks for medically unnecessary admissions to a hospital referenced in the False Claims Act Action – continued unabated.  Even as the United States Department of Health and Human Services put in place a monitor over the hospital named in the False Claims Act Action to prevent the recurrence of the conduct, Defendant and his co-conspirators put in place more sophisticated arrangements to evade detection.  Far from halting his illegal activities, Defendant reacted to this settlement by employing others as intermediaries in kickbacks with physicians in order to conceal his involvement, while Defendant continued to reap the benefits of the fraud.  As Defendant explained in a recorded conversation, "after [the False Claims Act Action]," he "stay[ed] away from doctors" and "push[ed] the girls to deal with that stuff."

18

Defendant's blatant lack of respect for the law undermines any claim that he may be trusted to appear at future proceedings.[4]

### D.  The Nature and Seriousness of Defendant's Danger to the Community

The Bail Reform Act directs the Court to consider also "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g)(4).  As the Eleventh Circuit has recognized, "[t]he term 'dangerousness,' as used in the Bail Reform Act of 1984, has a much broader construction than might be commonly understood in everyday parlance."  *King*, 849 F.2d at 487 n.2.  While "danger to any person" is intended to address physical danger to a particular individual, danger to the community "refers to the danger that the defendant might engage in criminal activity to the detriment of the community."  *Id.*  Thus, "the concern about safety [is] given a broader construction than merely danger of harm involving physical violence."  *Id.*; *see also LeClerq*, 2007 WL 4365601, at *4 & n.5 (unpublished).

As an initial matter, there is evidence that Defendant may present a physical danger to himself.  In a recorded conversation, Defendant stated that, if arrested like Guillermo Delgado, he "would kill [him]self," as he has "a great life insurance policy."

Furthermore, Defendant poses a substantial danger to the community – both physical and economic.  To carry out the fraudulent scheme, Defendant required thousands of beneficiaries to undergo medically unnecessary treatments.  Medicare beneficiaries are entitled to receive services for which they qualify from licensed and professional health care providers.  But that is not what happened in the Esformes Network.  Instead, Defendant sold Esformes Network beneficiaries to

---

[4] Nor can Defendant claim that strong family ties limit his risk of flight.  Defendant is in the midst of a divorce proceeding, and, as the allegations of the Indictment demonstrate, even while married Defendant was receiving kickbacks in the form of payments for high-end escorts.  *See* DE 62 (United States' Supplement Motion for Pre-Trial Detention, attaching pleadings filed by Defendant's wife regarding his failure to properly care for their minor child).

any provider that would pay him kickbacks, and forced beneficiaries into hospital and SNF admissions they did not need so that Defendant could bilk Medicare through fraudulent claims. Furthermore, Defendant and his co-conspirators preyed upon beneficiaries' addictions by plying them with narcotics so that they would remain in Esformes Network facilities, allowing the cycle of fraud to continue.   Defendant's callous disregard for the vulnerable beneficiaries that his facilities were supposed to house and treat establishes that he will remain a threat to the community if released.

Defendant also poses an acute economic danger.   Defendant and his co-conspirators took extraordinary measures to conceal the fraudulent scheme and to prevent discovery of Defendant's involvement.   They went to great lengths to cloak kickback arrangements in the guise of legitimacy through sham contracts and falsified invoices.   When his fraud was uncovered in a civil suit, Defendant merely heightened his deceptive practices, routing kickbacks through co-conspirators and accepting payments in forms such as cash, escorts, and basketball coaching.   Similarly, Defendant did not cease his criminal conduct when his lieutenants were arrested, but tried to insulate himself from prosecution by obtaining false affidavits and funding a defendant's flight from justice.   That Defendant continued to engage in the same illegal conduct even after paying a multimillion settlement and attempted to obstruct justice as his co-conspirators were arrested demonstrates that he is not likely to be deterred from future criminal conduct by the pending charges. *See United States v. Burke*, No. 13-20616-CR, 2013 WL 5194138, at *1 (S.D. Fla. Sept. 17, 2013) (finding that where a defendant engaged in "methodical and repetitive efforts to defraud and evade detection," this "pattern of deception suggests that [he] would continue to pose a danger of further harm to the community if released").   Given the strong likelihood that Defendant would persist in his pattern of criminal activity to the detriment of the community, Defendant's detention

is necessary to ensure that he does not continue to use and endanger vulnerable Medicare beneficiaries in order to steal millions more from Medicare.

