UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CR-20549-LENARD

UNITED STATES OF AMERICA

vs.

PHILIP ESFORMES,

        **Defendant.**
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S DECLARATIONS
REGARDING ASSET TRANSFER DOCUMENTS**

On September 7, 2016, Defendant Philip Esformes (the "Defendant") and the civil intervenors filed three attorney declarations (collectively, the "Declarations") in support of an argument that he relied on advice of counsel when he signed documents transferring his interest in numerous assets without notifying this Court or the court supervising a related civil action (DE 114-116). The United States of America respectfully submits that, for the reasons stated in the instant response, the Defendant's argument that he relied on advice of counsel in executing the transfer at issue is unavailing, as his attorneys had incomplete information as they worked at his behest. *Id*. Defendant's conduct while detained is highly probative of whether there is a significant risk that he will continue to obstruct justice if released, and his transfer of certain assets from FDC-Miami and the documentation concerning the same may assist this Court in its consideration of the Motion to Revoke Detention.

The Declarations submitted by counsel for Defendant make no mention of the fact that Defendant and his family intended to sell the assets the attorneys believed they were "preserv[ing]." Nor do the Declarations discuss that Defendant concealed from the Centers for Medicare and Medicaid Services ("CMS") that he would continue to benefit personally if CMS

1

released additional funds through the lease and management fees the skilled nursing facilities ("SNFs") and assisted-living facilities ("ALFs") were required to pay to companies he owned or controlled. Moreover, none of the Declarations dispute the fact that the Defendant dissipated assets in violation of a Court order and failed to disclose the transfer to this Court, Judge Williams, or the government. Finally, the Declarations fail to identify any exigent circumstances that would provide a basis for this failure. (*See* DE 114, 115, 116.)

I.    **FACTUAL BACKGROUND**

On July 22, 2016, as part of the related civil action ("Civil Action"), United States District Judge Kathleen M. Williams issued a Temporary Restraining Order ("TRO") enjoining the Defendant from: "alienating, withdrawing, transferring, removing dissipating, or otherwise disposing of, in any matter, assets, real or personal, . . . in which Defendant has an interest." *See* United States v. Esformes, 16-cv-23148-KMW (DE 11).

Ensuring that the patients at the ALFs and SNFs controlled and partially-owned by Defendant receive the care they need is of paramount importance to this Court, the government, and CMS. To that end, the Court appointed the Interim Manager to coordinate with the government and the SNFs, and to report to the Court, to make sure that the SNFs receive sufficient payment from Medicare to continue to treat patients, without releasing payments to Defendant.

In their Declarations, counsel for the intervenors represent that they received notice on August 5, 2016 that CMS was suspending certain payments to the SNFs.[1] (DE 116 at 3.) As further set forth in the Declarations, counsel for the intervenors claim that, after reviewing the suspension letters from CMS, they "believe[d] it prudent to prepare documents wherein Philip

---

[1] ALFs do not receive reimbursement from Medicare and are therefore not part of the Medicare payment suspension.

Esformes would resign all positions with the facilities and divest himself of all interest in them." (*Id.*) On August 12, 2016, Defendant undertook the extraordinary step of transferring his ownership interest in 16 SNFs and ALFs named in the Indictment – valued at more than $20 million – to his father. It is undisputed that between receipt of the suspension letter from CMS on August 5, 2016 and the execution of the transfer papers at FDC-Miami on August 12, 2016, neither the intervenors nor Defendant notified the Court or the government of the plan to transfer these assets.[2]

Instead, a third-party notified the government that, days before the asset transfer's execution on August 12, 2016, Defendant's father sought to sell the ALFs and SNFs to Greystone and Co., a Chicago-based investment company that had done business with Defendant before. *See* Exhibit A (email memorializing counsel for Greystone and Co.'s contact with counsel for the United States in this matter); *see also* Exhibit B (document obtained during the search of Defendant's office showing that Greystone and Co. provided management services for Defendant's health care companies in the past). This transaction, had it occurred, would not only have resulted in the transfer of assets subject to the TRO, but also would have run afoul of the clear terms of the transfer documents drafted by counsel for the intervenors:

> "Philip voluntarily agrees and acknowledges that the transferee agrees to accept such transfer with the knowledge and limitations understanding that such assets transferred under this Agreement as related to the pending litigation cited herein will be held and subject to any and all future potential repayment obligations under the pending litigation and that only after full and final settlement may the transferred interests or assets be used, transferred or sold for any other purpose."

*See* DE 112, Exhibit A.

---

[2] In fact, upon learning of the asset transfer – after the fact – the government was forced to begin working with the intervenors and counsel for Defendant to place the Defendant's interest in these assets in a trust, pending the resolution of the civil and criminal litigation involving Defendant.

According to the Declarations, counsel for Defendant and the intervenors apparently believed that if Defendant were removed from ownership of the SNFs and ALFs, CMS might reduce or remove its payment suspension to those Medicare providers.  What was not in the Declarations was the fact that even if he were removed from the ownership of these facilities, Medicare funds would continue to flow to the Defendant and his family members through purported lease payments and management fees.  This fact became apparent when the Interim Manager presented a cash flow analysis of the SNFs to the United States and CMS for the purpose of requesting removal of the Medicare payment suspension.  This analysis showed that large lease payments and management fees were being paid out by Defendant's SNFs.  On their face, the management fees and lease payments did not appear to have anything to do with Defendant or his family, however – at the government's request – the Interim Manager assembled and circulated a chart indicating that companies owned and controlled by Defendant and his family members were the true recipients of these purported lease payments and management fees.  *See* Exhibit C (Interim Manager's analysis of the management and lease companies).

