**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-20549-CR-SCOLA/OTAZO-REYES**

UNITED STATES OF AMERICA,

v.

PHILIP ESFORMES,

      Defendant.

_____/

**<u>REPORT AND RECOMMENDATION</u>**

      THIS CAUSE came before the Court upon Defendant Philip Esformes' ("Defendant" or "Esformes") Motion to Disqualify the Prosecution Team for Systematic Violations of the Attorney-Client, Work Product and Joint Defense Privileges (hereafter, "Motion to Disqualify") [D.E. 275]; and Defendant's Motion to Dismiss Indictment, in Whole or in Part, Suppress Evidence and/or Sever Counts 32 & 33 and Exclude the Obstruction Evidence (hereafter, "Motion to Dismiss") [D.E. 278].[1]

      The Motion to Disqualify was referred to the undersigned by the prior presiding District Judge, the Honorable Joan A. Lenard [D.E. 382]. The Motion to Dismiss was referred to the undersigned by the current presiding District Judge, the Honorable Robert N. Scola, Jr. [D.E. 453].

      The undersigned held evidentiary hearings on the Motion to Disqualify and the Motion to

---

[1]  A Third Superseding Indictment that post-dates the Motion to Dismiss no longer charges the obstruction of justice offense that was previously charged in Count 33. <u>See</u> Third Superseding Indictment [D.E. 869]; Second Superseding Indictment [D.E. 200]. Therefore the undersigned need not address the Motion to Dismiss with respect to Count 33 of the Second Superseding Indictment. The obstruction of justice offense that was previously charged in Count 32 is now charged in Count 34. <u>Id.</u> Therefore, the undersigned will address the Motion to Dismiss with respect to Count 34 of the Third Superseding Indictment.

Dismiss (together, "Motions") on the following dates:  October 3, 2017 [D.E. 578]; October 16, 2017 [D.E. 597]; November 6, 2017 [D.E. 620]; November 7, 2017 [D.E. 621]; November 30, 2017 [D.E. 643]; December 18, 2017 [D.E. 678]; December 19, 2017 [D.E. 681]; December 20, 2017 [D.E. 682]; and December 21, 2017 [D.E. 683].  In addition, the undersigned heard counsel's post-hearing legal arguments on the Motions on March 6, 2018 [D.E. 802].

For the reasons stated below, the undersigned RESPECTFULLY RECOMMENDS that Defendant's Motions be DENIED, subject to the suppression of certain items of evidence.

## PROCEDURAL BACKGROUND

Esformes has been charged with various conspiracy and substantive offenses relating to health care fraud, as well as one count of obstruction of justice.  See Third Superseding Indictment [D.E. 869].  Esformes was arrested at his home on July 22, 2016 pursuant to an arrest warrant [D.E. 4, 53].  That same day, federal agents executed a search warrant at the Eden Gardens Assisted Living Facility ("Eden Gardens") operated by Esformes, and seized 70 boxes of documents.  See Search Warrant Return [D.E. 329-45].[2]  Agents also seized various electronic devices and storage media.  Id. at 8.

Defendant argues that, as a result of the search of Eden Gardens, the prosecution team improperly obtained access to documents protected by the attorney-client and work product privileges and used some of those documents in conducting a reverse proffer with non-party Norman Ginsparg (hereafter, "Ginsparg reverse proffer") and interviews with non-party Jacob Bengio (hereafter, "Bengio debriefings").  Defendant also argues that the prosecution team violated a joint defense or common interest privilege, which arose from his Joint Defense Agreement ("JDA") with Guillermo "Willie" Delgado and Gabriel ("Gabby") Delgado (together, the "Delgado Brothers").  According to Defendant, this violation occurred in the course of the

---

[2] Box # 70 was labeled "taint."  Id. at 7.

Delgado Brothers' cooperation with the government.  Defendant seeks disqualification of the prosecution team and dismissal of what is now the Third Superseding Indictment as remedies for these alleged privilege violations.  Defendant also argues that Count 34 of what is now the Third Superseding Indictment, which charges him with obstruction of justice based on his interactions with the Delgado Brothers, is misjoined.  And, in the alternative to dismissal, Defendant seeks suppression of the evidence obtained as a result of the Delgado Brothers' cooperation with the government and/or severance of Count 34 of the Third Superseding Indictment.

Having considered the evidence of record and the applicable law, the undersigned concludes that Defendant's Motions should be denied, except that the government should be precluded from introducing certain items of evidence at trial, which are specified below.

## APPLICABLE LAW

Defendant seeks dismissal of the Third Superseding Indictment based on his claim that the government invaded the attorney client, work product and common interest privileges.  To obtain this remedy, Defendant must show misconduct on the part of the government that causes prejudice to him.  See United States v. Ofshe, 817 F.2d 1508 (11th Cir. 1987).  In Ofshe, the Eleventh Circuit analyzed a motion to dismiss an indictment based on government misconduct under both the Sixth and Fifth Amendments.  Id. at 1515-16.  With regard to violations of a defendant's right to counsel under the Sixth Amendment, the Eleventh Circuit noted that, pursuant to Supreme Court precedent, dismissal is "plainly inappropriate" if there is no "demonstrable prejudice."  Id. at 1515 (citing United States v. Morrison, 449 U.S. 361 (1981)).  With regard to violations of due process rights under the Fifth Amendment, the Eleventh Circuit stated that, "[t]o constitute a constitutional violation the law enforcement technique must be so outrageous that it is fundamentally unfair and 'shocking to the universal sense of justice

mandated by the Due Process Clause of the Fifth Amendment.'" Ofshe, 817 F.2d at 1516 (citing United States v. Russell, 411 U.S. 423 (1973)). See also United States v. Merino, 595 F.2d 1016, 1018 (5th Cir. 1979) ("[I]n the case of even the most egregious prosecutorial misconduct . . . the dismissal of an indictment in such a case must depend upon a showing of actual prejudice to the accused."). In United States v. Pabain, 704 F.2d 1533 (11th Cir. 1983), the Eleventh Circuit noted that "prejudice must be shown when dismissal is based on violations of the Constitution." Id. at 1540. The Eleventh Circuit further noted that, when a court considers dismissal of an indictment for government misconduct in the exercise of its supervisory power, the issue of "whether prejudice is required" had not been resolved by binding precedent. Id. Subsequent to this observation by the Eleventh Circuit, however, the Supreme Court held in Bank of Nova Scotia v. United States, 487 U.S. 250 (1988), that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant." Id. at 255. See also United States v. Campagnuolo, 592 F.2d 852, 865 (5th Cir. 1979) ("The supervisory powers of a district judge, however, allow him to impose the extreme sanction of dismissal of an indictment with prejudice only in extraordinary situations. . . . For this reason, we have held that a district judge may dismiss an indictment with prejudice because of misconduct by the government only if that misconduct actually prejudiced the defendant."); United States v. Deluca, No. 6:11-cr-221-Orl-28KRS, 2014 WL 3341345, at *9 (M.D. Fla. July 8, 2014) ("Dismissal under a court's supervisory powers, however, also requires prejudice.").

Defendant bears the same burden of showing misconduct and prejudice with regard to his Motion to Disqualify, which is similarly based on his claim of government violations of the attorney client, work product and joint defense privileges. See United States v. Walker, 243 F. App'x 621, 622-24 (2d Cir. 2007) (upholding the district court's denial of a motion to disqualify,

reasoning that there was no egregious misconduct on the part of prosecutors who had limited exposure to a handful of privileged documents and any theory of prejudice by the defendant was far too attenuated); United States v. Stewart, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) (denying a motion to disqualify the prosecutor for inadvertent review of a privileged email, where the motion was only supported by "vague and conclusory allegations of the harm").

Even when the requirements of misconduct and prejudice are met, courts may choose suppression of evidence rather that dismissal or disqualification.  See United States v. Melvin, 650 F.2d 641, 644 (5th Cir. Unit B 1981) (remanding the case for further findings of fact on the question of prejudice and, if prejudice was found, for consideration of some remedy short of dismissal, such as suppression); Deluca, 2014 WL 3341345, at *8 ("When a defendant has shown prejudice, a court must determine if a less drastic remedy, such as suppression of the evidence in question, can sufficiently address the constitutional violation."); Stewart, 294 F. Supp. 2d at 494 (noting that suppression rather than disqualification is the proper remedy for inadvertent disclosure of work product); United States v. Kaufman, No. CRIM.A.04-40141-01, CRIM.A.04-40141-02, 2005 WL 2087759, at *4 (D. Kan. Aug. 25, 2005) ("The Tenth Circuit has almost categorically rejected dismissal of the indictment as a proper remedy in federal prosecutions involving breach of the attorney-client privilege.").

With regard to the proper joinder of offenses, Rule 8(a) of the Federal Rules of Criminal Procedure provides that two or more offenses may be charged in the same indictment if the charged offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  With regard to severance, Rule 14(a) of the Federal Rules of Criminal Procedure provides that, if the joinder of offenses appears to prejudice a defendant, "the court may order

separate trials of counts." Fed. R. Crim. P. 14(a).

## EVIDENTIARY HEARINGS

### I.  Testimonial and documentary evidence

1.      The following witnesses testified at the evidentiary hearings on the Motions: FBI Special Agent Clint Warren ("Agent Warren"); State of Florida Office of the Attorney General Medicaid Fraud Control Unit ("MFCU") Investigator Joyce Cavallo ("Investigator Cavallo"); MFCU Investigator Abe Jurado ("Investigator Jurado"); Health and Human Services ("HHS") Office of the Inspector General Special Agent Bryan Lugones ("Agent Lugones"); Rosanna Arteaga-Gomez, Esq. ("Attorney Arteaga-Gomez"); Deborah Chames, Esq. ("Attorney Chames"); HHS Special Agent Ricardo Carcas ("Agent Carcas"); FBI Special Agent Jonathan Ostroman ("Agent Ostroman");  FBI Special Agent Mark Myers ("Agent Myers"); FBI Special Agent Scott C. Mitchell ("Agent Mitchell"); Department of Justice ("DOJ") Attorney Elizabeth Young ("Attorney Young"); DOJ Attorney Drew Bradylyons ("Attorney Bradylyons"); Robin Kaplan Eliani, Esq. ("Attorney Kaplan"); Jacob Bengio ("Mr. Bengio"); DOJ Attorney Christopher Hunter ("Attorney Hunter"); Norman Moskowitz, Esq. ("Attorney Moskowitz"); FBI Special Agent Alethea Duncan ("Agent Duncan"); and Gabriel Delgado.

2.      The documents that were admitted at the evidentiary hearings have been made part of the record in electronic storage media [D.E. 714, 729].  Some of these documents have been filed under seal.

### II.  The search of Eden Gardens

#### A.      Agent Warren's testimony[3]

3.      Agent Warren was in charge of the search team at Eden Gardens.   He was

---

[3]   See Transcript of October 3, 2017 Evidentiary Hearing (hereafter, "10/3/17 Transcript") [D.E. 591 at 21-149].

selected for this task by his supervisor, FBI Special Agent Mark McCormick ("Agent McCormick"), because he was not a case agent in the Esformes investigation.

4.     Prior to the search, Agent Warren learned that a "taint" protocol would be followed in conducting the search by having only non-case agents conduct it; and that those agents would segregate any potential attorney client and/or work product privileged materials in a separate box and label it as such.   As Agent Warren understood it, this protocol was implemented because a lawyer who was a business associate of Esformes worked at Eden Gardens.

5.     The "taint" protocol was communicated verbally to Agent Warren the day before the search.  The selection of non-case agents for the search team was made by Agent McCormick or one of the case agents.

6.     The search of Eden Gardens took approximately five hours.  The boxes of seized materials went to the FBI's Miramar healthcare fraud facility and were placed in the facility's evidence warehouse.

7.     At the evidentiary hearing, Agent Warren was shown the property receipt for the boxes of materials seized from Eden Gardens.   Although he signed the property receipt, he acknowledged that he did not read every single line item shown on it.

8.     Agent Warren also acknowledged that he did not know that Carlton Fields was the law firm representing Esformes, and that one of the boxes of seized materials was labeled "Carlton Fields."

9.     Agent Warren also acknowledged that the word "legal" written on the label of another box of seized materials did not stand out to him.

10.     With regard to another box of seized materials, labeled "court documents," Agent

Warren did not take any steps to ensure that it did not contain privileged materials.

11.     Moreover, although the search agents were supposed to segregate any documents that came from a law office or that were lawyer correspondence and place those documents in the "taint" box, the agents were not given the names of any law firms or lawyers prior to the search.

12.     Additionally, no privilege review of the electronic storage media that was seized was conducted prior to the seizure of those items.  As Agent Warren understood it, these items would be processed at a later date, but he had no knowledge of what the process would be or who would conduct it.

13.     Agent Warren could not explain why a document that said on the first page "Carlton, Fields, Jorden, Burt, Attorneys at Law" (hereafter, "Carlton Fields"), was seized and placed in a box other than the "taint" box.

14.     Agent Warren was aware that Marissel Descalzo ("Ms. Descalzo"), who he now knows to be Esformes' attorney, appeared at Eden Gardens the morning of the search.  However, Agent Warren did not speak to her and did not know that she went to Eden Gardens to invoke the attorney/client privilege with respect to the search and seizure being conducted there.  Agent Warren acknowledged that Agent McCormick spoke to Ms. Descalzo, but explained why he did not speak to her by stating that he was doing other functions.  The following colloquy ensued:

> Q. Don't you think it would be important to talk to the Defendant's lawyer
> about what documents might be privileged that you were seizing?
> A.  We had a taint procedure in place for -- for that so --
> Q.  Well, we already know that that didn't work, right?
> A.  Well, I think it worked majority-wise. . . . There may be a few that,
> you know, that didn't get into the taint box.

See 10/3/17 Transcript [D.E. 591 at 52-53].

15.     Agent Warren also could not explain why a document that said at page 2

"Answers to your questions related to Philip's deposition," followed by an attachment approximately an inch and a half thick, was seized and placed in a box other than the "taint" box.

16. At the time of the search of Eden Gardens, and even at the time of the evidentiary hearing, Agent Warren did not know that Michael Pasano ("Mr. Pasano") was Esformes' counsel in the very same case for which the search of Eden Gardens was being conducted. Agent Warren could not explain why a letter labeled privileged and confidential showing Mr. Pasano's name was not placed in the "taint" box.

17. Agent Warren also had no explanation as to why the following documents were not placed in the "taint" box: one titled "Medicare Medicaid future liability discussions;" one bearing the name the law firm "Zuckerman Spaeder;" documents titled "closing binders" showing law firm names; a document titled "Questions for counsel for Morris Esformes and Philip Esformes" that was marked "privileged and confidential attorney work product;" another document that was marked "attorney/client work product privileged communication;" and various correspondence from government agencies directed to "Norman Ginsparg, Director of Legal Affairs."

18. Agent Warren was shown a document, which bore the letterhead "Norman Ginsparg" and stated that he was licensed in Illinois. When asked what he was told about Norman Ginsparg prior to the search of Eden Gardens, Agent Warren responded:

> We were told that he was a business associate of Mr. Esformes. He was involved in the fraud scheme. He helped to make sham contracts and to help hide kickback moneys and payments for Esformes. He was a lawyer, but he was not licensed in Florida. He was a lawyer elsewhere.

Id. at 60-61. When asked, "Licensed in Illinois," Agent Warren responded, "Yes." Id. at 61.

19. When Agent Warren was asked if the search agents were instructed that anything regarding Norman Ginsparg should go in the "taint" box, the following colloquy ensued:

> A.  No, they would make a judgment call because he wasn't considered
> Mr. Esformes's lawyer.  He was, you know, involved in the scheme, so.
> Q.  Why not? Why wasn't he considered one of Mr. Esformes's lawyers?
> A.  That's what I was told.

Id.  Agent Warren identified the source of his information regarding Norman Ginsparg to be two case agents, namely Agent Reilly and Agent Carcas.

20.     Agent Warren was also shown a document labeled "Memo protected by attorney/client privilege work product doctrine," authored by the law firm Husch Blackwell, which referenced United States ex rel Nehls v. Omnicare, and bore the heading "Outline of potential defenses." Agent Warren did not know that Husch Blackwell represented Esformes, that Ms. Nehls is a government witness against Esformes, or that Omnicare is part of the Esformes case.

21.     Agent Warren was shown a witness interview memorandum authored by the Jenner & Block law firm, labeled "privileged and confidential, attorney work product, attorney client communication."  When asked why that document was not in the "taint" box, Agent Warren responded, "I don't know.  It should be." Id. at 70.

22.     With regard to another witness interview memorandum authored by Jenner & Block, and clearly marked "privileged and confidential," Agent Warren acknowledged that it was a "law firm-type document" that should have been placed in the "taint" box if the searching agent had seen it. Id. at 71.

23.     With regard to other documents labeled "attorney work product and confidential," "attorney/client privilege," and "work product and attorney/client privilege," Agent Warren acknowledged that these documents, including documents by Norman Ginsparg, should have been placed in the "taint" box.

24.     Agent Warren was also shown a stack of bills addressed to Esformes by the law

firm Carlton Fields, which included descriptions of legal work and spanned six years.  After being told that three bills from Carlton Fields had been placed in the "taint" box, Agent Warren could not explain why six years-worth of billings had not been similarly segregated.

25.     Agent Warren was shown additional legal bills addressed to Esformes from the following law firms: Husch Blackwell; Holland & Knight; Genovese Joblove & Battista; Gray Robinson; Quintero, Prieto, Wood & Boyer; Ford and Harrison; Seyfarth Shaw; Law Offices of Peter A. Lewis; Law Offices of Mark L. Rivlin; Ginsparg Bolton & Associates; and Kelly, Olson, Michod, DeHaan & Richter.[4]  None of these legal bills were placed in the "taint" box.

26.     Agent Warren acknowledged that Norman Ginsparg came to Eden Gardens in the early morning hours of July 22, 2016; that he was escorted into his office at Eden Gardens and allowed to point out documents that he was working on for clients other than Esformes; and that the search agents did not seize those documents because, according to Agent Warren, the search agents "tried to leave his other clients in place."  Id. at 87.

27.     Agent Warren also acknowledged that he did not speak to Norman Ginsparg at that time and did not ask him for information regarding any privilege claims in relation to Esformes' documents.  Agent Warren explained his actions by reiterating that he had been told by the case agents that Norman Ginsparg was not Esformes' lawyer.  Agent Warren stated: "They told us that he was his business associate, and so nobody ever told us anything about him being his lawyer."  Id. at 92.  He added:  "Well, they told us that he was his business associate and he was involved in the fraud scheme, so."  Id.

28.     Agent Warren wrote an FBI 302 Report after the search of Eden Gardens (hereafter, "Eden Gardens 302").  Agent Warren acknowledged that the Eden Gardens 302 does

---

[4]  Counsel for Esformes clarified that Ginsparg Bolton & Associates is a law firm from Chicago headed by Colman Ginsparg, not Norman Ginsparg.  Id. at 86.

not mention: the protocol that the search agents were to follow for segregating privileged documents; Norman Ginsparg being a lawyer; who Norman Ginsparg's clients were; or that a pre-search briefing took place.

29.     With regard to the methodology for conducting the search of Eden Gardens, Agent Warren testified that the search agents were supposed to conduct a "cursory review" of the documents to determine whether or not they should be seized pursuant to the search warrant; and in conducting such a "cursory review" a search agent "would have to read a portion or some parts of the document." Id. at 96.  Although that would be the normal procedure, Agent Warren could not say whether the agents followed it at Eden Gardens.

30.     In his pre-hearing affidavit, Agent Warren had stated:

> I instructed the searching agent to place any items that appeared to contain an attorney's name or law firm, were marked privileged or confidential, or appeared privileged into a box that was marked as "taint box," which they did based on my observations at the time.

Id. at 97.

31.     At the evidentiary hearing, Agent Warren acknowledged that he only observed agents placing items into the "taint" box in one of the rooms at Eden Gardens, where he was most of the time.

32.     The evidence recovery log from Eden Gardens does not reflect any particular search agent's name as being responsible for placing items in the "taint" box.  It only references "MFCU."[5]  Moreover, there is no mention of Agent Warren, even though he claims to have placed some items in the "taint" box.

33.     To Agent Warren's knowledge, no warning signs were placed on the first 69 boxes of documents seized from Eden Gardens stating that the documents should not be

---

[5]  As discussed below, MFCU Investigators Cavallo and Jurado participated in the Eden Gardens search on July 22, 2016.

reviewed pending a check for privilege.  Also, Agent Warren did not know what happened to those boxes and the "taint" box after the search was over and they went into the FBI's Miramar health care fraud evidence storage area.

34.      In his pre-hearing affidavit, Agent Warren had stated:  "Since the Eden Garden[s] search, I have not discussed the substance or content of what I reviewed or collected with any member of the Philip Esformes prosecution team, aside from the contents of this affidavit."  Id. at 101-02.  Agent Warren explained that the reason for making this statement in his affidavit with respect to the 69 boxes of documents seized from Eden Gardens (other than the "taint" box) was as follows:

> Q. I'm talking about 69, 1 through 69.  What's the problem with discussing 1 through 69 with the prosecution team?
> A.  Just in an abundance of caution in case there was, you know, any potential taint materials, but, I mean, there shouldn't have been.  But we were just being very cautious not to discuss the matter.
> Q.  So you were concerned that there might have been privileged documents in these Boxes 1 through 69?
> A.  I don't know.  I didn't know if there would be or not.  No, there shouldn't be, according to my instructions given to the agents.

Id. at 102.

35.      Agent Warren acknowledged having interviewed Dr. Mark Willner, a psychiatrist at American Therapeutic Corporation ("ATC") but denied any knowledge of Esformes being charged with Medicare fraud for sending patients from his facilities to ATC.

36.      Agent Warren also acknowledged having interviewed Dr. Jose Avila ("Dr. Avila") several times before the Eden Gardens search, but he denied knowing that Dr. Avila is a witness in the Esformes case.  He also acknowledged having interviewed Dr. Avila after the Eden Gardens search in connections with a case brought against another individual, Dr. Bahrami. Agent Warren had some recollection of Dr. Bahrami being a medical director at a Golden Glades

facility but denied knowing that Esformes owned the Golden Glades facility at the time of his interaction with Dr. Bahrami.

37.    During cross-examination, Agent Warren testified that there is usually a lot of overlap among healthcare fraud cases in Miami-Dade County and that, while he may have conducted investigations prior to the Eden Gardens search, such activities did not make him a case agent in the Esformes case.

38.    Agent Warren also testified that there was an effort to complete the Eden Gardens search in a timely fashion due to the place being an assisted living facility with active patients. According to Agent Warren, one such patient and her mother came up to speak to him and Agent McCormick to complain about the patient's treatment at Eden Gardens.

39.    According to Agent Warren, the purpose of not having case agents conduct the Eden Gardens search was "to prevent them from being tainted off the case or being exposed to anything that was potentially taint." Id. at 115.

40.    The following colloquy further explained Agent Warren's view of how the search was conducted:

> Q.  The purpose here was to get your documents, try to segregate them as best you could, and then if there needed to be further review, somebody else would do it for you, correct?
> A.  Correct.
> Q.  That was your understanding of this, right?
> A.  Yes, that's right.
> Q.  And to this day, you still have never discussed, other than what you're talking about here, you've never sat down with the prosecutors and told them anything that you saw in that particular taint box, correct, everything you saw in this entire search, correct?
> A.  That's correct.

Id. at 118.

41.    Agent Warren also testified that Norman Ginsparg signed the property receipt for

the materials seized from Eden Gardens and did not say at any time that they were privileged and could not be taken.

42.     Agent Warren also testified that at least 80 agents participated in the operations conducted on July 22, 2016.

43.     On re-direct examination, however, Agent Warren stated that the fact that a lot of activities were going on that day did not affect his search or the privilege review.

