United States District Court
Southern District Of Florida

| | | |
|---|---|---|
| United States of America | ) | |
|     Plaintiff, | ) | |
| v. | ) | Case No. 16-20549-Cr-Scola/Otazo-Reyes |
| | ) | |
| Philip Esformes, et al., | ) | |
|     Defendants. | ) | |
| _____ | / | |

### Order on Government's Objections (ECF No. 931) and Defendant's Objections (ECF No. 933) to Report and Recommendation (ECF No. 899)

    This matter is before the Court on the Government's objections (ECF No. 931) and Defendant Philip Esformes's objections (ECF No. 933) to the Report and Recommendation (ECF No. 899) (hereafter, "Report") entered by Magistrate Judge Otazo-Reyes on August 10, 2018. The Court referred Esformes's Motion to Disqualify the Prosecution Team for Systematic Violations of the Attorney-Client, Work Product and Joint Defense Privileges (hereafter, "Motion to Disqualify") (ECF No. 275) and Motion to Dismiss Indictment, in Whole or in Part, Suppress Evidence and/or Sever Counts 32 & 33 and Exclude the Obstruction Evidence (hereafter, "Motion to Dismiss") (ECF No. 278) to Magistrate Judge Otazo-Reyes. Judge Otazo-Reyes held nine days of evidentiary hearings in October, November and December 2017. Judge Otazo-Reyes also held oral arguments in March 2018 prior to entering her Report.[1]

---

[1] A Third Superseding Indictment that post-dates the Motion to Dismiss no longer charges the obstruction of justice offense that was previously charged in Count 33. *See* Third Superseding Indictment (ECF No. 869); Second Superseding Indictment (ECF No. 200). The filing of the Third Superseding Indictment moots the Second Superseding Indictment. Therefore the magistrate judge did not address the Motion to Dismiss with respect to Count 33 of the Second Superseding Indictment. The obstruction of justice offense that was previously charged in Count 32 of the Second Superseding Indictment is now charged in Count 34 of the Third Superseding Indictment. Therefore, the magistrate judge addressed the Motion to Dismiss with respect to Count 34 of the Third Superseding Indictment. In his objections, Esformes appears to effectively ask the Court to dismiss the *Third* Superseding Indictment despite the fact that its initial motion was about the Second Superseding Indictment. At the oral arguments on November 8, 2018, the Court pointed out to the parties that the motions filed by Esformes related to the Second Superseding Indictment. Esformes moved ore tenus to apply the motions to the Third

This Court has carefully read all of the transcripts of the evidentiary hearings held by Magistrate Judge Otazo-Reyes and the Report, which contains over 80 pages of factual findings. The Court has also reviewed the written submissions of the parties and relevant legal authorities. The Court held oral arguments on the objections to the Report on November 8, 2018.

## I. Judge Otazo-Reyes's Recommendations

In the Report, Magistrate Judge Otazo-Reyes recommends that the Court deny the Motion to Disqualify and the Motion to Dismiss. However, she also makes certain findings of improper government conduct and expresses credibility concerns about some prosecution testimony. As a result of those findings, she recommends exclusion of some evidence and testimony in the case. In particular, she recommends that the Court suppress: (1) any documents from the Eden Gardens search that are found to be privileged after Esformes's privilege log is litigated; (2) the "Descalzo documents," including the "Bengio notes" and the Excel/Quickbooks spreadsheets; (3) the text messages between Norman Ginsparg and Esformes related to Esformes's divorce that were listed by the Government as trial exhibits; and, (4) the recordings by the Delgado brothers and any testimony by them regarding the contents of those recordings.

Magistrate Judge Otazo-Reyes also ruled that the Defendant failed to meet the requirements for establishing misjoinder and obtaining the severance of Count 34 of the Third Superseding Indictment, which charges Defendant with obstruction of justice by funding Guillermo ("Willy") Delgado's flight from the United States to avoid trial in his own case.

## II. Objections

The Government and Esformes filed objections to the magistrate judge's Report. On October 30, 2018, the parties submitted responses to those objections.

### A. *The Government's Objections*

In its objections, the Government claims the magistrate judge erred in four ways:

1. By recommending exclusion of the "Delgado recordings" and related evidence;

---

Superseding Indictment and the Court granted the ore tenus motion without objection from the Government.

2. By recommending exclusion of documents relating to Jacob Bengio;
3. By recommending exclusion of certain text messages involving Esformes; and
4. By making findings regarding the Government's "improper conduct" including, but not limited to, finding that the Government disregarded the attorney-client and work-product privileges, attempted to obfuscate the evidentiary record, and provided facially inconsistent and an incredible explanation for its handling of "the Bengio documents."

The Government claims the exclusion of the Delgado recordings and related evidence is unsupported by the law and the facts. The Government further strongly disputes the findings of improper conduct and claims it always acted in good faith throughout its investigation. It claims that those findings are unsupported by the record and that this Court should reject those findings as unnecessary given the Report's conclusion that Esformes has not shown sufficient prejudice from any of the alleged violations. The Government also states that it does not intend to introduce either the Bengio documents or the text messages in its case-in-chief, thus making those recommendations unnecessary and Esformes's request to suppress those materials moot.

### B. Esformes's Objections

Esformes does not take issue with any of the magistrate judge's factual findings. However, Esformes objects to the remedies recommended by the magistrate judge, which he claims did not go far enough. Esformes argues that the Government's three-years-long pattern of misconduct and its repeated violations of the attorney-client privilege were so pervasive and so prejudicial that dismissal of the Third Superseding Indictment is warranted. In the alternative, Esformes seeks an order disqualifying the prosecution team from the case and excluding the Delgado brothers as witnesses in the case. Esformes did not object to the magistrate's ruling denying his request to sever Count 34.

### III.   Standard of Review

The Court reviews objections to a magistrate judge's report and recommendation de novo. *See United States v. Farias-Gonzalez*, 556 F. 3d 1181, 1184 n.1 (11th Cir. 2009). To the extent a party fails to object to parts of the magistrate judge's report, those portions are reviewed for clear error. *See Macort v. Prem, Inc.,* 208 F. App'x 781, 784 (11th Cir. 2006).

"When a district court refers a matter to a magistrate judge to conduct an evidentiary hearing and make findings of fact, the district court is required to make a de novo determination" as to the portions of the magistrate judge's report that the parties have objected to. *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1245 (11th Cir. 2007) (discussing 28 U.S.C. § 636(b)(1)); *see also United States v. Raddatz*, 447 U.S. 667, 674 (1980) (explaining that 28 U.S.C. § 636(b) "calls for a *de novo* determination, not a *de novo* hearing"). "In making its determination, the district court is generally free to employ the magistrate judge's findings to the extent that it sees fit—the court may adopt the magistrate judge's findings in whole, in part, or not at all." *Amlong & Amlong*, 500 F.3d at 1245. But "a district court may not reject a magistrate judge's factual and credibility findings" unless it holds a new hearing to observe the demeanor of the witnesses. *Id.*; *see also Raddatz*, 447 U.S. at 671–72 (accepting a magistrate judge's unadorned conclusion that he found one witness "more credible" than another). The rationale for this rule is simple: "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).

The Eleventh Circuit has stated, "this general rule is subject to a small exception in the 'rare case' where 'there . . . [is] found in the transcript an articulable basis for rejecting the magistrate's original resolution of credibility and that basis . . .[is] articulated by the district judge.'" *United States v. Cofield,* 272 F.3d 1303, 1306 (11th Cir. 2001) (citing *United States v. Marshall,* 609 F.2d 152, 155 (5th Cir. 1980)). A reviewing court must generally defer to the magistrate judge's credibility determinations unless those determinations appear to be "unbelievable." *Ramirez-Chilel*, 289 F.3d at 749.

## IV.    Legal Standards

Judge Otazo-Reyes properly summarized the appropriate legal standards that a district court must apply when considering whether to dismiss an indictment or disqualify a prosecution team. As Judge Otazo-Reyes explained, Esformes bears the burden of showing misconduct on the part of the government and prejudice to him. And, even if Defendant satisfies this burden, a less drastic remedy, such as suppression, must be considered.

"Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States." *United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983). However, "dismissal of an indictment for prosecutorial misconduct is an

'extreme sanction which should be infrequently utilized.'" *Id.* (quoting *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978)).

To obtain dismissal of an indictment on a claim of government intrusion into the attorney-client relationship, the Defendant must establish that the government misconduct caused prejudice to him. *See United States v. Ofshe*, 817 F.2d 1508, 1515 (11th Cir. 1987); *United States v. DeLuca*, 663 F. App'x 875, 878–79 (11th Cir. 2016). Pursuant to Supreme Court precedent, dismissal is "plainly inappropriate" as a remedy for a Sixth Amendment violation if there is no "demonstrable prejudice." *Id.* at 1515 (citing *United States v. Morrison*, 449 U.S. 361, 364 (1981)). The same has been held by the Supreme Court to be true where a Fifth Amendment violation has occurred, and the same seems to holds true for any Fourth Amendment violation as well. *See Morrison*, 499 U.S. at 364; *see also Ofshe*, 817 F.2d at 1516 (holding that defendant was not entitled to dismissal of indictment in part because the defendant had suffered no prejudice when the government used a defendant's criminal defense attorney as an informant against him). Similarly, although a district court may exercise its supervisory powers to dismiss an indictment in response to inappropriate government conduct, the moving party must still show prejudice. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988) (stating, in the context of non-constitutional grand jury errors, that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant"); *United States v. Campagnuolo*, 592 F.2d 852, 865 (5th Cir. 1979) ("The supervisory powers of a district judge, however, allow him to impose the extreme sanction of dismissal of an indictment with prejudice only in extraordinary situations. . . . For this reason, we have held that a district judge may dismiss an indictment with prejudice because of misconduct by the government only if that misconduct actually prejudiced the defendant.").

Esformes bears the same burden of showing misconduct and prejudice with regard to his motion to disqualify. *See United States v. Walker*, 243 F. App'x 621, 622–24 (2d Cir. 2007) (upholding the district court's denial of a motion to disqualify, reasoning that there was no egregious misconduct on the part of prosecutors who had limited exposure to a handful of privileged documents); *United States v. Stewart*, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) (denying partial motion to disqualify the prosecutor for inadvertent review of a privileged email, where the motion was only supported by "vague and conclusory allegations of the harm").

Yet, even when the requirements of misconduct and prejudice are met, courts often choose a lesser remedy, such as suppression of evidence, rather than dismissal or disqualification. *See United States v. Morrison*, 449 U.S. 361,

365 (1981) ("Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial."); *United States v. Melvin*, 650 F.2d 641, 644 (5th Cir. Unit B 1981) (remanding the case for further findings of fact on the question of prejudice and, if prejudice was found, for consideration of some remedy short of dismissal, such as suppression); *Stewart*, 294 F. Supp. 2d at 494 (noting that suppression rather than disqualification is the proper remedy for inadvertent disclosure of work product).

## V.     Analysis

### A. *Improper Joinder & Severance of Count 34*

Esformes's initial motion asked the Court, as an alternative to dismissing the entirety of the indictment, to sever what were then Counts 32 and 33 of the Second Superseding Indictment, which related to Esformes's alleged obstruction of justice. In the Third Superseding Indictment, the Government charges Esformes with obstruction of justice for funding Willy Delgado's flight to flee trial before Judge Martinez, in Count 34.

Magistrate Judge Otazo-Reyes recommends that Esformes's motion to sever Count 34 based on Federal Rules of Criminal Procedure 8(a) and 14 be denied. Esformes has not objected to that recommendation. Because Esformes did not object to this ruling, the Court reviews this recommendation for clear error. *See Macort*, 208 F. App'x at 784.

With regard to the proper joinder of offenses, Rule 8(a) of the Federal Rules of Criminal Procedure provides that two or more offenses may be charged in the same indictment if the charged offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). With regard to severance, Rule 14(a) of the Federal Rules of Criminal Procedure provides that, if the joinder of offenses appears to prejudice a defendant, "the court may order separate trials of counts." Fed. R. Crim. P. 14(a).

The magistrate judge's ruling concerning improper joinder/severance is not clearly erroneous and the Court adopts her ruling as to this issue. Count 34 was properly joined and should not be severed from the other charges in the Third Superseding Indictment.

## B. *The Joint Defense Agreement and Delgado Recordings*

Esformes argues that the Government improperly invaded the defense camp by initiating and directing the recordings of Esformes when it was aware of the existence of a joint defense agreement ("JDA") among the Delgado brothers and him. Esformes argues that the prosecution team should be disqualified and the indictment should be dismissed as a result, or in the alternative, the evidence obtained by the Government through the recordings should be suppressed because the evidence was obtained in violation of the Fourth Amendment, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2515 ("Title III"), and the joint-defense privilege, and that the Delgados should be prohibited from testifying at trial. Esformes also argues that the Government violated Florida Bar Rule 4.4-2(a) by initiating these recordings. Esformes also generally relies on Fifth Amendment and Sixth Amendment to support his argument that the indictment should be dismissed.

