## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-20549-CR-SCOLA

UNITED STATES OF AMERICA,

v.

PHILIP ESFORMES,

_____/

### DEFENDANT ESFORMES'S MOTION FOR A MISTRIAL, FAILING WHICH, TO STRIKE DR. CIFU'S TESTIMONY

Defendant submits this motion and memorandum to explain the prejudicial impact of the Government's recent expansion of its case through the testimony before the jury of expert Dr. Cifu. This Court has deferred ruling on whether Dr. Cifu's testimony is admissible under Fed. R. Evid. 702, but his testimony to date—accusing Esformes's health facilities of "unethical" conduct, and erroneously sharing with the jury his previously undisclosed "medical" opinion that alleged Medicare guidance policies are the applicable minimum "requirements" that apply to a finding of guilt, justifies both his exclusion and a mistrial.

Dr. Cifu's direct testimony, over the objections of the defense, demonstrates that the Government has:

(i)     impermissibly broadened the charges from those set forth in the Third Superseding Indictment, which lacks any reference to the Medicare regulations or guidance upon which Dr. Cifu's opinions about alleged violations are based;

(ii)    prejudiced Defendant's trial preparation rights under Fed. R. Crim. P. 16 by withholding these alleged Medicare opinions until this last week;

(iii)   prejudiced Defendant by erroneously instructing the jury that:

(a) compliance with Medicare guidelines is the minimum legal requirement of the Esformes facilities and their "owner" Defendant, to avoid criminal guilt;

(b) primary diagnosis psychiatric patients are ineligible for skilled nursing care under Medicare guidelines; and

(c) observations from a review of two patient medical records can be extrapolated to a patient population approaching 14,000 patients; and

(iv)    has substantially prejudiced Defendant under Fed. R. Evid. 403 because this material is irrelevant to Defendant's state of mind as to the offenses charged, given that Defendant is not a medical professional, nor subject to these alleged federal Medicare policies or requirements.

## I.     The Testimony of Dr. Cifu Should Be Stricken Under *Daubert*, Fed.R.Crim.P. 16, and the Rules of Evidence.

Even though Dr. Cifu is a *physiatrist*, not a *psychiatrist*, a substantial portion of his opinion testimony was devoted to psychiatric patient care, a subject upon which he lacks a medical license, with a declared reliance upon Medicare Manual guidelines, about which he has previously denied expertise. In the Government's pretrial disclosures for Dr. Cifu, going back to April 2017, there is no disclosure that

Dr. Cifu would be interpreting Medicare regulations, rules, or guidelines. The word "Medicare" is absent from the government's April 2017 disclosure concerning Dr. Cifu, nor can any Medicare references be found in the government's January 8, 2019 disclosure about Dr. Cifu (set forth in its entirety at the margin).[1]   In fact, the Government's "Sur-Reply" Brief, filed on the first day of trial (DE 1107, Feb. 11, 2019), discusses Dr. Cifu's proposed testimony without any mention of him having or offering any opinion regarding any aspect of Medicare. DE 1107, at 4.   This pretrial disclosure did not comply with with Fed. R. Crim. P. 16(a)(1)(G), justifying its exclusion under Rule 16(d)(2).   The first fulsome notice that Dr. Cifu would be offering opinions on Medicare came with the prosecution's March 2, 2019 Supplemental Disclosure (DE 1156), provided shortly before Dr. Cifu testified.

---

[1] DE 1062-3 (January 8, 2019 disclosure letter) ("Further, while we believe this topic was previously noticed to you, Dr. Cifu will opine on levels of care that are more appropriate for patients who do not qualify for skilled nursing facilities, including partial hospitalization programs and other alternative forms of treatment. Therefore, for example, Dr. Cifu may briefly touch upon, based on his prior employment and experience, the criteria and standards of care for partial hospitalization programs. In addition, Dr. Cifu may opine on the types of patients that qualify for home health therapy. Finally, Dr. Cifu will also talk about the different reimbursement rates for these levels of care and how the rates are reflective of the intensity and level of treatment. In so doing, Dr. Cifu will explain why skilled nursing services receive higher reimbursement rates than other forms of treatment. We anticipate that any such testimony will be brief.").

