**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-20549-CR-SCOLA**

UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

PHILIP ESFORMES,

     *Defendant*.

_____/

## DEFENDANT ESFORMES' MOTION FOR ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29

Defendant Esformes renews his previously filed motions pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal on all counts of the Indictment. This pleading highlights that an acquittal is justified because the Government has failed to prove: (i) any fraud case based upon a standard of care; (ii) any medical necessity case either generally or specifically for psychiatric patients; (iii) the money laundering concealment charges; (iv) the kickback case; or (v) a federal program bribery case. Defendant Esformes incorporates all of the arguments made at the close of the government's case, at the close of the evidence and those presented in his Motion for New Trial.

This case began with exaggerated claims of a one billion dollar fraud, later dropped. At trial, the case featured anecdotal testimony about isolated episodes of substandard care in violation of "all" Medicare rules, regulations, and guidance.

1

Over repeated defense objections, the prosecution introduced extensive expert and lay witness testimony in support of the incorrect and unpled claim that the Defendant breached a "minimum" standard of care required by Medicare's manuals. These manuals were also used to prosecute a claim that the admission of psychiatric patients violated these minimum Medicare standards.

In addition, the prosecution used a "summary" witness to support its claim that "proceeds" of unidentified health care offenses passed through multiple bank accounts of numerous parties that he then hypothetically used to fund the transactions which the indictment alleged were acts of money laundering concealment. Finally, the prosecution simply changed the topic to prosecute charges that the University of Pennsylvania is a federal program, such that payments to its coach allegedly to obtain the college admission of Defendant's son constitute federal program bribery.

## Applicable Legal Standard

Under Rule 29, this Court must apply the constitutional standard for sufficiency of the evidence articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979). While the evidence is construed in the light favorable to the verdict, if the evidence on any essential element is in equipoise, this Court must acquit. *Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir. 1982).

## I.   The Government Failed to Prove Healthcare Fraud (Count 1).

Even if the Government's evidence at trial is credited, it is legally insufficient because: (i) the standard of care the prosecution attempted to establish through its experts is not a legally applicable standard of care; and (ii) even if a valid standard of care was established, only an expert medical opinion can establish a breach of a standard of care and the prosecution never adduced such testimony at trial.

### 1.   The Government Did Not Prove a Valid Medical Standard of Care.

Federal law recognizes that the practice of medicine is regulated by state law. *See, e.g.,* 42 U.S.C. § 1395 ("Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided . . .").[1] Therefore, only Florida's standards of medical care apply in this case. Under Florida law, only currently licensed medical professionals are authorized to offer testimony on Florida's standards of medical care and, only then, after a complete review of patient medical records. Fla. Stat. Ann. § 766.102(3)(a)(5) ("A person may not give expert testimony concerning the prevailing professional standard of care unless the person is a health care provider who holds an active and valid license and

---

[1] The balance of this statute reads: "or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person." 42 U.S.C. § 1395.

conducts a complete review of the pertinent medical records and meets the following criteria."). The Government's experts – Mr. Quindoza and Dr. Cifu – were not qualified to offer any opinions under Florida's standards of medical care. Mr. Quindoza is not a healthcare professional and Dr. Cifu is not licensed to practice medicine in Florida. Trial Tr. 2.12.19 at 115; 3.17.19 at 248.

Under binding Supreme Court and Eleventh Circuit precedent, Medicare manuals and guidance documents do not have the force of law.[2] The prosecution's proposed standard of care derived from non-binding Medicare guidance documents certainly cannot displace the applicable Florida medical standard of care.[3] As recognized by the most senior officials in the Department of Justice, guidelines do not establish a binding "substantive standard"; therefore, the government cannot establish a "standard" of care derived solely from Medicare guidance documents.[4]

---

[2] *Bradley v. Sebelius*, 621 F.3d 1330, 1338 (11th Cir. 2010) (Medicare manual not entitled to force of law, citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)). The Supreme Court has consistently held that such guidance documents "'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'"

[3] The balance of this statute reads: "or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person."

[4] The Indictment's failure to cite any potentially applicable statute or regulation setting forth a standard of care, as compared to the indictment in *United States v. Houser*, 745 F.3d at 2343, which expressly did so, precludes the prosecution's reliance upon uncited regulations or statutes in this case. *United States v. Izurieta*,

In particular, the Eleventh Circuit in 2010 characterized guidance documents as merely "the Secretary's *ipse dixit*," and held that such guidance material is not entitled to judicial deference in this Circuit under the *Chevron* doctrine.[5] Furthermore, the Department of Justice's recent admission that the Affordable Care Act of 2010 ("ACA") is unconstitutional and invalid in its entirety renders obsolete the prosecution's expert's standard of care evidence that relied solely on these same invalid statutes, regulations, and guidelines. Shortly before this trial, the Department of Justice amended its own Manual to state:

---

710 F.3d 1176, 1181 (11th Cir. 2013) (indictment must cite allegedly violated regulation, citing *Babb v. United States*, 252 F.2d 702, 703 (5th Cir. 1958)). *See United States v. Scott*, 993 F.2d 1520, 1520 (11th Cir. 1993) (vacating conviction for indictment's failure to cite statutory subsection).

In *Izurieta*, the Eleventh Circuit held that, in a criminal case, the regulation violated must not only be cited in an Indictment for a court to have jurisdiction over it, but it must be a suitable basis for a criminal prosecution. 710 F.3d at 1182-84. Evaluation of whether a regulation can constitutionally be the basis for a criminal prosecution is impossible here, if only because this Court has no indictment-cited regulation violation to review. Further, the Secretary's authority to promulgate regulations is provided in 42 U.S.C. § 1302, and its language does not include any express delegation of authority to issue regulations with criminal punishments. *See Loving v. United States*, 517 U.S. 748, 768 (1996) (delegation upheld "whereby the Executive or an independent agency defines by regulation what conduct will be criminal, so long as Congress makes the violation of the regulations a criminal offense and fixes the punishment, and the regulations 'confin[e] themselves within the field covered by the statute.'").

[5] *Bradley*, 621 F.3d 1330 at 1338-39. Since then, the Eleventh Circuit has rejected judicial deference to agency interpretations of their own regulations in criminal cases. *United States v. Phifer*, 909 F.3d 372, 384 (11th Cir. 2018) (rule of lenity precludes deference to agency interpretation of ambiguous regulation).

> Criminal and civil enforcement actions brought by the Department must be based on violations of applicable legal requirements, not mere noncompliance with guidance documents issued by federal agencies, because guidance documents cannot by themselves create binding requirements that do not already exist by statute or regulation. Thus, the Department should not treat a party's noncompliance with a guidance document as itself a violation of applicable statutes or regulations. The Department must establish a violation by reference to statutes and regulations. The Department may not bring actions based solely on allegations of noncompliance with guidance documents.
>
> . . .

DOJ Manual, § 1-20.100 & 20 (revised December 2018). The Government failed to prove at trial any legally applicable standard of care because it did not adduce any expert testimony on Florida's standards of medical care and instead relied on non-binding and admittedly unconstitutional Medicare guidelines.

Mr. Quindoza testified in this case that his opinions "are based on guidance issued by Centers for Medicare and Medicaid Services," "in what are called manuals and there are several manuals published by CMS that outlines the rules for the Medicare and Medicaid program." Trial Tr. 2.12.19 at 64-65. He expressly based "most" of his direct testimony upon Chapter 8 in the 2018 Medicare Benefits Policy Manual. *Id.* at 84-85, 344.[6] Mr. Quindoza also testified in reliance upon another

---

[6] Trial Tr. 2.12.19 at 124:

Q And was this, besides your experience as an investigator, was this section in the manual one of your sources for what you were talking about?

A Yes, sir.

Manual (the Resident Assessment Instrument Manual) to discuss skilled nursing RUG levels, over defense objection. Trial Tr. 2.12.19 at 131-38. Mr. Quindoza admitted, however, he is not a licensed healthcare professional and had no clinical judgment to offer. *Id*. at 68-69.

The Government also elicited legally incorrect testimony from Mr. Quindoza. The Government asked Mr. Quindoza if "SNF care is proper under the Medicare manual . . . as long as [the care is] improving the patient or keeping them in the same condition?" to which he answered "Yes, sir." (*Id*. at 343).[7] Both the prosecution's question and Mr. Quindoza's answer are wrong as a matter of law. CMS has stipulated in federal court that Medicare coverage has *never* been conditioned on the improvement of a beneficiary's medical condition. *Jimmo v. Burwell*, No. 5:11–cv–17, 2017 WL 462512, at *3 (D. Vt. Feb. 1, 2017) ("CMS will disavow the application of the so-called 'Improvement Standard' as improper under Medicare policy for the SNF, HH, and OPT benefits, while making clear that CMS has consistently denied the existence of such an 'Improvement Standard.'"). Moreover, Chapter 8 of the

---

[7] Trial Tr. 2.12.19 at 81:

    Q Now, we were talking before about your base for your testimony today being your work experience and the Medicare manuals, do you remember that?
    A Yes.
    Q Did you review the Medicare manuals concerning the three-day hospital stay requirement for Medicare reimbursement for a SNF?
    A Yes, sir.

