UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-20549-CR-SCOLA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

PHILIP ESFORMES,

    Defendant.

_____/

**DEFENDANT ESFORMES' MOTION
TO ACQUIT ON THE FORFEITURE VERDICTS**

Pursuant to Federal Rule of Criminal Procedure 29, Defendant Philip Esformes moves this Court to acquit him on the jury's verdict forfeiting his minority interests in seven healthcare operating companies.

**I.   The Forfeiture of Defendant's Interests in Operating Companies Is Not Statutorily Authorized Nor Proven**

The only items that the jury found are forfeitable are Defendant's minority interests in seven operating companies that currently or formerly managed the corresponding nursing facilities. Based upon the counts of conviction, the only statutory basis for these forfeitures is the money laundering forfeiture provisions of 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(a).  Under these forfeiture statutes, there is no evidentiary or legal basis to forfeit Mr. Esformes' minority interests in the

1

operating companies because: (A) they do not fall within the "interests" subject to forfeiture under section 853(a)(3); and (B) they were not "involved in" the money laundering offenses under section 982(a)(1); (B)

### A. Forfeiture of "Interests In" the Operating Companies Is Unauthorized under 18 U.S.C. § 982(a) & 21 U.S.C. § 853(a).

The language chosen by Congress to authorize forfeiture of "interests in" "enterprises" has been limited to convictions under the RICO and CCE statutes, neither of which are involved in this case. *See, e.g.*, 21 U.S.C. § 853(a)(3) & 18 U.S.C. § 1963(a)(2). The Supreme Court has instructed that the presence of statutory language in one subsection (*i.e.*, the words "interest in" in subsection 853(a)(3)), coupled with its absence in other subsections, should be construed as intentional by Congress. "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019) (quoting *Department of Homeland Security v. MacLean*, 135 S. Ct. 913, 919 (2015)). This is supported by the "cardinal principle" against construing statutory language to be superfluous. *Republic of Sudan*, 139 S. Ct. at 1058; *Loughrin v. United States*, 573 U.S. 351, 358 (2014); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("no clause, sentence, or work shall be superfluous, void, or insignificant").

According to the Supreme Court, "when Congress includes particular language in one section of a statute but omits it in another[,] ... this Court presumes that Congress intended a difference in meaning." *Digital Realty Trust Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (quoting *Loughrin*, 573 U.S. at 358 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Here, if Congress intended that forfeiture of "interests in" a business enterprise be accomplished under 18 U.S.C. § 982(a)(1), or its incorporated language[1] from 21 U.S.C. §§ 853(1) & (2), then Congress would have had no need to create a separate subsection for the forfeiture of "interests," and to limit such forfeitures to CCE offenders in 21 U.S.C. § 853(3).  By singling out drug kingpins (CCE offenders) for this distinct species of forfeiture ("interests in" forfeiture), Congress plainly intended to reserve such punishment to CCE violators, a group that does not include this Defendant, as opposed to extending such forfeitures to all money launderers under the language of 21 U.S.C. § 982(a)(1), which lacks the term "interests."  The Supreme Court's 2017 opinion in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), compels the conclusion that criminal forfeitures must be limited

---

[1] *United States v. Elbeblawy*, 899 F.3d 925, 941-42 (11th Cir. 2018) ("And section 982, which includes the healthcare-fraud provision, provides that '[t]he forfeiture of property under this section ... shall be governed by the provisions of [section 853].'")

to the statutory language actually chosen by Congress, and that courts should not expand upon such language by accepting common law concepts of forfeiture.

## B. The Minority Operating Company Interests Were Not "Involved in" Money Laundering.

Section 982(a) limits criminal forfeitures for money laundering offenses to the property "involved in" the money laundering offense, and its traceable proceeds. § 982(a)(1) ("any property, real or personal, involved in such offense, or any property traceable to such property"). In turn, the incorporated provisions of Section 853(a)(1) authorize forfeiture of proceeds "obtained, directly or indirectly *as a result of* such violation." *Id*. (emphasis added).

Defendant's minority ownership interests (the proverbial stock certificates) in the operating companies were not "involved in" the alleged money laundering transactions in any meaningful sense of this statutory language. They were not deposited, negotiated, or used in any of the substantive financial transactions -- *i.e.*, they were not the subject of any financial transaction that formed the basis for a money laundering conviction. Moreover, as minority ownership interests, they were, by legal definition, not themselves engaged in, or necessary to, any financial transaction of the operating companies. *See, e.g.*, *Estate of Koons v. IRS*, 686 Fed. Appx. 779, 795 (11th Cir. 2017) (majority shareholder controls company).

