## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-CR-20549-SCOLA/Otazo-Reyes (s)(s)(s)

**UNITED STATES OF AMERICA**

**vs.**

**PHILIP ESFORMES,**
      **Defendant.**
_____/

### GOVERNMENT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

The United States of America respectfully objects to the Presentence Investigation Report [D.E. 1335] ("PSR") for Philip Esformes. The Government generally agrees with the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") as calculated by U.S. Probation in the PSR, but recommends the following additions: 1) an enhancement of two offense levels for risk of death or seriously bodily injury under U.S.S.G. § 2B1.1(b)(16)(A); 2) an enhancement of two offense levels for either 10 or more victims or mass marketing under U.S.S.G. § 2B1.1(b)(2)(A); and 3) the inclusion of additional losses beyond what the PSR applies (just over $73 million), to bring the total to more than $550 million in loss to Medicare and Medicaid under U.S.S.G. § 2B1.1(b)(1)(P).

It must be stressed from the outset that the recommended Guidelines range in the PSR, and the one recommended by the Government in this objection, are not appreciably different. The Government's objections result in one additional offense level (from a 42 to a 43) since the Guidelines are limited at higher offense levels (*i.e.*, offense levels higher than 43 are adjusted to no higher than a 43). Thus, even with the loss amount in the PSR that the Government argues is under inclusive, if either of the additional enhancements proposed by the Government are included, the Guidelines remain a 43. Under the PSR, Esformes' recommended sentence is 360 months to

life; with one additional offense level bringing it up to a 43, his recommended sentence is simply life.

## LEGAL STANDARD

"[T]he government generally has the burden of proving a guideline enhancement by a preponderance of the evidence." *United States v. Carillo-Ayala*, 713 F.3d 82, 90 (11th Cir. 2013). In determining the appropriate advisory Guidelines range, a sentencing court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. §6A1.3(a). A sentencing court is afforded wide latitude to make credibility determinations when determining the facts supporting specific Guidelines enhancements or adjustments. *See United States v. Gregg*, 179 F.3d 1312, 1316 (11th Cir. 1999) ("We accord great deference to the [sentencing] court's credibility determinations.").

## ARGUMENT

### I.    Esformes' Conduct Warrants a Conscious Risk of Death or Serious Bodily Injury Enhancement.

U.S.S.G. § 2B1.1(b)(16)(A) provides for a two-level enhancement "[i]f the offense involved . . . the conscious or reckless risk of death or serious bodily injury." To satisfy its burden of proof under U.S.S.G. § 2B1.1(b)(16)(A), the government is not required to show that any patient suffered actual harm, "because the Guidelines provision focuses on the defendant's disregard of risk rather than on the result." *See United States v. Mateos*, 623 F.3d 1350, 1371 (11th Cir. 2010).

District courts (including this Court) have consistently applied this enhancement in the context of Medicare fraud schemes where patient safety is placed at risk, and this application has been upheld by the Eleventh Circuit. *United States v. Moran*, 778 F.3d 942, 977–78 (11th Cir. 2015) (applying the enhancement where the partial hospitalization program "admitted elderly

patients with dementia, although the facility and staff were not equipped to meet the elderly patients' needs [,] the elderly patients with dementia were placed in a population that consisted mostly of chronic substance abusers[, and] failed to treat the substance-abuse issues in a meaningful way."); *see also Mateos*, 623 F.3d at 1371 (11th Cir. 2010) ("The district court did not clearly err in finding that a trained nurse, such as Mateos (who also received training as a doctor in Cuba), would be well aware that any injection always carries some risk of infection or other complications, and that the risk is especially high when the patients have HIV and weakened immune systems").[1]

Under these standards, there is little doubt the enhancement should apply.  The Esformes Network, particularly at Oceanside, created a serious and reckless risk to patients.  Elderly patients were routinely grouped together with younger patients suffering from mental illness and addiction, placing these elderly patients at risk of serious bodily injury.  The Esformes SNFs did not provide any training to the employees about how manage, treat, or control patients with these conditions. Defendant Esformes, as even defense witnesses testified, was frequently at Oceanside, and therefore knew this only too well.  Indeed, while it was not shown at trial, there was evidence of a patient's death due to this improper grouping of patients when an elderly patient was attacked and beaten to death by a younger mental health patient who never should have been at an SNF in the first place.  This evidence will be introduced at Esformes' sentencing.  Moreover, Esformes was aware of this incident and discussed it with Agency for Health Care Administration ("AHCA")

---

[1] *See also United States v. Achille*, 277 Fed. Appx. 875, 878 (11th Cir. 2008) (applying enhancement to defendant physician, where "[o]ne of the clinic nurses testified that some patients received drug injections, Dr. Moreno testified that the drugs involved carried the risk of serious side effects, and these side effects qualify as serious bodily injuries."); *see also United States v. Castro-Ramirez*, 461 Fed. Appx. 467, 471 (6th Cir. 2012) (affirming district court conclusion that doctor convicted of health care fraud merited specific offense characteristic for writing "tens of thousands of prescriptions for controlled substances to convince several Medicare beneficiaries to join the scheme.").

inspector Bernadette Edge after it happened, as Ms. Edge testified before this Court outside the jury's presence. (Edge Tr. 3/7/19 at 88-95).