### E.   Evidence That Defendant Will Obstruct Justice or Threaten Witnesses

In addition to the deception inherent in the fraudulent scheme, Defendant also attempted to impede the criminal process, and was recorded telling Guillermo and Gabriel Delgado that he would flee the country if he was in their shoes.  Not only does the Defendant discuss funding and getting Guillermo Delgado out of the United States to avoid trial, he suggests that Guillermo Delgado flee to countries that do not have a good relationship with the United States (such as Russia or China).  The "willingness to obstruct justice evinces a lack of respect for the rule of law and weighs heavily towards a finding that Defendant is a flight risk and a danger to the community."  *United States v. Burstyn*, No. 04-CR-60279-ALL, 2005 WL 2297605, at *4 (S.D. Fla. Mar. 18, 2005) (unpublished).  Accordingly, "obstruction of justice, an attack on the rule of law, is a traditional ground for pretrial detention."  *Id.*  Moreover, Defendant's attempt to fund and assist a co-conspirator's flight to avoid a criminal trial leaves little doubt that he would consider fleeing the country in light of the serious charges he now faces.  *See id.* ("That Defendant allegedly counseled two members of the Tobin criminal enterprise . . . to flee the country magnifies the Court's concern that pre-trial detention may be warranted because no set of restrictions would reasonably ensure Defendant's presence at trial.").

In addition to obstructing justice, the recording also shows the Defendant's willingness to tamper with witnesses.  As Judge Torres noted at the August 4, 2016 detention hearing, Defendant had a two-hour long conversation on the June 2015 recording with two co-defendants who are out on bond, in clear violation of their bond conditions.  S*ee United States v. Mildrey Gonzalez and Milka Alfaro*, No. 16-cr-20461-JEM (Magistrate Judge Barry L. Garber granted the United States'

Motion to Revoke Pre-Trial release for two defendants in a $24 million home health care fraud case after the defendants tampered with a witness and failed to make fulsome asset disclosures required by the Court).  Given that Defendant showed no respect for his co-conspirator's bond conditions, there is a serious risk, if not a guarantee, that he will fail to respect his own.

In his motion, Defendant correctly asserts that obstruction of justice charges do not create a presumption of pretrial detention.  In support of the proposition that courts have granted pretrial release to defendants charged with obstruction however, Defendant cites a litany of cases that stand in marked contrast to the instant facts.  (DE 87 at 15).  Here, the Government presented compelling evidence that Defendant was actively obstructing justice by encouraging witnesses to flee the country thereby making themselves unavailable for trial.  In the inapposite cases cited by Defendant, there was meager evidence of obstruction.  *See US v. Brannon*, No. 00-2037, 2000 WL 235237, at *1 (10th Cir. March 2, 2000) (noting that the evidence elicited by the Government supporting detention amounted to "sheer speculation"); *US v. Traitz*, 807 F.2d 322, 326 (3rd Cir. 1986) ("[t]he Government has produced no evidence of a threat to any witness in connection with the crimes charged in the indictment"); *US v. Afyare*, 2011 WL 1397820, at *14 (M.D. Tenn. April 13, 2011) ("[g]iven the defense challenges to the preparation of these transcripts and the lack of proof about the methods of identification of voice, the Court declines to base detention on that proof"); *US v. Demmler*, 523 F.Supp. 2d 677, 683 (S. D. Ohio 2007) (noting the Government's position that the defendant posed a threat to witnesses was "entirely speculative").  Here, in stark contrast, Defendant encouraged co-conspirators to flee the country, which was captured on tape and presented to Judge Torres.