## II.     ARGUMENT

After reviewing all the evidence, it appears that the Defendant attempted to create a windfall for himself and his family through a jailhouse transfer of assets.  Nothing in the Declarations provided by counsel indicate that they were aware of the ways in which the Defendant stood to profit from this transaction, the existence of which was withheld from the government and this Court until after its consummation.  The transaction and the attempted sale provide additional evidence that Defendant cannot be trusted to refrain from obstructing justice if released on bond.

### A.  Terminating Defendant's Ownership Was Not Necessary to Fund the SNFs

Both the Court and the United States have been available and willing to take action to ensure that the SNFs to continue to operate. Indeed, the Interim Manager was appointed by this Court for the very purpose of ensuring that the SNFs and ALFs were financially able to provide care to patients. Tellingly, the Declarations do not allege that the Court-approved review and funding processes prevented the SNFs and ALFs from meeting their patients' medical needs. Instead it appears that the transfers were done to circumvent court orders, as the Declarations do not identify a compelling exigency for this extrajudicial transfer.

At the September 6 status conference, counsel argued that the transfers were done without notifying the Court or the government due to an "emergency," and that the transfer documents were presented to the United States "literally . . . within the next day" of being signed. *See* Transcript of September 6, 2016 Status Conference at 30, Line 16-19. This is belied by the facts.

Instead, the Declarations represent that counsel for the intervenors received notice on August 5, 2016 that CMS was suspending certain payments to the SNFs. The transfer, however, was not executed until <u>seven</u> days later, on August 12. (DE 116 at 3.) It wasn't until <u>four</u> days after that when the government finally received notice of the transfer – eleven days after the purported "emergency." There is simply no basis for Defendant's failure to raise the transfer of a considerable portion of Defendant's assets—again, which were valued in excess of $20 million—with the government or the Court.

**B. Defendant and His Family Stood to Profit From the Transfer**

The government learned from a third party that Defendant's father intended to sell his son's interest in the SNFs once the transfer was finalized. *See* Exhibit A. Not one of the Declarations mentions, let alone disputes, Defendant's attempt to line up Greystone and Co. as a buyer, something Defendant does not claim was done with the blessing of counsel. The Declarations submitted by counsel for the intervenors did not provide a basis for this action and, presumably,

counsel for Defendant was not aware of this clear attempt to dissipate assets by Defendant and his father. Indeed, the very documents prepared by counsel for intervenors and Defendant expressly prohibited such a transfer. If this sale had occurred, Defendant's family would have received a windfall – which could have been outside the reach of the government as a substitute asset should the Defendant be convicted.

At the September 6, 2016 hearing, counsel for Defendant and the intervenors advised that the transfer of the assets to Defendant's father was made for no consideration. This fact is troubling to the government for two reasons. First, had the transfer been made for a fair price and with advance notice to the government, the proceeds of the sale could have been placed in escrow pending the resolution of this matter. Second, this transfer to Defendant's father may have been an attempt to deceive Medicare. It is not unusual for those engaging in Medicare fraud to hide their true ownership interests to avoid scrutiny from CMS and investigators.[3] Here, Defendant effected a paper transfer of these assets to a family member, while standing to receive significant sums of money from them – through purported rent and management fees. S*ee* Exhibit C. In other words, Defendant, although purportedly no longer an "owner," would continue to share in the profits of the properties named in the Indictment and subject to the TRO, while at the same time, making the assets harder to recover by the government upon conviction.

---

[3] In fact, United States has concerns that Defendant previously concealed his interest in two nursing homes that are purportedly owned by his father – Fountain Manor Health & Rehabilitation Center and The Terrace at Hobe Sound. Defendant received a substantial amount of money from both SNFs as recently as July 2016, including a check for $42,100 from the Fountain Manor Health & Rehabilitation Center account and $71,750 from the Terrace at Hobe Sound account. Defendant did not disclose any ownership interest in these two facilities to CMS.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that the Court should consider the papers memorializing the transfer of certain of Defendant's assets in its determination of the Defendant's Motion to Revoke Detention Order.

                                                Respectfully submitted,

                                                WIFREDO A. FERRER
                                                UNITED STATES ATTORNEY

By:     /s/ *Elizabeth Young*
            Elizabeth W. Young
            Trial Attorney
            Court ID No. A5501858
            Allan J. Medina
            Assistant Chief
            United States Department of Justice
            Criminal Division, Fraud Section
            1400 New York Avenue, N.W.
            Washington, D.C.  20005
            Tel:  (202) 262-7650
            Elizabeth.Young@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I hereby certify that, on September 11, 2016, I electronically filed and served this document with the Clerk's Office in the Southern District of Florida.

                                                      /s/ *Elizabeth Young*
                                           Elizabeth Young
                                           Trial Attorney
                                           United States Department of Justice
                                           Criminal Division, Fraud Section