44.     Agent Warren also testified that he knew that the "taint" attorney was going to review the "taint" box, but other than that he did not know what plan was in place.

45.     Agent Warren also testified that, once the boxes of documents and materials from the Eden Gardens search were placed in the FBI storage facility in Miramar, case agents and prosecutors could take a box and look through it on a need to know basis without signing a log, since no log was kept.

46.     Agent Warren also testified that the South Florida FBI agents working on Medicare fraud are divided into squads and that Agent Reilly, who is a case agent in the Esformes case, was at the time of the evidentiary hearing on Agent Warren's squad.[6]   Case Agents Myers and Ostroman are also on Agent Warren's squad and they are all supervised by Agent McCormick, who was part of the Eden Gardens search team as command and control.

**B.      Investigator Cavallo's testimony**[7]

47.     Investigator Cavallo has worked for MFCU for seventeen years.

48.     She worked on a case involving Esformes in 2009 for approximately two years and had no other involvement with Esformes until becoming involved in this case in May 2016.

49.     Since that time, Investigator Cavallo has interviewed approximately fifteen

---

[6]  As discussed below, Agent Reilly has since been reassigned to a different geographic location.
[7]  See 10/3/17 Transcript [D.E. 591 at 149-88].

witnesses; five of which she interviewed after the search of Eden Gardens.

50.     Investigator Cavallo was selected as a member of the Eden Gardens search team a couple of days before the search took place and participated in a briefing the day before the search.

51.     A protocol for the search was first discussed on the day of the search, when a list of the Esformes facilities and things to look for that would be responsive to the search warrant were provided.

52.     Before the members of the search team entered Eden Gardens, an FBI agent informed them that there was the potential for some privileged documents to be found there, that an attorney by the name of Pasano was involved, and that if they were to find any documents with that name on it, they should place those documents in a designated box.  This is the extent of the instructions that Investigator Cavallo recalled receiving.

53.     Investigator Cavallo knew of Norman Ginsparg prior to the search of Eden Gardens.  Based on her earlier investigation, she recalled that he was an attorney out of Illinois who had been on various corporate filings for the companies owned by Esformes, such as filing of corporate documents, registered agent, and things of that nature.

54.     Investigator Cavallo had also visited Eden Gardens prior to the search for the purpose of serving subpoenas.

55.     After the search of Eden Gardens, Investigator Cavallo met with Attorney Young, first on July 26, 2016 (hereafter, the "July Meeting"), and again in August 2016 (hereafter, the "August Meeting").

56.     At the July Meeting, Investigator Cavallo and her MFCU partner, Investigator Jurado, learned from the Esformes prosecution team and case agents where they were with the

investigation and where they were going in the future.

57.     Investigator Cavallo was not asked at the July Meeting if she had been a member of the Eden Gardens search team.

58.     After the Eden Gardens search, Investigators Cavallo and Jurado were encouraged to contact witnesses and go forward in the investigation, without any limitation on her continuing to work on the Esformes case.

59.     At the August Meeting, Investigator Cavallo discussed with Attorney Young her prior investigation of Esformes and provided her with copies of records and reports.  At that time, Attorney Young encouraged Investigator Cavallo to go back and contact some of the previous witnesses and see if they could give another statement.

60.     Investigator Cavallo contacted several Medicaid or Medicare beneficiaries at different Esformes facilities; and located some of the people with whom she had talked in the previous case, as well as others who had been identified but with whom she had not talked before.  Investigator Jurado submitted reports of these activities to the Esformes prosecution team.

61.     On December 16, 2016, Investigators Cavallo and Jurado received a telephone call from Attorney Young informing them that they would not be conducting any further investigations in the Esformes case, due to their having been exposed to tainted material.

62.     During the Eden Gardens search, Investigator Cavallo placed a small amount of documents in the "taint" box.

63.     As part of the Eden Gardens search, Investigator Cavallo searched and collected papers from the desk of Mr. Bengio.

64.     In response to questions about the search, Investigator Cavallo stated that she was

familiar with the La Covadonga Assisted Living Facility ("La Covadonga") from her prior investigation, but not the Family Rest Home Assisted Living Facility ("Family Rest").  She also identified a legal pad, a smaller pad, and some spreadsheets as documents that could have been at Eden Gardens during the search.  Investigator Cavallo had no recollection regarding other search materials that she was shown.

65.     On cross examination, Investigator Cavallo testified that nothing that she saw during the Eden Gardens search influenced the actions she took after the search.

66.     When presented with the names of various witnesses that she interviewed after the Eden Gardens search, Investigator Cavallo testified that she had previously had contact with those individuals in connection with her earlier investigations.

67.     As part of her work on the Esformes case, Investigator Cavallo also interviewed beneficiaries whose names had been derived from data analysis and were provided to her by Agent Carcas and Attorney Young.  According to Investigator Cavallo, nothing that she learned from the Eden Gardens search had anything to do with those beneficiary interviews.

68.     With regard to documents seized during the search, Investigator Cavallo did not conduct any detailed analysis of those documents or take any notes regarding them.  Additionally, Investigator Cavallo did not discuss anything she saw during the Eden Gardens search with any of the case agents in the Esformes case.

69.     Investigators Cavallo and Jurado were also involved in the Esformes investigation before the Eden Gardens search took place by conducting a beneficiary interview; interviewing a doctor who had made a complaint; and pulling some Medicaid claims data.

70.     On re-direct examination, Investigator Cavallo acknowledged that members of the Esformes prosecution team also participated in some of the post-search interviews she

conducted.

### C.   Investigator Jurado's testimony[8]

71.     Investigator Jurado has worked for MFCU for three and a half years.

72.     He participated in the July 22, 2016 search of Eden Gardens and was notified that he was going to be part of the search team a couple of days before.

73.     Investigator Jurado participated in a briefing that took place across the street from the facility approximately thirty minutes before the execution of the search warrant,

74.     At the briefing, Investigator Jurado received information regarding the facilities owned by Esformes and was instructed to collect materials pertaining to those facilities.

75.     In addition, Investigator Jurado learned that there was the possibility that some attorney/client privileged information would be at Eden Gardens and that a "taint" box would be allocated for collecting any documents with the names Pasano or Carlton Fields.   This is the extent of the instructions Investigator Jurado received about privileged documents.

76.     Investigator Jurado was instructed to search a particular office, which he later learned belonged to Mr. Bengio.   Investigator Jurado searched that office along with Investigator Cavallo, as well as other investigators and HHS agents.

77.     During the course of his search, Investigator Jurado did not find any documents with the names Pasano or Carlton Fields on them and did not place any documents in the "taint" box.   He did not recall seeing any documents with other lawyers' names on them.

78.     In July, after the Eden Gardens search, Investigator Jurado participated in a meeting that was attended by Attorney Young, Agent Carcas, Investigator Cavallo and an HHS agent named "T.D.K."

79.     At that meeting, action items were discussed and some items were assigned to

---

[8]   See 10/3/17 Transcript [D.E. 591 at 189-206].

him and Investigator Cavallo.  At that point in time, Investigator Jurado considered himself a member of the prosecution team in the Esformes case.

80.     Investigator Jurado was not asked if he had been involved in the Eden Gardens search at that time.

81.     The action items that were assigned to Investigators Jurado and Cavallo, and which they carried out, consisted of locating and interviewing certain beneficiaries.

82.     In December 2016, Investigators Jurado and Cavallo were told by Attorney Young that they could no longer be part of the team because they had participated in the search of Eden Gardens and had been potentially exposed to privileged information.  This issue had not come up before December 2016.

83.     On cross examination, Investigator Jurado testified that, before the Eden Gardens search, he had spoken to Agent Carcas, who had given him some reports about the Esformes case; had conducted interviews of one doctor and one beneficiary; had pulled some Medicaid data; and had done one drive through surveillance of a subject.

84.     After the Eden Gardens search, Investigator Jurado assisted Investigator Cavallo with interviews of beneficiaries and witnesses.

85.     Investigator Jurado also testified that nothing he saw during the Eden Gardens search influenced his post-search activities; and that he did not discuss anything about what he saw at Eden Gardens with the Esformes prosecution team.

86.     On re-direct examination, Investigator Jurado testified that, in his mind, he had an idea that the reason he was removed from the Esformes prosecution team was that attorney/client privileged documents may have been found in the execution of the search warrant at Eden Gardens.

87.     He also testified that, although Agent Carcas had advised him of the pre-search briefing, Agent Carcas did not mention at the post-search meetings that he and Investigator Cavallo had participated in the search of Eden Gardens and could not be part of the Esformes prosecution team.

**D.     Agent Lugones' testimony**[9]

88.     Agent Lugones participated in the Eden Gardens search and in a briefing the day before the search.

89.     Either during the briefing or the day of the search, Agent Lugones learned that there was an office at Eden Gardens of Esformes' attorney where there might be some privileged information; and if such information was found it should be placed in a "taint" box.

90.     Agent Lugones searched that particular office.

91.     Agent Lugones retrieved documents from a bookshelf, a drawer and a cabinet in Norman Ginsparg's office, but he had no recollection of the documents or the boxes in which they were placed.

92.     Agent Lugones recognized his handwriting from the notation "Box 6" and his name, which appeared on the outside of Box # 6 from the search of Eden Gardens.

93.     Agent Lugones could not recall placing a manila envelope in Box # 6, which was found in that box.

94.     Agent Lugones did not recognize the handwriting from the notation "No. 12" appearing on that same manila envelope.

95.     On cross-examination, Agent Lugones testified that, even if his name appeared on a box from a search, that did not mean that he packed all the documents contained in that box.

---

[9]     See 10/3/17 Transcript [D.E. 591 at 207-14].

96.     Agent Lugones also testified that he had no role in the prosecution or investigation of Esformes prior to July 21 and 22, 2016, or after July 22, 2016; and that he never spoke to the case agents about his participation in the Eden Gardens search.

97.     On re-direct examination, Agent Lugones agreed that if the name on a box does not tell who put the documents in it, there is no way to tell who picked up which documents and put them in which box.

### E.     Attorney Arteaga-Gomez's testimony[10]

98.     Attorney Arteaga-Gomez is one of Esformes' defense counsel in this case.

99.     As part of her discovery review, she helped prepare Defendant's privilege log, which she compared with the contents of the "taint" box that were segregated during the Eden Gardens search (namely Box #70, which contains approximately ten sets of documents and six disks).[11]

100.    Defendant's privilege log lists all legal documents, totaling 1,244 entries, for approximately 800 of which Defendant claims attorney client and/or work product privilege protection.   Based on that comparison, Attorney Arteaga-Gomez concluded that no "taint" protocol had been followed during the search of Eden Gardens.

101.    Preparation of the privilege log involved the work of more than ten persons over a period of several months and the final product underwent several levels of review.

102.    With regard to settlement documents from the Larkin and Omnicare cases that were seized from Eden Gardens, Attorney Arteaga-Gomez testified that, in addition to those documents, memoranda related to the cases were also seized.

---

[10] See Transcript of December 18, 2017 Hearing (hereafter, "12/18/17 Transcript") [D.E. 685 at 9-62].  A portion of Attorney Arteaga-Gomez's testimony was sealed.  See D.E. 692.  The undersigned has only referenced to the sealed portion of the testimony in general terms to avoid disclosing claimed privileged information.

[11] By contrast the 69 non-"taint" boxes from the Eden Gardens search contain over 179,000 documents.

103.     One such document is a list of questions prepared by counsel for which Norman Ginsparg obtained answers from Esformes and his father, Morris Esformes.  The document was marked privileged, confidential, attorney work product and subject to joint defense agreement. Another document, which was prepared by Norman Ginsparg for Ms. Descalzo, memorializes an interview of Esformes regarding his compensation.

104.     Attorney Arteaga-Gomez referenced additional documents related to the Larkin and Omnicare cases that were prepared by various law firms and seized from Eden Gardens, all of which were marked privileged and confidential and attorney work product.

105.     Attorney Arteaga-Gomez also identified numerous invoices from the law firm Carlton Fields for work done with Norman Ginsparg, which were seized from Eden Gardens.[12]

106.     On cross-examination, Attorney Arteaga-Gomez explained that, in preparing Defendant's privilege log, she included communications between Norman Ginsparg and Esformes or other clients and documents that reflected analysis of cases, research, and any work product that could have been prepared at Norman Ginsparg's direction.

107.     According to Attorney Arteaga-Gomez, Norman Ginsparg represented Esformes and Esformes' facilities and was the director of legal affairs, providing legal advice to those entities in Florida.   Attorney Arteaga-Gomez applied this premise to the preparation of Defendant's privilege log.

108.     Attorney Arteaga-Gomez testified that Norman Ginsparg had reviewed Defendant's privilege log and confirmed that it was correct.

109.     Upon questioning about the potential unauthorized practice of law in Florida by Norman Ginsparg, based on his not being licensed in Florida, Attorney Arteaga-Gomez

---

[12]   Attorney Arteaga-Gomez stated that, while all legal invoices were designated privileged, she anticipated further discussions with the government regarding those privilege claims and an ultimate decision by the Court.

responded that she had not conducted research on that issue.

110.    Upon questioning as to why she included certain documents in the privilege log that would not, standing alone, be privileged, Attorney Arteaga-Gomez responded that those documents appeared to be potentially responsive to grand jury subpoenas that preceded them, and that she considered the gathering of such documents to constitute work product.

111.    On re-direct examination, Attorney Arteaga-Gomez read from Florida Statute § 90.502 the definition of lawyer for purposes of the attorney client privilege as: "It's a person authorized or reasonably believed by the client to be authorized to practice law in any state or nation." See 12/18/17 Transcript [D.E. 685 at 55-56].

112.    Attorney Arteaga-Gomez further testified that Norman Ginsparg would receive documents from law firms to discuss with Esformes.

### III. Ginsparg/Esformes text messages

#### A.    Attorney Arteaga-Gomez's testimony

113.    On October 12, 2016, the government produced jump drives containing text messages from the three cell phones that were seized from Esformes at the time of his arrest.

114.    On December 22, 2016, the government served on Defendant "Hard Drive One," which contained its proposed trial exhibits, pursuant to a deadline established by the predecessor District Judge.

115.    Included among the trial exhibits in Hard Drive One were text messages between Esformes and Norman Ginsparg from only two of Esformes' three cell phones (except that not all text messages from one of those two phones were included).

116.    At the December 18, 2017 hearing, Attorney Medina represented to the undersigned that a paralegal had selected the text messages to be placed on Hard Drive One

without viewing the messages in advance.  <u>See</u> 12/18/17 Transcript [D.E. 685 at 39].  Attorney Arteaga-Gomez testified, however, that the text messages "weren't all dumped onto hard drive one."  <u>Id.</u> at 42.

117.    Based on her review of the text messages, Attorney Arteaga-Gomez testified that they related to Norman Ginsparg's role as an intermediary in the communications between Esformes and his former spouse in the course of their divorce.

118.    When asked why Mr. Pasano had not included Norman Ginsparg in the list of attorneys that he provided to Attorney Young whose text message communications could be found in Esformes' cell phones, Attorney Arteaga-Gomez responded that Attorney Young was already aware that Norman Ginsparg represented Esformes.

### B.    Attorney Chames' testimony[13]

119.    Attorney Chames represented Esformes in connection with his divorce from his wife Sherri Esformes ("Sherri").  Attorney Chames was retained in September 2015.

120.    During the course of the representation, a difficulty arose with respect to the communications between Esformes and Sherri because Esformes did not utilize e-mail and the tone of the communications between the two was less than amicable.

121.    To overcome this difficulty, Esformes "would dictate his responses to Norman Ginsparg and Norman Ginsparg would basically put it in an e-mail format and send it to Sherri." <u>See</u> 12/19/17 Transcript [D.E. 686 at 33].  Esformes and Norman Ginsparg communicated for this purpose via text message.  Attorney Chames also communicated extensively with Esformes via text message regarding "a multitude" of divorce issues.  <u>Id.</u> at 34-35.

122.    On cross-examination, Attorney Chames described Norman Ginsparg's role in the

---

[13] <u>See</u> Transcript of December 19, 2017 Evidentiary Hearing (hereafter, "12/19/17 Transcript") [D.E. 686 at 31-42].

divorce as follows: "[B]ut I knew that Mr. Ginsparg would revise, clean up, whatever language you want to use, some of those text messages or e-mails in order to assist Philip, and he knew that those e-mails and text messages were being used and were in connection with the divorce." Id. at 37.

123.    On cross-examination, Attorney Chames was asked if she had made any work product privilege claims with regard to Esformes' QuickBooks, to which she responded in the negative.

124.    On re-direct examination, Attorney Chames testified that she considered the text messages between Esformes and Norman Ginsparg in connection with the divorce to be privileged legal communications because Esformes was getting advice from his lawyer, Norman Ginsparg.

125.    Among the members of the synagogue that both Attorney Chames and Norman Ginsparg attend, it was common knowledge that Norman Ginsparg was an attorney in Chicago who had moved down to Florida around the time that Esformes relocated from Chicago; and Norman Ginsparg "was known as the Esformes family lawyer," and by logical implication, Esformes' lawyer. Id. at 41-42.

### IV. Ginsparg reverse proffer and Bengio debriefings

#### A.    Agent Carcas' testimony[14]

126.    Agent Carcas has worked as a Special Agent with HHS since July 2015.

127.    Agent Carcas was present as a witness at the Ginsparg reverse proffer that the Esformes prosecution team conducted on September 20, 2016.

128.    Agent Carcas was also present for the two Bengio debriefings conducted by the

---

[14] See Transcript of October 16, 2017 Evidentiary Hearing (hereafter, "10/16/17 Transcript" [D.E. 601 at 5-89].

Esformes prosecution team on September 28 and October 14, 2016.

129.   A report for each of the Bengio debriefings was prepared as an FBI Form 302, with the documents used at the debriefings attached thereto as "1A Materials."

130.   The documents used at the Ginsparg reverse proffer, <u>see</u> Def's Ex. 750, and the "1A Materials" attached to the FBI Forms 302 for the Bengio debriefings, <u>see</u> Def's Exs. 413, 413-1A, 414, 414-1A, were collectively referred to by Defendant's counsel as the "Descalzo documents."[15]

131.   Agent Carcas first saw the "Descalzo documents" at the Ginsparg reverse proffer and the Bengio debriefings.   He knew that these documents had been obtained by the government during the search of Eden Gardens.

132.   Agent Carcas took no notes at the Ginsparg reverse proffer or the Bengio debriefings.   He did review the FBI Forms 302 from the Bengio debriefings to ensure that they were accurate to the best of his recollection and to see if there were any improper spellings or corrections that needed to be done.

133.   At the Ginsparg's reverse proffer, the prosecution team presented to Norman Ginsparg, who was a target of the Esformes investigation, facts and evidence to see if he was willing to cooperate with the government.

134.   Based on the prosecution team's research, Agent Carcas knew that Norman Ginsparg was an attorney licensed in Illinois but not in Florida.   Agent Carcas also knew that Norman Ginsparg had an office at Eden Gardens.

135.   Agent Carcas understood Norman Ginsparg to be a co-conspirator with Esformes who was involved in part of the alleged fraud scheme regarding the inflation of lease agreements and payment of kickbacks.   Agent Carcas had also reviewed contracts drafted by Norman

---

[15]   These documents have been filed under seal.

Ginsparg for Esformes.

136.   Agent Carcas recalled that Attorney Young did most of the talking at the Ginsparg reverse proffer in presenting the government's position to Norman Ginsparg and his counsel.   However, Agent Carcas did not recall the specifics of what was discussed, which specific documents were shown to Norman Ginsparg, or what questions were posed to Norman Ginsparg about those documents.

137.   Because Norman Ginsparg made no statements at his reverse proffer, there were no notes for the agents to take.

138.   Because he was only a witness for the Bengio debriefings, Agent Carcas prepared for them only by doing some limited background check of Mr. Bengio.

139.   Agent Carcas recalled that Mr. Bengio identified himself as Administrative Assistant to Norman Ginsparg, Director of Legal Affairs; and that Mr. Bengio said that he handled most of the financials.

140.   Agent Carcas also recalled that, at the September 28, 2016 Bengio debriefing, which lasted approximately three hours, Attorney Young was asking the questions of Mr. Bengio.   Initially, she went over his background information to get a feel for his roles and responsibilities, particularly with regard to various corporations, and then she went on to discuss some of the documents attached as "1A Materials" to the FBI Form 302.

141.   .With regard to a toll enforcement invoice, Mr. Bengio was asked about the company to whom the invoice was directed, EMI Enterprise, and its address.   Mr. Bengio stated that he did financial work for that company.

142.   With regard to a document captioned "Meeting regarding Gabby – La Cov,"[16] Agent Carcas recalled that Mr. Bengio explained that the entry "put comments in actual column"

---

[16] "La Cov" stands for "La Covadonga."

referred to comments explaining transactions involving La Covadonga for a defense lawyer. Agent Carcas elaborated as follows:

> What he stated to us was that these notes came about a meeting with Norman Ginsparg. At no point did he say that, to my recollection, that there was a project that was being done. He just stated on that specific line item that he was doing, putting comments in an actual column, ah, to clarify payments and that he was going to share that with the defense counsel.

See 10/16/17 Transcript [D.E. 601 at 56].

143.    Agent Carcas clarified that this statement about what Mr. Bengio said was the result of Agent Carcas refreshing his recollection by reviewing the FBI Forms 302 and the 1A Materials for the Bengio debriefings. He had no other recollection on that subject.

144.    Agent Carcas did recall that, during the Bengio debriefings, Attorney Young asked Mr. Bengio to explain the tasks that were listed in some of the "Descalzo documents."

145.    Agent Carcas also recalled that, during the Bengio debriefings, Attorney Young asked Mr. Bengio a series of questions about the entries in other "Descalzo documents."

146.    Agent Carcas also recalled that, as to the spreadsheets generated by Mr. Bengio that were included among the "Descalzo documents," Mr. Bengio identified the handwriting on the spreadsheets as belonging to Norman Ginsparg.

147.    Agent Carcas stated that he was present at the Bengio debriefings to serve as a witness who could review the FBI Forms 302 after they were written by the note taker and help make any necessary corrections before they were finalized.

148.    Agent Carcas did not recall whether Mr. Bengio was given a "Kastigar" or immunity letter at the October 14, 2016 Bengio debriefing.

149.    Agent Carcas did not recall what occurred at the October 14, 2016 Bengio debriefing beyond having refreshed his recollection based on the FBI Form 302.

150.    On cross-examination, Agent Carcas stated that he first met Mr. Bengio at the September 28, 2016 Bengio debriefing.

151.    Agent Carcas recalled from that meeting that Mr. Bengio said he was an Administrative Assistant to Norman Ginsparg, and that he handled the financials for numerous corporations.  There were also discussions centered around Mr. Bengio being identified as the registered agent for approximately 90 companies, which he found out about after the fact.

152.    Agent Carcas testified that the documents used in the Bengio debriefings did not influence his investigation in any way.

153.    On re-direct examination, Agent Carcas acknowledged that additional documents were presented to Mr. Bengio at the October 14, 2016 Bengio debriefing, and that he was asked to explain additional accounting records at that time, different from those at the September 28, 2016 Bengio debriefing.  Agent Carcas insisted, however, that the documents used at the Bengio debriefings "did not enhance [his] part of the investigation."  Id. at 88.

**B.**     **Agent Ostroman's testimony**[17]

154.    Agent Ostroman has been an FBI agent since 2006.  He moved to the health care fraud squad in 2014 when the investigation of the Delgado Brothers was ongoing, and that led to the Esformes investigation.

155.    By the time Esformes was indicted, Agent Ostroman knew that Norman Ginsparg was a lawyer for Esformes, who had an office at Eden Gardens and who handled business contracts and civil matters for Esformes.