Judge Otazo-Reyes concludes that the Government improperly directed the recording of Esformes by the Delgados and intruded into the attorney-client relationship by doing so. In particular, she finds that the Government violated the Citizen's Protection Act, 28 U.S.C. § 530B, and Florida's No-Contact Rule, Rule 4-4.2(a). Judge Otazo-Reyes also finds that the Government failed to implement a satisfactory "taint" protocol in this context, and that even in attempting to get a determination as to the applicability of the crime-fraud exception to the attorney-client privilege by seeking post-taping review from Judge Ursula M. Ungaro, the Government did not provide Judge Ungaro with "a complete record of the attorney interceptions." (Report, ECF No. 899 at 114.) The Report does not specifically distinguish between the recordings of Esformes and the recordings of Ginsparg.

Accordingly, Judge Otazo-Reyes recommends that the recordings made by the Delgados and any testimony about those conversations be excluded from the trial. She does not find it necessary to prohibit the Delgado brothers from testifying at trial and believes they should be allowed to testify regarding the conduct underlying the charges against Esformes. She does not recommend dismissal of the case or disqualification of the prosecution team on this basis. The Government objects to Judge Otazo-Reyes's recommendation that these recordings be excluded from trial.

### 1. Relevant Facts

Gabriel and Willy Delgado were arrested in May 2014 and charged with health care fraud in a separate, but related, indictment pending before Judge Jose Martinez in this district. *See* Case No. 14-cr-20359. The Delgado brothers

were represented by Norman and Jane Moskowitz in that case. Esformes, who was under investigation, but not yet indicted at the time, was represented by Michael Pasano and Marissel Descalzo of the law firm Carlton Fields Jorden Burt, P.A. ("Carlton Fields"). Esformes and his attorneys and the Delgado brothers and their attorneys participated in an informal, oral JDA during 2014.

A formal, written JDA was prepared by Norman Moskowitz in late 2014 and was signed by Pasano on behalf of Esformes. Esformes did not sign the JDA himself. After the executed JDA was returned to Norman Moskowitz by Pasano, it was not signed by the Moskowitzes or the Delgado brothers, but the Moscowitzes believed the JDA was in effect and was made retroactive and enforceable as of December 2014. The parties operated under the JDA through at least May 2015. Although Gabriel Delgado testified that he did not believe there was a JDA, the magistrate judge implicitly rejected that testimony.

The JDA required each party to give written notice to the other party if that party intended on withdrawing from the JDA. In October 2014, a superseding indictment was filed in the Delgados' case, which added drug distribution charges against Willy Delgado, thus greatly increasing the Sentencing Guidelines range he faced upon conviction. In March 2015, Judge Martinez denied Willy Delgado's motion to sever the drug charges from the health care fraud charges. Willy Delgado's co-defendant, Emerson Carmona, then agreed to testify against him.

According to Gabriel Delgado, Esformes became concerned that Willy Delgado would capitulate and cooperate against Esformes to avoid what now loomed as a very long prison sentence. Esformes and Gabriel Delgado had discussions during which Esformes offered to pay a significant sum of money to Willy Delgado so that he could flee the United States and avoid prosecution in the United States. Gabriel Delgado also told his attorney, Norman Moskowitz, that both Esformes and his attorney, Pasano, were trying to convince the Delgado brothers to sign false affidavits claiming that Esformes had never engaged in illegal activity.

During the same time period of April through May 2015, the Delgado brothers decided to cooperate with the Government. Gabriel Delgado testified that it was his desire to cooperate with the Government as of May 2015.

However, the Delgados' attorneys did not provide a notice of withdrawal from the JDA to Esformes's defense counsel. In Norman Moskowitz's view, which he shared with the Government around that time, the JDA had been materially breached by Esformes and his counsel. Moskowitz believed that Esformes's conversations with the Delgado brothers during which Esformes asked them to sign false affidavits acknowledging Esformes had committed no wrong-doing and during which Esformes offered to help pay for the flight from

prosecution of Willy Delgado, involved the commission of new crimes, and thus, were not within the scope of the JDA.

So, Norman Moskowitz faced a dilemma. On the one hand, he did not want to alert Esformes of the Delgados' possible cooperation. But, on the other hand, he did not want to negotiate a cooperation deal with the Government while simultaneously continuing to participate in joint defense meetings. So, in an effort to balance these competing positions, Norman Moskowitz suggested to the Delgados that they hire attorney Joaquin Mendez to conduct secret plea negotiations with the Government. The Delgados retained Mendez at the end of April 2015. Mendez wrote an email to the prosecutors advising them that he was authorized to negotiate for the Delgados and requesting that his representation of the Delgados not be disclosed to anyone. Around this time, the Government and Mendez discussed possibly recording Esformes during his meetings with the Delgados about Esformes's plan to help Gabriel Delgado flee the country. Norman Moskowitz was not involved in those negotiations.

Notwithstanding these plea discussions, Norman Moskowitz set up a joint defense meeting with Pasano and Descalzo in late April 2015. At the end of that meeting, the potential for the Delgado brothers' executing exculpating affidavits for Esformes was raised by Esformes's counsel.

Around this time, the Moscowitzes continued with trial preparations for the Delgados. After May 4, 2015, the Moskowitzes had no further communications with Esformes's defense counsel. On June 3, 2015, Descalzo came to the Moscowitzes' office to review FBI 302 reports, but Norman Moskowitz claims he had no discussion with her at that time.

Mendez spoke to the prosecutors by telephone on May 14, 2015 requesting that the Government allow the Delgados to file a motion to dismiss the indictment without disrupting the good-faith plea negotiations. The Moskowitzes then filed a motion to dismiss on May 14, 2015. That motion remained pending for several months based upon the defense's agreement to allow several extensions for the Government to file its response. But, the district judge and magistrate judge assigned to the Delgados' case were informed that the Delgados had signed plea agreements and had been cooperating with the Government. (*See* Ex Parte Motion, ECF No. 329-2 at 3.)

On June 5, 2015, the Delgado brothers executed sealed plea agreements. However, the Delgados' plea agreements and factual proffers were not publicly filed until September 24, 2015. That day, Judge Martinez dismissed the pending motion to dismiss as moot.

On the day the Delgados secretly executed their plea agreements, prosecutors were informed by Mendez that Esformes had sought to get Willy Delgado to flee the United States to a jurisdiction that had no extradition treaty

with the United States, and had asked both Delgados to sign false affidavits that his lawyers were preparing. And, according to these sources, these events were to commence in the context of a kickback payment that was going to be paid that night.

The Government wanted to record any conversations related to these matters, which it viewed as collateral to the underlying health-care fraud investigation. But, prior to authorizing the recordings of that meeting, DOJ Trial Attorney Allan Medina contacted the DOJ Professional Responsibility Advisory Office ("PRAO") and informed a legal advisor there of the existence of the JDA. Medina received an opinion recommending use of a filter team to perform the consensual recordings in this collateral investigation related to the allegations of obstruction of justice and on-going criminal activity. Medina also spoke to supervisors at the United States Attorney's Office for the Southern District of Florida ("USAO-SDFL") and the ethics officer at the USAO-SDFL. Medina also informed his DOJ supervisor.

Consistent with that advice, on June 5, the Government assigned Senior Trial Attorney Christopher Hunter to be the taint prosecutor, and Special Agent Alethea N. Duncan to be the taint agent, in the separate investigation. Prior to that time, Agent Duncan had very limited knowledge of the Delgado brothers or the Esformes case.

After the plea agreements were executed, Hunter vetted the process for the recordings with his supervisors in the Fraud Section of the Criminal Division within the DOJ. Hunter also obtained an independent opinion from the PRAO regarding use of a filter team to record communications with Esformes and received approval to go forward.

Hunter and his team then directed the taping of Esformes on the evening of June 5, 2015. Although Hunter pursued several internal channels before commencing with the recordings, no efforts were made to seek approval from a court prior to the June 5th taping because of what Hunter believed were exigent circumstances: Gabriel Delgado was scheduled to meet with Esformes that evening; Esformes's alleged conduct of tampering with witnesses and his offering of money to people in exchange for certain actions; and the potential that the Delgado brothers might flee the jurisdiction even though they were cooperating with the Government.

Hunter understood that there was a potential for privilege issues due to the existence of the JDA. He had received an email from Norman Moskowitz stating that the Delgado brothers, Esformes, and their respective counsel were part of a JDA that had not been fully executed, but under which the parties had been operating. However, Norman Moskowitz expressed the view that: Esformes's conversations with the Delgado brothers to commit a new crime

were not within the scope of the JDA; the agreement had been materially breached by Esformes and his counsel; and the Moskowitzes did not consider themselves bound by the withdrawal notice provisions of the JDA. Norman Moskowitz also testified before Judge Otazo-Reyes that, in terms of the course of dealing under the JDA, counsel had not communicated directly with each other's clients or asked permission to do so. Norman Moskowitz had also learned from the Delgado brothers that Pasano had spoken to them, telling the Moskowitzes that they were being overly conservative; that they should feel free to sign the affidavits; and, that he could obtain substitute counsel for them.

Hunter instructed the FBI agents that he was supervising in this separate investigation to not to record attorneys. It was his understanding that, in turn, the agents instructed the Delgado brothers not to record attorneys. Agent Duncan testified, however, that she could not recall receiving an instruction to not record the attorneys. Gabriel Delgado also acknowledged that he was not given any instructions by Government agents on how or who he should record and that there were no restrictions imposed by the Government on the taping.

As planned, Gabriel Delgado went to see Esformes at his house the night of June 5th. They met in the closet of Esformes's bedroom, where the first taping took place. At that time, Gabriel Delgado made a $5,000 cash kickback payment to Esformes. On the tape, Gabriel Delgado can be heard telling Esformes that Willy Delgado wanted $300,000, adding, "He has his plan, man, you know," to which Esformes responded, "I don't even want to know the plan." *See* 11/30/17 Transcript, ECF No. 645 at 194:2–195:8.

The Government initiated other recordings after June 5, 2018. Duncan noted that, during the course of the recordings, Esformes would routinely call other people and she had no control over what he did. For instance, on June 8, 2015 and June 12, 2015, Esformes called his attorneys during the recorded conversations.

During the June 8th recording, Esformes's defense counsel, Descalzo and Pasano, were captured on the tape after Esformes put them on the phone while he was otherwise talking to Gabriel Delgado. The attorneys' side of the conversation was not recorded due to a glitch with the equipment. But, the agents assigned to the investigation created an FBI Form 302 to document Gabriel Delgado's recollection of what Esformes's attorneys had said in the phone calls.

Duncan explained that Hunter had instructed her not to debrief or write reports based on statements by the Delgado brothers. However, she had to interview Gabriel Delgado after one of the recordings because there was a malfunction in the recording device, and she took notes during the interview.

Judge Otazo-Reyes found that Duncan's participation in the underlying investigation as a relief supervisor reviewing 21 documents did not compromise her position as taint agent for the obstruction of justice investigation.

On June 8, 2015, Pasano transmitted affidavits to the Moskowitzes that memorialized Esformes's good faith and lack of criminal intent. Pasano asked the Moskowitzes to ask the Delgado brothers to execute them if they were accurate, or to revise them. Norman Moskowitz responded by email, "[w]e don't agree or consent to our clients signing declarations." Email, ECF No. 329-23 at 2. Pasano then replied to the Moscowitzes shortly by email, in part:

> And at this moment we continue to act per a joint defense understanding that is predicated on the notion that none of the clients are adverse to the others. If your clients are saying things that are adverse to Philip E's position, I must insist we be so advised. It is up to you to tell us the specifics or not. But we deserve to be told if we are directly or potentially adverse.

Email, ECF No. 329-24 at 2.

Norman Ginsparg is an alleged co-conspirator who held many different positions in the various Esformes entities. In some of the health care facilities he is listed as a manager, in some as finance director, and in some as director of legal affairs. Ginsparg was at the time an attorney licensed in Illinois but not in Florida. The Government though, had received information that Ginsparg provided legal advice to Esformes. On June 19, 2015 and June 24, 2015, the Delgado brothers recorded Ginspargwhen they went to obtain checks from him. Ginsparg was not a party to the JDA and the Report does not discuss why these recordings should be suppressed. There is no indication that there were any legal discussions during the recordings and thus, there appears to be no basis to suppress these recordings.

On September 10, 2015, three months after the recordings of Esformes were conducted, the Government filed an ex parte motion for an order from Judge Ungaro stating that certain communications and documents were not privileged because they were made in furtherance of a crime and giving it permission to share the tapes with the prosecution team. (*See* Ex Parte Motion, ECF No. 329-2.) The motion indicated that there was a "purported" JDA between the Delgados and Esformes but that the Delgados "reject the viability of any such agreement." (*Id.* at 1.) The motion also advised that of the many recordings a few had inadvertently captured two attorneys but no recordings were ever made directly against either of them. The motion also indicated that any inadvertent recordings of the attorneys would be minimized or removed

from the recordings turned over to the prosecution team.