In October 2015, Dr. Cifu appeared as a Government expert witness in a civil case and repeatedly testified that he lacked the expertise necessary to offer opinions on Medicare generally, on "Medicare policies," DE 1166-1, at 86, on Medicare reimbursement, on RUG levels, and on "how one seeks or obtains payment from Medicare for skilled nursing facility patient's care." *Id*. at 86. Dr. Cifu further testified that he did not have the background to opine whether a therapy claim was objectively or subjectively false, *id*. at 67, and could not offer any opinion about a therapist giving unnecessary therapy based upon corporate pressure or any scheme. *Id*. at 68-69. Despite his prior testimony that reviewing individual patient records was a necessary part of his methodology for offering expert opinions on patient care, DE 1166-1, at 15, 40,[2] Dr. Cifu did not do so in this case.

---

[2] Exhibit 1, at 15 (Q: " the patients who you're opining on, to be able to opine on them and whether the care that they received, the skilled therapy they received was reasonable and necessary in terms of intensity, duration, frequency, and type of therapy, to do that you had to review the medical records on each patient" A "That is correct."); *id* at 40 ("Q For purposes of the question I'm asking  about at this time, I think we're close to on the same page. But I'm saying that it is necessary, in your view, to actually read the medical records on the patient as part of the individualized review that somebody else might do on other Life Care patients, applying the methodology you've set out. Right?"  "A Yes." Q "Okay. So, like, whether it's three hours per patient that you spent reviewing medical records and doing the analysis or four hours or five hours,  whatever it is that you spent on each of the 437 patients, you didn't do that just for fun; you felt it was necessary to spend that time to do an individualized analysis. Right?" A "That is correct.")

The Government asked this Court to accept Dr. Cifu as an expert in "the field of physical medicine and rehabilitation specifically skilled nursing services and assisted living facilities," Tr. 3.7.19, at 132, but did not offer Dr. Cifu as an expert in any Medicare rule, regulation, or policy. On the stand, however, the Government broadened the bases for Dr. Cifu's opinions by asking him whether the "standards of practice" he learned in his professional experience were "also outlined in the Medicare manuals." 3.7.19, at 131.  Dr. Cifu responded that the Manual guidelines "certainly they are the minimum standard [:] You have to make sure you are doing what's in the guidelines." *Id.*  He proceeded to offer multiple expert opinions based on the Medicare manuals in the very Medicare areas as to which he had previously denied expertise under oath. The defense immediately objected to the witness "defining the guidelines as requirements," which this Court overruled.  *Id.* at 132. Dr. Cifu did not base or connect his medical standard opinions to the standards applicable to licensed Florida medical professionals—of which he is not one. For example, Dr. Cifu was unaware of Florida's Pre-Admission Screening Resident Review, which is the legally required process under Medicaid for Florida admissions of mentally disabled patients. 42 C.F.R. § 483.128. 3.11.19, at 89.  Further, while repeatedly invoking medical "ethics" to justify his opinions, Dr. Cifu did not identify any Florida medical ethics standard or source.

Instead, the prosecution had Dr. Cifu confirm that the Medicare guidelines were "what you are basing your testimony on here today." 3.7.19, at 132. Dr. Cifu then explained that he had been asked by the Government "to provide opinions relative to the care of individuals who are SNFs and ALFs from both hypothetical standpoint as well as a regulatory standpoint and to explain what those settings were...." *Id*. at 133. He confirmed that, at the request of the prosecution, he had "consult[ed] certain sections of the Medicare guidelines and certain exhibits shown to you by the government." *Id*. 134. No pretrial disclosure was made of those sections or or exhibits. The doctor described one such guideline to be "a nationwide statement and it's certainly true." *Id*. at 212-13.

Dr. Cifu was ultimately offered as an expert by the prosecution (pending court approval) to provide opinions on patient care from "a regulatory standpoint," and who based his opinions on sections of the Medicare manuals and guidelines furnished to him by the prosecution (but not disclosed to the defense pretrial as the basis for his opinions). Dr. Cifu then erroneously characterized these guidelines as the applicable "minimum" legal requirements for patient care.