Medicare Benefit Policy Manual itself clearly states that a beneficiary's ability to obtain skilled nursing facility services under Medicare is not dependent on the beneficiary's potential for improvement.[8]

The prosecution also firmly rooted Dr. Cifu's standard of care opinions in the standards "outlined in the Medicare manuals," Trial Tr. 3.7.19 at 132, which he opined were the "minimum standard" required. *Id.* at 131. Dr. Cifu confirmed that, at the request of the prosecution, he had "consult[ed] certain sections of the Medicare guidelines." *Id.* at 134. Specifically, when asked by the prosecution whether "these guidelines in your professional experience, is that what you are basing your testimony on here today?" He agreed. *Id.* at 134. Dr. Cifu proceeded to offer multiple expert opinions based on the "guidance" provisions in the Medicare manuals, testifying that "these are really minimum standards here in the SNFs I have worked in, these are certainly the standard of care." *Id.* at 160.

The prosecution's presentation of this incorrect standard of care evidence to the jury through the testimony of these alleged experts left the jury with the misimpression that these standards of care opinions were valid and applicable to this

---

[8] "Coverage of nursing care and/or therapy to perform a maintenance program does not turn on the presence or absence of an individual's potential for *improvement* from the nursing care and/or therapy, but rather on the beneficiary's *need* for skilled care." Medicare Benefit Policy Manual, Ch. 8 § 30 (emphasis added). *See also id.* at 30.2.1 ("Skilled care may be necessary to improve a patient's current condition, to maintain the patient's current condition, or to prevent or slow further deterioration of the patient's condition.").

case. *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (duty to cure under due process); *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978) (due process violated "if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression.").

The jury could not possibly make a valid determination regarding breach of a standard of care because a valid standard of care was never established during trial. Moreover, the government's "experts" are not qualified to articulate the standard of medical care in Florida, and any arguable federal standards of care which were, as here, expressly based upon Medicare and Medicaid guideline requirements, are simply invalid as a matter of law.

### 2. The Government Did Not Prove a Breach of a Valid Medical Standard of Care.

The prosecution attempted to prove a breach of the invalid standard of care it introduced at trial by having lay witnesses describe alleged deficiencies in services provided to almost exclusively unidentified patients. In Florida, as elsewhere, the burden of proving a violation of a medical standard of care requires expert medical

opinion evidence.[9] Lay witnesses are not competent to offer opinions on a breach of a medical standards – even when they are correctly told the applicable standard.[10]

Finally, the prosecution did not have its medical experts review any patient medical records or offer any medical opinions on any breach of a standard of care regarding any identified patient. The prosecution thus failed to prove a breach of a medical standard of care as a matter of law as to any individual patient.

### 3. The Government Failed to Prove the Applicable Regulations and Violated the *Ex Post Facto* Clause.

The Indictment in this case did not allege that Esformes breached a medical standard of care nor did it cite any statutes or regulations setting forth a medical standard of care. Assuming, without conceding,[11] that the prosecution can expand

---

[9] *Ponders v. United States*, No. 13-22876-CIV, 2014 WL 2612315, at *2-3 (S.D. Fla. June 11, 2014) ("the question of whether a medical practitioner employed the correct procedures for the diagnosis and treatment cannot be answered without expert testimony," citing cases); *Chaskes v. Gutierrez*, 116 So. 3d 479, 487-88 (Fla. 3d DCA 2013) (citing cases), *review denied*, 139 So.3d 297 (2014). *See also Rink v. Cheminova*, 400 F.3d 1286, 1295 (11th Cir. 2005) (causation requires expert).

[10] *Sowers v. R.J. Reynolds Tobacco Co.*, No. 3:09 C 11829, 2015 WL 12839775, at *5 (M.D. Fla. Jan. 23, 2015) (barring lay opinion on medical causation, citing numerous cases within the Eleventh Circuit). "Testimony as to the diagnosis and treatment of a patient, and the reasons therefore, is beyond the ability of the average lay witness' competency and is necessarily based on 'the expert's scientific, technical, or other specialized knowledge,' in the form of doctors' medical training and experience." *Daniels v. District of Columbia*, 15 F. Supp. 3d 62, 70 (D.D.C. 2014) (quoting Fed. R. Evid. 701).

[11] The Indictment did not allege that the Defendant violated any specific federal regulation, and for that reason any such alleged violation is not properly the subject

the Indictment and claim violations of uncited federal health care regulations, it necessarily assumes the burden of proving the exact *regulations in effect at the time of any such alleged violation. Caring Hearts Personal Homes Services, Inc. v. Burwell*, 824 F.3d 968, 970 (10th Cir. 2016) (Gorsuch, J.); *Cypress Homecare, Inc. v. Azar*, 326 F. Supp. 3d 307, 316 (E.D. Tex. 2018).

Here, the alleged health care conspiracy took place from 1998 to 2016, a period over which there has been continuous amendments and changes to the regulations applicable to Medicare and Medicaid benefits. *See Caring Hearts*, 824 F.3d at 970 ("[CMS] estimates that it issues literally thousands of new or revised guidance documents (not pages) every single year . . . ."). In addition, there have been substantial statutory amendments since 1998, including but not limited to the passage of the Affordable Care Act, which in turn, have generated their own progeny of regulations and guidance.

In *Caring Hearts*, the Tenth Circuit underscored the critical nature of matching specific patient treatment to the then-current CMS regulations to adjudicate a medical necessity claim. *Caring Hearts* involved a CMS determination

---

of this Court's jurisdiction, or before the jury for lack of a grand jury finding. *United States v. Izurieta*, 710 F.3d 1176, 1183 (11th Cir. 2013) (indictment must cite alleged regulation violated) (citing *United States v. Babb*, 252 F.2d 702-703-04 (5th Cir. 1958) & *Russell v. United States*, 369 U.S. 749, 765 (1962)).

that a home health provider had billed for medically unnecessary skilled nursing and physical therapy service. 824 F.3d at 974. Noting that the pertinent CMS skilled nursing and physical therapy regulations had changed multiple times since 2008 when the services had been provided, becoming increasingly more complex, especially with respect to documentation, the Tenth Circuit held that CMS erred in applying these newer, more "onerous" regulations, retroactively to the services at issue. *Id*. at 975-76. *See id*. at 977 ("[A]n agency decision that loses track of its own controlling regulations and applies the wrong rules in order to penalize private citizens can never stand.").

Here, the Government failed to introduce any evidence of: (i) the regulations in effect at any given time that it claims a regulation violation occurred; (ii) the date of any particular alleged violation from which an applicable regulation could be identified or applied; and (iii) the identity of any patient whose treatment violated any regulation on a specific occasion. Equally fatal, the Government's recent admission to the Fifth Circuit that ACA is unconstitutional in its entirety dooms the generations of regulations issued since March 2010 in reliance upon the statutory validity of the ACA.

In summary, the record created by the prosecution deprives this Court of the minimally sufficient evidence upon which to evaluate whether a specific regulation

was violated during a timeframe when it was legally in effect. If this Court cannot conduct such an evaluation, the jury could not possibly do so.

The task of linking a violation to an applicable and valid regulation belongs to the party with the burden of proof – the prosecution. No one can be convicted of violating a federal regulation unless there is conclusive evidence of what regulation was in effect and applied at the time of each alleged violation and that it was in fact violated.[12] *Caring Hearts*, 824 F.3d at 968.

Moreover, because this is a criminal case (not a civil case involving the CMS), the *Ex Post Facto* Clause prohibits the retroactive application of CMS regulations – even assuming that they are legal.[13] Art. I, § 9, cl. 3; Art. I, § 10.  *See Calder v. Bull*, 3 U.S. 386, 390 (1798).[14] As the *Caring Hearts* opinion makes clear, the regulations applicable to skilled nursing and physical therapy services (service areas that have been the subject of government evidence and accusations) have been extensively

---

[12] *Caring Hearts*, 824 F.3d at 970 ("The Centers for Medicare & Medicaid Services (CMS) estimates that it issues literally thousands of new or revised guidance documents (not pages) every single year. . . ."); *Cypress Homecare, Inc. v. Azar*, 326 F. Supp. 3d 307, 316 (E.D. Tex. 2018).

[13] *See Prater v. U.S. Parole Comm'n*, 802 F.2d 948, 953-54 (7th Cir. 1986) (*ex post facto* clause applies to statutes and regulations duly promulgated under delegation of legislative authority, but not to agency interpretations).

[14] *See Peugh v. United States,* 569 U.S. 530 (2013) (sentencing post-*Booker* using increased non-mandatory sentencing guideline violates *ex post facto* clause).

changed over the last two decades, becoming progressively more complex and "onerous."