The same conclusion follows from the Eleventh Circuit's identification of the three categories of property subject to money laundering forfeiture: (i) the transactional monies (the "corpus"); (ii) the commissions for engaging in these transactions; and (iii) "any property used to facilitate the laundering offense." *United States v. Seher*, 562 F.3d 1344,1368 (11th Cir. 2009) (citing *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003)).

These categories were drawn from a Tenth Circuit case cited and followed by the Eleventh Circuit in *Seher* -- *United States v. Bornfield*, 145 F.3d 1123 (10th Cir. 1998). In *Bornfield*, the Tenth Circuit vacated as clearly erroneous a jury's forfeiture verdict against a business bank account because the business bank account was separate and distinct from the defendant's personal bank account that was used to engage in the money laundering transaction. *Seher*, 562 F.3d at 1370 (citing *Bornfield*, and vacating district court forfeiture finding for clear error).

In this case, because Defendant's minority ownership interests were literally uninvolved in the money laundering transactions (*i.e.*, they were not the corpus transferred nor did they constitute commissions on transfers), the only potential legal argument for their forfeiture under *Seher* is the last forfeiture category -- property that facilities the commission of the charged money laundering concealment offense. But that is defined as property that is used to conceal or to disguise the underlying transaction. *Seher*, 562 F.3d at 369 (cash deposits disguised source of money

5

laundering). The minority business interests played no such role in implementing the money laundering transactions.

Courts also generally require facilitation property to have a "substantial connection" to the offense, *United States v. King*, 231 F.Supp.3d 872, 897 (W.D Okl. 2017) (citing Stefan Cassella, *Asset Forfeiture Law in the United States* (2d ed. 2013) § 26-1, p. 938),[2] but this Court denied a defense request to so charge the jury. *See also* 18 U.S.C. § 983(c)(3) (to obtain civil forfeiture, "Government shall establish that there was a substantial connection between the property and the offense").

The Eleventh Circuit's *Seher* case involved defendants using multiple jewelry companies as fronts for laundering drug transactions through jewel sales. In this regard, Defendant's minority ownership interests in the operating companies are unlike the jewelry store inventory at issue in *Seher*, which the Eleventh Circuit concluded openly facilitated the drugs-for-jewelry money laundering transactions.

*Seher* also reaffirmed that merely commingling tainted and untainted monies within a bank account does not render the entire account subject to forfeiture as "involved in" money laundering facilitation property.[3] *Seher* rejected application of

---

[2] *Accord, United States v. Bailey*, 2012 WL 569744, *8 (W.D.N.C Feb. 22, 2012) (citing *United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010)).

[3] *Seher*, 562 F.3d at 1368 ("Though the pooling or commingling of tainted and untainted funds would not by itself render the entirety of an account subject to forfeiture, if the government establishes that the defendant did so 'to facilitate or 'disguise' his illegal scheme,' then forfeiture

facilitation forfeiture liability to a bank account that was uninvolved in the money laundering transactions, holding instead that "there must be evidence that some part of the property was used for illegal activities." 562 F.3d at 1370.

Finally, *Seher* rejected the forfeiture of one company's bank account based upon the conduct of the other company, holding that to do so, the Government must first pierce the corporate veil to establish, and the trial court must thereafter find, that both companies "should be treated as one entity." 562 F.3d at 1370. In so holding, *Seher* instructs that legal distinctions between corporations and their owners should be honored, absent proof that the corporate formalities can legally be overcome. No such undertaking or proof has been made in this case as to Defendant's ownership interests in the healthcare companies.

To be sure, section 982(a)(1) also authorizes the forfeiture of "any property" traceable to "involved in" property, but by definition "such property" (*id.*) is derivative of the money laundering offense. Mr. Esformes' minority interests are not themselves "traceable to" any property "involved in" money laundering. His minority interests in the operating companies were all acquired before the alleged money laundering offenses. Because there is no evidence that any of Esformes'

---

is acceptable.") (quoting *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003)). *Accord*, *Bornfield*, 145 F.3d at 1135 (citing *United States v. Tencer*, 1097 F.3d 1120, 1134-35 (5th Cir. 1997)).

minority interests were obtained from any money laundering transactions, nor from the proceeds of any money laundering transaction, those interests cannot be forfeited under section 982(a)(1).

Finally, the Government proceeded under the invalid premise that every Medicare or Medicaid dollar received by an Esformes entity after Esformes certified he would comply with all regulations constituted proceeds. And there is no evidentiary basis for Mr. Petron's "opinion" that the transactions that occurred in December 2014 (count 28), July 2015 (count 27), and February 2016 (count 30) were funded by proceeds of a kickback scheme, since Delgado testified that all kickback activities ceased when he was arrested in May 2014.