And on a more widespread level, by placing mental health patients and substance abusers in an environment ill-equipped to treat their illnesses, Esformes created a serious, consistent, and all-encompassing risk to their health. Patients who abused drugs and alcohol or had mental health breakdowns were not discharged until they reached the point of needing hospitalization. After some time at the hospital, they would be recycled back to the Esformes Networks' SNFs and ALFs, where the pattern would be repeated. This was inherently dangerous. Esformes knew this. This was not a case where the harm is deemed foreseeable as a legal matter; Esformes had direct knowledge of it. Moreover, the risks of patient harm were not simply theoretical in this case; they actually happened. And because they did, this Court should find that the conscious risk of serious harm enhancement of +2 under Section 2B1.1(b)(16)(A) applies to Esformes.

## II.     Esformes' Conduct Warrants a Number of Victims/Mass Marketing Enhancement.

U.S.S.G. § 2B1.1(b)(2)(A) provides a two-level upward enhancement if the scheme either: (i) involved 10 or more victims, or (ii) was committed through mass marketing. Both are true here.

First, U.S.S.G. § 2B1.1(b)(2)(A)(i) provides for a two-level upward specific offense characteristic if the offense "involved 10 or more victims." Even though the primary victims of Esformes' crimes were the entities billed—*i.e.*, Medicare and Medicaid—the Guidelines and case law applying them permits the Court to consider the individual patients themselves as victims as well. The Guidelines define "victim" in the application notes to § 2B1.1. With two notable exceptions, the term "victim" means either: "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." *See* § 2B1.1, application note 1. The Eleventh Circuit has specifically found

that both private insurance companies and patients were to be counted as victims of the defendant's healthcare fraud when measuring loss (albeit in a different context than this specific sentencing enhancement).  *See United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009).  There were thousands of patients in this case.  Many of them had their insurance plans charged and/or paid co-pays.[2]  And thus these patients suffered a "part of the actual loss."  While it would take an inordinate amount of time at sentencing to present evidence regarding each particular resident of the Esformes Network, and the injuries they suffered, there is no doubt patients were harmed financially and suffered injuries. The record is more than sufficient to show that at least ten residents suffered "actual loss," as defined by the Guidelines, allowing for a two-level enhancement under § 2B1.1(b)(2)(A)(i), without any further evidence required at sentencing.

Second, U.S.S.G. § 2B1.1(b)(2)(A)(ii) provides for a two-level upward specific offense characteristic "[i]f the offense . . . was committed through mass marketing."[3]  In this case, Esformes and his co-conspirators mass marketed their fraudulent scheme through captive hospitals, such as Larkin, and though efforts to recruit patients from ALFs and other facilities, such as American Therapeutic Corporation (ATC), through an elaborate system of patient recruiters and kickbacks.  Thousands of patients were obtained by the Esformes Network as fodder for the scheme through this massive and extensive marketing effort.  In *United States v. Isiwele*, 635 F.3d 196, 203-05 (5th Cir. 2011), the Fifth Circuit held that the mass marketing enhancement applies

---

[2] In *United States v. Stokes*, 392 Fed. Appx. 362, *368-370 (6th Cir. 2010), the Sixth Circuit found the victim enhancement applicable in a fraud case because of co-payments. "So long as a person suffers reasonably foreseeable pecuniary harm as a result of an offense, he qualifies as a victim . . . Since it is reasonably foreseeable that patients will pay elevated copays and fees as a result of health-care fraud, patients who suffer such pecuniary harm count amongst the victims of the fraud." *Id.* at 368-369.

[3] The commentary to § 2B1.1 defines "mass-marketing" as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit." *Id.*, application note 4(a).

to Medicare fraud schemes that employ paid patient recruiters to engage in "face-to-face recruitment of Medicare/Medicaid beneficiaries" or "escort[] beneficiaries to the defendant's medical clinic."  Both happened in this case; patients were delivered to various ALF and SNFs, and to/from captive institutions such as Larkin Hospital by recruiters soliciting kickbacks from ancillary health care providers in person.