Finally, Defendant argues that he should be applauded for the fact that – after committing fraud for almost 15 years – he has not obstructed justice during his month-long detention.  Not

only does this argument lack legal support, it is also questionable on the facts. Defendant's conduct after being detained in transferring his interest in the 16 SNFs and ALFs, which he previously valued at over $21 million, to his father and uncle for no consideration appears to be directly at odds with, if not in violation of, the TRO in effect in the Civil Action. Were Defendant released, he would have far greater ability to transfer or liquidate assets out from under the TRO.

**F.      Defendant's Bail Proposal Should Be Rejected**

Defendant proposes that he reside at one of his three South Beach homes, valued collectively at over $7 million as of August 2014, with a variety of elaborate home confinement conditions that include 24-hour surveillance by retired police.[5]   A number of courts have repeatedly rejected proposals by wealthy defendants that propose creating their own personal prison in lieu of detention. For example, the Second Circuit has found that bail proposals that include the "extensive monitoring of homes, telephones, and travel that would be necessary to ensure compliance with the conditions of bail," observing that that such proposal would "impos[e] a burden on the Government that, apart from considerations of cost and practicality, was not required by the Bail Reform Act."[6]   *See United States v. Orena,* 986 F.2d 628, 632–33 (2d Cir. 1993). Indeed, the Second Circuit rejected a proposal similar to Defendant's and ordered pre-trial

---

[5] It should be noted that Defendant has requested to return to the very same multi-million dollar homes that have been restrained as traceable to proceeds of this fraud.

[6] Although Defendant does not make mention of who will foot the bill for this undoubtedly expensive proposal, any suggestion that he can pay to create an alternative to FDC Miami should be rejected. *See United States v. Patriarca*, 948 F.2d 789, 796 (1st Cir. 1991) (opinion of Senior Circuit Judge Hill of the 11th Circuit sitting by designation, concurring dubitante) ("The ability of the defendant to pay should have nothing to do with the decision as to whether pretrial release conditions constitute the 'heroic measures beyond those which can fairly be said to have been within Congress's contemplation,'" quoting *United States v. Tortora*, 922 F.2d 880, 887 (1st Cir.1990)).

23

detention in a case where the defendant was "a white-collar criminal [indicted for health care fraud] with no connection to the mob," but had attempted to tamper with witnesses (even though in a non-violent fashion).  *United States v. LaFontaine,* 210 F.3d 125, 133–35 (2nd Cir. 2000).

Further, Defendant cannot be relied upon or trusted to monitor his own phone calls, visitors, and whereabouts as suggested, given that he was already caught on tape obstructing justice.  *See United States v. Agnello*, 101 F. Supp. 2d 108, 114–16 (ED N.Y. 2000) (holding that "a security guard posted outside, video cameras directed at the outside of the house, and monitoring of telephone lines cannot be relied upon without good faith compliance from the defendant."). Defendant has already forced the government to chase around his finances while he is detained at FDC Miami and the Court should reject any proposal that requires the United States to spend the time and resources chasing him around in any other way while out on bond.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court affirm Judge Torres's order and detain Defendant pending trial.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


By:      s/*Elizabeth Young*
Allan J. Medina
Assistant Chief
Court Id. No. A5501748
Elizabeth Young
Trial Attorney
Court ID No. A5501858
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C.  20005
Tel:  (202) 257-6537
Fax:  (202) 514-6118
Elizabeth.Young@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on September 5, 2016, I electronically filed and served this document with the Clerk's Office in the Southern District of Florida.


                                                  s/*Elizabeth Young*
                                                Elizabeth Young
                                                Trial Attorney
                                                United States Department of Justice
                                                Criminal Division, Fraud Section

26