156.    Agent Ostroman participated in the Ginsparg reverse proffer that took place on September 20, 2016.

157.    Agent Ostroman did a very quick review of two or three of the boxes of

_____

[17]  See 10/16/17 Transcript [D.E. 601 at 89-208].

documents seized from Eden Gardens after the FBI took custody of those materials.  His review only consisted of flipping through the documents, so he could not recall what he saw in those boxes. He simply pulled the two or three boxes that had been placed at the highest point in the stack of boxes just to see the contents of the boxes.

158.   Although the prosecution team was advised not to look at the "taint" box, there were no specific instructions given for the non-"taint" boxes.

159.   After the Eden Gardens boxes were sent out to be scanned, Agent Ostroman did not look at the paper copies any more.

160.   Attorney Young pulled the documents that were used in the Ginsparg reverse proffer.  Agent Ostroman did not know what method she used for obtaining those documents.

161.   Agent Ostroman first saw the "Descalzo documents" during the Ginsparg reverse proffer.

162.   The Ginsparg reverse proffer took place at the FBI health care fraud facility in Miramar with the following persons present:  Agent Myers, Agent Carcas, Agent Ostroman, Attorney Young, Attorney Bradylyons, and Norman Ginsparg and his counsel.

163.   Agent Ostroman did not take notes at the Ginsparg reverse proffer.  He was the note taker at the October 14, 2016 Bengio debriefing.  The note taker for the September 28, 2016 Bengio debriefing was Agent Mitchell, whose FBI Form 302 report Agent Ostroman reviewed.

164.   At the Ginsparg reverse proffer, Attorney Young did most of the talking and used the "Descalzo documents."   Agent Ostroman did not recall whether he saw the "Descalzo documents" on the day of the Ginsparg reverse proffer or sometime later, prior to the September 28, 2016 Bengio debriefing.  At some point in time, Agent Ostroman received a copy of the "Descalzo documents" from Attorney Young at the Miramar facility.  Agent Ostroman needed

31

the documents to write the FBI Form 302 for the October 14, 2016 Bengio debriefing.

165.    Agent Ostroman knew that Family Rest was a relevant entity in the Esformes investigation since it was one of the entities that the government claims was involved in sham leases with the Delgado Brothers, who allegedly made inflated payments to Esformes that were disguised kickbacks.

166.    The page from the "Descalzo documents" that referenced Family Rest appeared to provide a checklist of things to do with regard to the finances of Family Rest.  See Def's Ex. 750 at 3.

167.    Agent Ostroman also knew that La Covadonga was a relevant entity in the Esformes investigation, with a lease payment arrangement similar to Family Rest.  The next page from the "Descalzo documents" referenced La Covadonga and a meeting regarding one of the Delgado Brothers on November 27, 2015.[18]

168.    This other page from the "Descalzo documents" also appeared to be a to-do list regarding the finances of La Covadonga, such as count payments, put comments, balance on the books, which Agent Ostroman acknowledged could be considered a financial analysis.  Id. at 4.

169.    The next page from the "Descalzo documents" referenced an entity called "Morphil," and reflected a six-item to-do list regarding the financials of that entity.  Id. at 5.

170.    The next pages of the "Descalzo documents" see Def's Ex. 750, appeared to be spreadsheets with handwritten interlineations and question marks.  Some of the questions were: "did we write off?"; "match terms?"; "paid?"; "xplain"; "count payments why '08 if rent '07?"; "need to explain"; "how do you match this with your spreadsheet?"  Id. at 6-15.

---

[18]   This date is after the Delgado Brothers pled guilty in their own case and were cooperating with the government against Esformes.

171.    The purpose of the Ginsparg reverse proffer was to convince Norman Ginsparg, who was a target of the Esformes investigation at the time, to cooperate with the government. Agent Ostroman's role in the Ginsparg reverse proffer was that of an observer. He did not participate in preparing the script to be followed; and had no idea what Attorney Young would say prior to the event.

172.    If Norman Ginsparg had made any statements during the Ginsparg reverse proffer, Agent Ostroman would have taken notes. However, Norman Ginsparg made no statements, so Agent Ostroman took no notes.

173.    Agent Ostroman could not recall any specific statements made by Attorney Young at the Ginsparg reverse proffer. Agent Ostroman did recall Attorney Young confronting Norman Ginsparg with documents.

174.    With regard to the September 28, 2016 Bengio debriefing, Agent Ostroman did not prepare for that event because he was a secondary agent whose role was to observe and ask questions as needed. Attorney Young was the main questioner and Agent Mitchell was the note taker. Agent Ostroman only asked a few questions.

175.    Agent Ostroman recalled that, at the time of the Bengio debriefings, Mr. Bengio was a witness who was given a proffer letter to invite him to speak without fear of self-incrimination.

176.    Agent Ostroman also recalled that, at the September 28, 2016 Bengio debriefing, Mr. Bengio was asked to explain the "Descalzo documents" and to identify the handwriting on those documents, some of which he identified as his own.

177.    With regard to a toll enforcement document, see Def's Ex. 413-1A at 1, the purpose of showing it to Mr. Bengio was to determine if the entity EMI Enterprise used the Eden

Gardens address.  Although Agent Ostroman believed that the toll enforcement document came from the Eden Gardens search, Agent Ostroman did not know how Attorney Young found it among the 69 boxes of documents.

178.    With regard to the documents referencing La Covadonga, Family Rest and Morphil, see Def's Ex. 413-1A at 2-4, Mr. Bengio identified the handwriting on those documents as his.

179.    With regard to the spreadsheets, see Def's Ex. 413-1A at 5-16, Mr. Bengio identified the handwriting on those documents as Norman Ginsparg's.

180.    Mr. Bengio explained that the document referencing La Covadonga memorialized his notes of a meeting he had with Norman Ginsparg on November 27, 2015 regarding one of the Delgado Brothers and La Covadonga.  Mr. Bengio further explained that, at that meeting, Norman Ginsparg gave him an assignment to look at the financial records and reconcile the finances of the La Covadonga lease payments.

181.    Agent Ostroman recalled that one of the line items in the assignment sheet was for Esformes' defense counsel.  Agent Ostroman did not recall Mr. Bengio's counsel stating at the debriefing that all of the line items in the assignment sheet were for a project for Ms. Descalzo or that the "Descalzo documents" were the work product of Ms. Descalzo.

182.    Agent Ostroman also recalled that Mr. Bengio made a statement at the Bengio debriefing that he never removed any payments from La Covadonga's accounting records.

183.    Agent Ostroman also acknowledged that Mr. Bengio stated that there was some type of spreadsheet that he was going to put comments on and send to Esformes' defense counsel.  After Mr. Bengio made this statement, the prosecution team continued asking him questions about the "Descalzo documents."

184.    Agent Ostroman agreed that, at his debriefing, Mr. Bengio stated that the "Descalzo documents" he was being shown were a project that Norman Ginsparg had directed him to do, whose purpose was "reconciling the contracts with the books and being able to explain all arrangements and payments to and from the Delgado brothers."   See 10/16/17 Transcript [D.E. 601 at 140].   When asked "Explain to whom," Agent Ostroman could give no answer. Id. at 141-42.

185.    Also, with regard to more specific questions asked of Mr. Bengio at the debriefing, Agent Ostroman could only testify from the FBI Form 302 without any independent recollection.   But Agent Ostroman was able to confirm that Mr. Bengio stated at his debriefing that he had not altered any of the original QuickBooks entries.

186.    Agent Ostroman was the note taker at the October 14, 2016 Bengio debriefing, which notes are retained in the case file.   Although he could not recall having a preparation meeting ahead of the debriefing, Agent Ostroman testified that the plan was to pose follow-up questions to Mr. Bengio and show him additional documents, based on what the prosecution team had learned at the September 28, 2016 Bengio debriefing.

187.    Agent Ostroman recalled that Mr. Bengio received a proffer letter for the October 14, 2016 Bengio debriefing, and all he was asked to do was to tell the truth.

188.    At the October 14, 2016 Bengio debriefing, Mr. Bengio was shown a document from the Eden Gardens search found by Attorney Young, titled "Transaction Detail by Account" for a company named "Morsey."   See Def's Ex. 414-1A.

189.    Agent Ostroman confirmed that Mr. Bengio was asked questions about this document and he explained that he had filled in the word "Family" on lines where it was missing in an earlier spreadsheet after determining from his research and a strong guess that he could

match those entries with Family Rest payments to Esformes.   Agent Ostroman also acknowledged that Mr. Bengio had made this guess for Ms. Descalzo.

190.   As to another document, Mr. Bengio explained that it was a report showing payments related to the La Covadonga contract, in which he was trying to accurately reflect those payments by moving out incorrect deposits.

191.   Agent Ostroman initially stated that, after the October 14, 2016 Bengio debriefing, he reviewed thumb drives, CD's and floppy disks from the Eden Gardens search.  He later stated that he could not recall the specific timing of this review.  Agent Ostroman conducted his review pursuant to instructions from one of the prosecutors to see if there was anything relevant to the prosecution.  He saw various files on the thumb drives and CD's that had videos but could not access the floppy discs because they were too old.

192.   On cross-examination, Agent Ostroman testified that he has never reviewed any electronic media seized from Eden Gardens other than the thumb drives.

193.   Agent Ostroman also stated that, at the September 28, 2016 Bengio debriefing, Mr. Bengio disclosed that he had worked at Eden Gardens as Administrator, assisting with day-to-day operations and helping patients' families, prior to Esformes' purchase of the facility.

194.   After the Esformes purchase, Mr. Bengio met Norman Ginsparg and assumed the responsibilities of keeping the financial books for the assisted living facilities, including Eden Gardens and La Covadonga.

195.   Mr. Bengio did not say anything about being Assistant Director of Legal Affairs or about doing any legal analysis or legal work.

196.   Agent Ostroman acknowledged that Norman Ginsparg signed contracts on behalf of La Covadonga and Morsey identifying himself as Director of Finance.

197.    Agent Ostroman also recalled that during his debriefing, Mr. Bengio stated that payments from one of the Delgado Brothers to an Esformes entity or to Esformes "would be bad." See 10/16/17 Transcript [D.E. 601 at 191].

198.    Agent Ostroman also recalled that, when Mr. Bengio identified the handwriting of Norman Ginsparg on some documents, no more questions were asked of him regarding those documents.

199.    In response to numerous questions as to whether Mr. Bengio's counsel stopped his debriefings at any point or asserted any privilege claims on behalf of Esformes, Agent Ostroman answered "No."

200.    With regard to Norman Ginsparg's functions, Agent Ostroman stated that he was aware that Norman Ginsparg handled some of the contract work, leasing agreements, corporate records, and LLC's for Esformes.   Agent Ostroman also testified that Norman Ginsparg identified himself as a manager in a Medicare enrollment document; and as Director of Finance in a Medicaid enrollment document.

201.    On re-direct examination, Agent Ostroman was shown a business card of Norman Ginsparg with the title "Director of Legal Affairs."   Agent Ostroman acknowledged that a lawyer can also be a businessman.

202.    Agent Ostroman also acknowledged that, at the Bengio debriefings, Mr. Bengio's lawyer did not represent Esformes.

**C.    Agent Myers' testimony**[19]

203.    Agent Myers joined the Esformes prosecution team in December 2015.

---

[19] See Transcript of November 6, 2017 Evidentiary Hearing (hereafter, "11/6/17 Transcript" [D.E. 625 at 6-26].

204.   In his capacity as case agent in the Esformes prosecution team, Agent Myers learned from cooperating witnesses that Norman Ginsparg was Esformes' attorney prior to the return of the original indictment against Esformes, so that, on July 22, 2016, Agent Myers knew who Norman Ginsparg was.

205.   In Agent Myers' view, Norman Ginsparg was initially considered a co-conspirator of Esformes.

206.   Agent Myers attended the Ginsparg reverse proffer on September 20, 2016. However, he did not participate in the preparations for the Ginsparg reverse proffer.  His role was limited to being an observer and to take notes if Norman Ginsparg said anything, but he took no notes.

207.   Also present at the Ginsparg reverse proffer were: Attorney Young, Attorney Bradylyons, Agent Ostroman, Agent Carcas, and Norman Ginsparg and his counsel.

208.   Attorney Young did most of the talking at the Ginsparg reverse proffer.  She discussed the case she thought she could make against Norman Ginsparg and presented documents that Agent Myers had not seen before and were later on in the litigation referred to as the "Descalzo documents."  Agent Myers understood these documents to be related to financial analyses of La Covadonga and Family Rest.  Agent Myers has not seen the "Descalzo documents" since the day of the Ginsparg reverse proffer.

209.   Agent Myers understood the government's theory against Esformes to be that he had entered into sham leases with the Delgado Brothers, pursuant to which lease payments were inflated to conceal kickbacks.

210.   Agent Myers recalled Attorney Young saying that Norman Ginsparg had participated in a crime, but he had no recollection of Attorney Young's specific statements or

questions to Norman Ginsparg regarding the "Descalzo documents."

211.    Agent Myers did recall that the purpose of the Ginsparg reverse proffer was to encourage Norman Ginsparg to plead guilty and cooperate with the government against Esformes and that, in trying to achieve this goal, Attorney Young brought up the sentences imposed on various other individuals, including Michael Mendoza and the Delgado Brothers.

212.    On cross-examination, Agent Myers explained his understanding, based on the government's investigation, that Nelson Salazar and Gabriel Delgado were paying Norman Ginsparg and Esformes "wads of cash" as kickbacks; and that the contracts with the Esformes entities were written to avoid having to deal with cash anymore.

213.    Agent Myers also testified that neither the documents presented nor the information exchanged at the Ginsparg reverse proffer on September 20, 2016 influenced his investigation in any way.

### D.    Agent Mitchell's testimony[20]

214.    Agent Mitchell was assigned to the Esformes prosecution team in late September 2016.

215.    Agent Mitchell took notes and wrote the FBI Form 302 for the first Bengio debriefing, which took place on September 28, 2016.  His notes were written in bullet point or outline format and the FBI Form 302 was a summary of the bullet points put together.

216.    Agent Mitchell shared the FBI Form 302 with Agents Ostroman and Carcas, who were present at the debriefing, before it was "serialized," that is, approved by a supervisor and put in final form in the FBI computer system.

217.    In addition to Agents Mitchell, Ostroman and Carcas, the following persons were present at the September 28, 2016 Bengio debriefing: Attorney Young (who asked the questions

---

[20]    See 11/6/17 Transcript [D.E. 625 at 27-111].

and did most of the talking), Attorney Bradylyons, and Mr. Bengio and his counsel, Attorney Kaplan.

218.    According to Agent Mitchell, Mr. Bengio was shown documents during the course of his debriefing; but prior to seeing the documents, Mr. Bengio stated that he had had a meeting with Norman Ginsparg after the Delgado Brothers had pled guilty at the end of September 2015, for the purpose of doing a reconciliation of payments regarding the leases of the Esformes entities with the Delgado Brothers.

219.    Agent Mitchell recalled that Mr. Bengio was shown spreadsheets and copies of three pages of handwritten notes, which Agent Mitchell knew to be documents found in Mr. Bengio's office during the search of Eden Gardens.  Attorney Young attached significance to the note page that had the entry "remove payments to ALFH and PE," as being possible evidence of obstruction by removing payments from the books.  See 11/6/17 Transcript [D.E. 625 at 39].[21]

220.    Agent Mitchell was not aware of any evidence that payments were removed or deleted from the QuickBooks electronic bookkeeping system maintained for the Esformes entities.

221.    In his pre-hearing affidavit, which he drafted with the assistance of Attorney Bradylyons, Agent Mitchell had stated:

> Trial Attorney Young asked Mr. Bengio if he removed payments from company accounting records, which Mr. Bengio advised were maintained in QuickBooks.  Mr. Bengio's counsel advised that Mr. Bengio's notes, including the notation regarding "remove payments," were taken during a conversation Mr. Bengio had with Ginsparg, after Ginsparg had a meeting with Descalzo during which Descalzo had asked him to undertake a project.  Mr. Bengio's counsel asserted that the notes related to a project for Descalzo and were not directing that the company books be altered.  Trial Attorney Young did not ask questions regarding any project for

---

[21]    According to Agent Mitchell, Mr. Bengio could not explain why he wrote down the "remove payments" entry in his notes.

Descalzo; she asked if the company's books had been altered to conceal kickback payments made by Esformes's co-conspirators.

See Def's Ex. 462B ¶ 6.[22]

222.    At the November 6th hearing, Agent Mitchell stated that the word "project" in his pre-hearing affidavit "refers to the spreadsheet that Mr. Bengio was talking about, that that's what he was going to be producing to Mr. Esformes's defense team." See 11/6/17 Transcript [D.E. 625 at 46].

223.    When asked to clarify this statement, Agent Mitchell added:

> My recollection is that wasn't the notes as a whole, because, once again, what Mr. Bengio was producing to be turned over to the Esformes defense counsel only came up during our one conversation in which the one bullet point said, put actual comments in column, which then Mr. Bengio explained it was for a spreadsheet, in which he was exporting the QuickBooks into an Excel spreadsheet, and then that was what's going to be produced to Mr. Descalzo.
> So in my mind, that was all we talked about for anything that was going to be produced for the Esformes defense counsel.
>                                   ***
> So the notes, in a whole, were from a conversation between Mr. Bengio and Mr. Ginsparg.  The item in which anything that was going to be produced or passed along to the Esformes defense team or Ms. Descalzo didn't come up until we had already began discussing the notes.  And it was in one certain bullet point in which that came up, when Mr. Bengio had mentioned that he was creating a spreadsheet by exporting it from QuickBooks and putting it in Excel.  And then that was going to be produced to the Esformes defense counsel or Ms. Descalzo.
>                                   ***
> So that was the only time that I recall that – at any point in regards to those notes, that something was mentioned about any work item that was going to be passed along to the defense team, and that was the spreadsheet.  So, for me, that project, which I don't know anything is or what it's about, is the spreadsheet itself.

Id. at 47-48.

224.    Agent Mitchell further testified with regard to his pre-hearing affidavit:

---

[22] Agent Mitchell acknowledged that he did not document Attorney Kaplan's statements in the FBI Form 302 he prepared for the September 28, 2016 Bengio debriefing.

> Mr. Bradylyons came [to] me, asked me my specific recollection of certain events, and then it was drafted. We read it, and this we worked it until it got to this draft you see before you that I signed. And then what I'm explaining is my understanding of how I read this the day that I signed it with Mr. Bradylyons.

Id. at 66.

225.    Agent Mitchell acknowledged that, after Mr. Bengio's counsel made her statement, Attorney Young continued to ask questions about Mr. Bengio's notes.

226.    According to Agent Mitchell, once Mr. Bengio identified the handwriting on the spreadsheets that were shown to him as belonging to Norman Ginsparg, they were put aside and the questioning moved on.

227.    At the November 6th hearing, the government turned over to defense counsel Agent Mitchell's handwritten notes from the September 28, 2016 Bengio debriefing. See Def's Ex. 900.

228.    Agent Mitchell acknowledged that, as reflected in his handwritten notes, Mr. Bengio stated during his debriefing that he had had a meeting with Norman Ginsparg after the Delgado Brothers had been indicted and that, during the meeting, they discussed that they were going to go over the books to check out the money flow, and reconcile the contracts with the books to be able to explain the arrangements between the Delgado Brothers and certain Esformes entities.

229.    According to Agent Mitchell, Mr. Bengio did not say at that point of his debriefing to whom that explanation was to be given. But in his handwritten notes, Agent Mitchell included the following notation:

(NOTES) (ALL JB'S WRITING)
- CONV W/ NG
1. COUNT PAYMENTS
2. ORGANIZE TO PRESENT TO MARISEL
        ↓

EXPL WHAT PAYMENT WAS FOR

Id. at 7.[23]

230.    Agent Mitchell's notes also reflect a notation "8/10/2008" that coincides with an entry in one of the spreadsheets, but he could not explain why he made that notation, nor why it was not included in the FBI Form 302, except that, at the time he wrote the report he could not recollect why the notation was in his handwritten notes.

231.    On cross-examination, Agent Mitchell testified that Mr. Bengio's counsel did not request that the prosecution team stop asking questions of her client.

232.    Agent Mitchell also reiterated his view that the "project" or "spreadsheet" did not pertain to the entire three-page set of Mr. Bengio's notes, but only to one bullet point.  He also stated that the comments referenced in that bullet point have not influenced his investigation.

233.    Agent Mitchell also testified that, during the debriefing, Mr. Bengio stated that any payments from the Delgado Brothers to ALF Holdings, Inc. ("ALF Holdings" or "ALFH") or Esformes would be bad.

234.    On re-direct examination, Agent Mitchell explained his understanding of that comment by Mr. Bengio as arising from the Delgado Brothers being in trouble after their arrest and that it could be perceived as problematic to have a relationship with them.

**E.    Attorney Young's testimony[24]**

235.    Attorney Young became involved in the Esformes investigation in December 2015.

---

[23]  Agent Mitchell acknowledged that "Marisel" referred to Ms. Descalzo. "JB" and "NG" stand for Jacob Bengio and Norman Ginsparg, respectively; "CONV" stands for conversation.
[24]  See 11/6/17 Transcript [D.E. 625 at 112-96]; Transcript of November 7, 2017 Evidentiary Hearing (hereafter, "11/7/17 Transcript" [D.E. 626 at 4-221]; Transcript of November 30, 2017 Evidentiary Hearing (hereafter, "11/30/17 Transcript" [D.E. 644 and 645 at 8-149].

236.    Initially, she reviewed the FBI Forms 302 related to the case.  As a result, she learned that cooperators Aida Salazar, Nelson Salazar, Michael Mendoza and Gabriel Delgado had identified Norman Ginsparg as Esformes' attorney.

237.    However, during an interview of Gabriel Delgado that Attorney Young conducted on April 26, 2016 at the federal prison in Jessup, Georgia, Gabriel Delgado stated he did not believe that Norman Ginsparg represented Esformes as an attorney.

238.    By the time of the search of Eden Gardens, Attorney Young had learned that Norman Ginsparg was not licensed to practice law in Florida and had concluded that he could not be Esformes' attorney in Florida because he could not practice law in Florida.

239.    Attorney Young knew, however, that Norman Ginsparg was licensed to practice law in Illinois; and acknowledged that Esformes, who resided in Florida, could have an attorney-client relationship with Norman Ginsparg, an Illinois lawyer who lived in Florida.

240.    Prior to the search of Eden Gardens, Attorney Young was aware, based on her review of Medicare, Medicaid and public records, that Norman Ginsparg used the following titles: manager, CEO, owner, and director of finance.

241.    At that time, Attorney Young had not yet seen a business card that Gabriel Delgado had previously turned over to the government, in which Norman Ginsparg used the title director of legal affairs.

242.    Another document available to the government, namely, a Medicare electronic funds transfer authorization, also showed Norman Ginsparg using the title director of legal affairs.

243.    Attorney Young acknowledged that the "Descalzo documents" were obtained by the government during the July 22, 2016 search of Eden Gardens.  At 10:39 a.m. that day, Ms.

Descalzo sent an email to Attorney Young, asserting that there were privileged documents inside of Eden Gardens. Attorney Young did not open the email until later in the day, and forwarded it to her supervisor, DOJ Attorney Allan J. Medina ("Attorney Medina"), at 1:50 p.m.

244.    Ms. Descalzo stated in her email: "I have informed agents that they are seizing attorney-client privileged materials. Norman Ginsparg identified his files for agents. Ginsparg is an attorney. He provided counsel for companies, Mr. Esformes, and others. These are privileged files. We are not waiving any privilege." See 11/6/17 Transcript [D.E. 625 at 134-35].

245.    In Attorney Young's view, Ms. Descalzo's email confirmed for her that the government

> had made the right decision to use agents who weren't part of the case
> agent team to search Eden Gardens.
> So, again, we had concerns that we might find potentially privileged
> information. Out of an abundance of caution, we used non-case agents.
> And her email confirmed for me that that was the correct decision.