On September 21, 2015, Judge Ungaro entered a sealed order (ECF No. 329-35) (now unsealed) which granted the Government's motion in part. Judge Ungaro concluded that any recordings between the Delgado brothers and Esformes in which no attorney was a party to the communications could be turned over to the prosecution and investigation team. However, any recordings between the Delgados and Esformes in which an attorney was a party to the communications had to be submitted for an in camera review prior to providing those recordings to the prosecution and investigation team.

On January 8, 2016 and January 13, 2016, Hunter submitted the recordings to Judge Ungaro. Hunter also sent a cover letter with each submission that explained the contents of the recordings. Hunter did not submit either the JDA or the FBI Form 302 setting forth the circumstances of the attorneys' conversation with Esformes on June 8th to Judge Ungaro for her review. Hunter decided not to submit the FBI Form 302 for review because he concluded that, on its face, it was evidence of criminal activity since Esformes was trying to procure false affidavits.

On May 6, 2016, Judge Ungaro entered a supplemental sealed order (ECF No. 329-37) (now unsealed), in which she found that certain of the recordings implicated the attorney-client privilege while others did not. Judge Ungaro ordered that certain recordings of the attorneys "shall be minimized, or removed, from the set of recordings to be provided to the government prosecution and investigation team." (*Id.* at 2.)

### 2. Analysis

The Government argues in its objections that at the time of the recordings, it had good reason to doubt there ever was a valid, enforceable JDA between Esformes and the Delgados, and, even if there had been one in place, the Government was told by the Delgados' attorney that the JDA had been breached by Esformes and was no longer in force. Further, the Government contends that even if there was a valid JDA in place at the time of the recordings, the conversations were not privileged. In particular, it argues that the JDA did not cover conversations between clients and under the law at least one attorney must be present for a conversation to be privileged. The Government also argues that even if the conversations were privileged, they are not protected because they were in connection with and in furtherance of the commission of a crime. Accordingly, the Government argues the crime fraud exception applies.

The Government further highlights that Judge Ungaro already ruled on this issue and found that any consensually-recorded conversations are not privileged to the extent that an attorney was absent from the conversation. The Government asserts that it failure to provide Judge Ungaro with a copy of the FBI 302 or the JDA when the Government sought her approval to disclose to the evidence to the prosecution team was not legally improper. And, that even if it erred, the suppression of the recordings where the attorneys are *absent* would not be the proper remedy.

The Government also objects to Magistrate Otazo-Reyes's ruling that the Government violated Florida's No-Contact Rule, Rule 4-4.2(a), and the Citizens Protection Act, 28 U.S.C. § 530B. It argues that the recordings were initiated in connection with the Government's investigation into Esformes's potential obstruction of justice, not in connection with his health care fraud charges. As a result, Esformes was unaware of these potential charges and could not have retained counsel to represent him as to this matter. Moreover, even assuming the Florida rule was violated, the Government refers to Eleventh Circuit precedent to support its alternative argument that admissible evidence cannot be suppressed based on violation of a state's professional responsibility rules.

Esformes argues that the Government's arguments are factually and legally incorrect. Esformes asserts that there is a client-to-client privilege and that the crime fraud exception does not apply. Moreover, Esformes argues that this Court should not rely on Judge Ungaro's privilege ruling because the Government did not provide her with a full picture of the circumstances.

The Court considers these arguments in turn. Ultimately, the Court disagrees with Judge Otazo-Reyes's ruling as to the applicability of Florida's No-Contact Rule. Nonetheless, the Court finds that the recordings in which any attorneys are present are inadmissible. To ensure that there is no invasion of the defense camp, the Court also finds that any recordings in which Esformes and Delgado discuss any legal strategies relating to the defense of the already completed health care fraud scheme for which Esformes was indicted are inadmissible, except to the extent that those conversations relate directly to the Government's claim that Esformes was seeking false exculpatory affidavits from the Delgados.

i.    *Judge Ungaro's Rulings*

While the Government encourages the Court to retain Judge Ungaro's rulings, Esformes contends that the Judge Ungaro rulings were based on incomplete information. The parties mainly dispute the correctness of Judge Ungaro's ruling as to the communications between the Delgados and Esformes

in which no attorney is present. In particular, Judge Ungaro allowed the filter team to share the majority of these recordings with the prosecution team and ruled that "the consensually-recorded communications between Gabriel Delgado, Guillermo Delgado, and [Esformes] in which no attorney is a party to the communications are not privileged, nor are documents associated with those communications." (*See* Order, ECF No. 312-11.)

The Government presented arguments to Judge Ungaro similar to the ones presented to the Court now—that there was no binding JDA at the time of the recordings, although some parties may have believed there was; no attorney-client privilege attaches to the conversations between Esformes and the Delgados; and even if their conversations could be considered privileged, the crime fraud exception applies. From a review of Judge Ungaro's orders, it is unclear what basis she relied upon to make her privilege determination.

Judge Otazo-Reyes found that the Government failed to provide Judge Ungaro a complete record of attorney interceptions, but did not make a particular finding or recommendation as to the weight this Court should give to Judge Ungaro's ruling on the privilege issues. Instead, Judge Otazo-Reyes relied solely on her finding that the Government, acting through the Delgado brothers, violated the Citizens Protection Act, 28 U.S.C § 530B, and Florida's No-Contact Rule, Rule 4-4.2(a), and that the "taint protocol" for these calls "came up short" to recommend that any recordings made by the Delgado brothers and any testimony by them regarding the contents of those recordings should be excluded.

The Court finds that Judge Ungaro's rulings, although considered by the Court, are not binding on the Court. Judge Ungaro's rulings came from *ex parte* communications with the Government's investigative team, in which she was arguably given an incomplete view of the legal issues and facts. Esformes had no opportunity to assert his position on the privileged nature of these tapes at the time Judge Ungaro released portions of them to the prosecution team. Further, Judge Ungaro was deciding whether these tapes should be shared with the prosecution team; she did not decide whether they were admissible.

If the Court were to adopt Judge Ungaro's rulings without further consideration, the Court would run the risk of violating Esformes's due process rights. *See Freeman v. Lester Coggins Trucking, Inc.*, 771 F.2d 860, 865–66 (5th Cir. 1985) ("An underlying principle is that it is a violation of due process for a judgment in a prior suit to be binding on a litigant who was not a party or a privy and there has never had an opportunity to be heard." (quoting *Parkland Hosiery Company, Inc v. Shore*, 439 U.S. 322, 327 n.7 (1979) (alterations omitted)); *United States v. Pineda-Mendoza*, No. 2:11-cr-0320 WBS (GGH), 2012

WL 4056829, at *2 (E.D. Cal. Sept. 14, 2012) (stating that law of the case is not implicated where orders were issued ex parte because "[i]t is generally unfair to preclude a party from later arguing an otherwise legitimate objection when that party has not had any opportunity to initially voice the objection"). As such, the Court has considered the arguments presented by Esformes, including those that Judge Otazo-Reyes did not discuss. The Court has reviewed the FBI 302 and the JDA and finds that Judge Ungaro's ruling would not have been different had the Government provided her with the FBI 302 and JDA.

The parties do not seem to dispute that the recordings that included the attorneys are not admissible. So, the Court focuses on the parties' disagreements as to the recorded conversations involving the Delgados and Esformes when no attorneys were present.

> ii. *Was there a valid, still-binding joint defense agreement in effect at the time of the recordings?*

In *United States v. Almeida*, 341 F.3d 1318 (11th Cir. 2003), the Eleventh Circuit implicitly acknowledged the validity of oral joint defense agreements but cautioned that in the future, defense lawyers should insist their clients enter into written joint defense agreements that fully explain the defendants' rights and obligations. *See id.* at 1327 n.21; *Minebea Co., Ltd. v. Papst*, 228 F.R.D. 13, 16 (D. D.C. 2005) ("Obviously, a written agreement is the most effective method of establishing the existence of a joint defense agreement, although an oral agreement whose existence, terms and scope are proved by the party asserting it, may be enforceable as well."); *United States v. LeCroy*, 348 F. Supp. 2d 375, 381 (E.D. Pa. 2004) ("courts have found that an oral joint defense agreement may be valid"); *United States v. Stepney*, 246 F. Supp. 2d 1069, 1080 n.5 (N.D. Cal. 2003) ("No written agreement is generally required to invoke the joint defense privilege."); *LaSalle Bank Nat. Ass'n v. Lehman Bros. Holdings, Inc.*, 209 F.R.D. 112, 116 n.3 (D. Md. 2002) (acknowledging that written joint defense agreement "does no more than confirm the existence of the common legal interest" existing between two parties);; *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 217 (Tenn. App. 2002) ("While a well-drafted joint defense agreement makes it simple for the courts to determine whether the parties intended to participate in a joint defense, an executed agreement is not a necessary ingredient to a common interest privilege claim," citing *Power Mosfet*, 206 F.R.D 422, 425 (E.D. Tex. 2000)). *See also* 2 Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual at 501-35-36 (8th ed. 2002) ("The parties need not agree in *writing* to pursue a common interest."). The Restatement has adopted this position as

well, stating that "[e]xchanging communications may be predicated on an express agreement, but formality is not required." *See* Restatement (Third) of the Law Governing Lawyers § 76, comment c.

Here, although the written JDA was not executed by Esformes or the Delgado brothers, Esformes and the Delgado brothers were bound by the JDA, both through their counsel under agency principles and by their continuous acceptance of the benefits of the agreement. Paragraph 20 of the JDA states:

> By executing this Agreement, all Counsel certify that they have explained the contents of the Agreement to their Clients, that it is their understanding that the Clients understand and agree to abide by the representations made in the Agreement, and that the Clients have authorized Counsel to execute the Agreement.

The Court does not find the fact that the Moscowitzes did not sign the JDA dispositive. The parties, through counsel, exchanged confidential material, frequently labeled their emails "joint defense," and met often to share information pursuant to their common interests. As just one example, on January 19, 2015, Esformes's attorneys provided Delgados's attorneys with a summary of numerous witness interviews that had been conducted of Esformes's employees, allegations made by Nelson Salazar, a cooperator, the circumstances surrounding the acquisition of the La Covadonga ALF, and information about a possible witness. Esformes's attorneys also shared two specific areas of concern with respect to potential kickback accusations—payments for limousine services and requests for contributions to a charity.

It is clear by their conduct, all parties operated under the assumption that their actions and statements were covered by a valid JDA. The Court finds that there was a valid JDA—relating to the pending Government investigation of Esformes for health care fraud—in effect among the parties from 2014 and up until the Delgado brothers' signed their plea agreements.

Esformes claims that the Government intentionally and improperly intruded into the defense camp when it utilized the Delgado brothers to record Esformes and his attorneys. He claims that the Government knew there was a JDA in place when it authorized the recordings.

Esformes relies on what he claims is a similar case from this district, *United States v. Pisoni*, No. 15-20339-CR-Gayles. In *Pisoni*, four defendants entered into a written JDA prior to the indictment in the case. The JDA provided that no defendant would disclose joint defense materials received from each other and required any attorney or defendant who wished to withdraw to provide written notification within 48 hours of withdrawing. And, any

defendant who withdrew was required to return any joint defense materials and was prohibited from utilizing any joint defense materials in a manner adverse to the interests of any other defendant.

One of Pisoni's co-defendants, John Leon, signed a plea agreement with the Government in February 2016. After he signed his plea agreement, Leon continued to participate in group chats through MMS and later through Whatsapp. Those discussions included privileged matters including what the defendants' attorneys had told them, and tactical and strategic decisions to be used to have the case dismissed.

In late March and through mid-April 2016, Leon participated by telephone and in person in several meetings with the three other defendants, their attorneys and an investigator during which defense strategies were discussed and joint defense documents were shared. Leon shared the information and documents he had obtained during these joint defense meetings with the agents and prosecutors in the case.

The Government attempted to justify its concealment of Leon's cooperation by arguing it was necessary to continue its investigation of another target and revealing Leon's plea agreement would have alerted the target of his cooperation. Judge Darrin P. Gayles found that the need to conduct further investigation of another target could not ever justify invading the defense camp. Judge Gayles found that Leon had intentionally tried to utilize information he obtained during joint defense meetings to obtain a lesser sentence for himself and excluded Leon as a witness in order to uphold the integrity of the proceedings. But, Judge Gayles did not dismiss the indictment based upon government misconduct because no prejudice was shown.

This case is distinguishable from *Pisoni.* Here, the Government had information that Esformes was attempted to pay for a co-conspirator to flee the jurisdiction and was attempting to obstruct justice by convincing his co-conspirators to file false affidavits. There was no attempt by the Government to use the Delgados to obtain information, strategy, or documents from Esformes or his criminal defense attorneys relating to the underlying health care fraud investigation. The Government sought and obtained approval from supervisors at the DOJ and at the USAO-SDFL. The Government brought in a taint prosecutor and taint agent to the site and instructed the Delgados to not record any conversations with attorneys. And, the Government sought approval from Judge Ungaro prior to sharing any of the recordings with the prosecution team.

The Court finds that there was no improper intrusion into the defense camp based upon the Delgado recordings of Esformes. As just noted, the JDA applied to the Government's pending investigation of Esformes for health care fraud. The JDA did not, and could not, apply to attempts by Esformes to

obstruct justice by offering to pay for a co-conspirator to flee from prosecution or by attempting to have co-conspirators execute false affidavits exculpating Esformes. Thus, even if the JDA was in effect, the Government's investigation of separate, ongoing criminal activity would not be encompassed by the JDA.