All of Dr. Cifu's subsequent opinions are the result of this combination of withheld government expert disclosure under Fed. R. Crim. P. 16, followed by a government trial request of the witness to offer Medicare regulatory and guidance opinions, finishing with an objectively erroneous opinion that the extensive

Medicare manuals establish a nationwide minimum SNF patient standard of care. For example, Dr. Cifu went through several specific Medicare Manual factors with the jury, 3.7.19, at 159-60, which he instructed the jury were "really minimum standards here in the SNFs I have worked in, these are certainly the standard of care." *Id*. at 160. He then opined that if the Medicare Manual factors are not met, Medicare would not pay for the skilled nursing services. *Id*. at 165.

Before the jury, he was repeatedly asked to read Medicare Manual guidelines regarding the likely coverage of patients with psychiatric conditions. *Id*. at 207, 208. Under questioning by this Court, Dr. Cifu admitted that he had not looked at the available CMS data on the percentage of patients diagnosed with psychiatric conditions admitted to skilled nursing facilities, 3.7.19, at 193, but he told the jury that he had never, in his 30 years of experience, admitted a patient from a psychiatric hospital and he has personally admitted less than 10 patients with a psychiatric condition, *id*. at 194, and testified that he had never had a patient with a RUG level indicating a behavior problem. *Id*. at 170. Despite this lack of professional experience or medical training with the admission of psychiatric patients, Dr. Cifu opined (over defense objection) that the Medicare Manual precluded the availability of psychiatric care under Medicare for patients with a primary diagnosis of

psychiatric illness. 3.7.19 at 208-211; 3.11.19, at 119.  This is just not true,[3] and reflects an improper prosecution effort to transform alleged Medicare guidance from a Medicare Manual into a criminal prohibition. Both Medicare and Medicaid cover psychiatric patients, whether they are primary or secondary diagnoses, as long as care takes place in a hospital, skilled nursing facility, nursing facility, or intermediate care facility. *Connecticut v. Heckler*, 471 U.S. 524, 529 (1985) ("Other provisions of the Act make it clear that services performed for the mentally ill may be covered, provided the services are performed in a hospital, a skilled nursing facility, or an ICF that is not an IMD"").

Coverage of mental disorders is only potentially excluded if a facility is re-classified as an Institution for Mental Disease (IMDs), and none of the Esformes facilities are IMDs.   There are several CMS guidance criteria for making such a re-classification, but the most fundamental requires proof that more than 50% of the

---

[3] The Manual's own language makes clear that: "*Skilled observation and assessment may also be required for patients whose primary condition and needs are psychiatric in nature* or for patients who, in addition to their physical problems, have a secondary psychiatric diagnosis." 30.2.3.2 (emphasis added). The Manual's passing reference to SNFS that "are primarily engaged in treating psychiatric disorders are precluded by law from participating in Medicare," is a reference to the facility classification system, whereby facilities that engage primarily in the treatment of "serious mental illness" are classified as Institutions for Mental Disease (IMDs). *See Connecticut v. Heckler*, 471 U.S. 524, 527 n.5 (1985) (more than 50% of patients must be so diagnosed).  No such allegation is made in the Indictment, nor has any facility re-classification been initiated by the CMS.

patients at IMDs have a "serious mental illness." 42 C.F.R. § 438.102. *See, e.g.,*
*Illinois v. HHS*, 1986 WL 291, *6 (N.D. Ill. July 1, 1986) ("something more than
50%-plus" patients with mental illness required for IMD status). Here, not only has
the Government certified the Esformes facilities as skilled nursing facilities (and the
Indictment so alleges), and these are admissions of a party opponent that they are
not IMDs (Fed. R. Evid. 801(d)(2)), the prosecution has not even suggested in this
trial that more than 50% of the patients at any Esformes facility at any given time
are patients with a serious mental illness.

More importantly, the Indictment contains no allegation that the admission of
psychiatric patients violates any Medicare statute, rule, regulation, Manual, or
guidance. DE 869. Nor does the Indictment provide notice that this will be a legal
issue in this trial. *United States v. Izurieta*, 710 F.3d 1176, 1180 (11th Cir. 2013)
(indictment must cite regulation allegedly violated); Fed. R. Crim. P. 7(c) (same).
*See* DE 869, at 10-11.

Despite not being a psychiatrist and not having psychiatric privileges at any
hospitals, Dr. Cifu testified about "questionable situations" listed in the Manual,
which included managing oral medicine for psychiatric patients. *Id*. at 225. He
testified that, under the Guidelines, adjusting oral medications would not typically
be a covered skilled service. *Id*. at 224.