Retroactive application of such regulations to a defendant in a criminal case would constitute *ex post facto* violations because they: (i) are "retrospective, that is, it must apply to events occurring before its enactment," and (ii) "disadvantag[e] the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29 (1981)).[15]

### 4. Medical Certifications Cannot Be Disproven by Conflicting Medical Opinions.

For Medicare to reimburse a skilled nursing facility for services provided to a patient, the patient must have spent 3 nights at a hospital prior to admission and have a healthcare professional certify the need for skilled nursing care on what is referred to as a 3008 transfer form. Medicare Benefit Policy Manual, Ch. 8 § 10 ("The beneficiary must have been an inpatient of a hospital for a medically necessary stay of at least 3 consecutive calendar days."); Fla. Admin. Code § 59G-1.045(4); Ex. 1, AHCA Form 5000-3008 at 2 §Y. Moreover, under Florida law, each patient seeking admission to a nursing facility must first complete a pre-admission screening procedure intended to identify any serious mental illness known as a Pre-Admission Screening and Resident Review ("PASRR"). Fla. Admin. Code § 59G-1.040

---

[15] Reflecting "principles of 'fundamental justice'," the prohibition applies to but "is not limited to laws that regulate primary conduct." *United States v. Matchett*, 837 F.3d 1118, 1125 (11th Cir. 2016) (quoting *Peugh v. United States,* 569 U.S. 530, 544 (2013)).

(PASRR). The screening is completed in two steps – a PASRR Level I screen identifies patients who suffer from serious mental illness, Fla. Admin. Code § 59G-1.040(2)(d), and a PASRR Level II screen is an "in-depth, individualized, assessment . . . to confirm whether the applicant to a [nursing facility] has [serious mental illness] . . . [and] to assess the need for [nursing facility] services . . ., Fla. Admin. Code § 59G-1.040(2)(e)." As part of the PASRR Level II screen, a healthcare professional working for a state-contracted vendor reviews the patient's medical records from the hospital and the skilled nursing facility to determine the need and appropriateness of skilled nursing facility placement. Fla. Admin. Code § 59G-1.040(4)(b)4.

Even though the prosecution sought to fault the admission of psychiatric patients at the Esformes' facilities, it did not refute, either through expert or lay opinions, the individual doctor certifications contained in the 3008 transfer forms or the determinations in the PASRR Level II screens.

Indeed, Dr. Cifu – the physiatrist who was the prosecution's purported skilled nursing facility admissions expert – testified that he was unfamiliar with PASRR screens, (Trial Tr. 3.11.19 at 89), even though it has been a federal requirement since 1989 that all patients in all states participating in Medicaid seeking admission to a Medicaid-certified nursing facility be screened for mental illness, regardless of

payment source.[16] "This process identifies all applicants with a serious mental illness ("SMI"), identifies supports needed for community living, diverts the individual from placement in nursing facility that can not meet their reported needs . . . and monitors these recommendations."[17]

Dr. Cifu was nonetheless unaware of these national requirements dealing directly with admission and level of care determinations regarding mental illness. Dr. Cifu admitted to this Court that there was CMS literature on the makeup of patient populations, but he had not reviewed this data for psychiatric diagnosis, relying instead upon his years of professional experience. Trial Tr. 3.07.09 at 192-93. He characterized the hypothetical prospect of a facility admitting more than two patients with a psychiatric diagnosis and a need for physical rehabilitation as a cause for concern and "heinous." Trial Tr. 3.07.19 at 178. He further testified that, in his 30 years of professional experience as a physiatrist, he had admitted less than 10 patients with a psychiatric diagnosis and knew of only one patient during that

---

[16] *See* Ex. 2, APS Healthcare, *Contractor Manual, Florida PASRR* 2 (May 2011) ("All persons must have a prescreening (Level I) and if mental illness and/or mental retardation appear to exist, the person must be referred for a further evaluation (Level II). The goal of this evaluation is to ensure appropriate placement of individuals with serious mental illnesses . . . ."). Medicaid's website also explains that the PASRR is a "federal requirement to help ensure that individuals are not inappropriately placed in nursing homes for long term care." (available at https://www.medicaid.gov/medicaid/ltss/institutional/pasrr/index.html).

[17] *See* Ex. 2, APS Healthcare, *Contractor Manual, Florida PASRR Program* at 2 (May 2011)

timeframe who was transferred from a psychiatric hospital to a SNF. Trial Tr. 3.07.19 at 194.

For comparison, the Seventh Circuit has held that a doctor who (like Dr. Cifu) relies upon their professional experience to qualify under *Daubert* are unqualified to do so when they have treated only five such patients in twenty year careers.[18] In addition, the Seventh Circuit noted that when professional experience is the basis for a doctor's expert opinion, the doctor must engage with the actual patients as they would have in real life, which did not happen with Dr. Cifu in this case.[19] Dr. Cifu's proposed extrapolation from *three* non-randomly-selected hypothetical psychiatric patient profiles provided him by the prosecution to a broader patient population cannot possibly qualify as a valid statistical conclusion. *United States v. Vista Hospice Care, Inc*., 2016 WL 3449833, at *14 (N.D. Tex. June 20, 2016) (patient sampling errors fatal to expert conclusion).

Assuming that the prosecution had presented expert medical evidence contradicting any of the medical necessity certifications (including PASRR determinations) supporting the admission and continued treatment of Esformes facility patients, this would be insufficient evidence as a matter of law that the

---

[18] *O'Connor v. Commonwealth Edison Co*., 13 F.3d 1090, 1107 n.19 (7th Cir. 1994).

[19] *Porter v. Whitehall Laboratories, Inc*., 9 F.3d 607 614 n.6 (7th Cir. 1993).

certifications are false. A post-treatment medical expert opinion is insufficient as a matter of law to overcome the prior medical judgment of a certifying health care professional. *United States v. Aseracare Inc.*, 176 F. Supp. 3d 1282, 1286 (N.D. Ala. 2016) (granting summary judgment against government for insufficient evidence of a false certification claim based upon alleged coverage ineligibility when supported only by **government** expert medical opinion evidence contradicting prior certifications); *United States v. Vista Hospice*, 2016 WL 3449833, at *15 (N.D. Tex. June 20, 2016) ("A testifying physician's disagreement with a certifying physician's prediction of life expectancy is not enough to show falsity.") (citing *Aseracare*); *Druding v. Care Alternatives, Inc.*, 346 F. Supp. 3d 669, 685-86 (D.N.J. 2018) (citing and following *Aseracare* and *Vista Hospice* as "persuasive").

### 5. The Government Presented Insufficient Evidence of Substandard Care or Worthless Services.

Although the Indictment makes no allegation that Defendant or his facilities provided substandard medical services, or provided "worthless services," the Government claimed from the outset of trial through its closing argument,[20] that

---

[20] Trial Tr. 3.29.19 at 215 (closing: "You know services aren't provided based on the long recording that Mr. Medina played for you and I'm not going to have him play it again but that recording shows that these SNFs were not providing the care that they were billing for. That recording shows that it's not just substandard facilities. And by the way, the instruction says you can evaluate the substandard facilities, you can evaluate whether or not the program instructions were followed.").

these were the offenses that it was prosecuting.[21] Indeed, the prosecution told the jury in closing that this alleged substandard care claim was fully consistent with this Court's charge.[22] Defendant incorporates by reference his prior briefing and argument on why injecting such charges at trial constitutes a constructive amendment. Assuming, without conceding, that such charges are properly in this case, they were not proven under the applicable precedent.

The Eleventh Circuit confronted an expressly charged "worthless services" case in *Houser*, 745 F.3d at 1338. Unlike this case, the *Houser* indictment expressly alleged a violation of providing "substandard" or "worthless" services, cited Medicare quality of care statutes and regulations, and claimed their violations. 745 F.3d at 1338, 1444-45.

The question presented in *Houser* was that, because CMS pays only a pre-fixed amount per service, or a *per diem,* without allocating separate values for component parts, at what point does the payment for bundled services become

---

[21] For example, on the eve of trial, the Government announced it intended to adduce evidence of "sub-standard services that were not commensurate with the allegedly reimbursable claims submitted to Medicare." DE 1105 at 1.

[22] This Court instructed the jury: "You have heard evidence of the care provided to patients at Esformes owned facilities. The defendant is not charged with providing substandard care to patients at his facilities." Trial Tr. 3.29.19. at 46. The prosecution then told the jury: "And by the way, the instruction says you can evaluate the substandard facilities, you can evaluate whether or not the program instructions were followed." *Id*. at 215.

"worthless"?[23] Confronted with a constitutional vagueness challenge, the Eleventh Circuit refused to draw "a proverbial line in the sand" [24] between negligent (*i.e.*, poorly performed) services and "worthless" services.