### 1. The ALFS Are Unconnected to Money Laundering.

The forfeiture verdict finds that Defendant's minority interests in two Assisted Living Facilities (ALFs), Flamingo Park and Eden Gardens, are subject to forfeiture. Neither of these ALFS were involved in the inflated invoice counts (Counts 18-21) or in a money laundering offense. For example, the bulk of the prosecution's case was predicated upon alleged issues regarding the admission or treatment of psychiatric patients for skilled nursing care, but that is not an issue with the ALFs, which are not even covered by Medicare.

Government Exhibit 28B purports to trace $18,000 in Medicaid proceeds into bank accounts of Eden Gardens and Flamingo Park, and from there into Ms. Betancourt's personal account in December 2014, seven months after the Delgados had been arrested. There was no testimony, other than Mr. Petron's supposition, that the funds from Medicaid to Eden Gardens and Flamingo Park Manor were generated by a patient procured through kickbacks. See *United State v. Willey*, 57 F.3d 1374, 1388 (5th Cir. 1995) (concealment cannot be proven through expert). Even the Government's summary charts do not identify any evidence (or claim) linking a money laundering transaction, or the proceeds thereof, to either Flamingo Park or Eden Gardens. *See, e.g.*, GX2000-2015.

By the Government's own evidence, this transaction involved a separate personal bank account of Ms. Betancourt. The sum total of the evidence was a paper trail by Mr. Petron purporting to show that $11,100 in Medicaid payments had been previously deposited into an Eden Garden account, and $7,179 had been deposited into a Flamingo Park account, which Mr. Petron then hypothetically combined and then transferred them into the Betancourt personal account based upon three payments totaling $22,000 on November 16, 2015, an amount from which he then hypothetically used to fund an $18,000 wire transfer on December 1, 2015. There was no evidence that any of the three transfers represented the proceeds of any criminal offense. The only alleged criminal offense that Mr. Petron claimed he was

tracing—kickbacks—ended no later May 14, 2014 when Mr. Delgado was arrested. 2.21.19, at 51, 83, 88, 100. Accordingly, there was no record evidence upon which to offer the opinion that these payments into or out of Ms. Betancourt's bank account were proceeds of any kickback offense.

> 2. **The Minority Interests in SNFs Uninvolved with Inflated Invoices Are Not Subject to Forfeiture.**

Two of the minority interests in health care operating SNF companies -- North Dade and Mercy -- are purportedly subject to forfeiture under Count 16 (conspiracy) "or" distinct substantive counts: (i) as to North Dade, the charge in Count 27 of a $75,000 check in 2015 for a Ferrari lease; (ii) "or" as to Mercy, the charge in Count 30 of a $20,000 check in 2016 from the BA9 bank account payable to Ken Duffy Design.

According to the government's summary exhibit 27D, the Ferrari payment was traceable to Medicaid proceeds deposited into a North Dade business account, which Mr. Petron purported to trace through two Esformes bank accounts (BA 14 to BA 17), into two checks payable to the dealer in July of 2015. The Government sought, but the jury did not return, a forfeiture verdict for Bank Accounts 14 or 17.

Moreover, there simply is no evidence tying the Ferrari payment to an antecedent health care or money laundering violation. Initially, there is no general or specific evidence that Medicaid claims were fraudulent, especially at any SNF --

the Government's prosecution theory was to the contrary, that patients were improperly being admitted and their care extended under Medicare. Medicaid, for example, covered psychiatric patients, even after 100 days of skilled nursing care.

Nor does Count 30 (the 2016 payment of $20,000 to Ken Duffy Design from Bank Account 9) remotely support the forfeiture of a minority interest in Mercy. The timing of this transaction (February 2016) is almost two years after Gabriel Delgado testified that he ceased kickbacks upon his May 2014 arrest, and comes long after the Delgados signed their cooperation plea agreements in June 2015. Furthermore, the jury declined to forfeit the bank account from which this check issued in 2016 (BA9). In short, there is no evidentiary connection between this check and either a kickback payment or a healthcare offense. There is likewise no evidence connecting this 2016 check to Defendant's acquisition or use of his minority interest in Mercy.

The government's effort to trace the Duffy check monies back to a deposit into a Mercy bank account is wholly speculative. As Government Exhibit 30E reveals, Mr. Petron recognized deposits of Medicare and Medicaid monies into the bank accounts of three health care facilities (Oceanside, Fair Havens, and Mercy), and then transferred (as alleged proceeds) sufficient amounts of commingled Medicare and Medicaid "proceeds" into BA9, from which he then selected sufficient monies to make the $20,000 payment. None of these monies are tied back to any health care, kickback, or money laundering transaction. Moreover, none of the

Medicare and Medicaid monies commingled by Mr. Petron through these accounts were spent on acquiring any ownership interest in Mercy, and the prosecution makes no such claim.