More broadly, *Isiwele* stands for the basic proposition that the mass marketing enhancement can be applied to an elaborate system of patient recruitment and kickbacks.[4]  And there is no question that Esformes oversaw a massive kickbacks scheme, as the jury found. Esformes sold access to his patients through an elaborate system of kickbacks that allowed ancillary providers to fraudulently bill Medicare and Medicaid for tens of millions of dollars. Gabriel Delgado, Guillermo Delgado, Nelson Salazar, and others would recruit providers (such as ATC[5] and Morales Pharmacy), and grant them access to Esformes' patients for kickbacks, which were paid to Esformes in cash and through other means (such as inflated leases and in kind benefits).[6]  Gabriel Delgado testified that, for roughly fourteen years, he himself routinely

---

[4] The mass-marketing enhancement has been applied in other Medicare fraud cases in this district involving the widespread use of patient recruiters who utilize contracts or "marketing agreements" to attempt to hide their fraud.  *See United States v. Karen Kallen-Zury, et a*l, Case No.12-CR-20757-MARTINEZ; *United States v. Kallen-Zury*, 629 Fed. Appx 894, 912 (11 Cir. 2015)(unpublished) (sentence upheld and not found to be excessive; sentencing enhancements listed, including mass-marketing).

[5] Mary Valera testified how she and her co-conspirators at ATC paid kickbacks for patients from the Esformes Networks' ALFs, through Nelson Salazar and others.  (Valera, Tr. 02/19/2019, at 100-110).

[6] Such witnesses included Gabriel Delgado, who testified about how kickbacks went through the Delgado brothers to Esformes for access to patients.  Gabriel Delgado described the sham contacts, fake lease agreements, and other elaborate kickback arrangements used to funnel money to Esformes, and how patients from the Esformes Network were the valuable commodity that everyone wanted, and which Esformes controlled. (G. Delgado Tr. 02/20/19 at 40-49, 81-88, GX 6L, GX 529).  Nelson Salazar testified to the same conduct.  (Salazar Tr. 2/15/19 at 168-185).  Guillermo Delgado testified to this kickbacks system in great detail as well, and described how Morales Pharmacy in particular paid $10,000 a month in kickbacks to Esformes, and that the services in the sham contracts he purportedly provided to Morales Pharmacy were completely fake, and that Esformes knew this.  (Guillermo Delgado, Tr. 2/25/19 at 34-85, 162-63).  All three witnesses testified about the initial meeting with Phillip Esformes, Gabriel Delgado, and

delivered bags of cash in the amounts of fifteen to twenty-five thousand dollars a month (and more) to Esformes from these kickbacks.  (G. Delgado Tr. 02/20/19 at 71-72, 91).  This is the very definition of a mass marketing kickbacks scheme.

There is no doubt that patient recruitment took place on a massive scale in this case.  It involved not hundreds, but thousands of patients, and lasted for years.  Further, the number of beneficiaries successfully targeted to attend the Esformes Network's facilities confirms that the scheme indeed did target a large number of people; thousands, in fact, over a period of fourteen years.[7]  The mass marketing enhancement therefore applies.

## III.   Esformes Should be Held Accountable for a Loss of Over $550 Million.

Esformes was convicted of numerous offenses, including conspiracy to commit money laundering.  U.S.S.G.  § 2S1.1(a)(1) covers this offense.  As the PSR correctly notes, Section 2S1.1(a)(1) applies the offense level for the underlying offense from which the laundered funds were derived if the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3); and the offense level for that offense can be determined. DE1335, ¶ 129.  Both conditions are met here.  In such cases, the most serious underlying offense, which in this case is health care fraud, is used.  *Id*.  Therefore, Esformes' Guidelines offense level is determined by applying U.S.S.G. § 2B1.1, which governs health care fraud, and its base offense level and applicable specific offense characteristics, including its loss table in Section 2B1.1(b)(1), as in the PSR.

---

Nelson Salazar at the Blue and Green Diamond in Miami Beach, which began this massive kickback scheme. (*Id*., at 34-35).

[7] In assessing whether a scheme involved "mass marketing," § 2B1.1(b)(2)(ii) looks to the number of people targeted, as opposed to the number successfully targeted.  *See United States v. Hall*, 604 F.3d 539, 544-46 (8th Cir. 2010); *United States v. Heckel*, 570 F.3d 791, 793-95 (7th Cir. 2009).