Id. at 139.

246.    Attorney Young also stated that she understood Ms. Descalzo

> to be objecting to the use of case agents in the search, before she
> understood that the search had a filter review in place. And so I didn't
> understand her as having objected to the way the search was ultimately
> executed, when she was informed of the procedure.

Id. at 141-42.

247.    Attorney Young discussed the procedure for the Eden Gardens search that she characterized as a "filter review" with Agent Reilly and his supervisor, Agent McCormick, as well as her supervisors, Attorney Medina and DOJ Attorney Nick Surmacz ("Attorney Surmacz"). Attorney Young described this "filter review" as requiring "the searching agents who weren't on the case team [to] put materials that appeared potentially privileged into a taint

box." <u>Id.</u> at 169.

248.     According to Attorney Young, all three government attorneys (herself, Attorney Medina and Attorney Surmacz) agreed that the "filter review" process that was put in place for the Eden Gardens search was adequate.  However, Agent Young acknowledged that "[t]here was not a lawyer instructing the agents on how to execute the filter process." <u>Id.</u> at 144.

249.     Attorney Young also acknowledged that Investigators Cavallo and Jurado had performed some case-related discrete tasks prior to the Eden Gardens search but noted that they were not case agents at the time of the search.  She further stated that, six months later, when she realized that Investigators Cavallo and Jurado had participated in the Eden Gardens search, she asked them to stop working on the case.

250.     Attorney Young began reviewing the materials from the Eden Gardens search in late July and continued in August 2016.  She found the "Descalzo documents" among the 69 boxes of documents from the search as a result of a manual and visual review.

251.     According to Attorney Young, her review

> was pretty informal.  I understood that we were going to have all 69 boxes, or most of them, sent out for scanning by a third-party scanner, and we were going to do a very kind of regimented review page by page, as a team, once they came back.  So I was just sort of doing a perfunctory look to see what kind of documents we had.

<u>Id.</u> at 150.

252.     Attorney Young believed that she came across the "Descalzo documents" in Box #6 and Box #12 from the Eden Gardens search.[25]

253.     As it turned out, documents that Attorney Young took from Box #12 and placed in a manila envelope for copying by her paralegal were later found in Box # 6.  <u>See</u> Def's Exs.

---

[25]  Inspector Cavallo's name was written on the outside of Box #12, but Attorney Young claimed not to have seen that label prior to asking Inspector Cavallo to work on the Esformes investigation after the Eden Gardens search was conducted.

627, 628A, 628B.

254.   Due to limitations on the size of the shipment, two of the 69 boxes from the Eden Gardens search were not included among those sent in August 2016 to Washington, D.C. for scanning by a vendor.  The two boxes that stayed back were Box # 6 (inside of which the manila envelope from Box #12 had been placed) and Box #31.   The contents of those boxes were scanned in March 2017.

255.   Attorney Young first produced in electronic format the contents of the boxes that were scanned in Washington, D.C.  She later arranged for a non-case paralegal to come to Miami and scan Box #6 and Box # 31 for electronic format production.

256.   Attorney Young consulted with Agent Reilly in preparation for the September 20, 2016, Ginsparg reverse proffer.  Attorney Young also prepared an outline of the presentation she would be making to Norman Ginsparg and his counsel.  Attorney Young also brought with her what have been referred to as the "Bengio notes" and what have been alternatively referred to as "spreadsheets" or "QuickBooks printouts" from the Eden Gardens search.  See Def's Ex. 750.

257.   Prior to the Ginsparg reverse proffer, Attorney Young had come to the conclusion that the Bengio notes related to the QuickBooks printouts as follows:

> In my mind, yes, I had come to that conclusion to the extent that the notes discussed assisted living facilities involved in the fraudulent scheme, and the QuickBooks printouts were the kickback payments that the government had identified in relation to that same scheme.  So I had determined a relationship based on both documents discussing illegal activity.
>
> ***
>
> I definitely showed Mr. Ginsparg evidence of his role in negotiating, accepting, and covering up kickbacks on behalf of Mr. Esformes through this inflated lease arrangement.  And then I also remember telling him that we had documents that showed instructions, such as remove payments from ALF Holdings, which were the exact kickback payments that the government had discovered his involvement in.
>
> ***

> I definitely thought that these QuickBooks and these handwritten notes were evidence of obstruction.
>
> ***
>
> I do recall using the Bengio notes and the QuickBooks to show that Mr. Ginsparg absolutely understood that the government had uncovered his role in this fraud scheme.

See 11/6/17 Transcript [D.E. 625 at 176, 178-80].[26]

258.    The documents used by Attorney Young in the Ginsparg reverse proffer consist of three pages of Bengio notes, handwritten on ruled paper; and twelve pages of QuickBooks printouts or spreadsheets with handwriting on them.  See Def's Ex. 750.

259.    In Attorney Young's mind, the instruction "remove payments" looked like Norman Ginsparg and Mr. Bengio were trying to alter, rather than study, the company books. According to Attorney Young:

> It looks like two co-conspirators, who were involved in this kickback arrangement, endeavored to remove payments from the company books. I understood already at this point that Mr. Bengio was the bookkeeper, that Mr. Ginsparg structured and accepted these kickbacks. To me, again, this was only significant to the extent that it appeared as though they were trying to remove payments of evidence of a crime.

See 11/7/17 Transcript [D.E. 626 at 12].

260.    Attorney Young also claimed to have found evidence of QuickBooks entries having been deleted or removed, based on her review of an electronic ALF Holdings QuickBooks file found in a thumb drive located in Norman Ginsparg's office at Eden Gardens. When she conducted this review, Attorney Young "did not see the payments to ALF Holding from Gabriel Delgado's shell company La Covadonga. They were missing. And I didn't see any payments from ALF Holding to Philip Esformes, which, obviously, corroborated Mr. Bengio's instruction, remove payments to ALFH, or ALF Holding, and to PE, for Philip Esformes." Id. at

---

[26]  Attorney Young had started the Ginsparg reverse proffer by showing to Norman Ginsparg the "sham" contracts that Gabriel Delgado had provided and that Norman Ginsparg had signed.

15. Attorney Young acknowledged, however, that she had not conducted an audit trail of that ALF Holdings QuickBooks file.

261. Attorney Young had possession of the "Descalzo documents" when she prepared for the first of the Bengio debriefings that took place on September 28, 2016.

262. Attorney Young understood Mr. Bengio to be a bookkeeper, notwithstanding that she showed him at his first debriefing a document that identified him as assistant director of legal affairs and that a number of other documents showed him as having the same title.

263. In fact, Attorney Young agreed with Attorney Kaplan's narrative set forth at D.E. 346-11 that, at the first debriefing, "Mr. Bengio explained his employment history, job description, and many duties among other things that he was assistant and right hand to Norman Ginsparg, director of legal affairs." Id. at 51.

264. After Mr. Bengio identified the handwriting in the Bengio notes as his own, Attorney Young asked Mr. Bengio to go through them, asking him questions about what most of the bullet points or line items meant. Attorney Young acknowledged: that Mr. Bengio stated that he had had a meeting with Norman Ginsparg and that the Bengio notes were the notes from this meeting; and that Mr. Bengio identified the handwriting on the QuickBooks printouts as belonging to Norman Ginsparg. Attorney Young otherwise disagreed with Attorney Kaplan's narrative of the first debriefing.

265. Attorney Young also testified that only one bullet point in the Bengio notes related to a project that he was working on for Ms. Descalzo, namely, "adding comments to the actual column." Id. at 63-64.

266. Thus, Attorney Young testified that she viewed Attorney Kaplan's reference to a project for Ms. Descalzo as limited to the creation of a spreadsheet, which Attorney Young

"didn't understand as to have ever seen that spreadsheet or have gotten any information about that spreadsheet." Id. at 65.  Attorney Young could only recall that Mr. Bengio said "this has Mr. Ginsparg's handwriting, and that was all he knew about the spreadsheet." Id. at 73.

267.   In her pre-hearing declaration, Attorney Young described this interaction as follows:

> At one point I showed Jacob Bengio the Descalzo documents and stated I believed that these documents constituted evidence of a crime because there was a notation, removing payments to ALFH and to PE. I asked Jacob Bengio if he removed payments from the company accounting records. Jacob Bengio's counsel advised that his notes, including the notation regarding removing payments, were taken during a conversation Jacob Bengio had with Norman Ginsparg after Ginsparg had a meeting with Ms. Descalzo, during which Ms. Descalzo had asked him to undertake a project.

Id. at 78; see also Def's Ex. 468B ¶ 25.

268.   According to Attorney Young, the drafting of this language was a collective effort in which she participated along with Attorney Bradylyons and Attorney Surmacz.  Attorney Young also acknowledged that the above language in her declaration is the same as that used by Agent Mitchell in his pre-hearing affidavit.

269.   And, like Agent Mitchell, Attorney Young gave an interpretation of her prior language as follows:

> Q.   And that language indicates that, including the notation regarding removing payments, that notation was also part of what Ginsparg had a meeting with Descalzo about, right?
> A.   No, that's not what this says.
> Q.   Okay. Where does this say anything about it relating to a single entry on -- that the assertion of Mr. Bengio and his counsel that there was a privilege issue relate[d] just to that one entry, count payments?
> A.   Well, nothing in the sentence says that the notes themselves were privileged. It's simply setting up the temporal sequence of events. First, Mr. Ginsparg had a meeting with Descalzo. Second, Mr. Bengio had a meeting with Mr. Ginsparg. It was simply to reflect the timing of those two meetings and the fact that those notes were taken during a

conversation between Mr. Ginsparg and Mr. Bengio, the entirety of those three pages.

Q. And do you see the [n]ext sentence?

A. Are you referring to, after Ginsparg had a meeting with Ms. Descalzo, during which Ms. Descalzo --

Q. Yes. I'm looking now at the next sentence in Agent -- I think it's Agent Mitchell's affidavit. The next sentence, Mr. Bengio's counsel asserted that the notes related to a project for Descalzo and were not directing that the company books be altered.

A. Yes, again, we understood that one bullet of the note to be related to the spreadsheet that Mr. Bengio made for Ms. Descalzo, which we never asked about.

Q. When you say the one bullet, where does it say in the affidavit anything about a single bullet?

A. It doesn't.

Q. Okay. It says the notes, plural, with an S, right?

A. Right. Again, this is just a general sort of recap in our affidavit, but it's my intention -- when I wrote this and when I signed it, obviously I understood that there was the one bullet in the notes that prompted Mr. Bengio to speak about the spreadsheet he made for Ms. Descalzo.

See 11/7/17 Transcript [D.E. 626 at 80-82].

270.    Between the two Bengio debriefings, Attorney Young looked at the QuickBooks electronic files in a thumb drive obtained from the Eden Gardens search, with the assistance of a forensic accountant.[27]

271.    The QuickBooks files included all the assisted living facilities named in the Indictment, as well as "shell" companies associated with those assisted living facilities, namely, ALF Holdings, Morsey and Morphil.

272.    In particular, Attorney Young looked at the QuickBooks file for ALF Holdings to see any payments that might have been removed.

273.    Attorney Young was unable to find in this file deposited checks for La Covadonga from the Delgado Brothers, which she considered to be kickbacks, or outgoing money to Esformes, representing his profit distribution from ALF Holdings.

---

[27] Agent Ostroman had located the thumb drive and shown it to Attorney Young.

274.    However, Attorney Young conceded that the government had not performed an audit trail to determine whether any entries had been removed from that ALF Holdings QuickBooks.

275.    Attorney Young also acknowledged that Mr. Bengio had told her during his debriefing that neither Norman Ginsparg nor anyone else had asked him to alter or destroy records.  She noted however that "he said he couldn't remember why he wrote, remove payments to ALF Holdings and to PE, but that if he had done that, he recognized that those payments would be -- I think bad was his word." Id. at 102.

276.    After the first Bengio debriefing, Attorney Young reached out to Attorney Kaplan requesting a second debriefing with her client.  Attorney Young brought a *Kastigar* letter to that second meeting, to afford Mr. Bengio some measure of protection that his statements at the second debriefing would not be directly used against him.

277.    Attorney Young brought to the second Bengio debriefing print outs from the electronic QuickBooks files that she had reviewed; and she asked Mr. Bengio questions about those printouts, specifically, if he had changed or altered any entries, to which he responded no.  However, based on Mr. Bengio's additional explanations, Attorney Young understood that he had added Family Rest to a column, changed some dates, and renamed some payments that he couldn't find, all within QuickBooks.  Attorney Young shared this understanding with Attorney Bradylyons, Attorney Medina, Assistant United States Attorney Daniel Bernstein ("Attorney Bernstein"), Attorney Surmacz and Agent Ostroman.[28]

278.    Although Attorney Young had stated that, at the first Bengio debriefing, she did not ask Mr. Bengio any questions about spreadsheets after Mr. Bengio identified the handwriting

---

[28]  Defendant's counsel then engaged in a series of questions designed to show that these changes were made to an Excel spreadsheet rather than directly on QuickBooks but Attorney Young reiterated the foregoing understanding.

on them as belonging to Norman Ginsparg, she recognized that, during the second Bengio debriefing, she did ask Mr. Bengio questions about spreadsheets with Norman Ginsparg's handwriting.

279.    On November 2, 2016, Attorney Young met with Norman Ginsparg's counsel who asserted "that Mr. Ginsparg didn't alter any company books and that the spreadsheet[s] and the handwritten notes by Mr. Bengio were arguably work product of Ms. Descalzo under an agency theory and that [the government] would arguably not be able to use that at trial against Mr. Ginsparg." Id. at 160-61.  Mr. Bradylyons was present at the meeting and Attorney Young told Attorney Medina and Attorney Surmacz about the conversation.   She subsequently told Attorney Bernstein about it.

280.    As a result, the Esformes prosecution team decided to act as follows:

> [I]f we were to use those notes or if we were to want to use those notes affirmatively in our case against Mr. Ginsparg, that we would first file a motion with the duty court asking for a crime fraud exception on the notes, but that until that point, we wouldn't use the notes for any purpose until we received a crime fraud exception.

Id. at 162.

281.    Attorney Young acknowledged, however, that she had used the Bengio notes in her investigation of Esformes but had not notified the Court of that fact because the prosecution team was not planning to use those documents in the case against Esformes, only in a potential case against Norman Ginsparg.

282.    When asked about bringing to the Court's attention her having been exposed to work product belonging to Esformes, Attorney Young responded as follows (referring to herself, Attorney Bradylyons, Attorney Medina and Attorney Surmacz):

> No. Again, we didn't feel like that was necessary because [Norman Ginsparg's counsel] had raised a potential for work product. I think he

said arguable in my recollection. And we understood that a number of issues would have to be litigated, you know, including, first, the fact that those notes were in the possession of a third party; second, that Ms. Descalzo wasn't personally involved in their creation.

There were a number of other issues including underlying business records such as QuickBooks are not typically work product. And we also had to deal with the fact that Mr. Bengio himself didn't describe them as being in anticipation of litigation which is a requirement to sustain a work product claim. And finally, we obviously, from our position, thought that the instruction regarding removing payments was potential for crime fraud.

Id. at 163-64.

283.    Notwithstanding the concerns expressed by Norman Ginsparg's counsel on November 2, 2016, Attorney Young continued her review of the Eden Gardens search materials after they were returned from scanning on December 5, 2016.

284.    Attorney Young reviewed the scanned documents for approximately five hours. On December 7, 2016, Attorney Young came across an item that appeared to have attorney names on it and she immediately clicked out of the document and stopped her review.   She informed Attorney Bradylyons, Attorney Medina, Attorney Surmacz and the Chief of the Health Care Fraud Unit at the Department of Justice, Attorney Joe Beemsterboer ("Attorney Beemsterboer").

285.    Attorney Young did not inform Defendant's counsel or the Court of her finding.[29]

286.    On cross-examination, Attorney Young explained that Agent Reilly was originally running the Esformes investigation, but when he was promoted and moved to FBI headquarters, Attorney Young was assigned to manage the tasks of discovery, reviewing documents and obtaining information via subpoenas.

287.    Attorney Young testified that the items that she selected and used for the first

---

[29] In an email dated February 12, 2017 to Esformes' defense counsel, Attorney Young stated: "The Eden Gardens materials are currently being reviewed by a filter team and not by the prosecution team." See D.E. 329-51 at 7.

Bengio debriefing did not affect the Esformes investigation in any way, and had nothing to do with: any of the charges against Esformes; the indictment; the superseding indictment; or, any subsequent witnesses and evidence that Attorney Young located.

288.     With regard to the Bengio notes used at the first Bengio debriefing, Attorney Young testified as follows:

a.     as to La Covadonga - when she joined the Esformes prosecution team, she read Nelson Salazar's FBI Form 302, who described La Covadonga as an assisted living facility as to which he, the Delgado Brothers, Norman Ginsparg and Esformes entered into a contract whereby the Delgado Brothers would pay about $13,000 a month as a kickback for access to the patients living in that facility.

b.     as to the notation "count payments for each agreement" - in September 2015, Gabriel Delgado had summarized all of the kickback payments associated with the "sham" lease agreement and the "sham" management agreement for La Covadonga, and provided to the government copies of the agreements; and the government also had copies of the checks written by Gabriel Delgado to cover the inflated leases.

c.     as to the notation "put comments in actual column" - this was the point at which Mr. Bengio referenced a spreadsheet for Ms. Descalzo and Attorney Young told him she did not want to know anything about it.

d.     as to the notation "change in rent not in agreement" - Gabriel Delgado had explained in September 2015 that the "sham" monthly rent payment was $9,879.17, plus an additional "sham" management payment of $1,500 per month to Esformes; Gabriel Delgado had actually summarized the relationships between La Covadonga and Family Rest, as well as the "sham" payments and how they worked in a chart he provided to the government.

e.     as to the notation "balance the books, balance sheet" - Attorney Young had thoroughly examined the bank records for La Covadonga prior to the first Bengio debriefing.

f.     as to the notation "management fee, count payments and end date" - Gabriel Delgado had provided to the government the start and end date of the management fee.

289.     Attorney Young's cross-examination testimony continued in a fashion to convey her view that she had not gained any new information with regard to the following subjects: the

Delgado Brothers' inability to bill Medicaid directly and their use of Esformes and Norman Ginsparg's billing number; Gabriel Delgado's purchase of La Covadonga from Esformes, including the sales agreement and financing details; the use of Family Rest for a kickback arrangement between the Delgado Brothers and Esformes through a similar lease arrangement as La Covadonga, with payments going to Esformes-controlled entities ALF Holdings, Morsey or Morphil.

290.   Attorney Young then explained her interest in the notation "remove payments to ALF Holdings and PE," which, to her, was the most significant line in all of the Bengio notes. Attorney Young knew that the ALF Holdings account and Esformes were two ways that the money was flowing to Esformes for the kickback arrangement with the Delgado Brothers, so, these words made Attorney Young think that they represented an attempt to cover up the kickback scheme.

291.   Attorney Young went on to explain her prior knowledge of the additional notations regarding: the consulting arrangement between Family Rest and ALF Holdings, whereby Esformes was paid $1,500 a month as a management fee; and the length of time that Esformes operated Family Rest after ending the arrangement with the Delgado Brothers, based on a spreadsheet provided to the government by Gabriel Delgado.

292.   Attorney Young also noted that, before the first Bengio debriefing, she had obtained from Gabriel Delgado email correspondence between him and Mr. Bengio independently of her reviewing the Bengio notes, which, according to her, is a common investigative practice.

293.   Attorney Young also testified that, in her view, the notation "look at ALFH for management fee" related to a "sham" consulting agreement that the government had already

seen, whereby the Delgado Brothers had to pay ALF Holdings for access to Esformes' patients residing at La Covadonga and Family Rest. Attorney Young had learned from Nelson Salazar, Aida Salazar and the Delgado Brothers that Norman Ginsparg had signed these "sham" agreements because "for some time, he had been accepting on Mr. Esformes's behalf so much cash, wads of cash, that they had to start papering the deal because it became difficult to deal with such a large volume of cash." Id. at 204.

294.     Attorney Young also testified that, in her view, the notation "look at La Cov INV" referred to a company by the name of La Covadonga Retirement Investors controlled by Esformes and Norman Ginsparg, which received some of the inflated lease payments from the Delgado Brothers. Attorney Young stated that she had prior knowledge of this entity through bank records, and the contracts and information provided by the Delgado Brothers.

295.     Attorney Young also testified that the notation "pull tax return and balance sheet and look for moneys owed from Gabby after sale," and "post sale agreement, $264,200" did not provide her with any new knowledge, since she was aware from the sales documents that, after the "sham" rent agreement ended, Gabriel Delgado had to pay closing costs in the amount of $264,200.

296.     Attorney Young also testified that the notation "Morphil" referred to a shell company used by Esformes to accept kickback payments, the name being a combination of Esformes' first name, Philip, and his father's first name, Morris. Prior to the first Bengio debriefing, Attorney Young had documents that showed payments from Family Rest to Morphil. Attorney Young was also aware of what "rent increase at KY" meant because she knew that sometime in 2004 the rent payments from Family Rest to Morphil went from roughly $11,000 to roughly $12,000 per month.

297.    With regard to the notation "what do books reflect," Attorney Young knew that payments went to Morphil through banking records, so she knew what the books reflected.  With regard to the notation "management fee agreement versus actual," Attorney Young testified that she was aware of the "sham" lease and management fee payments made by the Delgado Brothers to Esformes from having reviewed the "sham" agreements.  According to Attorney Young, the payments did not represent actual services; they were "just payment for patients." Id. at 208.

298.    With regard to the notation "option last payment versus closing date," Attorney Young understood it to refer to the fact that part of the purported "sham" management agreement fee was for an option to buy the assisted living facility at the end of the management period, as reflected in the agreement that Attorney Young had reviewed before the first Bengio debriefing, with a price of $1,500 disguised as closing costs.

299.    After testifying regarding the Bengio notes on a line by line basis, Attorney Young further testified that nothing in them influenced what she did with regard to the superseding indictment, discovery of a witness, discovery of trial evidence or exhibits to be used at trial; or that they provided assistance to members of the Esformes prosecution team.  Attorney Young also testified that she did not learn any defense strategy from reviewing the Bengio notes and stated that, "[t]he moment that Mr. Bengio described putting comments into a column for a spreadsheet for Ms. Descalzo [she] stopped asking about it.  So [she doesn't] have any awareness of what it was that he made for [Ms. Descalzo]." Id. at 212.[30]

300.    Attorney Young requested the second Bengio debriefing to ask some follow-up questions after she reviewed some recordings that captured Mr. Bengio, and the QuickBooks for

---

[30]   Attorney Young also claims not to have learned anything from the settlement agreement documents for civil cases that were seized during the Eden Gardens search because she had independent knowledge of those cases, which she claimed to have obtained from her former colleagues at the Department of Justice Civil Division.

ALF Holdings, which, in her view, did not reflect the payments from the Delgado Brothers.

301.   Attorney Young typed up some notes in preparation for the second Bengio debriefing and had some input from a consulting expert regarding questions to ask Mr. Bengio about the QuickBooks files to figure out if they had been altered.

302.   Attorney Young's outline for the second Bengio debriefing read as follows:

**Bengio interview 10/14/16**
• Kastigar letter
       o Example of Cohav Group
       o Example of HUD loan

• HUD loans
       o How did they work
       o Did he know that they needed the money fast
       o Why
       o Checks cut before stuff delivered?

• Quickbooks
       o For the interview, I suggest asking about the following:

• 1. How many QB accounts did you work with?
• 2. How many people had access to the QB files?
• 3. Did entities have more than one QB file? For instance ALF Holdings Inc and ALF Holdings Special Account?
• 4. Were there unique passwords for accounts? Can he provide the passwords?
• 5. How would you record payments to Morphil, Morsey, ALF Holdings, and LaCovadonga Retirement Living and Investors from Family Rest Management Group and LaCovadonga Management Group for consulting fees or other distribution?
• Fees at Adirhu – were they tied to your profit distribution
• Maria Delgado – how was she paid after Delgado was arrested? Why?
• Cost reports – who prepared the information for the cost report?
• Westchetser hopstial

<u>See</u> Gov't Ex. 134.