The Court recognizes that the JDA contained a provision requiring written notice within two business days to the other attorney if an attorney determines his client no longer has a mutuality of interest in a joint defense. Yet, the fact that the Delgado brothers were attempting to negotiate a settlement of the case with the Government would not constitute a lack of mutuality of interest. Those negotiations could very well have been unfruitful. But, once the plea agreement involving cooperation was signed, the JDA would have required the Delgado brothers' attorneys to notify Esformes's attorneys of the lack of mutuality of interest in a joint defense. The obligation to provide notice was on the Delgados and their attorneys, not on the prosecution team.

### iii. Were the communications between Esfomes and the Delgados privileged?

"The attorney-client privilege attaches *only* to communications made in confidence to an attorney by that attorney's client for the purposes of securing legal advice or assistance." *In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1224 (11th Cir. 1987) ("*Schroeder*") (emphasis added). The party invoking the privilege bears the burden of proving its existence. *Id.* at 1225. Here, the communications between only Esformes and the Delgados were not between an attorney and client.

The Eleventh Circuit, however, has recognized that many courts have held that the attorney-client privilege gives rise to an associated joint defense privilege when co-defendants are given the opportunity to collaborate on defense tactics and exchange confidential information without hiring the same attorney. *Almeida*, 341 F.3d at 1324. The joint defense privilege generally "serves to protect the confidentiality of communications passing from one party *to the attorney for another party* where a joint defense effort or strategy has been decided upon and undertaken by parties and their respective counsel." *Id.* (citations omitted) (emphasis added). Other courts have considered communications between clients, without the involvement of an attorney, to be privileged under particular circumstances. *See Crane Security Technologies, Inc v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 21–22 (D. Mass. 2017) ("The fact that communications are between non-lawyers does not per se waive the privilege."); *Gucci America, Inc. v. Gucci*, No. 07-civ-6820(RMB)(JCF), 2008 WL 5251989, at *1 (S.D.N.Y. Dec. 15, 2008) ("Thus, the common interest doctrine permits the

disclosure of privileged communications without waiver of the privilege provided the party claiming an exception to waiver demonstrates that the parties communications: (1) have a common legal, rather than commercial, interest; and (2) the disclosures are made in the course of formulating a common legal strategy."). While other courts have held that "[t]he mere fact that the communications were among co-defendants who had joined in a joint defense agreement is, without more, insufficient to bring such statements within the attorney-client privilege." *United States v. Krug*, 868 F.3d 82, 87 (2d Cir. 2017) (finding that communications where no attorney was present and communications were not made for the purpose of obtaining, sharing, or facilitating legal advice was not privileged).

From Esformes's perspective, at the time of the conversations with the Delgados, he may have believed that their conversations were protected under a joint defense privilege. However, even if the Court were to assume that a joint defense privilege covered conversations among Esformes and the Delgados based on their JDA, any purported joint privilege was waived by the Delgados when they agreed to cooperate with the Government. *See Almeida*, 341 F.3d at 1326 (holding that in case where each party to a joint defense agreement is represented by his or her own counsel, communications by one co-defendant to the attorney of another co-defendant are not privileged "in the event that the co-defendant decided to testify on behalf of the government in exchange for a reduced sentence."

Further, even if the joint privilege or any privilege had extended to these conversations, the Court finds that the crime fraud exception would apply to render those conversations unprivileged. The attorney-client privilege does not protect communications made in furtherance of a crime or fraud. *See Schroeder*, 842 F.2d at 1226. Under usual circumstances, there is a two-part test that courts use to determine whether the crime-fraud exception applies. *Id.*

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*Id.* To establish the first prong, the moving party must provide evidence, which has some foundation in fact, that would establish elements of some violation that was ongoing or about to happen. *Id.* The second prong is established by

showing that the communication is related to the criminal or fraudulent activity established under the first prong. *Id.* Although the crime-fraud exception generally applies when attorney-client communications are involved, the Court extends this exception to this case given that the principles underlying the crime fraud exception apply just as strongly in circumstances where co-defendants who are supposedly in a privileged relationship are attempting to commit a crime. No privilege should "be used as a cloak for illegal or fraudulent behavior." *See In re Grand Jury Proceedings (Pavlick)*, 680 F.2d 1026, 1028 (5th Cir. 1982) (quoting *United States v. Hodge & Zweig*, 548 F.2d 1327, 1354–55 (9th Cir. 1977)).

Esformes cites to *United States v. Pedersen*, No. 3:12–cr–00431–HA, 2014 WL 3871197 (D. Or. Aug. 6, 2014) for the proposition that only a court can determine applicability of crime fraud exception, so the Government's failure to obtain a determination that it applied before it recorded Esformes renders the Government's reliance on the crime fraud exception unpersuasive.

In *Pedersen*, a death penalty case, the district court exercised its supervisory powers to opine on the government's actions after the two defendants in that case had pled guilty. The court did so because it believed it could not "in good conscience" "allow the government's conduct to pass without comment." *Pedersen*, 2014 WL 3871197, at *2. In that case, while one of the defendants was incarcerated in state prison, the federal government intercepted the defendant's legal mail and reviewed those materials for months before a taint team was put in place; listened to and took notes of legal calls between the defendant and his mitigation specialist because it believed the mitigation specialist was part of an ongoing criminal conspiracy; and, intercepted calls between the defendant and several members of the defense team, among other acts that the Court found to be worthy of note. *Id.* at *12–*21.

The Court finds *Pedersen* distinguishable in important respects. For one, the communications were not between the defendant and an informant. Rather, they involved the defendant's communications with his attorney and others from his legal team. This is an extremely problematic element that is not found in this case. Further, in *Pedersen*, the defendant's legal mail was already in the government's possession and there was no exigency preventing the government from seeking a court's permission prior to reviewing it. Here on June 5, 2018, the government believed that there was a crime that was *about to take place*. And, importantly, in *Pedersen*, the court found that there was "no evidence whatsoever" of the existence of a crime or fraud. In this case, the Government had specific evidence from the Delgados that Esformes was about to commit obstruction of justice. The reliability of the information received and

the limited time available before the meeting between the Delgados and Esformes was to take place renders this case different from *Pedersen* at least with regards to the June 5th recording.

Ultimately the Court finds that no applicable privilege protected the conversations between the Delgados and Esformes. Even if the joint defense privilege did apply, Esformes's communications were exempt from protection because he was discussing the ongoing commission of a crime.

> iv. *Did Florida's No-Contact Rule apply to the prosecutors? If so did they violate the rule?*

The Citizen's Protection Act, 28 U.S.C. § 530B(a) provides:

> An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.

Relatedly, Florida's No-Contact Rule of the Florida Rules of Professional Conduct, Rule 4-4.2(a) provides:

> In representing a client, a lawyer must not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer. Notwithstanding the foregoing, a lawyer may, without such prior consent, communicate with another's client to meet the requirements of any court rule, statute or contract requiring notice or service of process directly on a person, in which event the communication is strictly restricted to that required by the court rule, statute or contract, and a copy must be provided to the person's lawyer.

The Government concedes that prosecutors are generally bound by state ethics rules but, relying on *United States v. Diaz*, No. 2:17-CR-31-KS-JCG, 2018 WL 1003751 (S.D. Miss. Feb. 21, 2018), it argues that state ethical rules do not apply to the investigatory phase of law enforcement. In *Diaz,* a co-conspirator of the defendant began surreptitiously recording conversations with the defendant in cooperation with the government. The defendant had not yet been indicted but the investigation was ongoing for several months and the defendant had been represented by counsel in interactions with the government prior to the recordings. The defendant in *Diaz* moved to dismiss

the indictment or, in the alternative, to suppress the recordings obtained in violation of the ethical rules.

The district judge in *Diaz* denied the motion. In doing so, the court noted that the Fifth Circuit, in addressing this same issue found that,

> 'professional disciplinary rules do not apply to government conduct prior to indictment. . . .' *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995); *see also United States v. Heinz*, 983 F.2d 609, 613 (5th Cir. 1993). In fact, DOJ regulations specifically provide that 28 U.S.C. § 530B 'should not be construed in any way to alter federal substantive, procedural, or evidentiary law. . . .' 28 C.F.R. § 77.1(b). Virtually every federal court to address this issue has ruled that similar ethical rules do not apply to the investigatory phase of law enforcement. Only one Circuit has applied a no-contact rule in a non-custodial, pre-indictment setting, and it still declined to suppress the recorded statements. *United States v. Hammad*, 858 F.2d 834, 842 (2nd Cir. 1988).

*Diaz*, 2018 WL 1003751, at *2 (footnote omitted).

The Third, Sixth, Eighth, Ninth and Tenth Circuits, as well as several district courts have also held that state ethical rules do not apply to the investigatory phase of law enforcement. *See, e.g. United States v. Brown*, 595 F.3d 498, 516 (3rd Cir. 2010); *United States v. Cope*, 312 F.3d 757, 773 (6th Cir. 2002); *United States v. Plumley*, 207 F.3d 1086, 1095 (8th Cir. 2000); *United States v. Balter*, 91 F.3d 427, 436 (3rd Cir. 1996) (Alito, J.); *United States v. Powe*, 9 F.3d 68, 69 (9th Cir. 1993); *United States v. Ryans*, 903 F.2d 731, 739 (10th Cir. 1990); *United States v. Sutton*, 801 F.2d 1346, 1366 (D.C. Cir. 1986); *United States v. Fitterer*, 710 F.2d 1328, 1333 (8th Cir. 1983); *United States v. Elliott*, 684 F. App'x. 685, 693–94 (10th Cir. 2017); *United States v. Grass*, 239 F. Supp. 2d 535, 542 (M.D. Penn. 2003); *United States v. Joseph Binder Schweizer Emblem Co.*, 167 F. Supp. 2d 862, 866 (E.D.N.C. 2001); *United States v. Marcus*, 849 F. Supp. 417, 421 (D. Md. 1994) (listing numerous cases); *In re Disciplinary Proceedings Re: Doe*, 876 F. Supp. 265, 268 (M.D. Fla. 1993) ("*Doe*"); *United States v. Heine*, No. 3:15–cr–238–SI–1, 2016 WL 6808595, at *22 (D. Ore. Nov. 17, 2016); *United States v. Sabean*, No. 2:15-cr-175-GZS, 2016 WL 5721135, at *5 (D. Me. Oct. 3, 2016); *United States v. Voigt*, No. 13-CR-0035(2), 2015 WL 9581740, at *2 (D. Minn. Dec. 30, 2015); *United States v. Lash*, No. 03–135, 2010 WL 5437275, at *4 (E.D. La. Dec. 10, 2010).

Magistrate Judge Otazo-Reyes distinguished *Diaz* by stating, without elaboration, that *Diaz* did not apply given the difference between Florida and

Mississippi's no-contact rules. Rule 4-2 of the Mississippi Rules of Professional Conduct provides, "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The Comment to the Rule provides, "[t]his Rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question."

In comparing the two rules, the Florida rule refers to communication with a "person" and the Mississippi rule refers to communication with a "party." The first sentences of the Mississippi and Florida rules are otherwise identical up to the words "unless the lawyer has the consent of the other lawyer." The first sentence in the Mississippi rule goes on to say, "or is authorized by law to do so." The first sentence in the Florida rule ends with "unless the lawyer has the consent of the other lawyer." The Florida rule then has a second sentence that reads:

> Notwithstanding the foregoing, a lawyer may, without such prior consent, communicate with another's client to meet the requirements of any court rule, statute or contract requiring notice or service of process directly on a person, in which event the communication is strictly restricted to that required by the court rule, statute or contract, and a copy must be provided to the person's lawyer.

In 1993, a three-judge panel of the Middle District of Florida interpreted the application of Florida Rule of Professional Conduct 4-4.2 in the context of a pre-arrest, pre-indictment federal criminal investigation and stated:

> We hold that Rule 4–4.2 does not apply to non-custodial communications with corporate employees during criminal investigations (including grand jury investigations) that have not become formal proceedings initiated by the making of an arrest, the filing of a complaint or the return of an indictment. In so holding we recognize, as pointed out earlier, that the Florida formulation of the ethical rule is broader than the ABA Model Rule 4.2 in that "person" was substituted for "party," and that the qualifying phrase "or is authorized by law to do so" was deleted. Nevertheless, we believe that the other references in the rule to "representing a client" in relation to communications concerning "the subject of the representation" and made "in the matter," all contemplate, as the court held in [*United States v. Ryans*, 903 F.2d 731 (10th Cir. 1990)] an adversarial relationship between litigants,

not a mere investigation.

*Doe*, 876 F. Supp. at 268.

The panel in *Doe* also noted that when government lawyers are conducting covert investigations, they as well as courts and other lawyers need and, are entitled to have, a bright-line rule separating ethical from unethical behavior. *Id.* at 269. That line is the arrest or indictment of the represented person. Thus, the *Doe* case is at odds with Judge Otazo-Reye's conclusion here that the difference in the wording of the Mississippi rule relied upon in *Diaz* and the Florida rule in this case is a legally significant difference.