The prosecution showed Dr. Cifu government exhibits regarding two patients with psychiatric diagnoses, from which Dr. Cifu opined, over defense objection,[4] that these two patients who were selected non-randomly (out of 14,000) by the prosecution, represented a "pattern" that supported his opinion that there are sufficient similar psychiatric conditions in the balance of the patient population, and his opinion that more than two such patients in a population would be "heinous." 3.7.19, at 177-78, 200, 235.  This methodology would not pass muster under any statistically accepted extrapolation methodology. *See, e.g, United States v. Long Grove Manor, Inc*., 315 F.Supp.3d 1107, 1117 (N.D. Ill. 2018) (extrapolation from four patients rejected under *Daubert*); *Cypress Home Care, Inc. v. Azar*, 326 F.Supp.3d 307, 325 (E.D. Tex. 2018) (describing minimum steps for extrapolation from random patient sample, rejecting extrapolation under *Daubert*).

Dr. Cifu further testified, erroneously and without any prior disclosure to the defense, that "owners" of skilled nursing facilities "are responsible for all the people that are working in the facility." 3.7.19, at 182. He testified that this includes owner responsibility for the medical necessity certifications made by licensed medical professionals for medical care.  *Id.* According to Dr. Cifu, the owner is responsible for medical certifications as part of the "ultimate responsibility for owning the

---

[4] 3.7.19, at 191-92.

facility." *Id.* at 182.[5]  By this means, Dr. Cifu erroneously instructed the jury that the certifications of medical necessity made by, and legally limited to, licensed medical professionals, are nonetheless the legal responsibility of every SNF or ALF owner in the country, including Defendant. Dr. Cifu did not ascribe this to any Medicare guidance and, as a matter of statute, Medicare will not accept certifications from a non-licensed person. 42 U.S.C. §1395f(a) (limiting certifications to physicians and subordinate assistants).

Contrary to Dr. Cifu's opinions that every owner has a strict legal responsibility for all the operations at a skilled nursing facility, Florida statutes provide: "No nursing home shall operate except under the supervision of a licensed nursing home administrator, and no person shall be a nursing home administrator unless he or she is the holder of a current license as provided in chapter 468." Fla. Stat. § 400.20 ("Licensed nursing home administrator required.").  Nonetheless, Dr. Cifu, without notice to the defense, erroneously told the jury that legal liability for medical certifications rests upon unlicensed owners who lack the legal ability to order medical treatment in the first place and who are legally obligated in Florida to delegate administrative responsibilities of the facility to a licensed administrator.

---

[5] There is no vicarious criminal liability.  *United States v. Moss*, 872 F.3d 304, 310-11 & n.9 (5th Cir. 2017); *United States v. Cadden*, 2018 WL 2108243, *6 (D. Mass. May 7, 2018) ("Vicarious liability . . . has no place in the criminal law as our Rules of Evidence recognize.").

According to Dr. Cifu, vicarious liability is now the standard for criminal liability at skilled nursing facilities.

The only basis identified by Dr. Cifu for these opinions (other than his professional experience) are the Medicare Manuals and guidelines presented to him by the prosecution at some undisclosed time, apparently for the first time after the commencement of trial. Both the Supreme Court and the 11th Circuit have unequivocally held that such Medicare guidance documents are not legally binding upon providers because they do not have the force of law, and the 11th Circuit has characterized such material as merely "the Secretary's *ipse dixit*."[6] The Secretary of HHS has admitted that CMS guidelines lack the force of law, and this should be known to the prosecution.[7] Indeed, CMS has previously defended itself against allegations of deliberate violations of the Manual on the ground that the Manual is

---

[6] *Bradley v. Sebelius*, 621 F.3d 1330, 1398 (11th Cir. 2010) (Medicare manual not entitled to force of law, citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)). The Supreme Court has consistently held that such guidance documents "'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Perez. v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)) (Medicare Provider Manual document).

[7] *See, e.g., Fournier v. Sebelius*, 718 F.3d 1110, 1119 (9th Cir. 2013) ("The Secretary agrees that her interpretation in the CMS Manual does not by itself carry the force of law.").

not legally binding, including upon the CMS.  *See California Ins. Guarantee Ass'n v. Burwell*, 2016 WL 3360955, * 3 (C.D. Cal. June 14, 2016).