After canvassing precedent, the *Houser* opinion rejected the sufficiency of a "gross negligence" standard, thereby declining to engage in any inquiry into what level of quality of care was sufficient to state a claim of fraud. Quoting a Sixth Circuit opinion, *Houser* held that section 1349 fraud was limited to billing "'for services that [Defendant] knew were not just of poor quality but had no medical value.'" *Houser*, 754 F.3d at 1348 (quoting *Chesbrough v. VPA*, 655 F.3d 461, 468 (6th Cir. 2011)).

---

[23] Medicare reimburses SNFs a fixed fee per patient, per day for the patient's overall care, based on a "prospective payment system." *See Abington Crest Nursing and Rehabilitation Center v. Sebelius*, 575 F.3d 717, 718 (D.C. Cir. 2009). *See also* 42 U.S.C. §1395yy(e) ("Nursing homes receive a flat per diem reimbursement from Medicare for each day of care that they provide, adjusted for the location of the nursing home and for the resources required to provide adequate care for the different types of resident."). *Fal-Meridian, Inc. v. United States Dept. of Health and Human Svcs.*, 604 F.3d 445, 448-49 (7th Cir. 2010). Likewise, Medicaid "pays room and board costs for eligible nursing home residents through the nursing home *per diem* rate. This is a specific payment per day that nursing homes agree to accept from Medicaid as full payment for providing care." *Maryland Dept. of Health and Mental Hygiene v. CMS*, 542 F.3d 424, 430 (4th Cir. 2008) (citing 42 C.F.R. §413.53).

[24] *Houser*, 754 F.3d at 1334 ("We do not believe that Mr. Houser's conviction requires us to draw the proverbial line in the sand for purposes of determining when clearly substandard services become 'worthless.'").

Thus, *Houser* upheld the Defendant's conviction only because the indictment alleged, the trial proof demonstrated, and the trial court found that statutorily-mandated and billed services "were not provided to residents *at all*." 754 F.3d at 1348 (emphasis in the original). *Accord, United States v. Dental Dreams*, *LLC*, No. Civ. 13-1141 JH/KBM, 2016 WL 9777254, at *9 (D.N.M. Sept. 26, 2016) ("To prevail on a worthless services claim, the plaintiff must show that the defendant knew the procedure billed had no medical value; *negligence is insufficient*.") (emphasis added, citing *Chesbrough*).

To avoid the inherently vague line-drawing exercise of attempting to place a value upon the quality of the bundled services provided (when are services sufficiently diminished?), the *Houser* opinion held that the failure to provide any services "*at all*" is the constitutionally acceptable standard under 18 U.S.C. § 1349.[25] Other courts agree. *See, e.g., United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014) ("It is not enough to offer evidence that the defendant provided services that are worth some amount less than the services paid for. That is, a 'diminished value' of services theory does not satisfy this standard. Services that are 'worth less' are not 'worthless.'") (citing

---

[25] Applied to this case, this would mean that the Government would have the burden of proving that Defendant provided no services "at all" since 1998. *United States v. Unisys Corp.,* 178 F. Supp. 3d 358, 365 (E.D. Va. 2016) (quoting *United States ex rel. Absher v. Momence Meadows Nursing Ctr, Inc.*, 764 F.3d 699, 710 (7th Cir. 2014)).

*Chesbrough*, 655 F.3d at 489-69). *See also United States v. Unisys*, 178 F. Supp. 3d 358, 366 (E.D. Va. 2016) (quoting *Momence*).

In *Momence*, for example, the Seventh Circuit held that a "worthless services" "claim would be absurd in light of the undisputed fact that [the nursing facility] Momence was allowed to continue operating and rendering services of some value despite regular visits by government surveyors." *Id.* at 710 (vacating jury verdict because "no reasonable jury could have found that Momence provided truly or effectively worthless nursing services to its residents"). *Accord*, *United States v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1326, 1343 n.23 (S.D. Fl. 2015) (Williams, J.) (quoting *Momence*). Similarly, here, despite continued Government regulatory oversight, the Government introduced no evidence that CMS ever discontinued the operations of any Esformes facility, which it could have done if any such facility was not in "substantial compliance" with Medicare or Medicaid requirements. 42 C.F.R. §§ 488.417 & 488.418. Finally, the Government never attempted to establish that the quality of any particular service was so deficient that it justified disregarding its own *per diem* payment system. In its Supplemental Disclosure tendered on March 2, 2019, (DE 1156), the Government suggested that Dr. Cifu "may" testify on the effect of the quality of care upon *per diem* reimbursement,[26] but

---

[26] DE 1156 at 5 ("Dr. Cifu may testify about: acceptable levels of the quality of care in a SNF, and an ALF; how the *per diem* Medicare reimbursement for SNF services and Medicaid reimbursement for SNF and ALF services is based on, and assumes,

he did not so testify. Accordingly, there is no evidentiary basis upon which to set a constitutionally valid standard for the imposition of criminal liability based upon substandard services.

Under the banner of the unpled "worthless services" charge, the prosecution saturated the trial record with anecdotal evidence of allegedly deficient services (*i.e.*, unhappy, ill-clad patients, scarce diaper inventories). This was not only a constructive amendment of the Indictment but, given that it was literally "absurd" to assert such a claim in the first place, this unpled claim was used to prejudice the jury against the Defendant with evidence that the prosecution labeled as "devastating evidence against him." DE 1096 at 4. Thus, this evidence was not only insufficient, it justifies granting a new trial, which Defendant requests in his accompanying new trial motion.

### 6. The Government Presented Insufficient Evidence that the Patients Did Not Need the Services Provided.

In trial, the prosecution attempted to establish that the patients at Esformes' facilities did not need the services provided based on: (i) the testimony of three identified psychiatric patients (Ms. J, Mr. D and Mr. B); and (ii) general evidence of admission of other psychiatric patients.[27] Given that the doctor certifications and

---

a certain level of quality of care and everyday services and medical supplies, including room and board; . . . .").

[27] The government attempted to introduce medical necessity evidence based upon observations that a few psychiatric patients could walk, but this Court indicated that

PASRR determinations of medical necessity were never rebutted by a medical professional, the Government failed to prove that the patients did not need the services the nursing homes provided. Despite three patients with psychiatric diagnoses testifying that they did not need nursing care, the prosecution failed to prove that patients with psychiatric diagnoses do not need the services provided at a nursing home because it did not introduce a psychiatrist's expert opinion on that subject. A patient's lay opinion is insufficient to establish a breach of a standard of care.[28] Evidence that other patients with psychiatric diagnoses were admitted to Esformes' facilities is irrelevant given that the government failed to prove that patients with psychiatric diagnoses did not need the services provided at the facilities.

Ms. J, for example, testified that she did not need to be at Oceanside. Trial Tr. 3.12.19 at 50. Ms. J also testified, however, that she was declared disabled due to her mental illness, *id.* at 52, has constant suicidal thoughts, *id.* at 113, is medication

---

it would not permits such medical necessity opinion evidence. Trial Tr. 3.5.19. at 69.

[28] *Sowers*, 2015 WL 12839775, at *5 (barring lay opinion on medical causation, citing numerous cases within the Eleventh Circuit). "Testimony as to the diagnosis and treatment of a patient, and the reasons therefore, is beyond the ability of the average lay witness' competency and is necessarily based on 'the expert's scientific, technical, or other specialized knowledge,' in the form of doctors' medical training and experience." *Daniels v. District of Columbia*, 15 F. Supp. 3d at 70 (quoting Fed. R. Evid. 701).

non-compliant, *id.* at 54-55, and has multiple medical problems, *id.* at 60-68, 72-73.
Dr. Frank Busillo, Ms. J's podiatrist, testified that Ms. J would benefit from
increased supervision, Trial Tr. 3.19.19 at 185, physical therapy, *id.* at 165-66, and
from skilled care, *id.* at 185. Dr. Busillo described Ms. J's failure to comply with her
post-operative instructions, *id.* at 157-58, medication regimen, *id.* at 185, and follow
up appointments, *id.* 161. A physician who treated Ms. J at Larkin Hospital and
signed the 3008 medical certification to transfer Ms. J to a SNF, Dr. Carla Rabassa,
also testified that Ms. J benefitted from SNF care to help her with her pain through
physical therapy and to help ensure that Ms. J takes her numerous medications
correctly. Trial Tr. 3.25.19 at 11-12.

Mr. D testified that he would repeatedly go to hospitals and threaten suicide
just to trigger the health care coverage that would take him off the streets temporarily
to obtain food and lodging before he would return to engage with others in substance
abuse on Miami Beach. Trial Tr. 2.14.19 at 178, 185, 193. Mr. D implied he had no
real need for skilled nursing services and was simply taking advantage of Medicare
or Medicaid (the prosecution has not said which). Mr. D, however, openly admitted
that at the time in question he was schizophrenic, had a "severe" case of
"alcoholism," and was addicted to crack cocaine. Trial Tr. 2.14.19 at 174-75. Of
course, Mr. D is not a doctor, and he was not in a position to give competent

testimony about his own mental health condition a decade before, or his need for psychiatric services at that time.