### 3. The Three Minority Interests in Health Care Facilities Connected to Counts 18, 19 & 20 Are Not Subject to Forfeiture.

Finally, the three minority interests that are allegedly connected to the inflated invoices -- Fair Havens, Oceanside, and Harmony[4] -- lack a sufficient evidentiary connection to Defendant's minority business interests in those operating companies. Defendant's minority interests in Fair Havens and Oceanside are allegedly forfeitable under Counts 16 or 30 or, respectively, 18 (Fair Havens) or 19 (Oceanside.). The Harmony business interest is allegedly forfeitable under Counts 16 or 20. Defendant's minority interests (the proverbial stock certificates) in these three operating companies played no role in, nor were they used to commit, any alleged money laundering offense.

## II. The Government Has Not Traced Any Alleged Proceeds.

During the trial, the Government relied exclusively upon the testimony of Mr. Petron who claimed to have traced alleged Medicare and Medicaid monies through a series of bank accounts and allegedly into the money laundering transactions in the

---

[4] The Government did not seek criminal forfeiture as to the fourth health care facility that issued an allegedly inflated invoice – Mercy -- on the basis of this money laundering count (Count 21).

12

substantive counts. Defendant has previously explained that such an evidentiary showing is legally insufficient to establish the offense of concealment money laundering. *See United State v. Willey*, 57 F.3d 1374, 1388 (5th Cir. 1995) (concealment cannot be proven through expert). In addition, Mr. Petron did not trace any of his "proceeds" contentions back to a specific offense (whether money laundering or health care offenses) -- which is a minimum requirement for tracing.[5]

The tracing methodology used by Mr. Petron -- the lowest intermediate balance test (LIBT) -- is legally insufficient to sustain the Government's tracing burden because: (i) it is used to trace commingled monies within accounts, and the minority interests here are neither accounts nor have they been commingled; and (ii) the LIBT methodology is inapplicable to multiple accounts of different entities and persons.

Courts "have noted [the] difficulty, if not impossibility," of tracing proceeds in forfeiture cases, and where property has been commingled, it is especially "demanding for establishing forfeiture, particularly as it relates to fungible assets." *United States v. Ayika*, 837 F.3d 460, 472, 474 (5th Cir. 2016) (citing cases). Here, the Government has chosen to use the LIBT methodology for tracing trust or similar

---

[5] "[T]he funds 'must be able to be tracked back to the commission of the crime; that is to say, there must be some nexus between the money sought and the health care offense.'" *Wood*, 2016 WL 8131221, *2 (quoting *United States v. Poulin*, 690 F.Supp.2d 415, 427-28 (E.D. Va. 2010)).

13

assets within an account, even though this methodology is wholly unsuited to the proceeds claims being made by the Government in this case. As explained in the other post-trial motions filed today, the LIBT methodology is flawed.

Here, Mr. Petron purported to apply LIBT methodology to trace alleged proceeds into and through the bank accounts of multiple operating health care facilities, into the bank accounts of intermediate entities, and/or into multiple personal, pension, or business accounts of the Defendant. In fact, in some instances Mr. Petron purported to segregate and then combine Medicare and Medicaid deposits through different bank accounts in order to fund (hypothetically) later transactions out of different accounts. *See, e.g.*, GX30E.

This alleged "tracing" took place between and among more than 30 different bank accounts (of health care facilities, intermediary companies, and of Defendant), yielding Mr. Petron's ultimate opinion that some proceeds from prior Medicare or Medicaid payments wound up in an Esformes account, from which a subset of the money laundering transfers took place (*i.e.*, several originated from third party accounts such as Ms. Betancourt's). In other words, Mr. Petron selectively consolidated more than 30 bank accounts spanning a six-year period (2010 to 2016) in order to characterize his preferred account deposits and transfers among these accounts as the proceeds of prior transactions in different accounts of different account holders. This "tracing" was legally insufficient to establish the offense of

concealment money laundering, and insufficient to allow forfeiture of Mr. Esformes' interests in the operating companies.

## CONCLUSION

For these reasons, the Court should acquit Mr. Esformes on the jury's verdict forfeiting his minority interests in the seven healthcare operating companies.

On the date stamped above, I certify that this document was served on all counsel of record using CM/ECF.

Respectfully submitted,

**BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
201 S. Biscayne Boulevard, Suite 1300
Miami, FL  33131
Tel: (305) 371-6421

By: */s/ Howard Srebnick*
 **ROY BLACK, ESQ**.
 Fla. Bar No. 126088
 **HOWARD SREBNICK, ESQ**.
 Fla. Bar No. 919063
 **JACKIE PERCZEK, ESQ**.
 Fla. Bar No. 042201