#### A.      Legal Standard

Under § 2B1.1(b)(1), subject to certain exceptions not applicable here, "loss is the greater of actual loss or intended loss."  U.S.S.G. §2B1.1, Application Note 3(A).  "The court need make only a reasonable estimate of the loss." U.S.S.G. §2B1.1, application note 3(C); *see also United States v. Miller*, 188 F.3d 1312, 1316-17 (11th Cir. 1999).  With respect to calculating the amount of loss relevant for sentencing purposes, the district court is required "to support its loss calculation with reliable and specific evidence." *United States v. Munoz,* 430 F.3d 1357, 1370 (11th Cir. 2005) (*quoting United States v. Renick,* 273 F.3d 1009, 1025 (11th Cir. 2001)). The Government's burden is to prove the amount of loss by a preponderance of the evidence.  *Id*.

In health care fraud cases, proof of the amount fraudulently billed to Medicare is *prima facie* evidence of intended loss.  *See United States v. Duran*, 620 Fed. App'x 687, 690 (11th Cir. Feb. 25, 2013) (per curiam) (finding that the loss attributable to the two leaders of American Therapeutic Corp. ("ATC") was the amount billed to Medicare ($202 million), as opposed to the amount paid by Medicare ($87 million);[8] *see also* §2B1.1, Application Note 3(F)(viii) ("In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of the fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss.").[9]

Under the Guidelines, Esformes must be held responsible for all "reasonably foreseeable pecuniary harm."  *See* Section 2B1.1, application note 3(A)(i) ("Actual Loss").  "'Reasonably

---

[8] Cases from other circuits follow this rule. *See United States v. Martinez*, 588 F.3d 301, 326-27 (6th Cir. 2009); *United States v. Mikos*, 539 F.3d 706, 714 (7th Cir. 2008); *United States v. Miller*, 316 F.3d 495, 501-05 (4th Cir. 2003); *but see United States v. Singh*, 390 F.3d 168, 193-94 (2d Cir. 2004).

[9] The reason why courts look to the amount billed, rather than the amount paid, is that the rules calculating loss look to the offenders' intent, as opposed to their expectation. As *United States v. Miller*, 316 F.3d 495, 501-05 (4th Cir. 2003), explained, "[t]he justification for this rule is clear. As anyone who received a bill well knows, the presumptive purpose of a bill is to notify the recipient of the amount to be paid." *Id.* at 504.

Foreseeable Pecuniary Harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense." *Id.* at application note 3(A)(iii).   Under U.S.S.G. § 1B1.3(a)(1)(B), "the district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Hunter,* 323 F.3d 1314, 1319 (11th Cir. 2003).   For example, evidence that a patient recruiter contributed a significant number of patients to a kickback scheme, recruited accomplices, and saw the extensive list of participants in the kickback logbook, made him responsible for the entire loss amount in a kickback conspiracy.  *United States v. Aguera*, 07-12950, 2008 WL 2404737 (11th Cir. June 16, 2008) (unpublished); s*ee also United States v. McCrimmon,* 362 F.3d 725, 732 (11th Cir.2004) (the entire loss caused by a money laundering scheme properly was attributed to the defendant because he "was fully aware of the objective of the conspiracy and was actively involved in recruiting investors to further the . . . scheme.").

### B.   Loss Attributable to Esformes Under §2B1.1(b)(1)

Applying these legal principles, this Court can make a reasonable estimate of the loss based on the reliable and specific evidence in the available record, evidence which more than meets the Government's burden.[10]  It is possible to quantify the loss Esformes' conduct caused to scheme to the Medicare and Medicaid programs in three basic ways:  1) by using his ALFs and SNFs to bill Medicare and Medicaid for fraudulent services for patients that were procured through kickbacks; 2) by selling off his patients to other Medicare and Medicaid providers (the "Ancillary Providers")

---

[10] A reasonable estimate of the loss amount is appropriate because "often the amount of loss caused by fraud is difficult to determine accurately."  *Miller*, 188 F.3d at 1312.

that paid him kickbacks and bribes; and 3) by cycling patients through a corrupt hospital that also profited off the scheme by billing Medicare and Medicaid for Esformes' patients.

### 1.     Medicare and Medicaid billing by Esformes SNFs and ALFs

The Government established at trial that Esformes' ALFs and SNFs billed Medicare and Medicaid for services that were not medically necessary, were not provided, or were procured through kickbacks and bribes.  Evidence at trial also established that for nearly a decade, Esformes bribed a state regulator to avoid being shut down by Medicare and Medicaid.  As a result of these bribes, Esformes' massive fraud went undetected causing hundreds of millions of dollars in fraud proceeds to be paid to the defendant. These facts were established by dozens of witnesses, numerous documents, and consensual recordings.