303.   With regard to the "Kastigar letter" and "HUD loans" entries, Attorney Young explained that the government did not consider Mr. Bengio a target but understood that he might have some awareness of illegal activity related to the HUD loans underlying an obstruction of

justice charge in the indictment.   Attorney Young explained the alleged illegal activity as follows: "HUD was going to reimburse the nursing homes that Mr. Esformes owned, and then Mr. Esformes was going to kick the money to [the] Delgado brothers so that they could use that money.  Instead of actually doing a construction project, they were just going to take the money and get Guillermo Delgado out of the country so that he could have a nest egg to live overseas and avoid trial." Id. at 217.

304.   Attorney Young further testified that the entries in her outline under the heading QuickBooks were supplied by the expert consultant so that Attorney Young could probe with Mr. Bengio whether or not the QuickBooks files had been altered.

305.   Attorney Young continued her cross-examination testimony by recapping that, during the first Bengio debriefing, Mr. Bengio described his work as involving administrative rather than paralegal issues; and that his day-to-day duties were those of a bookkeeper in that he wired money, cut checks, filed incorporation documents for companies, performed bookkeeping duties, and kept track of luxury vehicles provided to Esformes employees as incentives.

306.   Attorney Young also reiterated her view that, during the first Bengio debriefing, Attorney Kaplan never said that all of the Bengio notes reflected Ms. Descalzo's work product. Attorney Young also stated that, if Attorney Kaplan had made any such statement, she would have stopped the first Bengio debriefing immediately because she would have understood Attorney Kaplan to be making a work product or privilege claim.

307.   Attorney Young also said again: that the most important thing to her during the first Bengio debriefing was the notation in the Bengio notes "remove payments to PE and ALFH;" that she already knew all of the information contained in the Bengio notes from Nelson Salazar, the Delgado Brothers and the government's own analysis; that the focus of the interview

was to ask Mr. Bengio if he had "removed any payments from the company books with respect to those notes;" that she did not learn anything by going over the Bengio notes or the exhibits she chose; and that nothing from the Bengio notes in any way influenced the superseding indictment or the actions that she subsequently took, other than looking into QuickBooks to see if payments had been removed. See 11/30/17 Transcript [D.E. 644 at 11-12].

308.    With regard to her outline for the second Bengio debriefing, Attorney Young again explained her rationale for providing Mr. Bengio with a *Kastigar* letter as an attempt to make him feel more comfortable talking about things that might be illegal in connection with the HUD loans.

309.    Attorney Young also explained that, in asking Mr. Bengio questions about QuickBooks, she did not believe that she was showing him work product documents. Attorney Young added:

> I felt confident from the first meeting that Ms. Kaplan had alerted me to the potential privilege issue. And I felt as though we had successfully avoided it. There was no point in which I thought in that interview that we were asking about something that was privileged or work product.

Id. at 17-18.

310.    With regard to the HUD loans, Attorney Young recalled Mr. Bengio stating that he found it "weird" that the Delgado Brothers, who were durable medical equipment salesmen, were suddenly doing a large-scale construction project.

311.    With regard to her effort to uncover removed payments, Attorney Young testified that she tried to contrast electronic and paper versions of QuickBooks documents seized from the Eden Gardens search to determine which version was created first and if either of the two versions had been altered.

312.    Attorney Young also clarified that the Bengio notes were not used at the second

Bengio debriefing, as documented in the 1A attachments to the FBI Form 302 for the interview. She acknowledged that a set of handwritten notes were shown to Mr. Bengio at that time, which he could not identify.

313.    Attorney Young also denied obtaining any new information from the documents used in the second Bengio debriefing on the grounds that she already knew from other sources about the management fees paid to Esformes.

314.    With regard to Norman Ginsparg, Attorney Young testified that she viewed him as a co-conspirator in the alleged fraud scheme who profited handsomely from his involvement.

315.    On the day of the Eden Gardens search and Esformes' arrest, Attorney Young provided to Agent Reilly an outline of questions to ask Norman Ginsparg should Agent Reilly succeed in interviewing him.   Attorney Young also provided Agent Reilly with various documents, including a list of over 100 companies that Norman Ginsparg was associated with, based on a public records search.  Attorney Young also provided Agent Reilly with information regarding a home health company by the name of St. Jude, in which Norman Ginsparg had been involved as co-owner with Guillermo Delgado, which billed for home health services to patients living at Esformes' nursing homes.  According to Attorney Young, Norman Ginsparg derived revenue from these billings by receiving payments for consulting or legal work for the home health agency which work, according to the Delgado Brothers, he never performed.

316.    Attorney Young noted that, in some documents, Norman Ginsparg appeared as director of finance for La Covadonga Retirement Living.  She also noted that, on an Eden Gardens Medicaid application, he appeared as manager of various Esformes nursing homes.

317.    On April 16, 2016, prior to the search of Eden Gardens, Attorney Young visited Gabriel Delgado in Jessup, Georgia to clarify some issues regarding Norman Ginsparg.  Gabriel

Delgado explained Norman Ginsparg's role as follows: he was an investor in nursing homes; he signed "fake" contracts for inflated lease agreements used to pay kickbacks, he participated in the St. Jude scheme; he and Mr. Bengio cut checks from the Eden Gardens address; and he did not represent Esformes as an attorney.   Attorney Young added that, despite this last bit of information, the government used non-case agents for the Eden Gardens search in the event they did encounter potentially privileged information.

318.   With regard to the Ginsparg reverse proffer, Attorney Young did not think that any of the documents shown to Norman Ginsparg were privileged.   With regard to the notation "remove payments to PE and ALFH" in the Bengio notes, Attorney Young thought that Norman Ginsparg and Mr. Bengio had "looked at some of the corrupt payments that were the subject of the Delgados' indictment and attempted to manipulate company books." Id. at 42-43.   She saw the notation as possible evidence of obstruction of justice.

319.   Prior to the Ginsparg reverse proffer, Agent Reilly sent Attorney Young an email stating, "I think we should show him the notes from Bengio's desk that show them covering their tracks for La Covadonga and Family Rest Management." Id. at 44.

320.   Norman Ginsparg's counsel did not mention anything about a privilege issue during the Ginsparg reverse proffer or in two emails he sent to Attorney Young shortly thereafter.   However, in an email dated November 2, 2016, Norman Ginsparg's counsel stated something to the effect of: "Mr. Ginsparg did not actually remove payments and that arguably, this is work product that could not be used against him at trial." Id. at 47.

321.   According to Attorney Young, this was the first time that anyone said that the Bengio notes and the handwritten notes on the QuickBooks printouts were work product, and neither Attorney Kaplan nor Mr. Bengio had said that during the Bengio debriefings.

322.    After discussing the issue raised by Norman Ginsparg's counsel with their supervisors, Attorney Young and Attorney Bradylyons decided to put the documents aside and to seek blessing from the Court should they "want to actually use those documents in an affirmative sense." Id. at 48.

323.    Attorney Young responded in the negative to questions as to whether the documents influenced: the Esformes investigation; the superseding indictment; the listing of witnesses; the selection of evidence; trial strategy; or anything at all.

324.    During the Ginsparg reverse proffer, Attorney Young had used text messages between Esformes and Norman Ginsparg to show that Esformes was clearly in charge and telling Norman Ginsparg what to do.  Norman Ginsparg's counsel did not make a privilege claim with regard to the text messages at any time between the reverse proffer and the November 2, 2016 work product claim, or thereafter.

325.    On August 17, 2016, Attorney Young sent a letter to Esformes' counsel informing them that the Eden Gardens search warrant materials were available for their review at the FBI office in Miramar.  See Gov't Ex. 39.

326.    On October 24, 2016, Attorney Young sent to all defense counsel in the case duplicates of the thumb drives that had been seized from Eden Gardens.  See Gov't Ex. 127.

327.    On February 9, 2017, Esformes' counsel requested an appointment to review the boxes of materials seized from Eden Gardens.  See Gov't Ex. 116.

328.    On February 10, 2017, Esformes' counsel informed Attorney Young that, upon a review of the boxes of materials seized from Eden Gardens, they had found that three of the boxes contained attorney client and work product privileged materials; and requested that the

boxes be segregated and not viewed or copied by the government pending a ruling from the Court. See Gov't Ex. 117.

329.    Attorney Young referred Esformes' counsel to the filter prosecutors who were expected to review the Eden Gardens materials; and, given this communication, obtained permission to have a non-case paralegal scan the two boxes (#6 and #31) that had not been sent to the third party vendor in Washington, D.C.

330.    The scanning of Boxes #6 and 31 was completed on March 8, 2017.[31]

331.    Attorney Young also testified on cross-examination that Norman Ginsparg had been given the opportunity to do a walkthrough at the time of the Eden Gardens search to identify documents that were not part of the fraud scheme, which he did, and thereafter exited the scene. Norman Ginsparg was also given a property receipt to sign at the end of the search.

332.    With regard to the email that Ms. Descalzo sent her on the day of the search of Eden Gardens, Attorney Young testified that she did not believe that she was keeping that email a secret from Defendant or her colleagues at the Justice Department and added: "Agent Reilly on the day of the search contacted my supervisor Mr. Surmacz, about this issue which confirmed our use of a filter team, which I believe prompted the allowance of Mr. Ginsparg to enter the search site." See 11/30/17 Transcript [D.E. 644 at 63].

333.    With regard to the handwriting on the manila envelope bearing a notation "12" that was found in Box #6 from the Eden Gardens search, Attorney Young explained that, during the questioning of Agent Lugones, she realized that the handwriting was hers and so informed Defendant's counsel. See Gov't Ex. 102.

---

[31] The boxes that were sent to Washington, D.C. for scanning left Miami on August 31, 2016 and came back on December 5, 2016.

334.    With regard to the civil settlements as to which documents were seized from Eden Gardens, Attorney Young reiterated that she had prior knowledge of these matters, based on information obtained from the Department of Justice Civil Division, where she had previously worked.  See Gov't Exs. 100, 101.

335.    Attorney Young testified that, once she came across privileged information when reviewing the Eden Gardens documents, she stopped, informed Attorney Bradylyons, and consulted with her supervisors.

336.    On re-direct examination of Attorney Young, the following colloquy ensued:

> Q.   And you chose to proceed onward with the review of the Eden Gardens materials, even after Ms. Descalzo alerted you to her view that Norman Ginsparg was Philip Esformes' attorney, correct?
> A.   Yes.   Again, we used a filter team and proceeded with the review process that we had in place to segregate potentially privileged information that we had seized from Eden Gardens.
> Q.   But, of course, you knew that the filter team, so to speak led by Warren was not doing a privilege review, correct?
> A.   No, that's not correct.   My understanding was that they were instructed to remove -- or segregate anything that was potentially privileged and that an attorney would then, before releasing any of those documents that they had flagged, an attorney would make a determination whether the prosecution team would have those.   A filter attorney would do that.
> Q.   My question was:   Warren, his team on-site, did not conduct a privilege review; isn't that correct?
> A.   What do you mean by privilege review?
> Q.   What do you mean by privilege review?
> A.   Well, again, I think they did.   I think that they flagged documents that were potentially privileged.
> Q.   What does that mean to someone like Mr. Warren?
> A.   Our instruction was or I believe his instruction was to tell the agents to flag things that involved, you know, Mr. Pasano's name, an attorney, a law firm, things that had the common demarcations, privileged and confidential that appeared potentially.
> Q.   You heard Mr. Warren's testimony, he didn't even know who Mr. Pasano was?
> A.   Yes.   I believe Ms. [Cavallo] testified about looking for Mr. Pasano's name.

*      *      *

66

> Q. . . . Am I correct, no filter prosecutor [was] assigned to participate in a filter review on July 22, 2016, correct?
> A. Yes, that's correct.
> Q. Mr. Hunter wasn't even brought into this equation until January of 2017, correct?
> A. I don't remember the exact date he reviewed the taint box. But it is correct that it was sometime later that Mr. Hunter reviewed the taint box.
> Q. Leo Tsao, who has provided a declaration to Judge Otazo-Reyes wasn't assigned to do anything with regard to this search until January 25, 2017, correct?
> A. Again, I don't remember the exact date Mr. Tsao was assigned. But it was definitely after the execution of the search.

See 11/30/17 Transcript [D.E. 644 at 74-75, 78].

337.    With regard to Ms. Descalzo's attempts to contact her regarding the Eden Gardens search, Attorney Young testified that she only spoke once to Ms. Descalzo the morning of July 22, 2016 before the search began. When shown telephone records, Attorney Young acknowledged two additional calls by Ms. Descalzo at 8:59 a.m. and 5:15 p.m. on July 22 and another call at 6:39 a.m. on July 23.

338.    With regard to her initial review of the Eden Gardens materials, Attorney Young reiterated that she was conducting that review sometime in late July and early August 2016.

339.    With regard to the tasks listed in the Bengio notes, Attorney Young acknowledged that, for purposes of the Esformes investigation, it would be important or relevant: to count the payments in the bank records related to the "sham" lease and management agreements between Esformes and the Delgado Brothers; to determine whether there was any balance, any unpaid payments under these "sham" agreements; to count payments and determine the end date for the management fees; to find the management fees payments; to pull tax returns and balance sheets to look for monies owed from Gabby Delgado after sale; to compare the agreements versus the actual payments; to find the reason for rent increases; to find out if

Esformes entities were owed any monies by the Delgado Brothers; and to compare management fee agreements versus actuals.

340.    With regard to the notations on the spreadsheets prepared by Mr. Bengio, Attorney Young acknowledged that, for purposes of the Esformes investigation, it would be important or relevant: to find out if monthly payments were missed; to match payments with the contract; to find any money paid by the Delgado Brothers to Esformes entities regardless of the deposit account; and to prove up how much cash the Delgado Brothers paid Esformes.  Attorney Young also acknowledged that both she and Agent Reilly had reviewed the QuickBooks spreadsheets in preparation for a Bengio debriefing.

341.    Notwithstanding the foregoing, Attorney Young testified that the only relevance of the Bengio notes was a "potential for obstruction of justice.  We didn't see this as furthering the investigation of Mr. Esformes in any way."  Id. at 131.

**F.    Attorney Bradylyons' testimony[32]**

342.    Attorney Bradylyons was assigned to work on the Esformes case in August 2016 and, after a transition period, started actually working on the case in September 2016.

343.    To become acquainted with the Esformes case, Attorney Bradylyons spoke to Attorney Young, Attorney Medina and Attorney Beemsterboer in late August or early September 2016.

344.    Attorney Bradylyons attended the Ginsparg reverse proffer and the two Bengio debriefings.  He first saw the Bengio notes a couple of days before the September 20, 2016 Ginsparg reverse proffer.

345.    At the time he participated in the Ginsparg reverse proffer and the two Bengio debriefings, Attorney Bradylyons understood that there was a privilege issue relating to the Eden

---

[32] See 12/18/17 Transcript [D.E. 685 at 63-120].

68

Gardens search; but he had not seen the email that had been sent by Ms. Descalzo to Attorney Young the morning of the search.

346.    If he had been aware of the email, Attorney Bradylyons would have brought it to the attention of his supervisor, Attorney Surmacz.

347.    Attorney Bradylyons acknowledged that he was the draftsman of his own pre-hearing declaration and the affidavit of Agent Mitchell.  Specifically, he acknowledged drafting the passage from Agent Mitchell's affidavit that stated:

> Trial Attorney Young asked Mr. Bengio if he removed payments from company accounting records, which Mr. Bengio advised were maintained in QuickBooks.  Mr. Bengio's counsel advised that Mr. Bengio's notes, including the notation regarding "remove payments," were taken during a conversation Mr. Bengio had with Ginsparg, after Ginsparg had a meeting with Descalzo during which Descalzo had asked him to undertake a project.  Mr. Bengio's counsel asserted that the notes related to a project for Descalzo and were not directing the company books be altered.

See Def's Ex. 462B ¶ 6.

348.    The language in Agent Mitchell's affidavit comported with what Agent Mitchell told Attorney Bradylyons had happened during the first Bengio debriefing.  It also comported with Attorney Bradylyons' recollection of what happened during the first Bengio debriefing.

349.    However, in response to further questioning, Attorney Bradylyons testified:

> I think your implication is that all of the notes, that Ms. Kaplan asserted that all of the notes related to a project and that was not our understanding and not what we were trying to say in this affidavit.

See 12/18/17 Transcript [D.E. 685 at 72-73].

350.    Attorney Bradylyons further testified:

> So I recall as we were walking through these notes with Mr. Bengio that at some point Ms. Kaplan said that there may be an attorney/client issue because this spreadsheet went to Ms. Descalzo.
> I don't have an independent recollection of where in these notes she made that assertion.  I don't doubt that it happened next to the ["put comments

in actual column"], that, I believe, the 302. It was not in response to the ["remove payments"] bullet. That was a bullet that we were particularly interested in and she did not raise it after that.

Id. at 77.

351.    Attorney Bradylyons acknowledged that, in response to Attorney Young's repeated questions asking if he had changed the company books, Mr. Bengio denied having done so; and that Mr. Bengio suggested that a QuickBooks audit trail would confirm what he was saying.

352.    On November 2, 2016, Attorney Bradylyons heard from Norman Ginsparg's counsel that the "Descalzo documents" were part of a project that was arguably work product. The Esformes prosecution team did not take any steps to notify the Court or Esformes at that point. According to Attorney Bradylyons: "This document we understood was part of discovery and we also assumed that [Esformes' counsel] were already aware of this document." Id. at 80.

353.    According to Attorney Bradylyons, the Esformes prosecution team disagreed with the assertion of work product privilege as to the "Descalzo documents" and assumed that, to the extent they would be using the documents down the road, they "would have to litigate whether it was work product, whether there was a crime fraud exception, and whether [they] could use it moving forward." Id. at 82.

354.    Attorney Bradylyons acknowledged that the government did not produce the FBI Forms 302 of the Bengio debriefings until after Defendant demanded them, which occurred after the filing of the Motion to Disqualify.

355.    Attorney Bradylyons acknowledged that he looked at a handful of text message chains between Norman Ginsparg and Esformes.

356.    In his pre-hearing declaration, Attorney Bradylyons listed five items from the

Eden Gardens search materials that he had seen, which included the "Descalzo documents." <u>See</u> Def's Ex. 456B ¶ 3.

357.   On cross-examination, Attorney Bradylyons testified that, prior to the Ginsparg reverse proffer, he had a discussion with Attorney Young regarding the "remove payments to ALFH and to PE" notation in the Bengio notes; and added, referring to himself and Attorney Young: "We believe that those were the payments -- the kickback payments from the Delgado brothers which would -- could have made their way to ALF Holdings or to PE, Philip Esformes. We believe that removing payments could be an instruction to remove what might be inculpatory records from the accounting records of the company." <u>See</u> 12/18/17 Transcript [D.E. 685 at 91].

358.   Attorney Bradylyons also testified that, prior to the Ginsparg reverse proffer, he did not believe the "Descalzo documents" to be protected by the work product or attorney/client privileges; and added that those privileges were not invoked by Norman Ginsparg's counsel during the Ginsparg reverse proffer.  But afterwards, Norman Ginsparg's counsel requested and obtained a copy of the "Descalzo documents," characterizing them as troubling.

359.   Attorney Bradylyons also testified that, during his first debriefing, Mr. Bengio was asked about his responsibilities.  With regard to the time before Esformes purchased Eden Gardens, Mr. Bengio stated that he worked as an administrator for the facility, and that, afterwards, he took on more of a finance/bookkeeping role.  Mr. Bengio did not state that he had any legal background or describe any legal functions that he performed.

360.   Attorney Bradylyons also testified that, while shown the "Descalzo documents," neither Mr. Bengio nor his counsel asked to stop the debriefing.  Mr. Bengio stated that his notes were generated from a meeting that he had with Norman Ginsparg and did not say he had a meeting with Ms. Descalzo.

361.    When asked about the notation "remove payments to ALFH and PE," Mr. Bengio responded "that he couldn't remember why he wrote that.  He also said that he understood that payments from the Delgado brothers to ALFH or to PE would be bad and he agreed that he understood that kickbacks are illegal." Id. at 96-97.

362.    When Mr. Bengio was shown the QuickBooks printouts, he identified the handwriting on them as belonging to Norman Ginsparg.  Attorney Bradylyons did not recall any additional questions being asked of Mr. Bengio after that.

363.    According to Attorney Bradylyons, Mr. Bengio was shown a second set of handwritten notes at his second debriefing, which he was unable to identify.

364.    According to Attorney Bradylyons, to meet the December 23, 2016 deadline for serving trial exhibits on defense counsel, Attorney Young instructed a paralegal to pull text messages for certain co-conspirators or witnesses.

365.    Attorney Bradylyons testified that he reviewed an email from Mr. Pasano providing attorney names (and numbers) for whom communications with Esformes were privileged and stated that Norman Ginsparg's name was not included in that list and was never added to it.  Attorney Bradylyons further testified that Norman Ginsparg's counsel did not claim that text messages contained in Esformes' phones were privileged.

366.    Because Morris Esformes paid $200,000 for Norman Ginsparg's legal representation, and based on his past experiences, Attorney Bradylyons assumed that Norman Ginsparg's counsel and Esformes' counsel were communicating with each other.

367.    On re-direct examination, Attorney Bradylyons acknowledged that he had no specific information to support this assumption.

368.    Attorney Bradylyons further acknowledged that it was Esformes' counsel who

discovered the Bengio notes in boxes from the Eden Gardens search (which notes had not been included in the jump drive containing electronic versions of the seized documents), after which Esformes' counsel confronted the Esformes prosecution team. On March 8, 2017, Esformes' counsel demanded that the Esformes prosecution team disclose the sequence of events related to the government's possession of the Bengio notes. See D.E. 329-51 at 16.[33] However, the government did not produce the FBI Forms 302 from the Bengio debriefings until May 11, 2017. See Def's Ex. 863.

369. Attorney Bradylyons acknowledged that, at the first Bengio debriefing, Mr. Bengio was asked questions about two letters signed by him using the title Assistant Director of Legal Affairs, which the government believed to be "sham" letters. However, the government made no inquiry of Mr. Bengio regarding the title shown on the letters.

370. Attorney Bradylyons also acknowledged that, during his interview, Mr. Bengio referred to what the government characterized as QuickBooks printouts as spreadsheets.

### G. Attorney Kaplan's testimony[34]

371. Attorney Kaplan has been practicing law in Florida since September 2014, in the area of white collar criminal defense.

372. Attorney Kaplan was contacted to represent Mr. Bengio in July 2016, right before she had taken a short sabbatical to serve as law clerk for the Honorable Ursula Ungaro. Her partner at the time, Bruce Reinhart, handled the matter until Attorney Kaplan finished her clerkship in September 2016.

373. During the sabbatical, Attorney Young had requested that Mr. Bengio submit to an interview in the Esformes case just as a witness. At the end of her sabbatical, Attorney

---

[33] Esformes' counsel had made the same request on February 14 and 17, 2017. See D.E. 329-51 at 9-10, 12-13.

[34] See 12/18/17 Transcript [D.E. 685 at 121-86].

Kaplan reached out to Attorney Young to set up the voluntary interview.

374.    In preparing for the first Bengio debriefing, Attorney Kaplan became aware that "there were notes being touted as a sort of smoking gun evidence of obstruction," which Attorney Kaplan understood "to be potentially work product and privilege belonging to Mr. Esformes." See 12/18/17 Transcript [D.E. 685 at 124]. Attorney Kaplan devised a strategy "to raise the privilege, alert the government that there may be an issue and let them deal with it, but allow [her] client to answer questions so that in the event that this [was] what [the government] believe[d] to be smoking gun evidence of a crime, [Mr. Bengio] was not implicated and he could explain to them what [the notes] actually were and they could stop making assumptions." Id.