Esformes urges the Court not to follow *Diaz* and instead to rely on *Florida Ethics Opinion 90-4*, 1990 WL 446959 (July 15, 1990), which construed Florida's No-Contact Rule as prohibiting federal prosecutors and their agents from contacting represented persons prior to indictment. But, that ethics opinion was specifically discussed and rejected by the panel in *Doe.* The Court agrees with the panel in *Doe* as to the applicability of Florida Ethics Opinion 90-4.

Esformes further argues that the *Doe* opinion is no longer valid since it was entered prior to the enactment of 28 U.S.C. § 530B, which mandates the application of state ethics rules to federal prosecutors. In *Doe*, although the panel first found that the state ethics rules did generally apply to federal prosecutors, the panel held that the rules did *not* apply in a pre-indictment stage. And several circuit courts of appeal have come to this same conclusion for cases arising after implementation of 28 U.S.C. § 530B. *See Brown*, 595 F.3d at 516; *Cope*, 312 F.3d at 773; *Plumley*, 207 F.3d at 1095.

Furthermore, even if the state ethics rules apply to a federal prosecutor in the pre-indictment, pre-arrest stage of an investigation, the Eleventh Circuit has held that "a state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible." *United States v. Lowery*, 166 F.3d 1119, 1124 (11th Cir. 1999). The Court in *Lowery* distinguished between the enforcement of ethical rules and the admission of evidence in a federal trial:

> Making state prescribed professional conduct rules applicable to federal prosecutors is one thing. Letting those rules govern the admissibility of evidence in federal court is another. If Congress wants to give state courts and legislatures veto power over the admission of evidence in federal court, it will have to tell us that in plain language using clear terms.

*Id.* at 1125. The *Lowery* case was decided after the enactment of 28 U.S.C. § 530(b) and, although the conduct at issue occurred prior to the enactment of that statute, the Eleventh Circuit treated the legislation as if it were fully effective for the purposes of its analysis of the case.

Thus, either Rule 4-4.2 does not apply to the conduct of the federal prosecutors vis-a-vis the Delgado recordings under *Diaz* and *Roe* since this was a pre-indictment, pre-arrest stage of the investigation as to Esformes's obstruction of justice charge, or, if Rule 4-4.2 does apply, any violation of the rule could not result in the suppression of the recordings under *Lowery*.

> *v.*     *Constitutional and statutory considerations*

Esformes raises several statutory and constitutional arguments related to the recordings. The Government argues that none of these arguments are persuasive. Judge Otazo-Reyes did not reach these arguments, but in the Court's own review of the relevant case law and the parties' arguments, it concludes that the Sixth Amendment precludes the admission of any portion of the recordings that relate to the health care fraud scheme.

First, the Court finds that the Fourth Amendment does not protect conversations between co-defendants in circumstances such as these, where one co-defendant has decided to cooperate with the Government and has consented to the recordings. *See, e.g., United States v. White*, 401 U.S. 745, 752 (1971) (plurality opinion) ("Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police."); *United States v. Davanzo*, 699 F.2d 1097, 1100 (11th Cir. 1983) ("There is no Fourth Amendment violation here, however, because Ostrander, a paid informer and not a law enforcement agent of the government, gave his consent before recording each of the conversations, thereby freeing the conversations from the warrant requirement."); *United States v. Shields*, 675 F.2d 1152, 1158 (11th Cir. 1982) ("Supreme Court cases have consistently held that the government does not violate the fourth amendment by recording and transmitting private conversations with the consent of one of the parties, even though the other party does not know his conversation is being recorded or transmitted.") Although Esformes attempts to create a distinction between these cases by emphasizing the role of the JDA, the Court is unpersuaded. The Court finds the same rationale to apply to Esformes's argument that the Government violated Title III. *See Shields*, 675 F.2d at 1156 & n.2 ("Obviously . . . a party to a conversation who has consented to its interception need no authorize further its being divulged.").

To the extent Esformes is relying on the Fifth Amendment in this context, the Court is unconvinced that the Government's recording of Esformes violated

the Fifth Amendment. To constitute a constitutional violation the law enforcement technique must be so outrageous that it is fundamentally unfair and "shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." *Ofshe*, 817 F.2d at 1516 (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). The Court must consider the "totality of the circumstances." *Id.* Here, the Government initiated its recordings of Esformes to obtain information regarding Esformes's potential future criminal conduct. The use of an informant to obtain such information is "not so outrageous as to shock the universal sense of justice." *Id.*

The Court is, however, concerned that Esformes's Sixth Amendment rights were violated to the extent the Government was aware that the Delgados and Esformes would be discussing his health care fraud scheme. In *Maine v. Moulton*, 474 U.S. 159 (1985), the Supreme Court stated:

> Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Id.* at 176. In *Moulton*, the Supreme Court held that the state government had violated the defendant's Sixth Amendment right when it arranged to record conversations between the defendant and an undercover informant because it knew that they were meeting with "the express purpose of discussing [ ] pending charges and planning a defense for trial." *Id.* at 177. The Supreme Court held that incriminating statements pertaining to the pending charges were inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes. *Id.* at 178. However, the Supreme Court also recognized that "to exclude evidence pertaining to charges as to which the Sixth Amendment had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." *Id.* at 180.

Applying *Moulton* to this case, the Court finds that the Government

intended to obtain information about Esformes's attempts to obstruct justice rather than information about his pending charges and that this investigation was not improper. *United States v. Ford,* 176 F.3d 376, 379 (6th Cir. 1999). ("Accordingly, the fact that law enforcement officials arranged for an informant to converse with an indicted defendant about offenses other than those for which the defendant had been indicted is not unlawful.") However, to the extent the Government knew or became aware that Esformes and the Delgados would be discussing pending charges, and the Delgados elicited statements about them, the Court concludes that such portions of the recordings are not admissible at trial. *Id.* at 380 ("[I]f an informant 'deliberately elicited' incriminating statements relating to the charged offense, the defendant is entitled to suppression of those statements in the trial on the charged offense, but the Sixth Amendment raises no bar to the initiation of the interview itself or the use of any statements that incriminate the defendant or on uncharged offenses.").

In light of the Court's ruling that the Delgado recordings were lawfully obtained and lawfully shared with the prosecution team, the Court declines to adopt any findings in the Report of Government misconduct relating to these recordings.

## C. *The Search of Eden Gardens*

Judge Otazo-Reyes found that the "taint" protocol for the search of Eden Gardens was inadequate and ineffective and the prosecution team improperly reviewed materials from the Eden Gardens search before "taint" attorneys had reviewed the materials, despite assertions of Esformes's privilege. However, in assessing whether Esformes was prejudiced by the Government's actions regarding Eden Gardens, Judge Otazo-Reyes found that the "Descalzo documents" found there and used in Ginsparg's reverse proffer and during the Bengio debriefings did not lead to charges against Esformes or Ginsparg. The documents Esformes has claimed to be privileged from the search remain to be litigated and both sides have agreed to honor any validly asserted privilege relating to those documents.

The Government contends that it had no reason to believe before December 7, 2018 that there were any issues with the filter protocol that was implemented at Eden Gardens and that any issues with the search were not a result of bad faith. According to the Government, as soon as Young learned of a potentially privileged document, review of the Eden Gardens documents ceased, and as soon as she became aware that certain agents had been involved in the search, they were removed from the prosecution team.

## 1. Relevant Facts

Agents arrived at Eden Gardens to execute the search warrant issued by Magistrate Judge Chris M. McAliley on July 22, 2016. The search warrant authorized the search of the office suite at Eden Gardens and seizure of business records related to the health-care fraud investigation of Esformes.

Prior to the execution of the search warrant, agents conducting the search knew that Norman Ginsparg, an attorney who was a business associate of Esformes, worked at Eden Gardens. The Government was aware that Ginsparg was a lawyer licensed in Illinois, but not licensed in Florida. Some cooperating witnesses had told the Government that Ginsparg was Esformes's attorney or that Ginsparg had done legal work for Esformes. But other witnesses had told the Government that Ginsparg was not Esformes's attorney. Special Agent Clint Warren, the lead taint agent, had been told that Ginsparg was a business associate of Esformes and was involved in the fraud scheme. Ginsparg was known to have helped make sham contracts and to help hide kickback moneys and payments for Esformes.

Thus, in an abundance of caution, the Government established a taint protocol and only non-case agents were to be utilized in conducting the search. The search agents were to place any materials they believed could be potentially privileged into a "taint" box, which were to be subsequently reviewed by a filter attorney. But, no filter prosecutor was assigned to participate in a filter review during the search. And, although a taint protocol was to be followed, many of the taint agents had actually participated in investigations with some relation to Esformes prior to the search, some in a significant way. Other agents had not participated in this or related investigations prior to the search but became actively involved in the Esformes investigation after the search. Further, even though the whole purpose of having a taint team was because of the presence of Ginsparg, the agents did not receive sufficient instructions on how to treat the materials recovered from Ginsparg's office.

On the morning of the search, Descalzo spoke with Government agents on the scene to inform them of potential privileged documents on the premises. Agent Warren was aware that Descalzo had been there. However, he did not speak to her and did not know that she went to Eden Gardens to invoke the attorney-client privilege with respect to the search and seizure being conducted there. Warren acknowledged that Special Agent Mark McCormick spoke to Descalzo, but explained that he did not speak to her because he was doing other functions.

Moreover, Descalzo sent an email to Young the morning of the search, asserting that there were privileged documents inside of Eden Gardens. Young

did not open the email until later in the day, and forwarded it to her supervisor at the DOJ, Allan J. Medina, at 1:50 p.m. Descalzo stated in her email: "I have informed agents that they are seizing attorney-client privileged materials. Ginsparg identified his files for agents. Ginsparg is an attorney. He provided counsel for companies, Mr. Esformes, and others. These are privileged files. We are not waiving any privilege." *See* 11/6/17 Transcript, ECF No. 625 at 134:20–135:3.

Ginsparg also identified materials in his office that he claimed were privileged and unrelated to his business dealings with Esformes on the day of the search. Agent Warren and Young both testified that Ginsparg was given the opportunity to do a walkthrough and identify documents that were not part of the fraud scheme, which he did. Ginsparg was also given a property receipt to sign at the end of the search. Warren testified that did not speak to Ginsparg at that time and did not ask him for information regarding any privilege claims in relation to Esformes's documents.

Despite this, the executing agents were not provided the names of the attorneys of Esformes or the law firm of those attorneys. Hundreds of documents, clearly prepared by law firms and/or marked "privileged and confidential" or "attorney/client privilege" or "work product privileged" or "legal" were not segregated and placed in the "taint box" and were, thus, within the boxes providedto the prosecution team. Agent Warren acknowledged before Judge Otazo-Reyes that he did not even know that Carlton Fields was the law firm representing Esformes, or that one of the boxes of seized materials was labeled "Carlton Fields." Warren also stated that the word "legal" written on the label of another box of seized materials did not stand out to him. With regard to another box of seized materials, labeled "court documents," Warren did not take any steps to ensure that it did not contain privileged materials.

The search resulted in the seizure of 70 boxes of materials, one of which was the "taint" box. The other 69 boxes were enumerated and believed to include reviewable documents.

Young proceeded with the review of the Eden Gardens materials sometime around late July and early August of 2016. Young testified that she did not believe that she was keeping Descalzo's email a secret from Esformes's team or her colleagues at the Justice Department and added that Agent Terence Reilly contacted her supervising attorney Nick Surmacz on the day of the search about this issue. The use of a filter team had been confirmed, which prompted Ginsparg being allowed to enter the search site and point out any privileged materials to the agents.

In August 2016, the Government sent nearly all of the Eden Gardens materials to a third-party vendor in the Washington, D.C. area for scanning.

Box #6 and Box # 31 were not sent to D.C. Esformes's team did not review the documents before they were sent out for scanning.

On August 17, 2016, Young sent a letter to Esformes's counsel informing them that the Eden Gardens search warrant materials were available for their review at the FBI office in Miramar, Florida. On August 24, 2016, Young sent to all defense counsel in the case duplicates of the thumb drives that had been seized from Eden Gardens.

In December 2016, however, Young came across a document that appeared to be a memorandum with the name of what appeared to be a law firm in the header. Young testified that once she came across privileged information when reviewing the Eden Gardens documents, she stopped, informed AUSA Drew Bradylyons, and consulted with her supervisors.

Young and Bradylyons consulted with their DOJ supervisors on December 15, 2016 to establish a filter team to conduct a review of the Eden Gardens materials. In late January 2016, a Chicago-based DOJ attorney was assigned to serve as a filter attorney and was to be supervised by a DOJ Assistant Chief in Washington, D.C. The Government used a filter team and proceeded with the review process that they had in place to segregate potentially privileged information which had been seized from Eden Gardens.