The Justice Department has issued two directives, one from the Attorney General and the second from the Associate Attorney General, to all DOJ personnel in 2017 and 2018 prohibiting them from using guidance document to initiate or to pursue civil enforcement precisely because they lack legal status.  DOJ Memos November 16, 2017 and of January 25, 2018.   The prosecution cannot claim that these documents have a more exalted legal status in criminal prosecutions. See Exhibit 2 (2017 Memorandum by Attorney General Sessions) and Exhibit 3 (2018 Memorandum by Associate General Brand).

In summary, while criminal offenses are restricted to those enacted by Congress,[8] courts recognize that Congress can delegate some of its authority to do so to administrative agencies.[9]  But courts, including the Eleventh Circuit, restrict

---

[8] *United States v. Lanier*, 420 U.S. 259, 267 n.6 (1997).

[9] *Loving v. United States*, 517 U.S. 748, 768 (1996) (delegation upheld "whereby the Executive or an independent agency defines by regulation what conduct will be criminal, so long as Congress makes the violation of the regulations a criminal offense and fixes the punishment, and the regulations 'confin[e] themselves within the field covered by the statute.'") (quoting *United States v. Grimaud*, 220 U.S. 506, 518 (1911)). Here, because the Indictment fails to identify any relevant regulation (i.e., a quality of care regulation), this Court cannot assess whether Congress made a violation of the regulation a criminal offense, and defendant cannot be asked to defend against  an uncharged regulatory offense. Even in the context of formal regulations, the legal authority to delegate for purposes of creating criminal liability

that authority to formally promulgated regulations that have the force of law, and even then not all such regulations can be criminally enforced. *See United States v. Izurieta*, 710 F.3d 1176, 1180 (11th Cir. 2013) (vague regulation not proper basis for criminal prosecution).[10]

The fact that the Secretary has not taken the administrative steps necessary to turn a "guidance" policy into a formal regulation deprives that guidance of legal status. "As such, the policy 'does not impose any obligation or prohibition on regulated entities' or 'create a new basis for enforcement or liability.'" *Community Health Systems, Inc. v. Burwell*, 113 F. Supp.3d 197, 231 (D.D.C. 2015) (holding as to the Medicare Provider Reimbursement Manual: "The policy has no effect on the obligations or rights of the regulated entities.")  (quoting *AFA v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015)).

Accordingly, because Medicare Manuals, as mere guidance documents without legal status, cannot create a legal "minimum standard" for compliance by

---

is controversial.  *See, e.g.*, *United States v. Nichols*, 784 F.3d 666, 667 (10th Cir. 2015) (Gorsuch, dissenting from denial of rehearing), *rev'd on other grounds*, 136 S. Ct. 1113 (2016).

[10]  Moreover, the Eleventh Circuit has held that, in criminal cases, courts cannot defer to alleged administrative expertise regarding the interpretation of regulations. *United States v. Phifer*, 909 F.3d 372, 384 (11th Cir. 2018) (rule of lenity precludes deference to agency interpretation of ambiguous regulation).

providers that could be subject to criminal enforcement, it would violate Due Process to impose a criminal sanction based upon the failure to follow such an administrative policy.  Nor are the Medicare Manuals a source for a criminal legal prohibition on admitting psychiatric patients to a skilled nursing facility.

Nonetheless, Dr. Cifu instructed the jury that the standards "outlined"[11] within the 37,000 Medicare guidance documents[12] establish the minimum legal standards of care required under Medicare. Worse, Dr. Cifu offered erroneous medical opinions to the jury about alleged violations of the Manuals constituting violations of a federal standard of care.

The legally and medically flawed and inadmissible testimony of Dr. Cifu, however, is merely the last straw in a series of improper Government efforts to expand this case from the statutory charges in the Indictment.  The longstanding Eleventh Circuit law, and of Fed. R. Crim. P. 7(c), is that alleged regulatory violations must be cited and identified in the Indictment.  *United States v. Izurieta*, 710 F.3d 1176, 1182 (11th Cir. 2013) (citing *Babb v. United States*, 252 F.2d 702, 703-04 (5th Cir. 1958)).  No standard-of-care regulation or guidance is cited in the Indictment, and Dr. Cifu did not mention any Medicare regulation in his direct

---

[11]  Tr. 3.7.19, at 131.