But the defense presented the testimony of Mr. D's treating psychiatrist, Dr. Francisco Ricart, at the Nursing Center at Mercy. Trial Tr. 3.22.19 at 112. Dr. Ricart explained his treating notes, and the medical records of Mr. D as including an admitting diagnosis of "schizoaffective disorder," combined with false denials of substance use, a past history of multiple hospitalizations and a "long history of mental illness." *Id.* at 113-14, 132, 119. Dr. Ricart devised a plan of care that included changing, scaling back, and monitoring Mr. D's psychiatric medications. *Id.* at 122-24. Dr. Ricart testified that a person with Mr. D's conditions (psychiatric disorders and medication, substance abuse, and false denials) is the type of patient that needs skilled nursing supervision. *Id.* at 129-33 (agreeing that "this [is] the type of patient that you would treat at a skilled nursing facility").

On cross-examination, Dr. Ricart explained that patients exhibiting similar conditions as Mr. D (psychiatric disorders, substance abuse, the effects of psychiatric medication, and other medical conditions) are likely to suffer relapses that require returns to higher levels of care, including re-hospitalizations. Indeed, this is how he characterized Mr. D's history of relapses and further opined that this cycle was typical of psychiatric patients. Trial Tr. 3.22.19 at 176 ("I'm saying that the pattern that you describe is what we able to see in patient with mental illness. Here, in New

York, in every part of the world. It doesn't have to be here."); *id*. at 184-85, 198. Finally, Dr. Ricart testified that he referred psychiatric patients from hospitals to skilled nursing facilities for care based upon his medical judgment that they needed skilled nursing care. *Id*. at 192.

In addition, the defense presented evidence that, in accordance with Florida law, Mr. D had to be preliminarily evaluated and approved for skilled nursing care by a medical professional prior to his admission (PASRR Level I), and again within 30 days of admission to the skilled nursing facility by a state agency (PASRR Level II).[29] The state agency independently reviewed Mr. D's medical records and issued a PASRR Level II approving his admission to a skilled nursing facility. Trial Tr. 3.22.19 at 213-14. *See* GX 712A at 8837. The state of Florida, through a state-contracted vendor, independently conducts the PASRR Level I and II determinations under federal law to determine the appropriate level of care for any patient suspected of mental illness. *Joseph H. v. Hogan*, 561 F. Supp. 2d 280, 311 (E.D.N.Y. Mass. 2008) (42 U.S.C. § 1396r(e) "clearly places the ultimate responsibility for the initial PASRR determination on the state"; "The Federal Regulations explicitly provide

---

[29] Pre-Admission Screening and Residency Review ("PASRR"). Florida Administrative Code § 59G-1.040 (PASRR).

27

that the state . . . is responsible for the PASRR determinations") (citing regulations).[30]

The state of Florida's PASRR Level II determination for Mr. D confirmed that he needed skilled nursing care. *See* GX 712A at 8837 ("a nursing facility placement is determined to be appropriate due to the patient's inability to perform activities of daily living and need for medication").

Another former psychiatric patient, Mr. B, testified that he was dissatisfied with the services he received at Oceanside from July 15, 2015 to October 7, 2015, Trial Tr. 2.27.19 at 110, but he had difficulty remembering the medical services he was provided while at Oceanside, including forgetting about a dozen reported encounters with health professionals, *id.* at 112-15, up through and including an emergency room visit on September 5, 2015 at Westchester Hospital. *Id.* at 119. Mr. B had difficulty remembering almost any of his 20 hospitalizations for mental illness

---

[30] Citing 42 C.F.R. § 483.106(d)(1) (determination "whether an individual requires the level of services provided by a NF . . . .(1) . . . must be made the State mental health authority and be based on an independent physical and mental evaluation performed by a person or entity other than the State mental health authority"); 42 C.F.R. § 483.112(a) ("Determination of need for NF services. . . .[T]he State mental health . . . authority . . . must determine, . . . whether, because of the resident's physical and mental condition, the individual requires the level of services provided by a NF."). *See also* § 483.116(a) ("If the State mental health . . . authority determines that a resident or applicant for admission to a NF requires a NF level of services, the NF may admit or retain the individual."); § 483.118 (if State determines applicant "does not require NF services, the applicant cannot be admitted")

prior to arriving at Oceanside but confirmed that he had been diagnosed with a mental disability since age 19 or in his twenties, *id.* at 100, and had been under psychiatric care and taking psychiatric medications since then. He was discharged to Oceanside by his physicians at the "psych unit" at Mount Sinai Hospital yet could not remember the details of the care he received at Mt. Sinai. *Id.* at 80, 107. To send Mr. B to Oceanside, Mt. Sinai had to certify Mr. B's need for nursing home care. Furthermore, Mr. B's need for nursing home care was independently verified by Florida's PASRR regime. At Oceanside, he was counseled about his alcohol and drug abuse, which he did not remember, *id.* at 114, 121-22, and he was found using alcohol, which he denied remembering, but he admitted hiding beer and selling it to other patients. *Id.* at 88. He left Oceanside for another facility he described as a "mental health detox facility," *id.* at 124, and was then sent to another such facility from which he was hospitalized in 2016 as a result of his medication management issues. *Id.* at 123. Mr. B was unable to remember his 2016 diagnosis of having a heightened sense of smell, or his subsequent hospitalization in 2017. *Id.* at 104-05.

The prosecution presented no expert evidence about Mr. B or about his medical care at Oceanside, nor has it challenged the multiple medical professionals' (i.e., the physician who signed Mr. B's 3008 transfer form to send him to Oceanside and the state of Florida healthcare professional who completed Mr. B's PASRR Level II) determination that Mr. B needed nursing home care. The Government did

not present any testimony from a psychiatrist about any necessary or unnecessary psychiatric medical care for Mr. B.  Mr. B has no medical training or capacity from which he could diagnose the medical necessity of his own care.

Here, the only identified patients who gave evidence – Ms. J, Mr. D and Mr. B – are actually more representative than the Government wanted them to be. As Dr. Ricart explained, psychiatric patients are often recidivists when it comes to needing skilled nursing care and re-hospitalizations because of their propensity to experience relapses. If anything, the propensity for relapsing reinforces the need for vigilance in their care, as opposed to characterizing them as malingerers.

Psychiatric patients were the only class of patients where the prosecution challenged the medical necessity of their admission to a skilled nursing facility. The prosecution argued (without presenting medical evidence) that large percentages of such patients were admitted to Esformes' facilities, when none or few should have been, making their numbers evidence of Defendant's greed, the lack of medical necessity, and the success of Esformes' alleged scheme to bribe doctors to obtain patients.[31]

---

[31] The Government argued during closing: "it's a case about the patients who testified.  It's a case about the professionals who came in and said, of course, some psychiatric patients belong in an SNF but not all of them." Trial Tr. 3.29.19 at 217.

Again, under federal law, each admission of a psychiatric patient had to be independently screened by the state of Florida. There was no evidence – even from the Delgados – that the Florida contractors who made all of these level of care determinations were bribed by anyone, including the Delgados. While the prosecution was quick to make the accusation that "Esformes directed patients to be admitted to his facilities even if they didn't need . . . the care," they did not bother to explain how he could have directed the independent professionals the state of Florida hired to make PASRR level of care decisions.

There simply is no supporting medical evidence from the prosecution of lack of medical necessity for skilled nursing facility services, and indeed no *psychiatric* medical evidence from the prosecution whatsoever. Government expert Quindoza was forced to concede that Medicare covers skilled nursing care for psychiatric patients. Trial Tr. 2.12.19 at 138, 192.  Quindoza confirmed that "it doesn't really state it anywhere if they are mentally ill," that they are ineligible for Medicare coverage, acknowledging "I believe I said it as part of my testimony with Mr. Hayes, that it is possible for someone with mental conditions to be properly admitted into skilled nursing facility care." *Id*. at 209.

Admitting in its closing that "[t]his is not a case about patient files and going through each and every patient file," the prosecution abdicated any responsibility for proving a medical necessity case through individual patients. Instead, it offered

31

speculation about psychiatric patients who were unidentified with the exception of the three patients who testified, and without identifying a single medically unnecessary treatment, bill, or claim. A defendant cannot be asked to defend against such a vague medical necessity claim for nameless patients, from a pool of 14,000 patients over two decades, consistent with due process.

Separate and apart from Florida's independent medical necessity determinations for psychiatric patients, every medical treatment is accompanied by a doctor's certification of medical necessity, and none have been challenged or rebutted by the Government in this trial. Those doctors' certifications, standing alone, established medical necessity. *United States v. Aseracare Inc.*, 176 F. Supp. 3d 1282, 1286 (N.D. Ala. 2016) (after vacating jury verdict, granting summary judgment against government for insufficient evidence of a false certification claim based only upon government expert medical opinion evidence contradicting prior medical certifications). Even Mr. Quindoza agreed that, as to the patients admitted to Esformes' facilities, skilled nursing services "must have been ordered or certified by the patient's attending physician certifying the need for such services and explaining the patient's condition." Trial Tr. 2.12.19 at 77. The Government presented no expert or lay evidence identifying, much less challenging, any one of these medical certifications, including those for Ms. J, Mr. D, and Mr. B.