First, as discussed at length in its objection to Esformes' Motion for Judgment of Acquittal (DE1340), Esformes' scheme involved admitting patients into his SNFs for skilled services they did not always need or get.  (R.D., Tr. 2/14/19 at 178-79).  Patients with mental illness were sometimes admitted as if they had physical conditions that required skilled therapy and nursing services when they did not.  (S.J. 3/12/19 Tr. at 45).  Esformes' SNFs did not specialize in, or provide, the psychiatric services these patients needed.  (Ginarte Tr. 3/5/19 at 32-33).  These patients with mental illnesses sometimes used the SNF as a homeless shelter and spent the majority of the day wandering Miami Beach panhandling and doing drugs instead of getting treatment.  (S.J. Tr. 3/12/19 at 45).  Esformes personally demanded that his patients to be held in the facilities as long as possible (Barcha Tr. 2/13/19 at 31, 60).  The Government's witnesses, such as Nurse Ginarte and Bernadette Edge, testified that patients who did not need the SNF services billed amounted to approximately 15% of the patients cycled through multiple facilities in the Esformes

Network. [11]   And besides these medically unnecessary billings, services were often not provided even for patients that did need SNF services, as shown by various witnesses testimony, including (but not limited to) doctors who worked there (DelCristo Tr. 2/15/19 at 54-55), and patients who testified they and other patients wandered around Miami Beach all day (R.D. Tr. 2/12/19), never saw a doctor at Esformes' facilities (R.B. Tr. 02/27/19), and/or never received the treatments that were billed to their insurance, (S.J. Tr. 3/12/19).

Second, the Government also showed how Esformes corrupted the entire regulatory system designed to ensure the health and well-being of his patients by bribing a regulator at AHCA to tip him off before inspections.  The evidence at trial demonstrated that Esformes could not bill Medicare and Medicaid without obtaining a license from AHCA and passing his yearly inspections.  Esformes passed these inspections by removing patients with psychiatric patients from his facilities and instructing his employees to fix the patient files before the AHCA inspectors showed up.  Esformes could have never billed Medicare and Medicaid if he had not passed these AHCA inspections.  *See* Tr. 3/7/19 at 75; *see also* Tr. 2/22/19 at 125.  In fact, after Esformes' arrest, when he was no longer bribing the AHCA employee, a patient with a psychiatric issue at one of his most deplorable facilities (Oceanside) sexually assaulted another patient and the facility lost its license and, as a result, its ability to bill Medicare and Medicaid.  *See* Ex. 1.  Therefore, it is reasonable for this Court to conclude that, based on this evidence, absent the AHCA bribery, the

---

[11] Nurse Ginarte testified at length about specific patients and conditions generally, and established a pattern of admission for younger psychiatric patients who did not belong at Esformes SNFs because they lacked any underlying medical problems, estimating the amount of such patients was roughly 10 percent of the total she saw (and perhaps as high as 15 percent).  (Ginarte Tr. 3/4/19 at 226; Tr. 3/7/19, at 52).  Bernadette Edge, an AHCA inspector who visited multiple Esformes Network facilities (not just Harmony Health, where Nurse Ginarte worked), testified the number of younger psychiatric patients she saw after Esformes took over the SNFs was approximately 25 to 30% of the total number of patients.  (Edge Tr. 3/7/19 at 85).  Thus, this fifteen percent estimate is a conservative number.

Esformes Network would have lost is ability to bill.  Indeed, once AHCA terminates a provider's license, AHCA also terminates other related providers with the same owners.

Third, the Government also demonstrated that Esformes used his SNFs and ALFs to fraudulently bill Medicare and Medicaid because his patients were often procured through kickbacks.  Esformes also relied on his inner circle to bribe physicians to admit patients to his SNFs to make sure he kept the census full and the Medicare money coming.[12]  At the same time Esformes was paying and receiving kickbacks and bribes, he repeatedly signed certifications to Medicare and Medicaid falsely claiming that he was not.  GX1CO.

The basic ways to quantify the loss Esformes caused by using his ALFs and SNFs to bill Medicare and Medicaid for fraudulent services are outlined as follows:

- The full amount of Esformes' Medicare and Medicaid billing at his SNFs and ALFs during the period where claims data was available and he billed for services that were not necessary, not provided, were procured by kickbacks and bribes, or were made possible because he bribed an AHCA employee ("**Overall Billing**"), which amounted to approximately **$832,077,742**;

- The amount of Esformes Medicare and Medicaid billing at his ALFs and SNFs received after Esformes falsely certified to Medicare and Medicaid that he was abiding by established rules and regulations, including not paying or receiving kickbacks and bribes, while paying and receiving kickbacks and bribes and bribing an AHCA regulator ("**Post-Certification Billing**"), which amounted to approximately **$340,527,850**;[13] and

---

[12]   The evidence that Esformes paid or received kickbacks included testimony from Frank Palacios (Tr. 2/13/19 at 4), Odette Barcha (Tr. 2/14/19 at 56-57), the Delgado Brothers (Tr. 2/19/19 at 198-99; Tr. 2/25/19 at 66), and Nelson Salazar (Tr. 2/15/19 at 175).