375.    According to Attorney Kaplan, the initial portion of the first Bengio debriefing was a normal inquiry into her client's background. Attorney Kaplan added:

> But when it came to the notes, I thought it was a little confrontational, and they pressed on about what the notes were.  I raised the issue of privilege, that they could be potentially privileged.  And then they went -- they pressed on and continued with going line by line what the notes meant, especially with the removed payments.
>                                          ***
> So, the notes as a whole, when the notes appeared -- since I had seen them before the debriefing, when the notes appeared, and Mr. Bengio began to answer questions about whether or not that was his handwriting and what they were, I raised the issue with Ms. Young.  What I advised her was these notes related to a project that was done for Ms. Descalzo, who I understood to be Mr. Esformes's defense attorney.  And while Mr. Bengio may not understand that they were work product, I wanted to raise the issue for her to be aware of it.
>                                          ***
> I definitely didn't point to one line, that wouldn't have ma[d]e sense because the notes are a whole.  They were related to a meeting that Mr. Bengio had with Mr. Ginsparg about the project for Ms. Descalzo.  It wasn't one line of the notes that was related to the project, it was all of them.  So the privilege was raised as a group, all of the notes.

Id. at 125-26.

376.     When asked what Mr. Bengio said about the spreadsheets that were shown to him during the first Bengio debriefing, Attorney Kaplan testified:

> So the spreadsheets, from my recollection, came after the notes.  I wasn't aware of spreadsheets, but Mr. Bengio knew what they were when he saw them, and he explained that the spreadsheets, the Excel spreadsheets that were shown that we've seen in court throughout the testimony, were related to the notes; that that's exactly what he was talking about.  And he gave an example of, [y]ou see this spreadsheet, you see this note, leave columns, here is the column, for example.

Id. at 126-27.

377.     After listening to Attorney Young's testimony, Attorney Kaplan felt that she had been untruthful and brought it to the attention of AUSA Bernstein, who she knew and respected, via an email sent on November 7, 2017 at 12:15 p.m.  See Def's Ex. 851.  After the court lunch break that same day, AUSA Bernstein approached her to talk about the email and she told him "that everything [Attorney Young] said about how the privilege was asserted was not correct.  I alerted him that I knew in advance about the notes and that's why I'm quite certain how I asserted the privilege.  And then that was the end of it."  See 12/18/17 Transcript [D.E. 685 at 128].

378.     Attorney Kaplan had reviewed Agent Mitchell's pre-hearing affidavit and had found that the language used there to describe her privilege assertion, which was similar to the language in the other government declarations, correctly described what had happened.

379.     However, Attorney Kaplan found to be untruthful Attorney Young's hearing testimony "about the assertion of privilege being only related to one line in the notes."  Id. at 132.  Attorney Kaplan added:

> Obviously that didn't make sense to me, to be one line.  It was the entire notes.  In general, any testimony about the idea of stopping [] asking questions related to the QuickBooks spreadsheets when Mr. Bengio identified Mr. Ginsparg's handwriting.  But there's more than that.  He

> related the QuickBooks spreadsheets to the notes and explained what they were and what each note meant. And actually, some of the notes tied up some of Mr. Ginsparg's handwritten notes to Mr. Bengio's notes.

Id.[35]

380.    According to Attorney Kaplan, Mr. Bengio was asked questions line by line about the Bengio notes and was asked questions about the Excel spreadsheets that were presented to him. Mr. Bengio

> tied the Excel spreadsheets to the notes. He explained that he was -- he seemed to be happy to see them, that, Ah, this explains the notes. These are what I'm talking about. This is the project we were doing. And he explained, for example --I can't remember a particular that -- there was one of the spreadsheets that has a notation about columns, and one of the notes -- enumerated notes of his says, Add to columns. And he explained that that's what he was talking about.

Id. at 136.

381.    Upon being shown the Bengio notes attached to the FBI Form 302 from the first Bengio debriefing and asked when, in the course of the interview, did she assert the privilege, Attorney Kaplan testified:

> So when -- because I had seen the notes in advance of the meeting, when the notes came out, and Mr. Bengio was asked if he recognized them and he then began to explain what they were, I let him finish his sentence. As soon as he finished his sentence, I alerted the government that there was a potential privilege issue related to these notes. And why that was, because I explained that the privilege issue would be because these notes are related to a project that was ultimately done for Ms. Descalzo.
> ***
> The minute he finished his first sentence of explaining what [the notes] were, I raised the privilege issue.
> ***
> He described [the notes] as a project he was working on for Marissel . . . Descalzo.

Id. at 138.

---

[35]  Attorney Kaplan also stated that, contrary to Attorney Young's testimony, neither she nor Mr. Bengio ever referenced kickbacks in any way. Id. at 133.

382.   With regard to the first spreadsheet he was shown, Mr. Bengio explained that it "was an Excel spreadsheet pulled from QuickBooks related to the project he was doing for Marissel." Id. at 139.  When asked about the notation "remove payments," he said he couldn't remember why he wrote it, but explained that "all of these notes including the remove payments would have been related to the Excel spreadsheets he was working on.  He made it clear that he didn't remove anything from the company QuickBooks and none of these notes actually related to doing anything in the company QuickBooks.  It was related to the project." Id. at 139-40.  He also advised the prosecutors that they should do an audit trail, which "would show them anything that was changed, altered or removed from QuickBooks." Id. at 140.

383.   On cross-examination, Attorney Kaplan confirmed her understanding that Mr. Bengio's status during the Bengio debriefings was that of a witness.  Given her client's status, Attorney Kaplan did not have access to the materials that were seized during the search of Eden Gardens.

384.   However, because she and her client had a joint defense agreement with Norman Ginsparg and his counsel, she was able to view the Bengio notes that had been obtained by Norman Ginsparg's counsel after the Ginsparg reverse proffer.

385.   Attorney Kaplan was able to view the Bengio notes on September 28, 2016, the date of the first Bengio debriefing, one hour before the debriefing started.  Since she would be meeting with Attorney Young in one hour, Attorney Kaplan did not contact Attorney Young in advance of the meeting regarding the privilege issue raised during the debriefing.

386.   Attorney Kaplan acknowledged that she is "work friends" with Ms. Descalzo, who has referred cases to her, including the representation of Esformes' girlfriend, Astrid Swan ("Ms. Swan").  She also acknowledged that Morris Esformes paid Ms. Swan's fees, but not Mr.

Bengio's.  Her fees for representing Mr. Bengio are paid by ALF Holdings through its court appointed receiver or manager, Joe Mitchell ("Mr. Mitchell").

387.   Before the afternoon court session on November 7, 2016, Attorney Kaplan had a brief meeting with AUSA Bernstein, during which she explained the gist of the email she had sent to him during the lunch break.

388.   Attorney Kaplan was closely questioned about a proffer describing what transpired during the Bengio debriefings, which she had transmitted to Esformes' counsel via email on May 12, 2017.  See Gov't Ex. 43.  Attorney Kaplan explained that she did not draft the proffer sequentially.  "It's a summary of the entire event from the explanation of the [Bengio] notes.  So the important issue for this proffer was that the notes were privileged and explaining why they were privileged. . . . At the point where the notes were explained to be a project for Ms. Descalzo, that's when the issue was raised."  See 12/18/17 Transcript [D.E. 685 at 158].

389.   On October 14, 2016, Attorney Kaplan requested copies of the FBI Forms 302 for the Bengio debriefings.  See Gov't Ex. 123.

390.   Regarding her handling of the privilege issue during the first Bengio debriefing, Attorney Kaplan stated:  "I alerted Ms. Young to the issue so she could handle it appropriately and determine whether or not she was using privileged materials.  As an attorney, I understand when I tell the U.S. Attorney's Office that something is privileged, they generally take that seriously.  Ms. Young did not."  See 12/18/17 Transcript [D.E. 685 at 177-78].

391.   On re-direct examination, Attorney Kaplan testified that not all of the materials shown to Mr. Bengio at the Bengio debriefings were included among the documents attached to the FBI Forms 302 as "1A" materials.  Attorney Kaplan provided as an example a specific text message that was read to Mr. Bengio but is not attached to the FBI Form 302.  Attorney Kaplan

also recalled "seeing the Bengio notes at the second debriefing but they're not in the second debriefing's 1A materials." Id. at 184.  Specifically, "removed payments was brought up again." Id. at 185.

### H.      Mr. Bengio's testimony[36]

392.    Mr. Bengio is a Miami native who obtained a bachelor's degree in finance and business administration from Florida International University and a master's degree in taxation from Nova Southeastern University in 2009.

393.    He worked at Eden Gardens in 2002 as an assistant administrator.  He stayed on when Eden Gardens was acquired by the previous operator's pharmacies in 2004.  At that time, Mr. Bengio started working for Norman Ginsparg.

394.    Mr. Bengio's initial duties in 2004 were bookkeeping, keeping financial records for various assisted living facilities ("ALF's") and helping Norman Ginsparg with his duties, as assistant director of legal affairs.

395.    Mr. Bengio continuously worked for Norman Ginsparg since 2004.  At the time of his testimony, he was being paid by ALF Holdings and Adirhu Associates, LLC ("Adirhu").  His salary has been approved by the court-appointed manager, Mr. Mitchell.

396.    As part of his compensation over the years, Mr. Bengio acquired a small percentage of ownership interests in some of the entities owned by the Esformes family.

397.    He has held the titles of assistant director of legal affairs, assistant director of finance and, most recently, director of finance of ALF's.

---

[36] See 12/19/17 Transcript [D.E. 686 at 5-28, 42-140].  A portion of Mr. Bengio's testimony was sealed. See D.E. 693.  The undersigned has only referenced to the sealed portion of the testimony in general terms.

398.    According to Mr. Bengio, Norman Ginsparg has held many titles, including director of legal affairs, manager, CEO, and director of finance.  Mr. Bengio has been Norman Ginsparg's assistant in those capacities since 2004.

399.    Viewing photographs of Eden Gardens, Mr. Bengio identified the facility's office area, including his own office and an adjacent one belonging to Norman Ginsparg.  He also identified additional offices that had been vacated and were being used on the day of the Eden Gardens search by him and Norman Ginsparg for maintaining legal documents and financial records.

400.    Mr. Bengio described his duties as assistant director of legal affairs as involving, among other things: reviewing contracts; sometimes drafting contracts off templates; and making sure that parties to agreements were credentialed and properly contracted with HMO's.  He also received legal correspondence directed at the ALF's.

401.    Mr. Bengio acknowledged that, while he is not an attorney and has no legal training, he assisted Norman Ginsparg, who he knows to be an attorney, with his duties.  He also observed Norman Ginsparg functioning as an attorney for Esformes by doing legal work related to Esformes' divorce (by communicating and working with Esformes' divorce attorneys), consulting on private property acquisitions, communicating with Esformes' criminal defense counsel, and working with Esformes' personal tax attorney.

402.    Mr. Bengio identified a number of letters, emails and other documents that he signed in his capacity as assistant director of legal affairs.  See Def's Ex. 767.  He further testified that he had been identifying himself by that title in correspondence and to the public since 2004, so he would not be surprised to be described as such in court pleadings.

403.    Mr. Bengio recalled being shown during his first debriefing two letters signed by

him using the title assistant director of legal affairs, which letters he had drafted.

404.    With regard to the Delgado Brothers, Mr. Bengio admitted knowing who they were prior to the July 22, 2016 search of Eden Gardens.  He had met with Gabriel several times since 2004; and with Willie only once in 2015 or 2016, after he was indicted by the government. Mr. Bengio eventually learned that the Delgado Brothers had pled guilty in their criminal case, which Mr. Bengio understood to be some sort of Medicare fraud scheme involving ALF's they controlled.

405.    In October 2015, Norman Ginsparg approached Mr. Bengio to "go back in time and understand what occurred during the relationship of [] La Covadonga [and Family Rest] and the Esformes entities."  See 12/19/17 Transcript [D.E. 686 at 28].  According to Mr. Bengio, that relationship had ended in 2010.[37]

406.    Specifically, Norman Ginsparg asked Mr. Bengio to compare what the agreements with La Covadonga and Family Rest provided with what actually occurred.  Pursuant to this request, Mr. Bengio went into QuickBooks, identified where all the payments were, and exported the reports he generated in QuickBooks into an Excel spreadsheet.

407.    Soon after he met with Norman Ginsparg, Mr. Bengio learned that the purpose of the assignment was to be able to present the results directly to Ms. Descalzo.  To explain this knowledge, Mr. Bengio reviewed a series of emails, including some direct communications between Mr. Bengio and Ms. Descalzo that have been filed under seal for the government's "taint" attorney's eyes only (Def's Sealed Ex. 768).

408.    Mr. Bengio also reviewed a number of documents, including Excel spreadsheets

---

[37]  At this point in the proceedings, the Esformes prosecution team departed the courtroom, which was then sealed, and the government was represented only by the "taint" prosecutors, U.S. Department of Justice Attorneys Ashlee McFarlane and Catherine Wagner.  The undersigned's summary of the sealed portion of Mr. Bengio's testimony has been carefully crafted to avoid disclosing information not already known by the prosecution team, while preserving the substance of Mr. Bengio's testimony.

he worked on in connection with the assignment, which were attached to the emails he had previously reviewed, and which have been filed under seal for the government's "taint" attorney's eyes only (Def's Sealed Exs. 838, 839).

409.    Mr. Bengio compared some of those spreadsheets with ones he was shown during his debriefings and explained that the latter were printouts of his work.  At his debriefing, after he had identified Norman Ginsparg's handwriting on the printouts shown to him, Mr. Bengio was asked questions about them, which he answered.

410.    Mr. Bengio also explained that he had inserted comments on the Excel spreadsheets he developed, which appeared as "bubbles" only when viewed on the computer screen, and disappeared when printed out.  However, using the "print screen" function, the "bubbles" could be made to appear in the printed version.

411.    Mr. Bengio identified and matched up the spreadsheets he was shown at the evidentiary hearing and those he had been shown during his debriefings.

412.    Mr. Bengio also explained that, while Excel allowed him to modify anything on the spreadsheets, QuickBooks did not.  This explained the appearance of different labels in corresponding QuickBooks reports and Excel spreadsheets.

413.    In early January, 2016, Mr. Bengio forwarded to Ms. Descalzo the final summaries for the work he had done with respect to Family Rest and La Covadonga, after having presented them to her in person.  The emails and attachments have been filed under seal for the government's "taint" attorney's eyes only (Def's Sealed Exs. 410, 411).  The final spreadsheets transmitted by Mr. Bengio include a dedicated column for comments in place of the bubbles in the earlier versions, so that the comments would appear in the printed versions of the spreadsheets.

414.    On cross-examination by the government's "taint" attorney, Mr. Bengio explained that his duties as assistant director of legal affairs for the Esformes entities included interacting with city officials, interacting with the Agency for Health Care Administration ("AHCA"), reviewing agreements, including forbearance agreements and operating agreements, and sometimes helping Norman Ginsparg draft them.

415.    His duties as bookkeeper involved keeping the books for the ALF's, which included the use of QuickBooks.

416.    Mr. Bengio acknowledged that, during his initial meeting with Norman Ginsparg in early October 2015, when he was asked to look back at the books, Norman Ginsparg did not mention Ms. Descalzo.

417.    Mr. Bengio also acknowledged that it was Norman Ginsparg who gave him the title assistant director of legal affairs; and he explained that his understanding of Norman Ginsparg's functions as director of legal affairs was that all things legally related to the Esformes entities would pass through Norman Ginsparg. Thus, all contracts presented by vendors and all operating agreements involving the Esformes entities passed through Norman Ginsparg's and Mr. Bengio's office.

418.    Mr. Bengio also explained that he did not take any notes during the initial meeting with Norman Ginsparg in which he was given the assignment to look back at the books. However, there was a subsequent meeting in November 2015 at which he took notes, and these were the Bengio notes shown to him at his September 28, 2016 debriefing.

419.    Mr. Bengio also acknowledged that, in carrying out the project assigned to him by Norman Ginsparg, he made changes to QuickBooks on his own that were limited to correcting categories (such as consolidating "other income" with "income other"), but he did not change

any amounts.

420.    Mr. Bengio explained that, at the November 2015 meeting, Norman Ginsparg was giving him feedback on an early version of his draft of the project, which he had learned at some point in time he would be presenting to Ms. Descalzo in its final form; and that he was taking notes for himself to follow up on the project, which are the Bengio notes.

421.    Mr. Bengio confirmed that the charts he was shown at his debriefing were Excel spreadsheet, not QuickBooks printouts.  He also explained that changes he made pursuant to Norman Ginsparg's directive, to reflect actual moneys paid, were made to his Excel spreadsheets, not to QuickBooks.  He also explained that some, but not all, of the "bubble" comments on the Excel spreadsheets appeared in the final version he presented to Ms. Descalzo.

422.    Mr. Bengio recounted that at his debriefing, rather than being told by the prosecutors that they did not want to hear about the project, he was merely told that they did not want to know what he had said directly to Ms. Descalzo.

423.    On re-direct examination following the "taint" prosecutor's cross-examination, Mr. Bengio identified a document consisting of a printout of AHCA regulations, which he had obtained while researching those regulations pursuant to Norman Ginsparg's directive.

424.    Mr. Bengio also testified that he considered the assignment that Norman Ginsparg gave him to do in October 2015 involving La Covadonga and Family Rest to be a legal project rather than a bookkeeping function.

425.    After being shown an email dated October 21, 2015 reflecting a direct interaction between him and Ms. Descalzo, Mr. Bengio testified that sometime between October 1 and October 21, 2015 he knew that Ms. Descalzo was involved in the project he was working on.

426.    Mr. Bengio again clarified that any changes he made to QuickBooks merely

corrected mis-categorization of payments to ensure consistency, but that he did not delete, remove or otherwise change any amounts.

427.    Mr. Bengio also stated that there was no bookkeeping purpose for the Bengio notes since they were only taken as part of the project he was working on for Norman Ginsparg and Ms. Descalzo.

428.    With regard to the drafts of his work in progress, Mr. Bengio explained that those were kept electronically and that it was the printed copies that were seized during the search of Eden Gardens.[38]

429.    During his continued direct examination in the presence of the Esformes prosecution team, Mr. Bengio testified that at his first debriefing, which lasted two to three hours, he was questioned by Attorney Young.

430.    When asked to describe his work for the Esformes entities, he mentioned that he was the assistant to Norman Ginsparg, the director of legal affairs.

431.    When shown the first page of the Bengio notes, he said that "this was a meeting between Norman Ginsparg and [himself] regarding a project [he] was working on for Marissel Descalzo." See 12/19/17 Transcript [D.E. 686 at 45].  He also said that Attorney Kaplan stated at that point that the notes could be potentially privileged materials.  His understanding regarding Attorney Kaplan's privilege statement was that it referred to everything about the project and was not confined to a particular line in the Bengio notes.

432.    At his debriefing, Mr. Bengio explained to the prosecution team that the Bengio notes reflected Norman Ginsparg's feedback on the project they were discussing at their November 2015 meeting.  After giving this explanation, Mr. Bengio was asked to go through the Bengio notes one by one and explain them to the government.  Following is Mr. Bengio's

---

[38]  At this stage of the proceedings, the prosecution team returned to the courtroom.

recounting of his responses to the government at his debriefing.

433.    Mr. Bengio provided the following explanations to the government with respect to the first page of the Bengio notes, while remarking that this was for Norman Ginsparg and Ms. Descalzo:

- With regard to the notation "count payments for each agreement," he explained that he was to count the number of payments in the agreements between the Delgado Brothers and the Esformes entities and compare them to what actually happened.

- With regard to the notation "put comments in actual column," he explained that there were several comments in an earlier draft of the Excel spreadsheets and Norman Ginsparg wanted them in a dedicated column.

- With regard to the notation "La Cov, change in rent in document?" he explained that Norman Ginsparg wanted to know if a change in the rent amount between versions of the Excel spreadsheets was documented in any of the agreements between the Delgado Brothers and the Esformes entities.

- With regard to the notations "balance on the books" and "balance sheet," he explained that Norman Ginsparg wanted to know if a receivable had been recorded to reflect that the Delgado Brothers did not pay the full balance shown on the agreements.

- With regard to the notation "management fee, count payments and end date," he explained that this involved counting the payments in a separate agreement and determining when did the agreement actually end.

- With regard to the next item, he explained that the Delgado Brothers could not have their own license and Norman Ginsparg was asking if they were able to bill their own Medicaid.

- With regard to the notations "post agreement," "what does the agreement say," and "how many payments versus the agreement," he explained that this involved looking at the La Covadonga agreement and comparing what it said versus what actually occurred.

434.    Mr. Bengio provided the following explanations to the government with respect to the second page of the Bengio notes:

- With regard to the notation "check Morsey for Gaby payments missing rents," he explained that Norman Ginsparg was suggesting other places to look for

some missing rent payments that might have been deposited in another entity.

- With regard to the notation "remove payments to ALF Holdings and to PE," he could not explain it at the time or why he wrote down that notation but tried his best to convey that "any changes or modifications being referenced on [the Bengio] notes would have been done on the [Excel] spreadsheet and not on QuickBook[s]." Id. at 54. And when Attorney Young directly asked him if he had "removed payments from QuickBooks," he responded "no." Id. at 55. To convey confidence in his response, he suggested to Attorney Young that "she could run an audit trail and it would show that nothing was removed from QuickBooks." Id.[39]

- With regard to the notation "How long did we operate [Family Rest] after it was given back to us," he explained that Norman Ginsparg was simply asking him that question.

- With regard to the notations "management fee of [Family Rest] like La Cov," and "maybe it went to ALF Holdings," he explained that Norman Ginsparg was asking him to compare payments to Family Rest and La Covadonga and see how they matched; and to look in other places for missing deposits.

- With regard to the notation "Dovar Tove," he could not explain why he put it there.

- With regard to the notation "When did we start operating it after Gaby ended," he explained that Norman Ginsparg wanted a specific date when the Esformeses took back operation of Family Rest.

- With regard to the notation "look for e-mails," he explained that Norman Ginsparg directed him to look for narratives in emails that might help jog his memory as to what happened during the time of the La Covadonga and Family Rest arrangements with the Delgado Brothers.

435.    Mr. Bengio provided the following explanations to the government with respect to the third page of the Bengio notes, which related to La Covadonga:

- With regard to the notation "look at ALF Holdings for management fee," he

---

[39]    Mr. Bengio testified at the evidentiary hearing that after his debriefing, he figured out what the notation "remove payments to ALF Holdings and to PE" meant. Mr. Bengio had included in his spreadsheets two payments from Morphil Corporation, which was an Esformes entity: one to ALF Holdings and one to Esformes. Because the project only involved payments from Delgado entities to Esformes entities, those payments did not fit within its parameters. The payments had appeared in an earlier version of the spreadsheets and, upon Norman Ginsparg's instruction, Mr. Bengio took them out.

explained that Norman Ginsparg was suggesting to him that some missing deposits might be in a different entity.

- With regard to the notation "Look at La Covadonga Investors," he explained that this was a similar suggestion for looking for missing deposits.

- With regard to the notation "pull tax return and balance sheet and look for monies owned from Gaby after sale, post sale agreement," he explained that Norman Ginsparg was asking him to see if there were accruals or receivables that recognized the money that wasn't paid under the agreement; and that there was a post sale agreement that he was referring to for both La Covadonga and Family Rest.

436.    Mr. Bengio provided the following explanations to the government with respect to the fourth page of the Bengio notes, which related to La Covadonga:

- With regard to the notation "are licensed at both," he explained that there was an issue with the Delgado Brothers not being able to bill Medicaid and having to bill under the Esformes entity license, so Norman Ginsparg was asking him if that was the case for both La Covadonga and Family Rest.