On February 10, 2017, Esformes's counsel informed Young that, upon a review of the boxes of materials seized from Eden Gardens, they had found that four of the boxes contained attorney-client privileged and work-product materials. Counsel also requested that the boxes be segregated and not viewed or copied by the Government pending a ruling from the Court. The Government advised that it would not review any Eden Gardens materials until a filter process was agreed upon. Young also referred Esformes's counsel to the filter prosecutors who were expected to review the Eden Gardens materials. Given this communication, the Government obtained permission to have a non-case paralegal scan the two boxes (Boxes #6 and #31) that had not been sent to the third-party vendor in Washington, D.C. The scanning of these boxes was completed on March 8, 2017.

### i.    Did Esformes waive any privilege claim relative to the search?

The Government claims that Esformes waived any privilege issues relating to the search of Eden Gardens. Judge Otazo-Reyes found that given the Government's assurances that the search was being conducted by a "filter team," Esformes acted promptly in preserving his privilege claims and found no factual basis for the Government's argument that he waived those claims through subsequent inaction.

The Court agrees with Judge Otazo-Reyes. Descalzo appeared at Eden Gardens the morning of the search to assert Esformes's privilege claims, and spoke to Agent McCormick, who was leading the Eden Gardens search team. Descalzo also sent an email to Young the morning of the search, asserting that there were privileged documents inside of Eden Gardens. That email was forwarded by Young to her supervisor, Medina, that afternoon. These actions were sufficient to preserve Esformes's claims of privilege.

    *ii.    Was the Government required to implement an effective "taint protocol" for the Eden Gardens search?*

Prior to the search of Eden Gardens, the Government had information that Ginsparg was a lawyer, albeit not licensed in Florida, with an office in Eden Gardens. The Government was informed by Gabriel Delgado and other cooperating witnesses that Ginsparg handled lawsuits and legal paperwork in his office and where his office was located.

Notwithstanding this, the Government contends it had a basis to question or disregard the attorney-client relationship between Esformes and Ginsparg because it knew Ginsparg was not licensed to practice law in Florida, and therefore could not lawfully practice in the state and could not have established a law office at Eden Gardens. The Government also relies on the fact that Gabriel Delgado insisted that Ginsparg did not represent Esformes as an attorney. Further, to the extent he was Esformes's attorney, the Government contends that not every conversation with Ginsparg is per se privileged just because he is an attorney.

Although the Government is correct that Ginsparg cannot lawfully practice in this state, the Court finds Ginsparg meets the definition of an attorney for attorney-client purposes under Florida law as found by Judge Otazo-Reyes. Florida Statute § 90.502 defines the term lawyer for purposes of the attorney-client privilege as "a person authorized, or reasonably believed by the client to be authorized, to practice law in *any* state or nation." Fla. Stat. § 90.502(1)(a) (emphasis added). Ginsparg meets this definition and the Government should have considered this before completing its search of Eden Gardens.

Notwithstanding the Government's belief that Ginsparg was a co-conspirator and/or business associate of Esformes, the Government was aware that Ginsparg was an attorney who had worked in some capacity as Esformes's attorney prior to initiating the search at Eden Gardens. Therefore, the Government should have implemented an effective taint protocol in conducting the Eden Gardens search. As discussed further below, the Court finds that

although the Government attempted to implement a taint protocol prior conducting its search of Eden Gardens, its preparation for and the methods used during and after the search were sloppy and ineffective.

### iii. Was the "taint protocol" adopted by the Government effective?

The "taint" protocol adopted by the Government called for the use of non-case agents to conduct the search of Eden Gardens, and for those agents to segregate attorney client and/or work product privileged materials in a "taint" box. However, based on the testimony of Agent Warren, Investigators Joyce Cavallo and Abe Jurado, and Special Agent Bryan Lugones, it is apparent that the taint agents were either provided inadequate instructions or ignored those instructions, and the search was conducted in a way that can best be described as clumsy and border-line incompetent.

As stated by Judge Otazo-Reyes, "[c]onsequently, only a handful of documents were placed in the 'taint' box, while numerous documents bearing law firm letterheads, and documents variously marked 'privileged,' 'confidential,' 'work product,' and 'attorney/client' went into the 69 boxes of purportedly non-'taint' materials." (Report, ECF No. 899 at 107.) To give some perspective, as Judge Otazo-Reyes pointed out in her Report, one of Esformes's attorneys, Rosanna Arteaga-Gomez, prepared a privilege log consisting of 1,244 entries showing privilege claims for approximately *800* items. The Government acknowledges that these privilege claims must still be litigated and that it would not rely on any items determined to be privileged. Nonetheless, these results clearly show that the Government's "taint" protocol was to a large extent inadequate and ineffective.

Further, despite the Government's requirement to utilize non-case agents to execute the search at Eden Gardens, the Government relied on several agents for the search who had participated in other health care fraud cases that bear some relationship to the Esformes case or who were later used in the underlying Esformes investigation. The use of these agents raises questions about their independence and effectiveness as members of the filter team. As such, the decision to allow these agents to participate in the search was also ill-advised.

### iv. Did the prosecution team improperly review materials from the Eden Gardens search prior to further scrutiny by "taint" attorneys?

Magistrate Judge Otazo-Reyes found that the prosecution team reviewed materials from the Eden Gardens search before "taint attorneys" were added to

the process. The Court agrees.

Before any action was taken to share the seized documents with Esformes, Young conducted a "pretty informal" review of the documents obtained at Eden Gardens to "see what kind of documents [the Government] had." (Report, ECF No. 899 ¶ 251.) During that search, she came across what have become known as the "Descalzo documents." Young found the "Descalzo documents" in Box #12. She took them out for copying but then placed them back in Box #6 instead of Box #12.

As a result, the scanned version of the Eden Garden materials initially provided to Esformes did not include these documents. The Government used the "Descalzo documents in Ginsparg's reverse proffer and the Bengio debriefings in September and October 2016, which are discussed in further detail below. Agent Reilly independently recommended to Young that she use the Bengio notes, which are contained within the Descalzo documents, in conducting the Ginsparg reverse proffer.

Unlike many documents seized from Eden Gardens which were marked with the name of a law firm or were marked "attorney-client privileged," there are no writings or markings on the "Descalzo documents" which would alert anyone that the documents were privileged. Young was first alerted to a potential privilege issue as to these documents as early as September 25, 2016 by Bengio's attorney at Bengio's first debriefing and again on November 2, 2016 via email from Ginsparg's attorney, David O. Markus. Nevertheless, Young continued her review of the documents until December 7, 2016, when she came across a different document that appeared to be privileged. Esformes's team, however, did not become aware of the Descalzo documents until February 2017, when Esformes's attorneys conducted a physical inspection of the documents seized from Eden Gardens.

Even after Young found the potentially privileged document on December 7, 2016, she did not inform the Court or Esformes. When the Esformes's team pointed out the privileged nature of certain documents in the Eden Gardens boxes they had begun to review, Young stated that "the Eden Gardens materials are currently being reviewed by a *filter team* and *not* by the prosecution team" and directed them to Attorney Leo Tsao, who was supervising the filter review and had been assigned to the case after the execution of the search. (Emails, ECF No. 329-51 at 7. (emphasis added)). On March 9, 2017, after some disagreement between the parties, Bradylyons sent an email to Esformes's defense team stating that it would not conduct a filter review until the Court approved of a filter protocol. (*Id.* at 18–19.)

Other members of the Esformes prosecution team also viewed Eden Gardens search materials prior to any review by "taint" attorneys. Specifically,

Special Agent Jonathan Ostroman conducted a quick review of two or three of the boxes before they were sent out for scanning since he had received no instructions to refrain from reviewing those boxes. He also reviewed some of the electronic media, namely, thumb drives. Agent Warren, however, testified before Judge Otazo-Reyes that the search agents only conducted a cursory review of the documents at Eden Gardens in the course of the search and that there was no review at all of the electronic storage media that was seized, based on his understanding that these items would be processed at a later date.

The Court finds that there were numerous occasions in which the Government could and should have implemented a filter protocol after the Eden Gardens search but failed to do so. First, as previously discussed, Descalzo's numerous privilege alerts should have warranted a response from the Government after the search, if not before the search. Knowing after the search that Descalzo had raised this issue, the Government could have developed a post-search taint protocol with a filter team to ensure that no potentially privileged documents were turned over to the prosecution team. Even accepting that the Descalzo documents did not appear to be privileged on their face, Young was alerted as early as September 2016, during the Bengio debriefings. And, even when Young *did* come across a potentially privileged document in December of 2016, she did not alert Esformes's team or this Court. It was only in February that this issue came to the fore.

Accordingly, the Court finds that the Government continued to act with disregard for potential privilege issues after the Eden Gardens search..

### D. *The "Descalzo Documents": Ginsparg's Reverse Proffer & the Bengio Debriefings*

Judge Otazo-Reyes found that the Government utilized privileged materials, the "Descalzo documents," in conducting debriefings of Jacob Bengio, Ginsparg's assistant. Judge Otazo-Reyes, although finding these documents were also used in Ginsparg's reverse proffer, did not make a particular finding as to the propriety of their use at the reverse proffer.

The Government argues that these documents bear no indication on their face of being attorney-client documents or attorney work product, and that any use of the documents during the Bengio debriefing was done in good faith. The Government asks that the Court reject Judge Otazo-Reyes's adverse findings about the prosecution team's attempt to "obfuscate the record" by providing a changed narrative as to the invocation of privilege by Bengio's attorney, Robin Kaplan, at his debriefings.

### i. The "Descalzo Documents"

The Descalzo documents seized from the Eden Gardens search were used during two investigative episodes by the Government: (1) Ginsparg's reverse proffer and (2) Jacob Bengio's debriefings. The Descalzo documents are comprised of 12 pages of Quickbook and Excel spreadsheets and three pages of notes prepared by Bengio. There are also some handwritten notes of Ginsparg and Bengio on the spreadsheets. The documents are mostly financial records related to the La Covadonga and Family Rest entities. The documents were part of a project Ginsparg asked Bengio to complete that was for Descalzo's ultimate review.

By way of background, Bengio is a Miami native who obtained a bachelor's degree in finance and business administration from Florida International University and a master's degree in taxation from Nova Southeastern University in 2009. He worked at Eden Gardens in 2002 as an assistant administrator. He stayed on when Eden Gardens was acquired by the previous operator's pharmacies in 2004. At that time, Bengio started working for Ginsparg. Bengio has held the titles of assistant director of legal affairs, assistant director of finance and, most recently, director of finance of ALF's.

In October 2015, Ginsparg asked Bengio to compare the agreements between the Esformes entities and La Covadonga and Family Rest with what actually occurred. Pursuant to this request, Bengio went into QuickBooks, identified where all the payments were, and exported the reports he generated in QuickBooks into an Excel spreadsheet. Soon after he was assigned this task, Bengio learned that his results were going to be presented to Ginsparg's attorney, Descalzo. Bengio had multiple meetings with Ginsparg about the project. At a November 2015 meeting with Ginsparg, Bengio took notes to complete his tasks. These notes are what have become known as the "Bengio notes."

In early January 2016, Bengio forwarded the final summaries of his work to Descalzo after having presented his findings to her in person. Certain of the comments he had entered on the Excel spreadsheets appeared in the final version of the project sent to Descalzo.

Printed copies of Bengio's drafts were seized during the Eden Gardens search. The Government believed that these documents included proof of obstruction of justice. The Government was particularly interested in a notation Bengio had included that said "remove payments to ALFH and to PE." Bengio later explained that this notation was included because Descalzo was only interested in payments from the Delgados to Esformes and those payments were inapplicable.

## ii.    The Ginsparg Reverse Proffer

The Ginsparg reverse proffer took place on September 20, 2016 at the FBI health care fraud facility in Miramar, Florida. In a reverse proffer, the government makes a presentation to the target of an investigation to show the target that the government has a strong case against him and to convince him to cooperate with the government. The target generally listens and does not speak during a reverse proffer. The following persons were present at Ginsparg's reverse proffer: FBI Agent Myers, HHS Agent Ricardo Carcas, FBI Agent Ostroman, AUSA Young, AUSA Bradylyons, Attorney Ginsparg, and his counsel, Markus. Young chose to rely on the "Descalzo documents" in the Ginsparg reverse proffer.

Young did most of the talking at the Ginsparg reverse proffer in presenting the government's position to Ginsparg and his counsel. Neither Agents Ostroman nor Carcas had specific recollections of the details of what was said. None of the agents took notes at the Ginsparg reverse proffer since Ginsparg only listened and did not speak.

Young believed that the Bengio notes related to the Quickbook printouts, and that the notes related to a fraudulent scheme. In particular, she believed that instructions related to removing payments from ALF Holdings, were supporting evidence of kickback payments that the Government had already discovered and obstruction of justice. Ginsparg's attorney did not raise a potential privilege issue at the reverse proffer.

It was not until November 2, 2016 that Ginsparg's counsel, Marcus, raised the issue of a potential privilege issue via an email to prosecutors. In his email, Ginsparg's counsel stated something to the effect of: "Mr. Ginsparg did not actually remove payments and that arguably, this is work product that could not be used against him at trial." (Report, ECF No. 899 at ¶ 320.)