[12]  *Caring Hearts Homes Services, Inc. v. Burwell*, 824 F.3d 968, 970 (10th Cir. 2016) (Gorsuch, J.).

testimony, instead basing his opinions upon alleged violations of the "minimum requirements" stemming from the Medicare Manual provided to him by the prosecution.

Furthermore, by using experts to usurp this Court's role as law giver, and by inaccurately suggesting to the jury that a violation of Medicare rules, regulations, or policy, of any federal law, of any medical ethics standard, or of patient perspective, warrants conviction, the prosecution has substantially prejudiced the Defendant under Fed. R. Evid. 403.

### The Broadening Government Case

On the first day of trial, the prosecution told this Court: "We are saying the substandard quality of the services at some, not all the facilities, is relevant to that, is encompassed in the Medicare and Medicaid regulations, and is included in the claim itself.  It's directly four square relevant." 2.11.19, at 208.   No such allegation of "substandard" care is in the Indictment, nor does it label any facility "substandard."

The prosecution further revealed that it would present a hypothetical "Medical Director doctor" who would rely upon medical ethics as the applicable standard, predicting that he would be:

laying out the standards of practice and standards of care. Let's not even –
let's leave aside whether or not Medicare and Medicaid would have paid for
it. *It violates medical ethics in the standard of care* and as it happens no they
would not have paid for it because I know that because I was the medical
director of a SNF. . . .

2.11.19, at 209 (emphasis added). The Indictment makes no reference to medical

ethics.

The prosecution then explained to the jury in its opening statement that, what

"this case is about," is "that Philip Esformes well knew that many of these patients

in his facilities were getting substandard care that Medicare and Medicaid would not

pay for." 2.12.19, at 37.

Deploying this limitless claim of Medicare and Medicaid relevancy to place

prejudicial evidence before the jury, the prosecution introduced the testimony of

former patients and staff to vilify unidentified patients and staff,[13] largely as a matter

of lay opinion.

---

[13] These include a patient of ten years ago who admitted to being schizophrenic,
addicted, alcoholic, and homeless at the time. This patient explained that he
repeatedly lied to hospitals that he was going to kill himself in order to trigger the
medical coverage benefits necessary to be hospitalized and then to be sent to the
Oceanside facility to obtain food and a bed. 2.14.19, at 185, 193. He testified that
the facility "smelled like feces most the time, people yelling all the time. . . smell
diapers on the floor." *Id.* at 183. He had to share rooms with elderly people and
"felt like" the treatment of the elderly "was very sad" because "the nurses weren't
very kind, not sympathetic to their needs." *Id.* at 187. He claimed the nurses were
numerous, but "mean," and "did nothing." *Id.* at 201. He claimed to have seen
patients neglected "all the time," and saw them "screaming, crying, the worst thing
that I seen was the nurses left them alone and didn't come help them, left them

For example, the Government introduced lay testimony purporting to diagnose psychiatric patients as "walkie talkies"[14] or "repeat offenders,"[15] including

---

there." *Id.* at 188. This patient then self-diagnosed that the facility "kept me feeling insane." *Id.*

The Government continued by presenting the testimony of an owner of a 7-11 convenience store neighboring Oceanside. She shared with the jury her grievances about patients coming into her store to "yell at me, they make me problems in the store with the customers;" they stole items and pan handled in the store; 2.15.19, at 152-53; and they looked "like homeless,"  [t]hey smoke," and are "sick peoples smelling very bad and they dirty too." *Id.* at 153. Although just a neighbor, she agreed with the prosecution's leading question that "So it smelled bad inside Oceanside and it was dirty?" 2.15.19, at 154. The Government's case has now expanded into the manners and hygiene of possible patients.