Indeed, this Court granted judgments of acquittals on Counts 2 and 3, relating to the services billed for Ms. J, precisely because of a failure of proof that Esformes was involved in allegedly improper billing by others (Carmouze) charged in the conspiracy. If the Government failed to prove that Esformes was liable for the allegedly improper billing by a charged co-conspirator, then surely the Government failed to prove that Esformes entered into a conspiracy with the hundreds of uncharged/innocent medical professionals to bill Medicare for (a) services not rendered or (b) services not necessary, relating to the thousands of patients who resided in Esformes facilities.

## II. Insufficient Evidence Supports the Kickback Convictions

The jury convicted the Defendant on six substantive counts of receiving or paying kickbacks (Counts 8 & 9, and 10-13), plus one count of conspiracy to impede HHS (*Klein* conspiracy) in Count 6. The evidence adduced on these counts, however, fell short. Mr. Esformes reiterates the arguments made during the Rule 29 hearings held at the close of the government's case and at the close of all the evidence, and adds in particular that as to Counts 8 and 9, which involved alleged payments of kickbacks from a Delgado-related entity (Preferred Provider Group or PPG) to female companion Raven Ervin to basketball coach 1 (Martin Fox), neither check was identified by either Delgado witness as a kickback.

Moreover, the *Klein* object, particularly in this setting, is hopelessly vague under the Due Process Clause.[32]  Historically, *Klein* conspiracies derive from judge-made determinations that the scheme to defraud language of section 371 is not limited to common law schemes to defraud of money or property, enabling courts to engraft upon this statutory language a distinct species of fraud—interference with Government functions. *See, e.g.*, *United States v. Coplan*, 703 F.3d 46, 59 (2d Cir. 2012) (inviting Supreme Court to revisit vitality of *Klein* conspiracy).   In a series of more recent opinions, however, the Supreme Court has declined invitations to go beyond common law notions of fraud and has instead more narrowly limited the statutory term "scheme to defraud" to efforts to deprive victims of money or property. *See, e.g*, *McNally v. United States*, 483 U.S. 350, 358 (1987) (kickback scheme that did not affect state insurance payments fails to establish necessary scheme to defraud State of money or property; citing *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)); *Neder v. United States*, 527 U.S. 1, 24-25 (1999)

---

[32] *Johnson v. United States*,135 S. Ct. 2551, 2556 (2015) (emphasis added, citations omitted). The vagueness doctrine targets three independent violations of due process. "[First] If the statute fails to provide a person of ordinary intelligence fair warning, *or* [Second, if the statute] authorizes arbitrary and discriminatory enforcement, the statute is void." *United States v. Lebowitz*, 676 F.3d 1000, 1012 (11th Cir. 2012) (emphasis added).  As to the latter possibility, a statute is void if it "is so standardless that it invites arbitrary enforcement." *Johnson,* 135 S. Ct. at 2556. Third, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

(statutory term "scheme to defraud" incorporates relevant common law limitations, including materiality).  No such money or property object is pled in Count 6 for the Klein object.

The jury's acquittal on Count 6's kickback conspiracy object offenses: (i) further undermines any argument that this Klein "scheme to fraud" had a monetary or property object; and (ii) eliminates kickbacks as a means of avoiding the charge of unconstitutional vagueness as to the *Klein* conspiracy object.  *See, e.g., Skilling v. United States*, 561 U.S.358, 412 (2010) (upholding against a vagueness challenge the intangible rights fraud statute but only as narrowly construed to apply only to kickback and bribe offenses). Regardless, the prosecution adduced no evidence that submitting a kickback-tainted Medicare claim impeded the administrative functions of HHS. It may be that Medicare would have declined to pay a provider who concealed that it kicked back a portion of the revenue earned for delivering medically necessary services to an otherwise qualified patient; but Medicare would have paid the same amount to a different provider for the same service. It is not apparent, nor was it proven, that defying Medicare rules, in and of itself, impairs the functions of HHS.

## II.   The Money Laundering Offenses Should Be Dismissed.

Defendant was convicted of nine money laundering concealment offenses, plus a concealment conspiracy (Count 16). The money laundering charges in this

case are for allegedly engaging in a transaction "designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). This offense has three critical elements: (i) a design to conceal; (ii) knowingly; (iii) the proceeds of unlawful activity – all of which are missing from the Government's proof.

### 1. Insufficient Evidence of a Design to Conceal.

The first and overarching critical element of a concealment money laundering offense, is proof of the "design" to conceal. *Cuellar v. United States*, 553 U.S. 550, 567 (2008) ("a conviction under this provision requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute."). The government adduced no direct evidence of a design to conceal—such as testimony from a transferor that he or she designed the transactions to conceal that the transaction originated from the proceeds of a criminal offense.

### 1. Checks are Inconsistent with a Design to Conceal

For example, seven of the eight money laundering convictions (Counts 18-21, 25-28, & 30) involve checks, which because they disclose rather than disguise a transaction, have led courts to reject check transactions as money laundering concealment. *See, e.g., United States v. Johnson*, 440 F.3d 1286 (11th Cir. 2006) ("a money laundering concealment conviction pursuant to § 1956 requires evidence of

something more than a simple transfer of funds between two accounts, each bearing the parties' correct name"); *United States v. Caldwell*, 560 F.3d 1214, 1221 (10th Cir. 2009) ("Money laundering requires more than simply writing a check with the proceeds of unlawful activity;" use of check inconsistent with allegation of concealment or defendant's intent to conceal).

The Defendant unsuccessfully sought a jury instruction on this point, and objected to the prosecution's proposed instruction, given by this Court, defining the term "transaction" as "including the writing of a check." This prosecutorial addition not only ignored the accepted precedent that checks are inconsistent with an intent to conceal but added the erroneous suggestion that merely writing a check, as opposed to negotiating a check in a transaction, was sufficient to convict.

In this Circuit, the "[e]vidence of concealment must be substantial." *United States v. Johnson*, 440 F.3d at 1291. Here, the prosecution purported to establish concealment simply from an allegation (made by summary witness Petron) that the transactions could be traced backwards through other accounts into alleged "proceeds" of Medicare or Medicaid payment. While this is legally insufficient to establish the flow of alleged proceeds, it actually fundamentally disproves the fact or intent to conceal.

The monies that were originally deposited into the Esformes health care facility accounts, and the payees, are fully known to the Government because the

government is the payor.  The fact that the government's summary witness (hired in September 2016 after the charges in this case) could, by examining an alleged paper trail, trace these Medicare and Medicaid payments forward through several accounts demonstrates that these monies were not concealed from the government. The Government presented no evidence, for example, that any transaction was structured to frustrate Medicare or Medicaid's ability to follow this same paper trail. No one from Medicare or Medicaid testified that the transactional records were opaque or not wholly transparent. Moreover, simply spending money obtained from Medicare or Medicaid on personal expenditures is not concealment either.  Here, both ends of the transactional trail—the Medicare payments through the ultimate issuance of checks for personal expenditures—were done in the open.

### 2.  Personal Expenditures are Not Concealment Transactions

"Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime .... If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute." *United States v. Majors*, 196 F.3d 1206, 1213 (11th Cir. 1999) (quoting *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994).

In particular, "payments for personal benefits out of previously laundered proceeds do not themselves constitute money laundering unless they are designed to

conceal the nature or source of the money." *United States v. Magluta*, 418 F.3d 1166, 1176 (11th Cir. 2005). The Court has already acquitted the Defendant on Counts 24 and 29, involving the purchase of a watch, and some clothing. Those transactions were not designed to conceal anything, but rather fell into the aforementioned category of undisguised personal expenditures. *See United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994) ("If transactions are engaged in for present personal benefit, . . . they do not violate the money laundering statute."). Counts 25 to 28 and Count 30 should fall into the same category because they represent similar personal expenditures -- Count 25 ($500 to a female companion); Count 26 ($3,500 check to basketball coach 1); Count 27 ($75,000 Ferrari payment for lease in Defendant's name)[33]; Count 28 ($18,000 wire from Betancourt to basketball coach); Count 30 ($20,000 check to Duffy Designs)).

During trial, the Court acknowledged this point with respect to personal expenditures, telling the defense that "That's a good argument for Rule 29." Trial Tr. 3.1.19 at 112. For example, as to the payments to Dr. Carmouze's girlfriend, the Court asked the prosecution:

> THE COURT: Was somebody shown that check and explain
> and testify before the jury that Carmouze said please make this
> check out to my girlfriend to hide the money?
>
> MS. YOUNG: I don't believe -- I need to check I need to check the

---

[33] Trial Tr. 3.13.19 at 135 (GX127B).

record, Your Honor, but I don't know that Gabriel Delgado actually said her name.