[13] The Eleventh Circuit has held that such conduct, on its own, can be a basis for a conviction of health care fraud.  In *United States v. Medina*, 485 F.3d 1297-99 (11th Cir. 2007), the Eleventh Circuit held that a defendant may be guilty of health care fraud for submitting prescription claims to Medicare that were tainted by kickbacks, because, as here, the defendant submitted the claims after signing a provider application stating that she would follow Medicare's rules and regulations, and thus made a knowing fraudulent representation to Medicare.  *Id.*, at 1297-98. As was testified to at trial in *Medina* and in this case, Medicare would not have paid the claim had it known of the kickback.  *Id.*

- The amount Esformes' SNFs billed Medicare and Medicaid paid as a result of physicians who received kickbacks and bribes ("**Kickback Physician Billing**"), which amounted to approximately **$115,142,348**.

### 2.    Medicare and Medicaid Billing by the Ancillary Providers

The Government also demonstrated that Esformes sold off his patients to corrupt providers in exchange for kickbacks and that these corrupt providers billed Medicare and Medicaid for services that the Esformes patients did not receive.  GX6H.  These corrupt providers included pharmacies, partial hospitalization programs, home health care companies, and diagnostic companies.  There was testimony during trial that providers like the pharmacy run by Guillermo Delgado and ATC paid kickbacks and bribes to access the Esformes patients, but did not provide those patients with the services that were billed to Medicare and Medicaid.  (G. Delgado Tr. 2/25/19 at 50); (Valera Tr. 2/19/2019 at 112-118).[14]  A number of individuals from these providers did not testify at trial, but were convicted of billing patients, including Esformes' patients, for services the patients did not need or get.  *US v. Morales*, 12-CR-20644-LENARD; *US v. Butler*, 15-CR-20438-BLOOM.  When these corrupt providers were arrested or went under review with Medicare, Esformes simply found a different provider to pay him kickbacks and bribes.  (G. Delgado Tr. 2/25/19 at 42-43).  This "Ancillary Provider Billing" amounted to approximately **$63,046,142**.[15]

---

[14] Indeed, Mary Valera testified that *ninety* percent of the patients at ATC—necessarily including patients from the Esformes Network—did not qualify for PHP services billed by ATC; she further testified that the services that ATC provided were not legitimate PHP services.  (*Id.*, at 114-115).

[15] The PSR calculates the loss to be $73,381,555 based on information provided by the Government. DE1335 at ¶¶ 44, 107, 108.  The Government believes this loss amount is based on:  1) what the ancillary providers billed Medicare and Medicaid for the Esformes Network patients as a result of kickbacks; and 2) the Medicare Part B billing for Esformes Network patients billed by physicians who received kickbacks. Exhibits showing these breakdowns were presented at trial. GX 6H.  The Government agrees that these figures should be included in the loss amount calculation, and simply argues that Probation is being under-inclusive in determining the loss amount, which is far higher than $73 million.

### 3.    Medicare and Medicaid Billing by Larkin Hospital

Third, the Government put on two key witnesses from Larkin Hospital – Odette Barcha and Frank Palacios – who explained how their employer played a key role in the fraud by admitting patients for unnecessary services and discharging the patients to the Esformes SNFs.  (Palacios, Tr. 2/13/19 at 109-110 (explaining that "other diagnoses were created like . . . unsteady g[ait] . . . by Mr. Carmouze and others.").  Esformes needed the patients to spend three days in a hospital before he could bill Medicare at his SNFs.  (Palacios Tr. 2/13/19 at 46 ("[A]t Larkin under Carmouze's care, and some of the other doctors, patients always ended up getting admitted.  And always was the same diagnosis, unsteady gait, weakness that led to the return to the [SNFs].")).  The Government put on evidence about the Medicare and Medicaid billing from, and payments to, Larkin Hospital that resulted from the scheme, and established how much Larkin Hospital billed and was paid for patients who were also billed by Esformes' patients ("**Larkin Hospital Billing**").  This billing amounted to approximately **$654,639,721**.