- With regard to the notations related to Morphil and "rent, the agreement versus the actual," "rent increase of 1K, why," and "what do the books reflect? are we owed?" he explained that Norman Ginsparg was asking him to compare what the agreement said versus what actually happened, the reason for and any documentation related to the rent increase, and whether any accrual or receivable had been created to show money owed by the Delgado Brothers to the Esformes entities.

- With regard to the notation "management fee and call an agreement versus actual," he explained that there were multiple agreements in the relationship.

- With regard to the notation "post closing," he could not remember what his explanation was.

437.    After going over the Bengio notes at his debriefing, Mr. Bengio was shown the spreadsheets, which he was happy to see because that's what the notes were talking about, which he expressed to the prosecutors.  He was first asked whose writing was on the spreadsheets, to which he responded Norman Ginsparg's.  Then he went on to explain what the notations on the

spreadsheets meant.[40]

438.    During his first debriefing, Mr. Bengio explained to the prosecutors that he had created the spreadsheets by going into QuickBooks and exporting reports to Excel and then working off the exports.  However, he is not sure that the prosecutors appeared to understand the difference between QuickBooks and Excel.

439.    During his second debriefing, Mr. Bengio received an immunity letter.  He was asked again about the notation "remove payments," but he still could not remember. Nevertheless he could tell them "with absolute certainty" that it was "in reference to a spreadsheet and anything removed would have been on the spreadsheet, and not QuickBooks." Id. at 79.

440.    Mr. Bengio was asked to compare documents and asked why certain payments from the Delgado Brothers' bank records were not showing on his spreadsheets, but he could not provide an explanation at the time.

441.    Mr. Bengio was also shown handwritten notes, with which he was not familiar, and could only identify the handwriting as being Norman Ginsparg's.

442.    Mr. Bengio was also asked at his second debriefing about a text message between Esformes and Norman Ginsparg that was read to him by Attorney Young.  He explained that it had to do with Norman Ginsparg wanting Esformes to stop his practice of giving away cars and suddenly finding paperwork that he had just given one to an individual by the name of Martin Fox.  Mr. Bengio also saw a deposit slip to this bank account at his second debriefing.

443.    Neither the Bengio notes, nor the text message, nor the deposit slip are included among the "1A" materials attached to the FBI Form 302 for the second Bengio debriefing.

---

[40]    At the evidentiary hearing, Mr. Bengio reviewed each of the spreadsheets and recounted the explanations he had given to the prosecutors as to Norman Ginsparg's notations on them, although he did not recall providing an explanation as to some of the notations.

444.    On cross-examination by the prosecution team, Mr. Bengio testified that he had met with Esformes' counsel between five and ten times in anticipation of his testimony at the evidentiary hearing.

445.    He reaffirmed that his degrees were in finance, international business and taxation and that he had no legal training.

446.    He also recounted that, initially, he was the assistant administrator at Eden Gardens, helping the administrator operate the building, do marketing, and dealing with the residents and their families.

447.    He also recounted that, in 2004, he was hired by Esformes to keep the financial records of the Esformes entities, which involved preparing monthly reports showing the financial performance of all the ALF's put together, and monitoring cash flow issues to cover salaries. He also supported the operators of the ALF's with maintenance issues or anything to do with a vendor.

448.    Mr. Bengio acknowledged that, in describing his responsibilities during his first debriefing on September 28, 2016, he did not include any legal functions; and that Attorney Kaplan did not add to his background the functions of legal assistant or legal advisor.

449.    Mr. Bengio also acknowledged that, at the time of his first debriefing, he was asked about being the registered agent for close to 90 different companies; and he stated that it was Norman Ginsparg who made the decision to make him a registered agent.

450.    Mr. Bengio was also asked about his positions as officer or manager of various companies, some of which are companies he created for himself and his wife, and some of which are Esformes entities. With regard to the latter, his understanding was that he was assistant director of legal affairs for all of the Esformes entities, given Norman Ginsparg's affiliation as

director of legal affairs and his own position as assistant to Norman Ginsparg.

451.   When asked if he was legal assistant to Norman Ginsparg, as described in one of Defendant's motions, Mr. Bengio stated that he thought so, even though he knew that Norman Ginsparg is not licensed to practice in Florida.   Mr. Bengio also acknowledged that his supervisor was Norman Ginsparg, not Ms. Descalzo.

452.   Mr. Bengio also reaffirmed his belief that Norman Ginsparg was giving legal advice in Florida by working directly with Esformes' divorce lawyers and other lawyers.   But Norman Ginsparg instructed Mr. Bengio not to use Esq. in letters drafted for his signature; and he made it clear to anyone who might inquire that he was not licensed in Florida.

453.   Mr. Bengio acknowledged that he has never been paid by Norman Ginsparg or any of his companies.

454.   Regarding his first debriefing, Mr. Bengio stated that, when he was shown the Bengio notes, he "explained the meeting [during which he wrote the notes] was between [him] and Norman Ginsparg and it was for a project [he] was working on for [Ms. Descalzo]." Id. at 117.  He also confirmed that, at the time he created the Bengio notes he knew about a project with Ms. Descalzo.

455.   In response to a purported discrepancy between this testimony and Attorney Kaplan's proffer, Mr. Bengio stated:

> I'm sorry.  Can I clarify?  There's a confusion as to the handwritten notes [that] were from November 27th.   That's a secondary meeting.   The project didn't start until early October.   So there is a confusion between the meeting I had in early October when I was asked to do the project, and then the notes which were written as a followup and feedback to some earlier versions I had given.   So hopefully that clarifies it for you.

Id. at 121-22.

456.   Mr. Bengio did not recall Attorney Young telling him she didn't want to know

about the project or the document referred to in the notation "put comments in actual column." He also did not recall stating, with respect to payments related to the Delgado Brothers, that that would look bad. He added, "I think what was asked was can you understand why this looks bad?" Id. at 126. And in response to the question, "So you never said that it would look bad?" he answered, "No. They asked me can you understand why this looks bad. That's what was asked of me;" and he "made it very clear that this [was] referencing an Excel spreadsheet." Id.

457.   Mr. Bengio acknowledged that he was never instructed by Norman Ginsparg or Ms. Descalzo to mark the documents he was working on as "attorney client."

458.   Mr. Bengio testified that he saw the Bengio notes approximately one hour before his first debriefing and had not seen them before that. He also testified that he had not told Ms. Descalzo or anyone on the Esformes defense team about the Bengio notes until they approached him.

459.   Mr. Bengio acknowledged that, after the first debriefing, he considered what changes he might need to make regarding his employment future but decided to remain at his job because he "thought it was the right thing to do." Id. at 129.

460.   Mr. Bengio acknowledged that, at his second debriefing, he told Attorney Young that he didn't understand why Gabriel Delgado was submitting invoices for improvements to the buildings in connection with HUD loans, and that he thought it was weird. He also acknowledged explaining at the time that any reimbursement request in excess of $50,000 would have to go through a bidding process.

461.   On re-direct examination, Mr. Bengio explained that the reason for removing payments from the Excel spreadsheet between Esformes entities was that Ms. Descalzo was only interested in Delgado payments to Esformes.

462.     Mr. Bengio also confirmed that he did not stop the first Bengio debriefing because it was in his interest to explain that the Bengio notes were for a project for Norman Ginsparg and Ms. Descalzo and not some effort to obstruct justice.

## V.     JDA with the Delgado Brothers

### A.     Attorney Hunter's testimony[41]

463.     On June 5, 2015, in the late morning or early afternoon, Attorney Hunter was assigned to conduct a separate investigation into allegations of witness tampering and obstruction of justice by Esformes.   See Attorney Hunter's pre-hearing declaration (hereafter, "Hunter Decl."), Def's Ex. 459B ¶ 2.   Attorney Hunter and the FBI agents assigned to work with him on this separate investigation comprised a "filter" or "taint" team.   Id. ¶ 5.

464.     According to Attorney Hunter, "there was a potential for privilege issues to surface, as a result of [a] purported joint defense agreement."   See 11/30/17 Transcript [D.E. 645 at 187].   Therefore, Attorney Hunter "was engaged to be the taint or filter attorney to handle the investigation of those allegations and to deal with any privilege issues that may have arisen." Id.[42]

465.     For purposes of the investigation, Attorney Hunter received information on June 5, 2015 from Attorney Medina and Joaquin Mendez, Esq. ("Mr. Mendez"), who was one of the Delgado Brothers' defense counsel.   The information that Attorney Hunter received on June 5, 2015 from these sources was that Esformes "had sought to get Guillermo Delgado to flee the United States to a jurisdiction that had no extradition treaty with the United States, sign false affidavits that his lawyers were preparing. And all of that was to commence in the context of a

---

[41]   See 11/30/17 Transcript [D.E. 645 at 155-245].
[42]   Attorney Hunter first saw the JDA between Esformes and the Delgado Brothers sometime between June 8 and June 10, 2015.

kickback scheme of payments [] which were going to be paid that night, Friday, June 5th." Id. at 178. Specifically, "Gabriel Delgado was going to be making a payment to Philip Esformes." Id. at 180.

466.    By the time Attorney Hunter was engaged to undertake the separate investigation, the Delgado Brothers had entered into a plea bargain with the government whereby they had agreed to cooperate.

467.    As part of the separate investigation supervised by Attorney Hunter, the Delgado Brothers were directed to tape a series of conversations with Esformes starting at 6:12 p.m. on June 5, 2015. Nothing was submitted to a court prior to that time about a crime fraud exception that would vitiate the attorney client privilege.

468.    On the evening of June 5th, Gabriel Delgado went to see Esformes at his house and they met in the closet of Esformes' bedroom, where the taping took place. At that time, Gabriel Delgado "made a $5,000 cash kickback payment to Philip Esformes." Id. at 192.

469.    In his pre-hearing declaration, Attorney Hunter had stated that Esformes was trying to convince Willie Delgado to flee, and was going to finance the flight, including paying for plastic surgery. Id. at 196; see also Hunter Decl., Def's Ex. 459B ¶ 4. In the June 5th tape, Gabriel Delgado tells Esformes that Guillermo Delgado wants $300,000, adding, "He has his plan, man, you know," to which Esformes responded, "I don't even want to know the plan." See 11/30/17 Transcript [D.E. 645 at 194-95]; see also Def's Ex. 301-2.

470.    Attorney Hunter testified that he instructed the FBI agents that he was supervising in the separate investigation not to record attorneys and it was his understanding that, in turn, the agents instructed the Delgado Brothers not to record attorneys.

471.    The Delgado Brothers recorded Norman Ginsparg on two occasions, when they

went to obtain checks from him.

472.   During a June 8th recording, Esformes' defense counsel, Ms. Descalzo and Mr. Pasano, were captured on the taping after Esformes put them on the phone while he was otherwise talking to Gabriel Delgado. The attorneys' side of the conversation was not recorded due to a glitch with the equipment. The agents assigned to the investigation created an FBI Form 302 to document what the attorneys had said. Attorney Hunter decided not to submit the FBI Form 302 for review by a court under the crime-fraud exception to the attorney client privilege because he "concluded that, on its face, it was evidence of criminal activity where Philip Esformes was trying to procure false affidavits." Id. at 216.

473.   On June 8, 2015, Attorney Hunter sent an email to Mr. Mendez stating his understanding that none of the Delgado Brothers' defense counsel "are party to or in any way bound by any joint defense agreement with Philip Esformes and/or Mr. Esformes' counsel," and asking if this understanding was correct or needed clarification. Id. at 224.

474.   Attorney Hunter explained that the reason for this inquiry was that he was "trying to get to the bottom of exactly what people's perception of [the JDA] was." Id. at 225.

475.   When asked what evidence he had presented to the court for review, as stated in his pre-hearing declaration, Attorney Hunter acknowledged that he only submitted the tapes of conversations in which lawyers had been recorded and did not submit a copy of the JDA nor a copy of the FBI Form 302 of Attorney Moskowitz stating that there was a handshake agreement for the JDA.

476.   On cross-examination, Attorney Hunter testified that he had acted under exigent circumstances based on Esformes' alleged conduct of tampering with witnesses and offering people money, and the potential that the Delgado Brothers might flee the jurisdiction even

though they were cooperating with the government.

**B.** **Attorney Moskowitz's testimony**[43]

477.    Attorney Moskowitz has been practicing law since 1977.  In May 2014, Attorney Moskowitz and his partner Jane Moskowitz (together, "the Moskowitzes") were representing the Delgado Brothers.

478.    On May 12, 2014, Attorney Moskowitz received a copy of the criminal complaint against the Delgado Brothers, which was the result of the investigation in which the Moskowitzes had already been involved representing them.[44]

479.    Attorney Moskowitz testified that he would not be surprised if in 2010 the Delgado Brothers, represented by Jane Moskowitz, and Esformes, represented by Mr. Pasano, had entered into a joint defense agreement in connection with a civil state Medicaid investigation.  However, such a joint defense agreement would be separate from the JDA that is relevant to this case.

480.    The 2014 federal criminal complaint against the Delgado Brothers involved their connection with ALF's, specifically, La Covadonga and Family Rest, which were owned by Esformes.  For this reason, the Moskowitzes were interested in working with Esformes in preparing the defense of the Delgado Brothers.

481.    During his direct examination under seal, Attorney Moskowitz reviewed a number of emails between the Moskowitzes and Esformes' defense counsel related to the

---

[43] See Transcript of December 20, 2017 Evidentiary Hearing (hereafter, "12/20/17 Transcript") [D.E. 687 at 7-58].  A portion of Attorney Moskowitz's testimony was sealed.  See D.E. 694.  The undersigned has only referenced to the sealed portion of the testimony in general terms.

[44] At this point in the proceedings, the Esformes prosecution team departed the courtroom, which was then sealed, and the government was represented only by the "taint" prosecutors, U.S. Department of Justice Attorneys Ashlee McFarlane and Catherine Wagner.  The undersigned's summary of the sealed portion of Attorney Moskowitz's testimony has been carefully crafted to avoid disclosing information not already known by the prosecution team, while preserving the substance of Attorney Moskowitz's testimony.

Delgado Brothers' prosecution, which were proffered for the purpose of establishing the existence of the JDA between Esformes and the Delgado Brothers (Def's Sealed Exhibits 5-37, 40-46, 49).

482.    According to Attorney Moskowitz, the interactions reflected in these emails exchanged in 2014 were pursuant to what eventually became a formal joint defense agreement that was made retroactive to the earlier informal arrangement.

483.    In December 2014, Attorney Moskowitz proposed formalizing the parties' joint defense agreement by putting it in writing, based on his understanding of Eleventh Circuit case law.  To this end, Attorney Moskowitz forwarded to Mr. Pasano and Ms. Descalzo a draft JDA based on one he had used in another case in which he and Mr. Pasano had participated.  Mr. Pasano wanted to insure that the JDA included the prior un-memorialized collaborative conduct, which Attorney Moskowitz assured him it did.  Attorney Moskowitz also confirmed that the parties had been operating to date pursuant to an oral joint defense agreement.

484.    Mr. Pasano executed the JDA proposed by Attorney Moskowitz, who considered it binding at that point on both counsel and their clients.  Moreover, even though Attorney Moskowitz did not sign the JDA, this made no difference as to its enforceability as far as the Moskowitzes were concerned.

485.    Thereafter, and into 2015, the parties to the JDA continued to act pursuant to it, including exchanging an email labeled "joint defense communication" and sharing FBI Forms 302 produced by the government.

486.    Eventually, the Delgado Brothers decided to cooperate with the government and retained Mr. Mendez at the end of April 2015 to assist them in that endeavor.  Notwithstanding this development, Attorney Moskowitz set up a joint defense meeting with Mr. Pasano and Ms.

Descalzo in late April, 2015.  At the end of that meeting, the potential for the Delgado Brothers executing exculpating affidavits for Esformes was raised by Esformes' counsel.

487.   Afterwards, Mr. Mendez reached out to the government.[45]

488.   In the meantime, the Moskowitzes continued with trial preparations for their clients.  After May 4, 2015, the Moskowitzes had no further communications with Esformes' defense counsel and, in Attorney Moskowitz's view, the parties became effectively adverse to each other.

489.   However, Attorney Moskowitz did not provide a notice of withdrawal from the JDA to Esformes' defense counsel.

490.   The Moskowitzes' motivation for having the Delgado Brothers tape Esformes was for their protection, to show that it was Esformes who had initiated the plan for them to sign affidavits exculpating him and also for Willie to flee.

491.   The Delgado Brothers ultimately entered into a full cooperation agreement with the government and agreed to plead guilty.  The plea agreement was executed on June 5, 2015 and the change of plea hearing was held at the end of September 2015.

492.   In the meantime, the Delgado Brothers' motion to dismiss their indictment remained pending.[46]

493.   On cross-examination, Attorney Moskowitz clarified that, in late April 2015, the Delgado Brothers engaged Mr. Mendez "to have discussions with the government relating to the cooperation that [the Delgado Brothers' counsel] wanted in terms of recording Esformes concerning the meetings he was then having with the Delgados."  See 12/20/17 Transcript [D.E.

---

[45]  This resulted in the investigation supervised by Attorney Hunter as described in his testimony, *supra*, and Agent Duncan's testimony, *infra*.

[46]  At the end of Attorney Moskowitz's direct examination, the courtroom was unsealed.

687 at 22]. In response to these overtures, the government demanded that the Delgado Brothers enter into "a global agreement, meaning plea and cooperation agreement." Id.

494.    Attorney Moskowitz denied having filed the motion to dismiss the Delgado Brothers indictment as a ruse. He explained that there were agreements on extension of time for the response pending the outcome of the plea agreements. "So at some point if things broke down, then we would expect [the government] to file a response." Id. at 24.

495.    On June 5, 2015, when the Delgado Brothers signed their plea agreements, the JDA was still formally in place and the Moskowitzes had not given notice to withdraw. According to Attorney Moskowitz:

> But, in fact, we were not operating under it. In other words, there was no -
> - where there had previously been a lot of cooperation, exchange of
> information for that last month, once we -- once M[r]. Esformes had
> proposed the criminal activity, we were really not communicating with
> them. The only activity which was within I suppose joint defense was I
> think on June the 3rd, Marissel Descalzo came over and reviewed the 302s
> we had received in discovery. But we had no communication with her at
> all.

Id. at 26-27.

496.    The alleged criminal activity, about which the Moskowitzes learned in the last week of April 2015, was that:

> [I]n early April, Esformes had proposed to the Delgados that A) they plead
> guilty, that he had kind of wired through Mike Pasano with the department
> in Washington, and to represent that Willie would have to take a plea and
> have to do time, but he could perhaps get probation for Gaby. And we
> told them, you know -- but he needed to have affidavits from them
> exculpating him. That was kind of the package.
> ***
> I guess Gaby would plead, but [Willie] needed to flee, and he, Esformes,
> would -- you know, if he fled, he would take care of Willie's family
> financially. So that was clearly, as we saw it, illegal conduct.

Id. at 27.

497.   The Moskowitzes and Mr. Mendez passed on this information to the government and offered the Delgado Brothers' cooperation at the beginning of May and again around June 4-5, 2015, seeking to record conversations between Esformes and the Delgado Brothers.  Attorney Moskowitz later learned that Attorney Hunter would be handling the recording and working with FBI agents reporting to him and not to the Esformes prosecution team.

498.   Attorney Moskowitz discussed the JDA with Mr. Mendez and, in the latter's view, there was not a valid joint defense agreement.  Nevertheless, the Moskowitzes did not share with the government what they regarded as joint defense privileged communications.

499.   In response to an inquiry from Attorney Hunter regarding the JDA, Attorney Moskowitz wrote an email to him stating that the Delgado Brothers, Esformes and their respective counsel were part of a JDA which had not been fully executed, but under which the parties had been operating.  However, Attorney Moskowitz expressed the view that: Esformes' conversations with the Delgado Brothers to commit a new crime were not within the scope of the JDA; the agreement had been materially breached by Esformes and his counsel; and the Moskowitzes did not consider themselves bound by the withdrawal notice provisions of the JDA. See Gov't Ex. 185.

500.   Attorney Moskowitz also testified that, in terms of the course of dealing under the JDA, counsel had not communicated directly with each other's clients or asked permission to do so.

501.   On June 8, 2015, Mr. Pasano transmitted to the Moskowitzes affidavits memorializing Esformes' good faith and lack of criminal intent, which he was asking the Delgado Brothers to execute if they were accurate, or to revise them.   The Moskowitzes

responded, "[W]e don't agree or consent to our clients signing declarations." See 12/20/17 Transcript [D.E. 687 at 37].

502.    Attorney Moskowitz learned from the Delgado Brothers that Mr. Pasano had spoken to them, telling them the Moskowitzes were being overly conservative and they should feel free to sign the affidavits; and that he could obtain substitute counsel for them.

503.    On re-direct examination, Attorney Moskowitz again stated that the communications that Esformes was having with the Delgado Brothers "were not within the scope of the joint defense agreement, they were not legitimate joint defense agreement, they're simply criminal." Id. at 56.

### C.    Agent Duncan's testimony[47]

504.    On June 5, 2015, Agent Duncan was summoned to participate in an undercover operation. Prior to that time, Agent Duncan had very limited knowledge of the Delgado Brothers or the Esformes case.

505.    Agent Duncan's instructions were that she would be the "taint" agent working on an obstruction of justice case and would be liaising with Attorney Hunter.

506.    Agent Duncan was the co-author of an FBI Form 302 documenting telephone calls between Gabriel Delgado and Esformes. See Def's Ex. 847. The words in the FBI Form 302 are from Agent Duncan and her co-author, both of whom who were present with Gabriel Delgado during the calls. According to Agent Duncan, Esformes could often be heard on the calls because he tended to yell a lot. Nevertheless, the FBI Form 302 "is a report of only Gabriel Delgado's recollection of the phone calls that are documented in [the] report." See 12/20/17 Transcript [D.E. 687 at 64].

---

[47] See 12/20/17 Transcript [D.E. 687 at 59-124].

507.    Agent Duncan could not recall whether Attorney Hunter instructed her not to record attorneys.  However, Agent Duncan noted that, during the course of the recordings, Esformes would routinely call other people and she had no control over what he did.  Because she was the "taint" agent, it was her duty to filter out privileged information.

508.    A separate case file was established for the obstruction of justice investigation.  Also, the Esformes prosecution team knew that Agent Duncan was the "taint" agent and knew not to ask her or talk to her about the investigation.

509.    Agent Duncan was unsure how the prosecution team obtained the FBI Form 302 reporting the calls with Esformes, but the process for the "taint" team was that, after the Court ruled on what could be provided to the prosecution team, she released the redacted recordings from the phone calls.

510.    Agent Duncan testified regarding the FBI Form 302 that she drafted and uploaded to the FBI databased on May 6, 2016, see Def's Ex. 861, as follows.  She explained that Attorney Hunter had instructed her not to debrief or write reports based on statements by the Delgado Brothers.  However, she had to interview Gabriel Delgado on June 5, 2015 because there was a malfunction in the recording device, and she took notes during the interview.

511.    Agent Duncan kept the notes of the interview in a locked drawer in her desk since she felt that she was obliged, as a federal law enforcement officer, to preserve them.  After a year or so, she decided it would be better to have her notes preserved in the case file.

512.    Agent Duncan also testified about her role as relief supervisor and the functions that such a role involves.  According to Agent Duncan, the role involves certain administrative

functions relating to documents submitted for approval, which she generally checks for grammatical errors.[48]

513.    In her relief supervisor role, Agent Duncan also reports arrests and sentencings to FBI headquarters.  According to Agent Duncan, the role is "not a rubber stamp."  See 12/20/17 Transcript [D.E. 687 at 93].