After discussing the issue raised by Ginsparg's counsel with their supervisors, Young and Bradylyons decided to put the documents aside and to seek blessing from the Court should the Government want to actually use those documents in an affirmative sense. According to Bradylyons, the Esformes prosecution team disagreed with the assertion of work product privilege as to the "Descalzo documents" and assumed that, to the extent they would be using the documents down the road, they "would have to litigate whether it was work product, whether there was a crime fraud exception, and whether [they] could use it moving forward." (ECF No.685 at 82:2–4.)

### iii.    Bengio Debriefings

On September 28, 2016 and October 14, 2016, Bengio met with agents and prosecutors for debriefings. Bengio had retained Robin Kaplan to represent him during the investigation phase of this case.

During the debriefings, Bengio was shown the "Descalzo documents." All of the witnesses agree that Kaplan alerted the Government to the fact that there was a possible work-product privilege issue. The main dispute in the testimony, which the magistrate judge had to resolve, was whether Kaplan's assertion of work-product privilege related to one line in the notes or whether the assertion of privilege related to the notes as a whole. Further, there was conflicting testimony regarding Young's questioning of Bengio regarding notes contained within the documents that were handwritten by Ginsparg.

In order to determine what happened during the Bengio debriefings, Judge Otazo-Reyes considered and weighed the testimony of agents Carcas, Myers, Mitchell and Ostroman, prosecutors Young and Bradylyons, and Bengio and Kaplan. The magistrate judge also considered pre-hearing affidavits submitted by some of those witnesses..

### a. Prosecution team's version of the Bengio debriefings:

Agents Carcas, Myers, Mitchell and Ostroman were present for the two Bengio debriefings conducted by the Esformes prosecution team. Mitchell and Myers took notes during the September 28 debriefing and Ostroman was responsible for taking notes during the October 14 debriefing. According to Ostroman, Bengio was given a proffer letter for the October debriefing to invite him to speak without fear of self-incrimination.

At the September 28, 2016 debriefing, which lasted approximately three hours, Young asked Bengio questions. Initially, she went over his background information to get a feel for his roles and responsibilities, particularly with regard to various corporations, and then she went on to discuss some of the documents attached as "1A Materials" to the FBI Form 302 prepared for the debriefings.

Although Agent Carcas testified that Bengio identified himself as Administrative Assistant to Norman Ginsparg, Director of Legal Affairs, Young testified that, during the first Bengio debriefing, Bengio described his work as involving administrative rather than paralegal tasks; and that his day-to-day duties were those of a bookkeeper in that he wired money, cut checks, filed incorporation documents for companies, performed bookkeeping duties, and kept track of luxury vehicles provided to Esformes employees as incentives.

At the first debriefing, Young also asked Bengio about the contents of the Descalzo documents. Young asked Bengio to explain the tasks that were listed in some of the Descalzo documents and asked a series of questions about other entries in the Descalzo documents.

Bengio identified the Bengio notes as his own and he explained what each of the notes meant. According to Young, Bengio stated that he had had a meeting with Norman Ginsparg in November 2015 and the Bengio notes were the notes from this meeting. Young attached significance to the note page that had the entry "remove payments to ALFH and PE," as being possible evidence of obstruction by removing payments from the books. Young testified that she believed only one bullet point in the Bengio notes related to a project that he was working on for Descalzo, namely the note that said, "put comments in actual column."

Bengio also identified the handwriting on the QuickBooks printouts as belonging to Norman Ginsparg. According to Young, no more questions were asked about these documents once Bengio identified the handwriting as Ginsparg's. However, Young did later concede that she asked about documents with Ginsparg's handwriting on it at the second debriefing. (Report, ECF No. 899 at 111, n.53.)

Young stressed her view that, during the first Bengio debriefing, Kaplan never said that *all* of the Bengio notes reflected Descalzo's work product. Young also stated that, if Kaplan had made any such statement, she would have stopped the first Bengio debriefing immediately because she would have understood Kaplan to be making a work product or privilege claim. Young added that she felt confident from the first meeting that Kaplan had alerted her to the potential privilege issue. She felt as though she had successfully avoided it. There was no point in which she thought in that interview that she was asking about something that was privileged or work product. Young testified that she viewed Kaplan's reference to a project for Descalzo as limited to the creation of a spreadsheet. Young could only recall that Bengio said "this has Mr. Ginsparg's handwriting, and that was all he knew about the spreadsheet." (Report, ECF No. 899 at ¶ 266.)

In her pre-hearing declaration, Young described this interaction as follows:

> At one point I showed Jacob Bengio the Descalzo documents and stated I believed that these documents constituted evidence of a crime because there was a notation, removing payments to ALF [Holdings] and to PE. I asked Jacob Bengio if he removed payments from the company accounting records. Jacob Bengio's counsel

advised that his notes, including the notation regarding removing payments, were taken during a conversation Jacob Bengio had with Norman Ginsparg after Ginsparg had a meeting with Ms. Descalzo, during which Ms. Descalzo had asked him to undertake a project.

Bradylyons had no independent recollection of where in the notes Kaplan made her work product or privilege assertion. He did not doubt that it happened next to the "put comments in actual column." He did not believe it was in response to the "remove payments" bullet because that was a bullet that they were particularly interested in. Bradylyons also testified that, while being shown the "Descalzo documents," neither Bengio nor his counsel asked to stop the debriefing. Bengio stated that his notes were generated from a meeting that he had with Ginsparg and did not say he had a meeting with Descalzo.

On November 2, 2016, Young met with Ginsparg's counsel who asserted that Ginsparg did not alter any company books and that the spreadsheets and the handwritten notes by Bengio were arguably work product of Descalzo under an agency theory and that the government would arguably not be able to use that at trial against Ginsparg. As a result, the Esformes prosecution team decided that if it wanted to use those notes affirmatively in their case against Ginsparg, it would first file a motion with the duty court asking for a crime fraud exception on the notes, but that until that point, the notes would not be used for any purpose until they received a ruling as to the crime fraud exception.

When asked about bringing to the Court's attention her having been exposed to work product belonging to Esformes, Young responded that the prosecution team did not feel it was necessary just because Ginsparg's attorney had told them it was arguably a potential for being work product. There were a number of issues which would have to be litigated, including the fact that those notes were in the possession of a third party. There was also a question of whether Descalzo was personally involved in their creation. Young also thought that Quickbooks are not typically work product and Bengio did not describe his work as having been done in anticipation of litigation. And finally, she thought that the instruction regarding removing payments was potential for crime fraud.

Young testified that the items that she selected and used for the first Bengio debriefing did not affect the Esformes investigation in any way, and had nothing to do with: any of the charges against Esformes; the indictment; the superseding indictment; or, any subsequent witnesses and evidence that she located. Young also testified that she did not learn any defense strategy from

reviewing the Bengio notes and that the moment that Bengio described putting comments into a column for a spreadsheet for Descalzo she stopped asking about it and she does not have any awareness of what it was that Bengio made for Descalzo. Carcas testified that the documents used in the Bengio debriefings did not influence his investigation in any way. Relatedly, Myers also testified that neither the documents presented nor the information exchanged at the Ginsparg reverse proffer on September 20, 2016 influenced his investigation in any way.

### b. *Kaplan and Bengio's version of Bengio debriefings*

In preparing for the first Bengio debriefing, Kaplan became aware that the government considered certain notes to be "smoking gun" evidence of obstruction. Kaplan also understood that the notes were potentially work product privilege belonging to Esformes. Kaplan and Bengio had a joint defense agreement with Ginsparg and his counsel, and she was able to view the Bengio notes that had been obtained by Ginsparg's counsel after the Ginsparg reverse proffer. Kaplan met with Ginsparg's counsel concerning the potential work product privilege just one hour before the first Bengio debriefing so she was very focused on that issue when the debriefing took place.

Kaplan devised a strategy to raise the privilege, alert the government that there may be an issue, and let them deal with it. But, she would allow Bengio to answer questions so that in the event that this was what the Government believed to be "smoking gun" evidence of a crime, Bengio was not implicated and he could explain to them what the notes actually were and the Government could stop making incorrect assumptions.

According to Kaplan, the initial portion of the first Bengio debriefing was a normal inquiry into her client's background. Kaplan testified that when the notes came up during the debriefing, Bengio began to answer questions whether or not his handwriting appeared on the notes. Kaplan said she raised the issue of privilege with Young and advised her that the notes related to a project that was done for Descalzo, who Kaplan understood to be Esformes's defense attorney. Kaplan expected the prosecution to take her assertion of the privilege seriously, but Young did not.

Kaplan told Young that she did not only point to one line, that she told Young that the notes as a whole were related to a meeting Bengio had with Ginsparg about a project for Descalzo. Kaplan reiterated that she raised privilege as to all the notes, not just one line of the notes.

Kaplan testified that it was her recollection that the spreadsheets were shown to Bengio after the notes. She was not previously aware of spreadsheets,

but Bengio knew what they were when he saw them, and he explained that the Excel spreadsheets pulled from Quickbooks that were shown to him were related to the notes.

When Kaplan was in court and heard Young's testimony, she felt that Young had been untruthful by testifying that the assertion of the privilege related to only one line in the notes. Kaplan immediately brought it to the attention of AUSA Daniel Bernstein, who she knew and respected, via an email sent on November 7, 2017 at 12:15 p.m. After the court lunch break that same day, AUSA Bernstein approached her to talk about the email and she told him that everything Young said about how the privilege was asserted was not correct. Kaplan said she was quite certain about how she had asserted the privilege because she knew in advance of the debriefing about the notes.

Kaplan added that she asserted the privilege for the entire notes because it would have made no sense to assert a privilege for one line. Bengio was asked questions line by line about the notes and was asked questions about the Excel spreadsheets that were presented to him. Bengio tied the Excel spreadsheets to the notes. He explained that he was happy to see the spreadsheet since they helped explain the notes. Bengio explained the notes and spreadsheets related to a project they were doing.

When he was asked about the notation "remove payments," Bengio said he could not remember why he wrote it, but explained that all of the notes including the "remove payments" would have been related to the Excel spreadsheets he was working on. He made it clear that he did not remove anything from the company QuickBooks and none of the notes actually related to doing anything in the company QuickBooks. It was all related to the project for Descalzo.

Kaplan was questioned about differences between her proffer and her hearing testimony. She explained that she did not draft the proffer sequentially and it was a summary of the entire event from the explanation of the Bengio notes. To her, the important issue for the proffer was explaining that the notes were privileged and why they were privileged.

Bengio testified before Judge Otazo-Reyes that, while he is not an attorney and has no legal training, he assisted Ginsparg, who he knows to be an attorney, with his duties. He also observed Ginsparg functioning as an attorney for Esformes by doing legal work related to Esformes's divorce (by communicating and working with Esformes's divorce attorneys), consulting on private property acquisitions, communicating with Esformes's criminal defense counsel, and working with Esformes's personal tax attorney.

In October 2015, Ginsparg approached Bengio to go back in time and understand what occurred during the relationship of La Covadonga and Family

Rest and the Esformes entities. According to Bengio, that relationship had ended in 2010. Specifically, Ginsparg asked Bengio to compare what the agreements with La Covadonga and Family Rest provided for with what actually occurred. Pursuant to this request, Bengio went into QuickBooks, identified where all the payments were, and exported the reports he generated in QuickBooks into an Excel spreadsheet.

Soon after he met with Ginsparg, Bengio learned that the purpose of the assignment was to be able to present the results directly to Descalzo. Bengio acknowledged that he was never instructed by Ginsparg or Descalzo to mark the documents he was working on as "attorney client."

At the hearing, Bengio compared some spreadsheets with ones he was shown during his debriefings and explained that the latter were printouts of his work. At his debriefing, after he had identified Ginsparg's handwriting on the printouts shown to him, Bengio stated that he was asked questions about them, which he answered.

Bengio recounted that at his debriefing, rather than being told by the prosecutors that they did not want to hear about the project, he was merely told that they did not want to know what he had said directly to Descalzo. When shown the first page of the Bengio notes, he said that this was a meeting between Ginsparg and himself regarding a project he was working on for Descalzo. He also testified that Kaplan stated at that point that the notes could be potentially privileged materials. His understanding regarding Kaplan's privilege statement was that it referred to everything about the project and was not confined to a particular line in the Bengio notes.

At his debriefing, Bengio explained to the prosecution team that the Bengio notes reflected Ginsparg's feedback on the project they were discussing at their November 2015 meeting. After giving this explanation, Bengio was asked to go through the Bengio notes one by one and explain them to the government.

c.    *Judge Otazo-Reyes's Findings*

The magistrate judge found the assertion by Young that the Descalzo project related only to one bullet point to be inconsistent with her pre-hearing affidavit, which discussed the Bengio "notes" in the plural, not singular. Young, Bradylyons and Mitchell had each filed pre-hearing affidavits in which each referred to the Bengio "notes."