On February 19th, the Government introduced evidence from the former owner of a non-Esformes facility—a chain of six health care facilities known as ATC with more than 100 employees--who never knew of Esformes, but told that jury that 90% of ATC's  patients did not belong there, 2.19.19, at 115, they were weren't really being treated at all, and she instead directed her staff at these facilities to cycle people through "to maximum the benefits." *Id.* at 123-24.  On top of trying to hold Esformes criminally responsible for these business practices of ATC, the prosecution used this same witness to paint a desperate portrait of the quality of care afforded to ALF patients, including Esformes' patients. Asked by the prosecution about how ATC patients who were transferred from ALFs appeared when they arrived, including arrivals from Esformes ALFs, she testified, over objection, that these patients were: "disheveled, neglected, very fragile," skinny, lacked clothing, and what little clothes they brought were not warm enough for the cold. *Id.* at 139. Upon arrival, they displayed "Dirty stains, they haven't been bathed on a regular basis;" and with the "substance abusers, you could tell that they were some of them came high to the facility.*" Id.*

---

[14]  2.13.19, at 30, 32, 34; 2.26.19, at 144, 154, 155, 157, 158, 159; 2.27,19, at 54, 73-74, 75.

[15]  2.13.19, at 32-33.

lay opinion testimony diagnosing that "20 to 30 percent" of the patients at Esformes facilities were such patients. 2.26.19, at 155.  The government also offered testimony that psychiatric patients often lacked families, were homeless,[16] were "indigent,"[17] and were the subject of complaints by other patient's families, and from staff. 2.27.19 at 73-74.  The Government cast a pejorative stereotype upon patients whom the Government contends should have been excluded from the Esformes SNFs because of their mental impairments, or who were perceived by others as mentally impaired, based upon their demeanor and not any actual diagnosis.

The Government has thus embarked upon proving a claim of substandard care by proving that a subset of patients at Esformes facilities (and even at non-Esformes facilities): (i) were dissatisfied with the medical or residency services they received, whether it involved their daily care or some other individual grievance; (ii) were without manners, lacking in personal hygiene, homeless, unsuitably clothed, lacking in family supervision, posing some perceived menace to the general public; and (iii) were the source of complaints by other patients, other patient's families, staff, and the neighbors.

---

[16] 2.13.19, at 133;  2.14.19, at 153 ; 2.27.19, at 73.

[17]  2.27.19, at 73.

The Indictment does allege that "some" psychiatric patients were admitted at Esformes facilities who did not needed skilled nursing services, which could raise an issue about an individual patient's coverage eligibility, a potentially legitimate grievance that could be determined upon a medical examination of the patient's individual circumstances. Indictment, Count 1, ¶ 9. But aside from the statistically insignificant number of mentally impaired patients who have testified or who have been named by other witnesses, the prosecution has instead offered lay pseudo-diagnoses of psychiatric patients as "walkie-talkies," a condition allegedly discernible based upon the hygiene, dress, mobility, or demeanor of unidentified patients.[18]   That is not medical evidence, that is stereotyping people based upon perceptions of mental illness.

Despite longstanding federal laws barring private persons and state governments from discriminating in providing benefits, services, or accommodations against persons perceived as having mental impairments,[19] the

---

[18] "Testimony as to the diagnosis and treatment of a patient, and the reasons therefore, is beyond the ability of the average lay witness' competency and is necessarily based on 'the expert's scientific, technical, or other specialized knowledge,' in the form of doctors' medical training and experience." *Daniels v. District of Columbia*, 15 F. Supp.3d 62, 70 (D.D.C. 2014) (quoting Fed. R. Evid. 701).

[19] The Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(3)(A).

prosecution inveighs against the mere fact and number of potentially-identifiable psychiatric patients at Esformes facilities when the federal Government has exempted itself from this legal prohibition on discriminating against those perceived to be mentally impaired. *Hendrickson v. Potter*, 327 F.3d 444, 447 (5th Cir. 2003) ("In sum, the entire federal government is excluded from the coverage of the ADA.").[20]

## ARGUMENT

### I. Dr. Cifu's Testimony Fails to Satisfy *Daubert*.

Mr. Esformes has explained why the Government's Rule 16 expert disclosures have been insufficient, but even if the Court doubts this, the fact remains that this Court must exercise its *Daubert* gatekeeping role under Fed. R. Evid. 702 before the jury is exposed to unreliable expert opinion evidence. Such preliminary determinations of admissibility under Fed. R. Evid. 104 are normally conducted outside the presence of the jury, with counsel being afforded the right of *voir dire*. *Kellner v. NCL (Bahamas), Ltd.*, 2016 WL 8679313 (S.D. Fl. Aug. 17, 2016).

---

[20] *But see Hunter ex rel. Lynah v. Cook*, 2013 WL 5429430, *14 (N.D. Ga. Sept. 27, 2013) (enjoining state Medicaid Department from ADA violation and discrimination against disabled patients by reducing hours of skilled nursing care).