Trial Tr. 3.13.19 at 146-47.[34]

The answer is no, the Government did not offer evidence of concealment as to any specific check or wire transfer that formed the basis of a money laundering conviction. The Ferrari payment (Count 27), for example, was a check from an LLC of which Defendant was the publicly-disclosed owner, for a lease that was made in own his name. 3.1.19 at 279.  As to the $20,000 check to Ken Duffy Design (Count 30), this Court inquired whether there was any evidence about who Ken Duffy was, and his relationship with Esformes and the purpose of the transactions. Trial Tr. 3.1.19 at 267-70.  The prosecution admitted it had introduced no such evidence but suggested that this evidence would be provided by its summary witness Petron, although he admitted that tracking proceeds in the hands of Mr. Duffy was "where my expertise ends, your Honor." *Id.*

---

[34] Courts have long held that the money laundering statute is not a "'money spending statute.'" *United States v. Heid*, 651 F.3d 850, 856 (8th Cir. 2011) (quoting *United States v. Shoff*, 151 F.3d 889, 892 (8th Cir. 1998)). *Accord United States v. Sanders*, 928 F.2d 940, 945 (10th Cir. 1991) (cash car purchases do not constitute money laundering concealment; "To so interpret the statute would, in the court's view, turn the money laundering statute into a 'money spending statute.'").

In short, the prosecution did not elicit any evidence that a specific transaction alleged to be a money laundering offense was designed *to conceal* the proceeds of any identified health care or other offense.

### 3. Design to Conceal Proceeds Cannot be Proven Through a Summary Witness.

The prosecution has not identified, any particular statutorily-listed "attribute" that the monetary transaction was designed to conceal (*i.e.*, the nature, location, or source of the monetary transaction). Instead, the prosecution relied almost exclusively upon the testimony of summary witness Petron first to label the transactional monies as "proceeds", and then to suggest that these proceeds were being concealed. That is simply an insufficient evidentiary showing of a design to conceal proceeds. *United States v. Willey*, 57 F.3d 1374, 1388 (5th Cir. 1995).

In *United States v. Willey*, 57 F.3d 1374, 1388 (5th Cir. 1995), the government presented evidence of a paper trial revealing that the defendant's wife (a co-defendant) had transferred money traceable back to the defendant between two of her accounts, both of which were in her own name. *Id*. at 1388. The prosecution attempted to portray these open transfers as concealment through the expert opinion testimony of an IRS agent by tracing them back to her husband. *Id*. The Fifth Circuit, following the guidance of *Garcia-Emanuel,* vacated defendant's conviction and concluded that this undisguised paper trail was legally insufficient to prove a

41

"design" to conceal when it was only supported by the government *expert*'s opinion that the transaction did in fact conceal the source of the proceeds (her husband).  *Id*.

In the absence of other evidence, the testimony of Mr. Petron and his summary charts were insufficient to support a conviction on concealment money laundering. *See, e.g., United States v. Spalding*, 894 F.3d 173, 184 (5th Cir. 2018) ("We have therefore found reversible error where the government "attempted to use a summary chart to prove an element that it otherwise had not established"; error to permit summary exhibits to contain "an expert's inferences and opinions about the underlying records") (citing and quoting cases). The Government did not proffer Mr. Petron as an expert, and this Court did not certify him as an expert.  The defense objected to his opinions on Rule 16, *Daubert*, and Fed. R. Evid. 702 grounds, which this Court overruled.  Trial Tr. 3.13.19 at 117.  *See* Fed. R. Crim. P. 16(a)(1)(G) Advisory Cttee Note (1993) (summary witness opinions must be disclosed pretrial); *United States v. Hart*, 295 F.3d 451 (5th Cir. 2002) (error to permit summary witness opinion based upon witness' assumptions).

Mr. Petron had no personal knowledge of the transactions and could not testify that these transactions were designed to conceal. While Mr. Petron traced the funds backwards into other accounts that received Medicare or Medicaid deposits, this is not evidence of concealment. To the contrary, the trail of transactions established

that the funds could be easily traced to Medicare or Medicaid payments by the government and that there was no concealment.

### 4. There is Insufficient Evidence that Defendant "Knowingly" Concealed a Transaction.

The statute requires that Mr. Esformes "know[] that the property involved in a financial transaction represents the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1).  While this knowledge requirement applies to all money laundering offenses, it has special importance in concealment offenses because without knowledge of the unlawful origins of the monies, there is no point in designing transactions of concealment.

The only evidence that that the money involved in the substantive money laundering offenses was "proceeds" of a prior specified unlawful activity came from Mr. Petron, who testified that he was able, by [mis]applying the lowest intermediate balance (LIBT) methodology, to trace generic Medicare and Medicaid payments into and through layers of bank accounts of different entities and persons, so as to hypothetically fund the individual money laundering transactions as including the "proceeds" of the antecedent Medicare and Medicaid payments to another party or account.  As will be explained below, this is a misapplication of LIBT methodology. But for purposes of establishing that the Defendant "knowingly" agreed to the use of alleged "proceeds" as a part of, or all, of these transactions, this showing is inadequate.

43

There is no evidence, for example, that the Defendant was aware of the LIBT methodology or of Mr. Petron's methodology in commingling the 30-plus bank accounts that Mr. Petron collated to arrive at his proceeds opinions.  For example, Mr. Petron examined the bank accounts of Delgado companies to arrive at his opinion that monies contained therein included Medicare and Medicaid monies sufficient to pay alleged transactions, but there is zero evidence that the Defendant knew of, had access to, or could duplicate this tracing analysis using Mr. Petron's misapplication of LIBT to reach the same opinion about the status of "proceeds."

### 5. Insufficient Evidence of Proceeds of Specified Unlawful Activity.

More important, Mr. Petron did not have any evidence, nor did he offer any evidence, that these prior Medicare or Medicaid deposits in predecessor accounts were, themselves, the proceeds of unlawful activity.  He merely attempted to trace the transactions backwards to prior accounts with Medicare or Medicaid deposits-- not even attempting to establish whether those original deposits were themselves lawful or unlawful proceeds. In particular, Mr. Petron denied having traced these earlier Medicare and Medicaid deposits back to any particular patient, including any patient identified in this case. Trial Tr. 3.14.19 at 15 ("I haven't connected it to the patients"). Of course, not every Medicare or Medicaid check over an 18-year period constitutes the proceeds of unlawful activity.

By charging concealment of proceeds, the prosecution had to prove that the prior deposits were proceeds of unlawful activity.  Simply tracing money back to an account with a Medicare or Medicaid deposit does not prove beyond a reasonable doubt that the later transaction is, in fact, the proceeds of a Medicare / Medicaid offense. Several of the charged financial transactions (counts 27, 28 and 30) occurred months or years *after* the Delgados were arrested and terminated the alleged kickback scheme in May 14, 2014, by their own admission.  Tr. 2.21.19, at 51, 83, 88, 100.  As further explained in the Motion for New Trial, there is no evidentiary basis for Mr. Petron's "opinion" that the transactions that occurred in December 2014 (count 28), July 2015 (count 27) and February 2016 (count 30) were funded by proceeds of a kickback scheme. And even entertaining his LIBT methodology, Esformes submits that *revenues* received by his facilities for medically necessary services rendered to otherwise qualified patients does not constitute *proceeds* for purposes of concealment money laundering. If any part of the funds involved in the kickback scheme constitute "proceeds," it is only those funds—typically cash or bogus payments to shell companies—that are kicked back to the referring source, *not* the revenues paid to the provider by Medicare deliver otherwise legitimate services that Medicare would be obligated to pay to another provider.

## III.    Count 31 and 32  Should Be Dismissed for Lack of Proof.

Counts 32 alleges a conspiracy to commit federal program bribery (Count 32) in the form of payments to a University of Pennsylvania basketball coach to obtain the college admission of Defendant's son. This count should be dismissed for: (i) lack of jurisdiction; (ii) failure to establish a transactional value; (iii) lack of agent status; and (iv) lack of a federal interest. Count 31 alleges a conspiracy to bribe ACHA to obtain inspection schedules, and it should be dismissed for insufficient evidence of a transactional value.

### 1. The Lack of Proof of Jurisdiction.

The alleged "federal program" is University 1, which the trial revealed to be the University of Pennsylvania (UPenn). Of course, UPenn is not a federal or state entity, but Congress enacted 18 U.S.C. § 666 to reach bribes intended to influence the agents of purely private "organizations," as long as that organization and the alleged bribe have a sufficient nexus to federal programs. An essential element of federal program bribery is that the "organization" (for private entities such as UPenn) must have received within a year of the alleged bribery "benefits in excess of $10,000 under a federal program." 18 U.S.C. § 666(b). *Fischer v. United States*, 529 U.S. 667, 681 (2000). This is the "jurisdictional element" of federal program bribery. *United States v. McLean*, 802 F.3d 1228, 1240 (11th Cir. 2015).