### C.    Summary of Medicare and Medicaid Billing and Payments

Based on the types of billings and theories of loss described above, the following table summarizes how the loss to Medicare and Medicaid as a result of the scheme can be quantified:

| Providers | Conduct | Billed | Paid | Evidence |
|---|---|---|---|---|
| Esformes SNFs and ALFs – Scenario 1 | **Overall Billing** | **$832,077,742** | $493,378,623 | GX1A |
| Esformes SNFs and ALFs – Scenario 2 | **Post-Certification Billing** | **$340,527,850** | $207,474,897 | GX1CO |
| Esformes SNFs and ALFs – Scenario 3 | **Kickback Physician Billing** | **$115,142,348** | $66,618,772 | GX529O[16] |
| Ancillary Providers | **Ancillary Provider Billing** | **$63,046,142** | $35,354,811 | GX6H |
| Larkin Hospital | **Larkin Hospital Billing** | **$654,639,721** | $9,623,012 | Will be established at sentencing |

It must be stressed that these loss numbers are conservative, given the long running nature of this scheme and the inherent inability to collect older claims data from Medicare and Medicaid. As a result of restrictions in the maintenance of Medicare and Medicaid data, the earliest claims data available to the Government for Esformes' SNFs and ALFs was 2006. Similarly, while some data existed for the other providers because they were investigated by the Government or indicted, a majority of that data only went back to 2006 as well.

> **D.** **Esformes Is not Entitled to a Credit for Medically Necessary Services, and Even if One Was Applied His Guidelines Range Would Be the Same**.

Esformes has repeatedly taken the position that he deserves a "credit" for providing medically necessary services at his ALFs and SNFs. But Esformes has not, and cannot, establish how such a "credit" would alter his § 2B1.1 loss category. Certainly he can find no support in Eleventh Circuit case law. *Cf. United States v. Pelle*, 263 F. App'x 833, 840 (11th Cir. 2008) (collecting cases for idea that "[c]osts incurred in defrauding victims should not be deducted from a defendant's loss calculation"); *see also United States v. Dehaan*, 896 F.3d 798, 827 (7th Cir.

---

[16]  The Government revised this chart after trial to remove the hospital billing attached to the patients who had an admitting physician who received kickbacks or bribes (listed as the "attending physician" on the claim line for the Medicare or Medicaid data).

2018).[17]   He certainly cannot ask for credit for services purportedly ordered and provided by a person working without the proper supervision of a licensed physician (Carmouze).  *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(v).  Moreover, while some defendants can point to the medical records to support the necessity of services, Esformes cannot because he instructed his employees to alter the records.

More fundamentally, it would be repugnant for Esformes to receive "credit" for his conduct.  The broader idea that Esformes helped bed ridden individuals who may have needed services is debunked by the record of psychiatric patients posing a danger to others and the risks to their own safety, and evidence that Esformes let the conditions of his facilities lapse until the AHCA inspectors showed up.  The Esformes Networks' SNFs and ALFs were shown to be both dangerous and sub-standard.  Further, Esformes' top medical professionals who allegedly ordered the SNF services received kickbacks; one pled guilty (Carmouze, who was not even a doctor but rather a Nurse Practitioner who was, as many witnesses testified, inadequately supervised, involved in kickbacks, and signed whatever he was asked (*see, e.g.* Palacios Tr. 2/13/19 at 42-46), and another testified (DelCristo, who admitted he admitted patients who did not need the treatment, and was willing to "play ball" for access (Tr. 2/15/19 at 41, 51-55, 67-68, 141)).

However, even if Esformes received a credit for medically necessary services, he cannot establish that any such credit would result in a Guidelines calculation under a Total Offense Level of 43.  For example, the claims data in evidence shows that Esformes' facilities billed over $67 million for patients with psychiatric diagnosis codes, or codes such as "muscle wasting" and

---

[17] Esformes may similarly argue that the loss under the Guidelines under a *Medina* theory cannot include amounts paid for services that were medically necessary.  But this does not overcome *Pelle* and other cases, nor can it cure Esformes' inability to show such necessary services, and even if he could overcome these obstacles, such a set-off would still result in more than $51 million in fraudulent billing loss, since at least fifteen percent of the over $340 million in Post-Certification billings were shown to be fraudulent.

"unsteady gait." *See* Ex. 2.  This amounts to roughly 8 percent of the overall billing at the Esformes SNFs.  Nurse Ginarte testified that she though approximately 10 to 15 percent of the patients she saw at the SNF where she worked (Harmony) were able bodied and did not need appear to require SNF services.  (Ginarte Tr. 3/4/19 at 226; Ginatre Tr. at 3/7/19 at 52; Palacios, Tr. 2/13/19 at 33-34).  Even assuming every other diagnosis codes was necessary, which Esformes certainly cannot establish, his Total Offense Level would *still* be a 43 based on a handful of suspect diagnosis codes alone.