514.    Agent Duncan acted as relief supervisor and signed off on documents related to the Esformes case 21 times.  See Def's Ex. 862.  The documents approved by Agent Duncan include: the collection of items from Esformes at the time of his arrest; attempts to interview Mr. Bengio; a report by Agent Ostroman regarding a collection of press articles about Esformes' arrest; the collection of items seized from Eden Gardens; the FBI Form 302 for the Eden Gardens search; a report drafted by Agent Reilly; a request by Agent Ostroman for another agency to serve a subpoena on a potential witness against Esformes; interviews of witnesses, including Mr. Bengio; and various other items extending to November 15, 2017.

515.    On cross-examination, Agent Duncan testified that her approval of FBI Forms 302 as relief supervisor is a very administrative function that involves checking for grammatical errors, and verifying that the right case file is referenced and that the needed legal caveats are clicked off.

516.    When she served as "taint" agent in the Esformes case, she understood that she could not participate in the investigation of Esformes that was unrelated to the obstruction of justice case.   In Agent Duncan's view, her function as relief supervisor did not equate to participating in the Esformes investigation.

---

[48]  Agent Duncan has a limit of up to three grammatical errors.  "If I see three grammatical errors I'll note them."  See 12/20/17 Transcript [D.E. 687 at 93].

517.   Moreover, her participation in the obstruction of justice investigation, including her hearing the Delgado Brothers' recording of Esformes' defense counsel, did not influence her approval of the 21 documents she checked off as relief supervisor.

518.   On re-direct examination, Agent Duncan testified that "nothing that [she] heard during the course of the obstruction of justice investigation influenced [her] decision as a supervisor or [her] approval of documents." See 12/20/17 Transcript [D.E. 687 at 110-11].

519.   Agent Duncan further testified that she "remembered for a period of time what was said in each specific conversation" between Esformes and the Delgado Brothers, "but as time goes by your memory is not as concrete with certain items." Id. at 116.

520.   Agent Duncan added, "I can say with certainty [what I heard] did not affect my supervision because it's a very administrative function." Id. at 117. "[M]y knowledge of the case has no impact to any of the documents that [were] submitted for me to review because I'm not putting my input into those documents." Id. at 121.

### D.   Gabriel Delgado's testimony[49]

521.   At the outset of his testimony, Gabriel Delgado denied that his lawyer had told him that he had entered into a joint defense agreement with Esformes on his behalf, adding: "I was under the impression that we didn't have entered a joint defense." See 12/21/17 Transcript [D.E. 688 at 9].

522.   Asked when he got that impression, he replied: "Throughout the whole process.  I never signed for a joint defense.  We never got anything from Philip's side." Id. at 10.

523.   When confronted with an excerpt from a recorded conversation in which Esformes stated: "You know, if you think I did something wrong, then you -- then we can't have

---

[49] See Transcript of December 21, 2017 Evidentiary Hearing (hereafter, "12/21/17 Transcript") [D.E. 688 at 5-75].

an agreement anymore," Gabriel Delgado first said that the agreement referenced by Esformes was for Gabriel Delgado to sign a no wrongdoing affidavit, and then he said that the two had had numerous agreements over twelve to thirteen years of doing business together and that he didn't know which agreement Esformes was talking about in the recording. Id. at 10-11.

524.   Gabriel Delgado acknowledged that, in June 2015, he signed a plea agreement, which provided that he would cooperate with the government by giving a full debriefing disclosing everything he knew about Esformes.

525.   Gabriel Delgado explained that, in March 2015, he and his brother Willie had hired Mr. Mendez to provide them with a second opinion on the applicable sentencing guidelines.  He added that it was in June 2015 that Mr. Mendez was hired to help negotiate a plea agreement.  And that it was in May 2015 that he and his brother decided to cooperate.

526.   Gabriel Delgado recalled that, on at least two occasions, Mr. Pasano and Ms. Descalzo were conferenced in on a call between him and Esformes.

527.   Gabriel Delgado acknowledged that, on June 8, 2015, he was tasked, pursuant to his plea agreement, with making undercover tapes of Esformes.  During that time, the Delgado Brothers kept having communications with Esformes "like normal" and did not want him to think that they were adverse to him because '[t]hen we wouldn't have communication, we were fighting it." Id. at 32.

528.   In a specific recording, Gabriel Delgado stated to Esformes, "I don't want to go to war." Id. at 33.  After some back and forth, Gabriel explained:  "I -- the relationship I had with Philip I wouldn't go against him on things.  It was pretty much the way he wanted to do things, the way he said it was going to be done, and that was what was our relationship." Id. at 38.

When asked if he wanted to continue that relationship during the taping, he answered, "Yes, just normal conversation, everyday." Id.

529.    In a conversation that occurred on June 5, 2015, inside a closet next to Esformes' bedroom, Gabriel Delgado brought up the no wrongdoing affidavits.  Regarding a statement from Esformes that Ms. Descalzo "is going to tell me when she's bringing it to them," Gabriel Delgado testified that he did not know who "them" meant.

530.    When Gabriel Delgado asked Esformes for the no wrongdoing affidavit to show it to Willie, Esformes responded that Ms. Descalzo would not give it to Gabriel.  As Gabriel understood it, the affidavits would be signed at Ms. Descalzo's office.  However, the affidavits were faxed over for the Delgado Brothers' signature from Esformes' counsel's office to one of the nursing homes.  At that time, the Delgado Brothers signed the affidavits and gave them to Esformes.  Gabriel Delgado could not recall if he had seen the affidavits prior to their execution.

531.    In another recording, Gabriel Delgado and Esformes discussed the Delgado Brothers' motion to dismiss their indictment.  At the time of this conversation, Gabriel Delgado had already signed his plea agreement.  According to Gabriel Delgado, "I had a motion that we filed that and we were waiting for the outcome of it. . . . I didn't know what the courts would do, but I felt it was going to -- something was going to get done.  I don't know how the court[] was going to handle it, but I know we had that in there." Id. at 55-56.  In talking about the motion with Esformes, Gabriel Delgado said that they could go to the Eleventh Circuit.  He explained that he was telling Esformes that the motion to dismiss "was filed with the courts" and wanted him to think that the Delgado Brothers "were going on with business as usual." Id. at 56-57.  If Esformes knew that the Delgado Brothers were no longer defending their case, he wouldn't have talked to Gabriel Delgado.

532.     During the bedroom closet conversation, Gabriel Delgado agreed for Esformes to call Ms. Descalzo.  Gabriel Delgado acknowledged that he was not given any instructions by government agents on how or who he should record and that there were no restrictions imposed by the government on the taping.

## FINDINGS

### 1.     The "taint" protocol for the search of Eden Gardens was inadequate and ineffective.

Prior to the search of Eden Gardens, the government had information that Norman Ginsparg was a lawyer with offices in Eden Gardens.  The government has challenged the attorney client relationship between Esformes and Norman Ginsparg, an attorney licensed in Illinois but not in Florida.  However, Florida Statute § 90.502 defines the term lawyer for purposes of the attorney client privilege as "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation."  Fla. Stat. § 90.502(1)(a).  Clearly, Norman Ginsparg meets this definition.  Therefore, the government should have implemented an effective "taint" protocol in conducting the Eden Gardens search.

The "taint" protocol adopted by the government called for the use of non-case agents to conduct the search, and for those agents to segregate attorney client and/or work product privileged materials in a "taint" box.  However, based on the testimony of Agent Warren, Inspectors Cavallo and Jurado, and Agent Lugones, the undersigned finds that the instructions and information provided to the agents who conducted the Eden Gardens search were insufficient for them to properly carry out the segregation task.  Consequently, only a handful of documents were placed in the "taint" box, while numerous documents bearing law firm letterheads, and documents variously marked "privileged," "confidential," "work product," and "attorney/client" went into the 69 boxes of purportedly non-"taint" materials.  These results

clearly show that the "taint" protocol utilized by the government was both inadequate and ineffective.[50]

> **2.** ***Esformes' counsel acted with dispatch at the time of the Eden Gardens search to alert the search team and the prosecution team of Defendant's attorney client and work product privilege claims and there is no factual basis for the government's argument that those claims were waived by subsequent inaction.***

Ms. Descalzo appeared at Eden Gardens the morning of the search to assert her client's privilege claims, at which time she spoke to Agent McCormick, who was acting in the role of command and control for the Eden Gardens search team. Ms. Descalzo also sent an email to Attorney Young the morning of the search, asserting that there were privileged documents inside of Eden Gardens, which email Attorney Young forwarded to her supervisor, Attorney Medina, that afternoon. Given the government's assurances that the search was being conducted by a "filter" team, the undersigned finds that Defendant acted promptly in preserving his privilege claims and finds no factual basis for the government's argument that he waived those claims through subsequent inaction.

> **3.** ***The Esformes prosecution team improperly reviewed materials from the Eden Gardens search prior to further scrutiny by "taint" attorneys.***

Agent Warren testified that the search agents only conducted a cursory review of the documents at Eden Gardens in the course of the search. He also testified that there was no review at all of the electronic storage media that was seized, based on his understanding that these items would be processed at a later date.

Despite the cursory screening of paper documents and the non-existent screening of

---

[50] Defendant has challenged the "non-case agent" status of Agent Warren on the basis of his participation in other health care fraud cases that bear some relationship to the Esformes case, and the status of Inspectors Cavallo and Jurado based on their temporary post-search participation in the Esformes investigation. With regard to the latter, the undersigned finds that the recruitment of Inspectors Cavallo and Jurado notwithstanding their purported status as non-case agents exemplifies the lack of care with which the government implemented its "taint" protocol.

electronic documents, Attorney Young began reviewing the search materials from the 69 purported non-"taint" boxes in late July and continuing into August, 2016 when all but two of the boxes were shipped to Washington, D.C. for scanning by a vendor.  Attorney Young found the "Descalzo documents" in Box #6 and Box #12 as a result of that initial search and used them extensively in the Ginsparg reverse proffer and the Bengio debriefings, which several members of the Esformes prosecution team attended.[51]

Other members of the Esformes prosecution team also viewed Eden Gardens search materials prior to any review by "taint" attorneys.  Specifically, Agent Ostroman conducted a quick review of two or three of the boxes before they were sent out for scanning since he had received no instructions to refrain from reviewing those boxes.  He also reviewed some of the electronic media, namely, thumb drives.  And Agent Reilly independently recommended to Attorney Young that she use the Bengio notes in conducting the Ginsparg reverse proffer.

Moreover, as early as September 28, 2016 and no later than November 2, 2016, the privilege issue was brought to Attorney Young's attention.  Nevertheless, Attorney Young continued her review of the Eden Gardens search materials after they were returned from scanning on December 5, 2016 and she did not stop until December 7, 2016, when she came across an item that appeared to have attorney names on it.

Defendant's counsel, Attorney Arteaga-Gomez, has prepared a privilege log consisting of 1,244 entries showing privilege claims for approximately 800 items.  The government acknowledges that these privilege claims remain to be litigated; and that it may not rely on any

---

[51]  Box #6 was one of the two boxes that did not go to the scanning vendor.  The "Descalzo documents" that Attorney Young found in Box #12 and took out for copying were placed back in Box #6 instead of Box #12.  As a result, the scanned version of the Eden Garden materials initially provided to Defendant did not include the "Descalzo documents."  Scanning of the two boxes that had been left behind did not occur until March 2017.

items determined to be privileged.[52]

### 4. The Esformes prosecution team presented a facially inconsistent and not credible explanation for their continued use of the Bengio notes at the Bengio debriefings despite privilege warnings from Attorney Kaplan.

In their prehearing sworn submissions, members of the Esformes prosecution team presented an internally consistent narrative regarding Attorney Kaplan's privilege warnings during the first Bengio debriefing. The gist of that narrative was that Attorney Kaplan's warning extended to the entirety of the Bengio notes. At the evidentiary hearings, various members of the prosecution team attempted to change this narrative to one in which Attorney Kaplan's privilege warning was limited to one line item in the Bengio notes. The undersigned finds this "new" narrative to be facially inconsistent with the prior sworn narratives, as well as with Attorney Kaplan's and Mr. Bengio's credible hearing testimony. The undersigned assigns no credibility to the prosecution team's "new" narrative, which, in any event, makes no logical sense; and deplores the prosecution team's attempts to obfuscate the record.

The undersigned also assigns no credibility to the proposition that Attorney Young stopped asking questions about the QuickBooks/Excel spreadsheets after Mr. Bengio identified Norman Ginsparg's handwriting on them. Rather, the undersigned finds that Attorney Young wholly disregarded all privilege concerns in conducting the Bengio debriefings.

### 5. The government utilized privileged materials in conducting the Bengio debriefings.

The undersigned found Mr. Bengio's testimony to be cogent and credible and accepts it as an accurate description of the events in which he participated. Mr. Bengio received an assignment from Norman Ginsparg in October 2015 to compare the agreements relating to La Covadonga and Family Rest between the Delgado Brothers and Esformes with the actual

---

[52] See Transcript of Hearing on Motion to Dismiss and Motion to Disqualify, held on March 6, 2018 [D.E. 804 at 65].

payments made pursuant to the agreements.  Soon after receiving this assignment, Mr. Bengio learned that its purpose was to present the results to Esformes' counsel, Ms. Descalzo.  The Bengio notes were the result of a feedback meeting Mr. Bengio had with Norman Ginsparg in November 2015; and he presented the final product of his work to Ms. Descalzo in January 2016.

When he was shown the first page of the Bengio notes at his first debriefing by Attorney Young, Mr. Bengio explained that the notes were from a meeting between him and Norman Ginsparg regarding a project he was working on for Ms. Descalzo.  This disclosure put the government on notice of the potential work privilege nature of the Bengio notes.

Moreover, after Mr. Bengio identified Norman Ginsparg's handwriting on the Excel spreadsheets, Attorney Young continued to ask him questions about those spreadsheets, which he answered.[53]  And, rather than being told by the prosecutors that they did not want to hear about the project, he was merely told that they did not want to know what he had said directly to Ms. Descalzo.

Thus, the undersigned concludes that the government's exhaustive questioning of Mr. Bengio regarding all the details of the Bengio notes and the related QuickBooks/Excel spreadsheets constitutes a violation of the Esformes/Ms. Descalzo work product privilege.[54]

> **6.**     ***The Ginsparg/Esformes text messages included in the government's "Hard Drive One" containing its proposed trial exhibits are protected by the attorney client privilege.***

As discussed above, Norman Ginsparg fits the definition of lawyer for purposes of the attorney client privilege under Florida law.  Attorney Arteaga-Gomez testified that the text

---

[53]  While Agent Ostroman, Agent Mitchell and Attorney Young claimed that, when Mr. Bengio identified the handwriting of Norman Ginsparg on the Excel spreadsheets, no more questions were asked of him regarding those documents, Attorney Young recognized that, during the second Bengio debriefing, she did ask Mr. Bengio questions about spreadsheets with Norman Ginsparg's handwriting.

[54]  Because the undersigned finds a direct link between the Bengio notes and related spreadsheets and Ms. Descalzo that was disclosed to the government, the nature of Mr. Bengio's regular duties and title have no effect on the privilege determination.

messages between Esformes and Norman Ginsparg included in Hard Drive One, which contains the government's proposed trial exhibits, related to Norman Ginsparg's role as an intermediary in the communications between Esformes and his former spouse in the course of their divorce. Attorney Chames described Norman Ginsparg's role in the divorce as assisting Esformes in his communications with his former spouse and explained that she deemed those messages to be privileged legal communications because Esformes was getting advice from his lawyer, Norman Ginsparg.

Therefore, the undersigned concludes that the Ginsparg/Esformes text messages in the government's "Hard Drive One" are protected by the attorney client privilege.

7.   ***The government improperly directed the recording of Esformes by the Delgado Brothers in early June 2015.***

Based on Attorney Moskowitz's testimony, the undersigned finds that Esformes and the Delgado Brothers, and their respective counsel, participated in an informal joint defense agreement during 2014, which was formalized in writing and made retroactive and enforceable in December 2014, and under which the parties operated into the year 2015. When the Delgado Brothers decided to cooperate with the government in late April 2015, their counsel did not provide a notice of withdrawal from the JDA to Esformes' defense counsel. In Attorney Moskowitz's view, which he shared with the government, the JDA had been materially breached by Esformes and his counsel; and Esformes' conversations with the Delgado Brothers to commit new crimes were not within the scope of the JDA.[55] The Delgado Brothers engaged Mr. Mendez to conduct secret plea negotiations with the government, and offered their clandestine taping of Esformes to show that it was Esformes who had initiated what the Moskowitzes deemed to be illegal conduct so that the Delgado Brothers could be protected.  Meanwhile the Moskowitzes

---

[55] Those crimes were the proposed signing of no wrongdoing affidavits by the Delgado Brothers and the flight of Willie Delgado with Esformes' financial help.

continued with trial preparations for their clients, including a pending motion to dismiss for which the response date was extended by agreement.

On June 5, 2015, the Delgado Brothers executed sealed plea agreements.[56]  On that same day, Attorney Hunter became involved in a separate investigation into allegations of witness tampering and obstruction of justice by Esformes.  Agent Hunter understood that there was a potential for privilege issues due to the existence of a JDA among Esformes and the Delgado Brothers and their respective counsel.

Agent Hunter and his team directed the taping of Esformes by the Delgado Brothers, but nothing was submitted to a court prior to the taping about a crime fraud exception that would vitiate the attorney client privilege encompassed within the JDA.  In the course of the undercover operation, Esformes' attorneys were recorded, which the court excised on post-taping review. Mr. Pasano and Ms. Descalzo had participated in a conversation during which the taping device malfunctioned and which Agent Duncan eventually memorialized in an FBI Form 302, but that document was not submitted to the court for review.

The government, acting through the Delgado Brothers as its agent, engaged in contact with Esformes, who it knew to be represented by counsel at the time, in violation of the Citizen's Protection Act, 28 U.S.C. § 530B, which makes federal prosecutors subject to state ethics rules, and Florida's No-Contact Rule (Rule 4-4.2(a)), which prohibits lawyers from contacting represented parties.[57]  Moreover, as with the Eden Gardens search, the government's "taint" protocol came up short.  Even assuming that the government met its obligation to obtain a court

---

[56]  The change of plea hearings did not take place until September 2015.

[57]  In this regard, the government's reliance on United States v. Diaz, No. 2:17-CR-31-KS-JCG, 2018 WL 1003751 (S.D. Miss. Feb. 21, 2018) for the proposition that state ethical rules do not apply to the investigatory phase of law enforcement, is misplaced given the difference between Florida's and Mississippi's no-contact rules, as detailed in Esformes' Response to Supplemental Authority Cited by the Government During the Oral Argument of March 6, 2018 [D.E. 805]; and Esformes' Supplemental Authority on the Applicable Ethics Law [D.E. 806].

determination of the applicability of the crime-fraud exception to the attorney client privilege by seeking post-taping review, as it did, the government did not provide the reviewing court a complete record of attorney interceptions.[58]

## DISCUSSION

As previously noted, Defendant bears the burden of showing misconduct on the part of the government and prejudice to him with regard to his Motion to Dismiss and Motion to Disqualify.   And even if Defendant satisfies this burden, a less drastic remedy, such as suppression, must be considered.

The undersigned has found that the government engaged in improper conduct in connection with: the Eden Gardens search; the review of the search materials; the Bengio debriefings; the listing of the Ginsparg/Esformes text messages as trial exhibits; and the recording of Esformes by the Delgado Brothers.   Thus, the government's disregard for the attorney client and work product privileges has not been limited to a single instance or event. Additionally, the undersigned has found the government's attempt to obfuscate the evidentiary record to be deplorable.   Therefore, the undersigned concludes that Defendant has sufficiently met his burden of showing misconduct on the part of the government, albeit not to the level of extraordinary misconduct found in other cases.   Compare Shillinger v. Haworth, 70 F.3d 1132 (10th Cir. 1995) (prosecution obtained details of defense strategy from deputy sheriff who supervised jail cell meetings between defendant and his counsel, and modified own strategy accordingly); United States v. Horn, 811 F. Supp. 739 (D.N.H. 1992) (prosecutor surreptitiously obtained duplicate copies of documents selected by defense counsel from document repository

---

[58]   As a parallel to his challenge of the Eden Gardens search, Defendant challenges the non-case agent status of Agent Duncan on the basis that she acted as relief supervisor with respect to a number of case related documents.   Based on Agent Duncan's testimony, who the undersigned found to be a forthright and credible witness, the undersigned does not find that the exercise of these administrative duties "tainted" Agent Duncan.

maintained by an independent vendor, used them during the pendency of a motion to seal, and kept a duplicate set of the documents in violation of the court's sealing order).

With regard to the prejudice prong, Defendant has also met his burden to some extent. The Bengio notes and Excel/QuickBooks spreadsheets, which are part of the "Descalzo documents," were used in the Ginsparg reverse proffer and the Bengio debriefings in an effort to establish that Esformes entities' financial records had been altered. However, the government has not charged Esformes or Ginsparg with any offense arising from these documents. The Ginsparg/Esformes text messages were listed by the government as trial exhibits, even though the government claims that they were listed in bulk by a paralegal without attorney review. The Delgado Brothers' recordings of Esformes have been rendered irrelevant to the extent they support the dismissed obstruction of justice count relating to the no wrongdoing affidavits; and would only be admissible, if at all, to support the obstruction of justice count related to Willie's flight. Defendant has claimed privilege with respect to approximately 800 items from the Eden Gardens search materials. However, the prosecution team turned over those materials to a fully functioning filter team no later than February 2017, after Attorney Young found a document on December 7, 2016 appearing to have attorney names on it.

Given the foregoing levels of government misconduct and prejudice to Defendant, the undersigned concludes that the extreme remedies of dismissal and disqualification are inappropriate in this case. Therefore, the undersigned has considered, and recommends, the less drastic remedy of suppression of the following items of evidence:

1.      Any documents from the Eden Gardens search that are found by the Court to be privileged after Defendant's privilege log is litigated.

2.     The "Descalzo documents," including the Bengio notes and the Excel/QuickBooks spreadsheets.

3.     The Ginsparg/Esformes text messages related to Esformes' divorce that were listed by the government as trial exhibits.

4.     The recordings made by the Delgado Brothers and any testimony by them regarding the contents of those recordings.  The undersigned does not find it necessary to entirely prohibit the Delgado Brothers from testifying at trial as government cooperating witnesses, as requested by Defendant.  To the extent the Delgado Brothers have knowledge regarding the conduct underlying the charges against Esformes, which arises from their long term business relationship with him, such evidence was not obtained as a result of the government's misconduct and need not be suppressed on the grounds advanced in the Motion to Dismiss and Motion to Disqualify.[59]

With regard to Defendant's misjoinder and severance arguments, the undersigned does not find that Defendant has met the requirements for establishing the misjoinder and obtaining the severance of Count 34 of the Third Superseding Indictment, which charges Defendant with obstruction of justice by funding Guillermo Delgado's flight from the United States to avoid trial in his own case.  See Third Superseding Indictment [D.E. 869 at 37-38].  Given the long term business relationship between Esformes and the Delgado Brothers, it cannot be said that the joinder of Count 34 of the Third Superseding Indictment violates Fed. R. Crim. P. 8(a), or that Count 34's joinder prejudices Defendant to the extent of requiring severance pursuant to Fed. R. Crim. P. 14(a).

---

[59] The undersigned does not foreclose other potential grounds for suppression or inadmissibility that were not raised in the Motion to Dismiss and Motion to Disqualify.

## **RECOMMENDATION**

In accordance with the foregoing, the undersigned RESPECTFULLY RECOMMENDS that Defendant's Motion to Disqualify and Motion to Dismiss be DENIED, except for the suppression of the items of evidence listed above. Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen** days from the date of this Report and Recommendation to file written objections, if any, with the Honorable Robert N. Scola, Jr. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Miami, Florida this *10* day of August, 2018.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:     United States District Robert N. Scola, Jr.
        Counsel of Record