Accordingly, Judge Otazo-Reyes found that the prosecution team presented "an internally inconsistent narrative" regarding Kaplan's warning about the privileged nature of the Bengio notes. She "assign[ed] no credibility to

the prosecution team's 'new narrative,' which, in any event, ma[de] no logical sense; and deplore[d] the prosecution team's attempts to obfuscate the record." (Report, ECF No. 899 at 110.) Judge Otazo-Reyes also assigned no credibility to the proposition that Young stopped asking questions about the QuickBooks/Excel spreadsheets after Bengio identified Ginsparg's handwriting on them. Rather, she found that Young wholly disregarded all privilege concerns in conducting the Bengio debriefings. She also found Bengio's testimony to be "cogent and credible" and accepted it as "an accurate description of the events in which he participated." (Report, ECF No. 899 at 110.)

Judge Otazo-Reyes concluded that the Government's exhaustive questioning of Bengio regarding all the details of the Bengio notes and the related QuickBooks/Excel spreadsheets constituted a violation of the Descalzo's work product privilege. However, in making her prejudice ruling, found that the "Descalzo documents" were not used to charge Esformes or Ginsparg with any offense.

The Government argues vehemently that the Court need not accept Judge Otazo-Reyes's credibility finding regarding the use of the Bengio notes during Bengio's debriefings because either (1) such a finding is contradicted by the record; or (2) it is an unnecessary ruling given the lack of prejudice to Esformes. The Government also informs the Court that it does not intend to use the Bengio notes in its case in chief, so any finding of misconduct as to these issues is moot.

The Court agrees with Judge Otazo-Reyes that these documents are privileged given that they were created for Esformes's attorney for purposes of coming up with a strategy in defense of the kickback claims against Esformes. The Government attempted to use the information contained in those documents to gather more information from Esformes's confidant, Ginsparg, and his assistant, Bengio.

However, the Court agrees that Esformes has not sufficiently demonstrated that he was prejudiced by the use of the Descalzo documents. Although these documents were used in the investigative process, the documents did not ultimately produce any charges against Esformes. And while Esformes contends that these documents were some sort of blueprint for his defenses, the Court is unconvinced that a review of these documents resulted in any real advantage to the Government.

Having found that there was no demonstrable prejudice from the use of the "Descalzo documents," and given the Government's agreement not to use the documents during the trial, the Court first finds that it is unnecessary to adopt the Magistrate Judge's credibility determinations and findings of

"misconduct," "attempts to obfuscate the record," and creating a "'new' narrative," particularly given the adverse consequences of such findings to the careers of the prosecutors. *See United States v. San Pedro*, 781 F. Supp. 761, 771 (S.D. Fla. 1991) (Gonzalez, J.) ("[T]he Court cannot, based on the review of a cold record and in light of the testimony of all parties, make a finding that Behnke and Fernandez deliberately lied when they testified before Magistrate Judge Snow. Moreover, such a finding is unnecessary to the Court's ruling on the defendant's motion.").

But, the Court finds that there is an articulable basis in the record for rejecting those credibility findings. At the end of the day, the factual dispute really comes down to whether the prosecutors thought the assertion of the privilege was for a "note" or for "notes." All of the attorneys who testified concerning the "Descalzo documents," including Kaplan, had inconsistent recollections of which of the notes and/or spreadsheets were included in the invocation of the privilege. Even Descalzo herself had provided a written proffer that "the Excel workbook is my work product," but she did not say that the three pages of Bengio's notes were included as work product.

During the reverse proffer of Ginsparg, he and his attorney were shown the "Descalzo documents" and were told that the Government believed notes on the documents showed a criminal attempt to remove certain records. Ginsparg's attorney may not have known at that time about the potential work product nature of the documents but he certainly knew before the first Bengio debriefing as evidenced by his alerting of Kaplan to that fact just before the first Bengio debriefing. But Ginsparg's attorney also knew that there was an innocent explanation for the notes and it was to Ginsparg's benefit to have Bengio review the documents with the Government and provide that innocent explanation. He may not have had a legal or ethical obligation to notify the Government but he chose to alert Kaplan before the first Bengio debriefing and did not send an email to the Government alerting it of the potential work product issue until November 2, 2016 – after the second Bengio debriefing.

From a complete and careful reading of the record, this Court concludes that the difference in the testimonies of Young and Kaplan and the difference in pre-hearing affidavits and trial testimony of the prosecutors is due to differences in memories and from misunderstandings, and not due to any intentional attempt to lie or subvert justice.

The Court finds that Kaplan's recollection relating to the use of the "Descalzo documents" is more accurate than the prosecutors' recollection. After all, Kaplan was told just an hour before the debriefing by Ginsparg's attorney to be on alert for the documents and their potential work product nature. But,

because Kaplan's testimony is more accurate does not equate to Young's or Bradylyons's testimony being perjurious.

The problems with the use of the "Descalzo documents" as well as the search of the Eden Gardens and the Ginsparg text messages, to be discussed *infra.,* stem in part from the prosecution team's belief that Ginsparg was acting as a criminal co-conspirator and not an attorney. Yes, they had obtained evidence of Ginsparg's role in Esformes's criminal conduct, but they had also received information that he was an attorney and handled legal affairs for Esformes. Yes, he was not licensed in Florida, but he was licensed in Illinois. Their myopic view of Ginsparg as a criminal and not an attorney skewed their reaction to, and blurred their ability to see, the potential for privilege.

But, these same prosecutors had, on numerous occasions in this case, consulted with superiors at the United States Attorney's Office and the Department of Justice, consulted with attorneys in the DOJ Professional Responsibility Advisory Office ("PRAO"), established a taint team for the search of the Eden Gardens and established a taint team for the Delgado recordings. By the time they testified at the hearing before Magistrate Judge Otazo-Reyes, they knew that the "Descalzo documents" were in no way inculpatory and were a drop of water in the sea of evidence against Esformes. Why would they conspire with each other and risk their careers to create a "new narrative" over this issue? It's inconsistent with their conduct throughout the case. The Court finds an articulable basis in the record to find that the prosecution team did not engage in any intentional misconduct in the case.

### VI.   *Ginsparg / Esformes Text Messages*

The Government included texts between Ginsparg and Esformes on its "Hard Drive One," which Judge Otazo-Reyes found to be privileged material that should not be admitted at trial. However, the Government has agreed not to use these text messages at trial, rendering any suppression question moot. Nonetheless, the Court believes it is worthwhile to consider this issue to assess the Government's general conduct and any prejudice that Esformes may have suffered notwithstanding the Government's recent concession.

### 1. Relevant Facts

Esformes retained attorney Debra Chames in September 2015 to represent him in his divorce from his wife Sherri. During the course of the representation, a difficulty arose with respect to the communications between Esformes and Sherri because Esformes did not utilize e-mail and the tone of the communications between the two was less than amicable.

To overcome this difficulty, Esformes would dictate his responses to Ginsparg and Ginsparg would basically put it in an e-mail format and send it to Sherri. Esformes and Ginsparg communicated for this purpose via text message. Chames also communicated extensively with Esformes via text message regarding "a multitude" of divorce issues.

Ginsparg's role in the divorce was to revise or clean up text messages or e-mails from Esformes to Sherri and Ginsparg knew that those e-mails and text messages were being used and were in connection with the divorce. Chames considered the text messages between Esformes and Ginsparg in connection with the divorce to be privileged legal communications because Esformes was getting advice from his lawyer, Ginsparg. Among the members of the synagogue that both Chames and Ginsparg attend, it was common knowledge that Ginsparg was an attorney in Chicago who had moved down to Florida around the time that Esformes relocated from Chicago and was Esformes's lawyer.

During the Ginsparg reverse proffer, Young used text messages between Esformes and Ginsparg to show that Esformes was clearly in charge and telling Ginsparg what to do. Ginsparg's counsel did not make a privilege claim with regard to the text messages at any time between the reverse proffer and the November 2, 2016 work-product claim, or thereafter.

These text messages were turned over to the defense after they were copied from the cell phones of Esformes which had been seized at the time of his arrest. Bradylyons testified that he reviewed an email from Pasano providing attorney names (and numbers) for whom communications with Esformes were privileged but Ginsparg's name was not included in that list and was never added to it. Attorney Arteaga-Gomez testified that Ginsparg's name was not on the list but that Young was already aware that Ginsparg represented Esformes,

## 2. Privileged Nature of Texts

Judge Otazo-Reyes found that the Ginsparg/Esformes text messages in the Government's "Hard Drive One" are protected by the attorney-client privilege. The Government does not appear to contest this fact and has conceded that it will not use this text messages as evidence at trial. The Court need not address the propriety of Judge Otazo-Reyes's ruling as to this issue. Not all communications between a client and his attorney are privileged and the privileged nature of these text messages was not readily apparent upon first review.

## VII.   Suppression, Dismissal of Indictment, & Disqualification

In support of her recommendations, Judge Otazo-Reyes concluded that Esformes had sufficiently met his burden of showing misconduct on the part of the Government, though not to the level of extraordinary misconduct found in other cases. *Compare Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995)(finding per se constitutional violation where prosecution obtained details of defense strategy from deputy sheriff who supervised jail cell meetings between defendant and his counsel, and modified own strategy accordingly); *United States v. Horn*, 811 F. Supp. 739, 750–51 (D.N.H. 1992) *rev'd in part on other grounds,* 29 F.3d 754 (1st Cir. 1994) (finding prosecutorial misconduct where prosecutor surreptitiously obtained duplicate copies of documents selected by defense counsel from document repository maintained by an independent vendor, used them during the pendency of a motion to seal, and kept a duplicate set of the documents in violation of the court's sealing order). As for the prejudice prong, Judge Otazo-Reyes found that Esformes had met his burden "to some extent." In light of these conclusions, she recommended less drastic remedies than those requested by Esformes. As previously noted, she recommended that the following documents be suppressed:

1. Any documents from the Eden Gardens search that are found by the Court to be privileged after Defendant's privilege log is litigated.
2. The "Descalzo documents," including the Bengio notes and the Excel/QuickBooks spreadsheets.
3. The Ginsparg/Esformes text messages related to Esformes's divorce that were listed by the Government as trial exhibits.
4. The recordings made by the Delgado brothers and any testimony by them regarding the contents of those recordings.

Esformes argues that the Government's disregard for his rights warrant not only the suppression of the Government's ill-gotten evidence, but also the dismissal of the Third Superseding Indictment or the disqualification of the prosecution team. Esformes believes that he has been prejudiced sufficiently to warrant this kind of relief. In contrast, the Government contests that there was any bad-faith, intentional misconduct or demonstrable prejudice to Esformes.

Ultimately, the Court agrees with Judge Otazo-Reyes that the prosecutors and agents in this case failed to uphold the high standards expected from federal agents and prosecutors from the United States Attorney's Office and Department of Justice during this investigation and prosecution.

But the Court does not agree with her conclusion that the prosecutors acted in bad faith. Nor does the Court believe that the prosecutors acted with any overt intent to violate the Defendant's rights or mislead the Court. Although the prosecution team operated in good faith, their execution of their duties was often sloppy, careless, clumsy, ineffective, and clouded by their stubborn refusal to be sufficiently sensitive to issues impacting the attorney client privilege.

Based on the Court's review of the record, the relevant legal authorities, and after considering the parties' oral arguments, the Court finds that although the Government conducted multiple errors over the course of its investigation and infringed on Esformes's attorney-client and/or work product privileges, the Court is unconvinced that it must go beyond Judge Otazo-Reyes's rulings and dismiss the Third Superseding Indictment or disqualify the prosecution team.

Although Judge Otazo-Reyes found that Esformes had met his burden to show prejudice "to some extent," the Court finds that some of Judge Otazo-Reyes's reasons for reaching this conclusion are now moot. The Government has conceded that it will not rely on the Bengio notes, the texts between Ginsparg and Esformes, or any other document that this Court deems privileged from the Eden Gardens search. So, to the extent the Court agreed with Judge Otazo-Reyes's recommendation that these documents were to be suppressed at trial, it is now unnecessary for the Court to provide such relief.

Further, the Court disagrees with Judge Otazo-Reyes's main ruling on the recordings of Esformes by the Delgados. Despite the Government's failure to obtain prior judicial approval, the Court finds that it did not intentionally intrude the defense camp given that the Delgados had already pled and were cooperating with the Government. The Court deviates from Judge Otazo-Reyes's ruling in this regard because the Court finds that the Government's investigation into Esformes's potential obstruction of justice was separate and apart from its charges for health care fraud and the parties' JDA terms. The Court also finds that there was no violation of the Florida "no contact" rule and, even if such a violation was established, such violation does not justify exclusion of the recordings.

The Court finds that neither dismissal of the indictment nor disqualification of counsel is warranted on this basis alone.

However, the Court does find it necessary to suppress certain of the recordings. In particular, the Government may not introduce any tapes in which attorneys are present or any portions of the conversations in which the parties discuss legal strategy as to Esformes's alleged health care scheme except to the extent that those conversations relate to the preparation of false exculpatory affidavits.

## VIII. Conclusion

The Court therefore **adopts in part and declines to adopt in part** Judge Otazo-Reyes's Report (**ECF No. 899**). The Court **denies** Esformes's Motion to Dismiss (**ECF No. 278**) and **denies** the Motion to Disqualify (**ECF No. 275**).

Done and ordered in Miami, Florida this 13th day of November, 2018.

Robert N. Scola, Jr.
United States District Judge