Here, because the Government concealed both the opinions of Dr. Cifu and his factual bases for these opinions up through the start of trial and the Court declined to conduct a *Daubert* hearing outside the presence of the jury, the Court should grant a mistrial, failing which, it should strike Dr. Cifu's testimony. *See, e.g., United States v. Long Grove Manor, Inc*., 315 F. Supp. 1107, 1117 (N.D. Ill. 2018) (excluding opinion of former medical director because derived from review of only four patient records: "Conspicuously, the methodology Dr. Baer used to discern fraud in this case is decidedly different from the patient-specific one he insists is required by Medicare rules and regulations.").

## II.   The Prosecution of Uncharged Offenses That Do Not Violate the Criminal Law Violates Fed. R. Evid. 403, Fed. R. Crim. P. 16, Due Process and the Fifth and Sixth Amendments.

For the reasons previously given in support of the motion to exclude undisclosed expert testimony (DE 1062), and herein, the continued admission of prejudicial evidence relating to uncharged, legally standardless offenses (for example, violation of a "guideline") only serves to confuse and mislead the jury within the meaning of Fed. R. Evid. 403, and warrants a mistrial.

Broadening the charges beyond the violations alleged in the Indictment constitutes a constructive amendment of the indictment, and it occurs when, as has

happened here, evidence is admitted on the uncharged offenses.[21]   *United States v.*

*Miller*, 471 U.S. 130, 138 (1985).

A constructive amendment violates the Fifth and Sixth Amendments, and "'is *per*

*se* reversible error.'" *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir. 2004)

(quoting *United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990)).[22] Accordingly,

it is the type of fundamental denial of constitutional trial rights that justifies a

mistrial.[23] In addition, the evidence already introduced to prove these uncharged

offenses is prejudicial not only because it constructively amends the Indictment to

include uncharged offenses, but also because it has already exposed the jury to

---

[21] "A constructive amendment to an indictment occurs when (1) the evidence presented at trial proves a crime different from the conduct charged in the indictment or (2) the District Court's instructions to the jury broaden the possible bases for conviction beyond the basis set forth in the indictment." *United States v. Gonzalez*, 540 Fed. Appx. 967, 973 (11th Cir. 2014) (citing *Stiron*e & *Narog*).

[22] The vices of constructive amendments include forcing courts to guess whether a grand jury made the same finding as a petit jury, and depriving the defendant of the benefits of double jeopardy. *United States v. Griffin*, 324 F.3d 330, 356 (5th Cir. 2003) (quoting *Russell*, 369 U.S. at 770); *Berger v. United States*, 295 U.S. 78, 82 (1935). Both violations have occurred here; Defendant has been denied a grand jury finding on any Medicare or Medicaid rule, regulation, or guidance violation, and if acquitted, the government would later argue that he has no jeopardy defense for any other such alleged violation that may have occurred since 1998.

[23] *Brewer v. Hetzel*, 913 F.3d 1042, 1052 n.3 (11th Cir. 2019); *United States v. Hoa Quocta*, 2006 WL 1097719, *3 (N.D. Ga. April 25, 2006).

highly prejudicial evidence confusing the jury that any departure from any standard of care is criminal, and will continue to do so.  *See* Fed. R. Evid. 403.[24]

## CONCLUSION

For the foregoing reasons, this Court should grant a mistrial, failing which, the Court should strike the testimony of Dr. Cifu.

## CERTIFICATE OF SERVICE

On the date stamped above, we served all counsel of record using CM/ECF.

Respectfully submitted,

**BLACK, SREBNICK, KORNSPAN
  & STUMPF, P.A.**
201 South Biscayne Boulevard
Suite 1300
Miami, FL  33131
Tel: (305) 371-6421

By:     */s/ Rossana Arteaga-Gomez*
       **HOWARD SREBNICK**
        Fla. Bar No. 919063
       **ROSSANA ARTEAGA-GOMEZ**
        Fla. Bar No. 0014932

---

[24] *See, e.g.*, *United States v. Rosen*, 444 F.Supp.2d 774, 670 (E.D. Va. 2006) (even assuming evidence did not constitute constructive amendment, excluding it under Fed. R. Evid. 403).