Courts distinguish between the simple receipt of federal funds, and the receipt of federal "benefits." *Fischer*, 529 U.S. at 681; *United States v. Doran*, 854 F.3d

1312, 1315 (11th Cir. 2017) (quoting *Mclean*, 802 F.3d at 1243-44 and citing *Fischer*) ("the Government must prove that the federal program had 'a sufficiently comprehensive 'structure, operation, and purpose' 'and a relationship with 'the ultimate use of [the program's] funds at the local level.'"). Mere proof that an organization received federal funds is insufficient to prove the necessary receipt of federal benefits. *United States v. Bravo-Fernandez*, 913 F.3d 244, 247 (1st Cir. 2019) (citing *Fischer*). "[N]ot all federal funds constitute 'benefits' under the statute." *Id.* (citing *Fischer*).

As summarized by the Supreme Court, to establish "'whether an organization participating in a federal assistance program receives 'benefits,' an examination must be undertaken of the program's structure, operation, and purpose.'" *Bravo-Fernandez*, 913 F.3d at 247 (quoting *Fischer*, 529 U.S. at 681). "The government has the burden of producing adequate evidence for this examination occur." *Id*. In *Bravo-Fernandez*, the prosecution produced evidence that the organization "Puerto Rico" received $2.8 billion in federal funds (the receipt of which was stipulated by the defense), but the First Circuit held that this only established the receipt of federal funds, not any federal benefits, and concluded that the prosecution had failed to establish that the structure, operation, and purpose of any federal program was involved in the alleged bribery.

Mr. Esformes unsuccessfully sought a jury instruction on this essential element, which the Court refused. To be sure, the defense stipulated that the prosecution would have called a witness to address the topic of benefits, but did not stipulate to the sufficiency or adequacy of the government's jurisdictional showing.[35] And the prosecution did not prove that the UPenn basketball program received any of the federal funds or "benefits" that UPenn may have received; actually, Ms. Shanahan, the former Associate Athletic Director testified that the basketball program did not receive any federal funds. Nor did the prosecution prove up the "structure, operation, and purpose" of the federal program.

### 2. The Insufficient Evidence of Transactional Value.

The "transactional" element of 18 U.S.C. § 666(a) requires proof that the object of the alleged bribe must be worth $5,000. *United States v. Tillmon*, No. 17-4648, 2019 WL 921534, *11 (4th Cir. Feb. 26, 2019) ("[T]he statutory language reveals that this element requires proof of the value of whatever was exchanged for the bribe."). Here, the Government presented no evidence that the subject of either alleged section 666 bribe—college admission for an individual or disclosure of

---

[35] *See* Trial Tr. 3.14.19 at 109. ("John Horn, who is a University of Pennsylvania comptroller, would be prepared to testify that the trustees of the University of Pennsylvania received over $10,000 in benefits under a federal program involving grants in each of the calendar years 2013, 2014, 2015, and 2016.")

inspection or patient complaint information furnished by Ms. Blanco—had a value of more than $5,000.

While some courts have permitted use of the bribe amount as a proxy for the valuation of "intangible" transactions that are unsuitable to a measurement of value, *see United States v. Townsend*, 630 F.3d 1003, 1011 (11th Cir. 2011) (value of bribe may evidence value of intangible benefit of avoiding jail), there has been no claim or evidence, in the indictment or at trial,  that the subjects of these alleged bribes were an "intangible benefit." To the contrary, the subject matters of the "federal program bribes" were very tangible--the college admission of a specific person, and the disclosure of documents. No evidence was adduced by the prosecution as to the value of either college admission or access to AHCA documents.

Finally, even if the alleged subject matters of the bribes could be characterized as "intangible benefits," the prosecution failed to prove their economic value. In *Tillmon*, for example, the prosecution claimed that a local police officer who took bribes to "protect" the transportation of phony FBI drug shipments, was an intangible benefit worth more than $5,000.  The Fourth Circuit disagreed and granted acquittal for the prosecution's failure to prove up the $5,000 threshold, successively rejecting the prosecution's claims that the $5,000 threshold was proven by aggregating the value of the payments to all coconspirators (the aggregation theory),

by the market value of the drugs allegedly shipped (the market value theory), or by the costs of local police enforcement (the public safety theory).

Here, the prosecution adduced no evidence of the financial worth of the subject matter of either alleged bribe—no evidence of the worth of increased admission chances to UPenn, or the value of access to AHCA inspection schedules or patient complaint information.

As to UPenn, the prosecution presented the testimony of Ms. Shanahan, the former Associate Athletic Director and supervisor of Coach Allen, but Shanahan gave no estimate of a value for the admission of Defendant's son, nor even any valuation of the alleged reputational injury to UPenn or to its basketball program, from the allege bribe (*i.e.*, no market value testimony).  *See* Trial Tr. 3.04.19 at 134-210.

Similarly, as to the AHCA allegations involving Ms. Blanco, the only identified patient complaint (B.K.) was procured on June 8, 2015, *after* Gaby Delgado began his work for the prosecution (Indictment, Ct. 31, overt act 2), and was for a patient who had previously left the Esformes facilities for hospitalization under the Baker Act. 2.22.19 at 144; GX31V.  Again, there was no evidence of the economic value of this alleged transaction, or any prior ones.

**3.  The Lack of Proof of Agency.**

An essential element of federal program bribery under 18 U.S.C. § 666(a)(2) is that the alleged bribe is offered "to influence or reward an agent of an organization." *Id*. Here, the alleged agent of UPenn is Mr. Allen, its basketball coach. The Fifth Circuit has construed the term "agent" under § 666 as limited to those having some authority "with respect to control and expenditure of the funds of an entity that receives federal monies." *United States v. Phillips*, 219 F.3d 404, 415 (5th Cir. 2000). In *Phillips*, the Fifth Circuit held that a tax assessor who lacked control over the federal program monies at issue was not an "agent" for purposes of section 666(a)(2). The Fifth Circuit reached this construction using the constitutional avoidance canon because Congress's broad authority under the Spending Clause "to impose duties on non-federal entities . . . is not without limits." *Id.* at 414. Here, there is no proof that Coach Allen had any agency status with respect to whatever federal program the prosecution believes was involved at UPenn. *Accord*, *United States v. Sunia*, 643 F. Supp. 2d 51, 63-64 (D.D.C. 2009) (citing *Phillips*, "the defendants must have been agents of the American Samoa agency that received the purportedly converted federal funds to be subject to liability under that statute"; "the 'integrity' of a federal program can only be 'threat[ened]' from within; i.e., by an agent of the program receiving federal funds").

The Eleventh Circuit has similarly construed the term "agent" of an "organization" under section 666 as requiring that the agent have some nexus to the

charged organization's federal funds. In *United States v. Doran*, 854 F.3d 1312 (11th Cir. 2017), the Eleventh Circuit held that, where the defendant Florida State University professor embezzled money from a student fund he was appointed to manage by FSU, the legally relevant agency relationship under section 666 was between the professor and the student organization, not the University or its federal funding, and dismissed the case because there was no federal fiscal interest at stake in the student fund. *Id.* at 1316. *See also United States v. Langston*, 590 F.3d 1226, 1234 (11th Cir. 2009) (vacating conviction because agent only controlled and disbursed monies of state college commission, and was not Alabama state agent as charged).[36]

There is no evidence that Coach Allen had any control over federal benefit funds at Penn. For example, there is no evidence that the coach, or any decision by the coach, involves the control or expenditure of any federal monies. Indeed, there is no evidence that the coach had control over the resources of the University.

Furthermore, while the Supreme Court has upheld application of section 666 generally as a proper exercise of Congressional authority under the Spending Clause, *Sabri v. United States*, 541 U.S. 600, 605 (2004), in this case the prosecution

---

[36] In *Sabri v. United States*, 541 U.S. 600 (2004), the Court concluded that the statute does not require a nexus between the activity and specific federal funds, such a limitation may be constitutionally implicated in the absence of a federal interest. *Id.* at 613.

presented no evidence of a federal interest at stake in the University's admissions process, which is required for a conviction. *See United States v. Doran*, 854 F.3d 1312, 1316 (11th Cir. 2017) (no section 666 violation absent federal interest; vacating section 666 conviction of college professor embezzling university club monies, stating that section 666's "net cannot be cast so widely as to encompass the wrongdoing that occurred here, for the Government has not demonstrated any federal interest.").

**Conclusion**

For the foregoing reasons, and those provided in Court, this Court should grant Defendant's Rule 29 motion.

On the date stamped above, I certify that this document was served on all counsel of record using CM/ECF.

Respectfully submitted,

**BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
201 S. Biscayne Boulevard, Suite 1300
Miami, FL  33131
Tel: (305) 371-6421

By: */s/ Howard Srebnick*
   **ROY BLACK, ESQ**.
   Fla. Bar No. 126088
   **HOWARD SREBNICK, ESQ**.
   Fla. Bar No. 919063
   **JACKIE PERCZEK, ESQ**.
   Fla. Bar No. 042201