In fact, Oceanside alone billed Medicare and Medicaid over $167 million and was paid over $103 million.  GX1A.  Again, even with the Medicare and Medicaid billing for merely one SNF—which does not even cover the entirety of its operation—Esformes' Total Offense Level is 43.  Further, Esformes has not, and cannot, establish that the Ancillary Providers paid him kickbacks and bribes, and then provided adequate services.  In fact, many owners of these businesses pleaded guilty for failing to provide the services Medicare paid for, such as Mary Valera, who testified at length at trial that the patients from Esformes' facilities never got the treatment billed to Medicare.  *See* Tr. 2/19/19 at 115; Tr. 2/20/19 at 107-11.  In short, Esformes cannot establish that he is entitled to a credit for services rendered or that one would result in a Total Offense Level of less than 43.

### E.     The Government's Loss Recommendation

The Government recommends that Esformes should be held accountable for the Post-Certification amounts billed by his SNFs and ALFs, the Ancillary Providers billing, and the Larkin Hospital billing.  This amount well exceeds $550,000,000.  Even the Court were to find that 90 percent of the patients needed a hospital stay and then SNF services, based on the suspect

diagnoses codes and the testimony of Ginarte, he would still be facing a loss of over $211 million.[18] Even if some credits against loss are granted, the Guidelines range will not change. This is also true even if certain billing categories recommended by the Government are exempted by the Court,[19] and/or if only certain amounts within each category were included in the Court's loss determination (*i.e.,* only the Larkin Hospital billings based on "unsteady gait" or "muscle wasting," which accounted for $65 million in billings). Indeed, even if only Oceanside billings were included in the loss ($167 million), the Guidelines will remain the same.

---

[18] This is based on 10 percent of the Overall Billing, 10 percent of the **Larkin Hospital Billing**, and the **Ancillary Provider Billing**.

[19] For example, even if Esformes is only held to account for his **Post-Certification** and **Ancillary Provider Billing**, the loss amount nevertheless exceeds $400 million which, while it would result in two levels below the Government's recommended offense level, would still subject him to a total offense level of 43 (adjusted from 50). Thus Esformes' Guidelines range would remain at life.

The Government therefore recommends the following enhancements and Guidelines range be applied to Esformes based on his criminal conduct:

| Guideline Provision | Guideline Application |
|---|---|
| **Base Offense Level**, §2S1.1(a)(1), §2B.1(a)(2) | 6 |
| **Loss** (over $550,000,000) §2B.1(b)(1)(P) | 30 |
| **Sophisticated means**, §2B.1(b)(10)(C) | 2 |
| **Risk of Death or Bodily Harm** | 2 |
| **More than 10 Victims or Mass Marketing** | 2 |
| **Conviction under 18 U.S.C. 1956**, §2S1.1(b)(2)(B) | 2 |
| **Sophisticated money laundering**, §2S1.1(b)(3): | 2 |
| **Obstruction of justice**, §C3C1.1 | 2 |
| **Role**, §3B1.1(a) | 4 |
| **TOTAL OFFENSE LEVEL** | 43 (adjusted from 52) |

## CONCLUSION

The United States respectfully objects to the PSI and asks the Court to include the enactments for risk of death or seriously bodily injury, and for 10 or more victims and mass marketing. The United States also asks the Court to include the full amount of loss, which totals more than $550 million. Aside from these three objections, the United States otherwise agrees to the Guidelines calculations in the PSI.

Dated:  July 10, 2019                               Respectfully submitted,

                                                    ROBERT ZINK, ACTING CHIEF
                                                    CRIMINAL DIVISION, FRAUD SECTION
                                                    U.S. DEPARTMENT OF JUSTICE

                                                    ARIANA FAJARDO ORSHAN
                                                    UNITED STATES ATTORNEY

                                                    */s/ Elizabeth Young*
                                                    Elizabeth Young (FL Bar #A5501858)
                                                    Allan Medina
                                                    James V. Hayes
                                                    Trial Attorneys
                                                    Elizabeth.Young@usdoj.gov
                                                    United States Department of Justice
                                                    Criminal Division, Fraud Section
                                                    1400 New York Avenue, N.W.
                                                    Washington, D.C. 20005
                                                    Telephone: (202) 262-7650

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 10, 2019, a true and correct copy of the foregoing was filed and served on all counsel of record via the CM/ECF system.

<u>*/s/ Elizabeth Young*</u>
Trial Attorney