UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CR-20549-SCOLA/Otazo-Reyes (s)(s)(s)

UNITED STATES OF AMERICA

vs.

PHILIP ESFORMES,

    Defendant.

_____/

**SENTENCING MEMORANDUM OF THE UNITED STATES**

    Philip Esformes' conduct was pernicious, premediated, and part of a lifelong pattern of disrespect for the law.  Like many convicted white-collar defendants, Esformes stole taxpayer dollars to fund his lavish lifestyle, paying kickbacks with impunity and billing federal health care programs for services people did not need or get.  But what sets Esformes apart from other white collar offenders is clear evidence that he thinks anything, including justice in a United States District Court, can be bought.  Esformes tried to corrupt the administration of justice in the Southern District of Florida by influencing and funding Guillermo Delgado's flight from the country before trial, to avoid being held accountable for his own conduct in this case.  His conduct made a mockery of the civil settlements he reached in other United States District Courts.  He corrupted the state regulatory system designed to protect the well-being of vulnerable nursing home patients.  He even corrupted the college admissions process.  The judicial and regulatory systems of this country mean nothing to this defendant, and the Court's sentence must reflect that fact.  A sentence of at least 30 years' incarceration, plus other penalties discussed below, is required by 18 U.S.C. § 3553(a).

**PROCEDURAL HISTORY**

The jury convicted Esformes of 20 separate counts. The maximum term of incarceration for these crimes is 255 years. A sentence of at least 30 years' imprisonment is well below that maximum, and is fully justified by the facts.

**ARGUMENT**

**I.     Sentencing Law.**

"[T]he district court must consider several factors [set forth in 18 U.S.C. § 3553(a)] to determine a reasonable sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims." *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005) (internal quotations and citations omitted).

**II.    Application of the 18 U.S.C. § 3553(a) Factors to Esformes.**

The 18 U.S.C. § 3553(a) factors compel a sentence of at least 30 years' imprisonment.[1] Although we will address the other 18 U.S.C. § 3553(a) factors that appear in the statute, we believe that the Court should place particular emphasis on three factors: the nature and circumstances of the offense, respect for the law, and the need for deterrence. *United States v.*

---

[1] As discussed below, were Esformes' Guidelines range not capped at a statutory maximum of 255 years, application of the Guidelines would dictate a sentence of life imprisonment. *See* Infra, Section II.E. But, regardless of Esformes' Guidelines, the Section 3553(a) factors compel a sentence of at least 30 years' imprisonment.

*Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (stressing that the sentencing court "is permitted to attach great weight to one factor over others" and adding that the "decision about how much weight to assign a particular sentencing factor [is] committed to the sound discretion of the district court.") (internal citations omitted). It is those factors above all that set Esformes apart from others who have engaged in similar massive frauds, and justify a severe punishment regardless of how the Court calculates loss or the Guidelines.

**A. The Nature and Circumstances of this Offense, the Seriousness of this Offense, Esformes' Total Lack Respect for the Law, and the Need for Just Punishment Require a Severe Sentence.**

**1. Nature and Circumstances of this Offense and Seriousness of this Offense.**

We are confident that the Court, having heard the evidence firsthand, is well aware of the nature and severity of Esformes' misconduct. Esformes' actions were not impulsive crimes of passion or isolated lapses in judgment. This was not one criminal act, but hundreds of choices to break the law, even thousands, for more than a decade. Further, the seriousness of the crimes committed by Esformes is obvious and cannot be understated. His fraud involved thousands of patients, 16 nursing homes, the systematic payment of bribes, a complex web of bank accounts, and brazen obstruction of justice to try to prevent it all from coming to light.

The Eleventh Circuit has roundly condemned fraud schemes of a similar scope and severity as the one masterminded by Esformes. In affirming the fifty and thirty-five year sentences imposed upon the executives of American Therapeutic Corporation ("ATC") following their guilty pleas, the Eleventh Circuit remarked:

> The offenses in this case spanned nearly eight years and involved Appellants paying ALFs and halfway houses to exploit thousands of seriously impaired individuals for their Medicare benefits. Appellants submitted over $200 million in bogus Medicare claims, received over $87 million in fraudulent payments, and used shell corporations and sham transactions to launder their ill-gotten gains. They did so at

3

>the expense of the public fisc and thousands of individuals unable to effectively care for themselves. In our view, crimes such as these stem from greed of the worst variety, and evince a parasitism and disregard for societal norms that are anathema to civil society. It is the very aim of sentencing to exorcise individuals such as these from the public square.

*United States v. Duran*, No. 11-14429, slip op. at 17 (11th Cir. Feb. 25, 2013) (per curiam) (unpublished). In this case, Esformes's conduct went on for twice as long, involved more facilities, and billed and took in vastly more money. This alone points to the reasonableness and need for a sentence of at least 30 years in prison for Esformes.

### 2. Respect for the Law.

Esformes' criminal activities demonstrate that he has no respect for the law or the courts, and that when presented with an obstacle, he will simply attempt to buy his way out of it.

First, there can hardly be a more direct affront to the integrity of a United Stated District Court than a defendant tampering with the witnesses to his crimes. In recorded conversations, Esformes encouraged Guillermo Delgado to go to Russia or a place without ties to the United States to prevent him from being extradited back for trial. He told the Delgado Brothers to google where to go from someone else's computer so it would not leave a trail. Esformes' disrespect for the law, and this Court, knows no bounds.

Second, Esformes' conduct was not only the basis for 20 counts of conviction it was also a direct flouting of two civil settlements reached before United States District Judges resolving allegations that he perpetrated similar health care fraud schemes. *See* 04-CV-2159, S.D. Fla.; 07-CV-0577, N.D. Ill. In one of those cases, Esformes resolved allegations that he committed fraud using the same skilled nursing facilities ("SNFs") and assisted living facilities ("ALFs") he used to commit fraud in this case. Instead of changing his ways or expressing remorse after these settlements, Esformes simply altered his criminal scheme to avoid detection. A recording captured

4

by Gabriel Delgado in June 2015 demonstrates Esformes' cunning and desire to perpetuate the fraud without getting caught again: "[A]fter the [Larkin] case if you notice, I don't see so many doctors anymore. I don't go to the hospitals. I don't do any market[ing]. I stay inside the building. I'm on top of my buildings and I sit and I push the girls to do the stuff." DE119:33-34.

Third, when the Delgado Brothers were out on bond subject to restrictions against contacting witnesses, Esformes not only contacted them despite knowing that they were on bond, but continued to dispatch them to bribe a state nursing home regulator for confidential AHCA information. *See* Tr. 8/4/16 at 22 (Magistrate Judge Edwin Torres' observation that the recorded conversations between the Delgado Brothers and Esformes were "discussions that he's having with somebody, that it's not just somebody being suspected, but somebody who's already charged and had a trial date and was out on bond, and the defendant is having conversations knowing that that would violate their bond."); *see also* DE82, DE133:15.

Fourth, even after co-conspirators accepted responsibility for the crimes they had committed with him, Esformes remained undaunted, and simply found other co-conspirators with whom to break the law. Tr. 2/25/19 at 62. The conclusion is clear: never again should Esformes be at large in society with an opportunity to disrespect the law for his own personal gain.

### 3. Just Punishment for this Offense.

Anything less than 30 years in prison for Esformes would be unjust, given: (a) the length and scope of the fraud; (b) his premeditated efforts to hide the fraud by creating fake documents and a web of shell companies and bank accounts; (c) his victimization of vulnerable people who were elderly or suffered from mental health issues; (d) his bribery of a state nursing home regulator, effectively crippling the ability of the regulator to ensure that his nursing homes were operating in compliance with the law; (e) the staggering amount of money he made from the

5

scheme, which totaled at least $38 million based on bank records going back as far as 2010; (f) his use of stolen Medicare and Medicaid fraud proceeds to bribe a division one basketball coach to admit his son into the University of Pennsylvania; (g) his disrespect for the courts when he funded and influenced Guillermo Delgado's flight from the country to avoid trial; and (h) his previous civil settlement with the Department of Justice for the same conduct which caused him to double down on his criminal activities instead of stop.

### B. The History and Characteristics of the Defendant Also Support a Severe Sentence.

Esformes holds a master's degree in business, speaks two languages, is plainly an intelligent individual, and had every opportunity to be a legitimate business owner. Esformes' crimes were not the actions of a person with limited options. Esformes had every opportunity in life. Esformes' father was in the nursing home business in Illinois and acquired a net worth of $74.7 million. DE220:4. Before his arrest in July 2016, Esformes' net worth surpassed his father's: $78.9 million. DE9, Ex. A. As noted above, and throughout the course of trial, Esformes could have run profitable businesses for patients who needed and received services, as many nursing home owners do. Instead, Esformes paid bribes, obstructed justice, laundered money, and took advantage of vulnerable patients to commit fraud for decades. Esformes' personal and family wealth enabled him to further commit crimes, live beyond his already extraordinary means, and disrespect the law for years.

Esformes' total lack of remorse for the harm he caused – to taxpayers, to patients, to the courts, even to Wharton School applicants – is another reason to impose a severe sentence.[2] The Eleventh Circuit has recognized that a defendant's lack of remorse is relevant to his history and

---

[2] Jerome Allen testified that other students did not get admitted to the Wharton School because he gave the spot to Esformes' son in exchange for the bribes from Esformes. Tr. 3/8/19 at 110-111.

6

characteristics and to other factors. *See, e.g., United States v. Kapordelis*, 569 F. 1291, 1317 (11th Cir. 2009) (holding that a defendant's lack of remorse can be relevant to the "history and characteristics" factor); *see also United States v. McNair*, 605 F.3d 1152, 1231 (11th Cir. 2010) ("The district court's consideration of Swann's lack of remorse was not improper. A district court is permitted to consider lack of remorse in its §3553(a) analysis as to several factors, such as the characteristics of a defendant, the need to promote respect for the law, and the need to protect society").

This very Court has taken the same view. For example, in *United States v. Feldman*, the "B-Girls" case, this Court justified a substantial upward variance for defendant Feldman, convicted again after his retrial, in part because despite lengthy proceedings he "hadn't shown any remorse" for the effects of his conduct. 931 F.3d 1245, 1264 (11th Cir. 2019). *Feldman* is instructive because it demonstrates, as this Court recognized, that a fraud defendant can show remorse for his victims even without admitting criminal liability and forgoing his appellate rights. Esformes, by contrast, has shown no remorse for any of his victims, or any of his misconduct, despite many opportunities to do so in countless pleadings to the Court and previous hearings about his sentencing. Notably, Feldman made a significant pitch to obtain this Court's leniency based upon his alleged good deeds and good standing in the community, to the point of describing himself as a "humanitarian," making his failure to express remorse all the more significant.

### C. Esformes' Sentence Must Afford Adequate Deterrence.

A significant term of incarceration is necessary, not only to deter Esformes (who has never been punished criminally for his longstanding fraud, bribery, and money laundering schemes), but also to promote general deterrence. We know that sentences imposed upon Medicare fraudsters in this District have had significant positive effects on the Government's fight against Medicare

fraud, both nationally and in our backyard. A review of Medicare Part A data (covering SNFs and hospitals) and Part B data (covering physician office visits) shows that Medicare spent $1.02 billion less in the Southern District of Florida in 2017 than it did in 2010. The Government has devoted substantial resources to prosecuting health care fraud in this District. The effect of the Government's investigation and prosecution of Medicare and Medicaid fraud executives, along with significant sentences imposed in the Southern District of Florida, show that general deterrence is working, even against defendants like Esformes who believe their wealth and cunning put them above the law.

Nothing short of 30-year prison sentence will deter Esformes from engaging in criminal conduct. He has shown a willingness to use shell companies, money launderers, and shell bank accounts to hide his involvement in fraudulent businesses, a skill set that would serve him well while committing any type of financial crime even after he is excluded from participating in Medicare and Medicaid. It is obvious that Esformes is willing to corrupt any regulatory or legal framework. He even laundered stolen Medicare and Medicaid proceeds and used it to commit another crime: the bribery of the head men's basketball coach at the University of Pennsylvania. A sentence that ensures Esformes remains in prison for the rest of his life is warranted for this reason as well.

### D. The Need to Protect the Public from Esformes is Great.

A significant sentence is also appropriate to protect the public from further crimes of Esformes. Esformes not only took advantage of the taxpayers who fund Medicare and Medicaid, he exploited vulnerable patients who did not have families to take care of them and often battled with substance abuse and psychiatric conditions. The Court heard from a number of these patients who testified about how they suffered as a result of the conditions at Esformes' facility, Oceanside.

A lengthy sentence is warranted to protect the taxpayers and other patients from Esformes, someone willing to capitalize on the vulnerabilities of others.

    **E.    The Advisory Guidelines Range Supports a Lengthy Sentence.**

Esformes' Guidelines range, properly calculated, is life, and only limited by the statutory maximum of 255 years. The Court has already decided the applicable Guidelines with the exception of loss. We accordingly will not repeat our arguments about the Guidelines other than to state again the applicable loss for Esformes' money laundering conspiracy conviction (Count 16) under § 2B1.1.

As the Government already demonstrated (DE1354:9-15), it is possible to quantify the loss Esformes' conduct caused to the Medicare and Medicaid programs in a number of ways:

| Providers | Conduct | Billed | Paid | Evidence |
|---|---|---|---|---|
| Esformes SNFs and ALFs – Scenario 1 | **Overall Billing** | **$832,077,742** | $493,378,623 | GX1A |
| Esformes SNFs and ALFs – Scenario 2 | **Post-Certification Billing** | **$344,527,850** | $207,474,897 | GX1CO |
| Esformes SNFs and ALFs – Scenario 3 | **Kickback Physician Billing** | **$115,142,348** | $66,618,772 | Ex. 1 |
| Ancillary Providers | **Ancillary Provider Billing** | **$63,043,142** | $35,354,811 | GX6H |
| Larkin Hospital | **Larkin Hospital Billing** | **$654,639,721** | $93,632,012 | GX1256-1260, 1480 |

As the Government previously argued, Esformes has not, and cannot, establish that he should receive a "credit" for any services that his facilities rendered let alone that any such credit would alter his § 2B1.1 loss category. *Cf. United States v. Pelle*, 263 F. App'x 833, 840 (11th Cir. 2008) (collecting cases for idea that "[c]osts incurred in defrauding victims should not be deducted from a defendant's loss calculation"). This is especially the case because it was not possible to obtain Medicare and Medicaid data for the SNFs and ALFs from the beginning of the conspiracy period, and therefore Esformes is already effectively receiving a credit for services

9

rendered (or not) during times that the claims data does not exist.[3] Even if Esformes received some credits for rendering medically necessary services, the loss would still be significant and so would his Guidelines, under any possible scenario:

- First, even if the Court were to credit Esformes for providing medically necessary services at every facility besides Oceanside (an approach that is undercut by the testimony of, for example, a former nurse at Harmony who testified that 10-15 percent of patients had suspect diagnoses), Oceanside alone billed over $167 million to Medicare and Medicaid ("**Esformes SNFs and ALFs Credit Scenario 1 – Oceanside Patients**");

- Second, the claims data in evidence shows that Esformes' SNFs billed over $67 million for patients with psychiatric diagnosis codes, or codes such as "muscle wasting" and "unsteady gait" ("**Esformes SNFs and ALFs Credit Scenario 2 - Psychiatric Patients**"); and

- Third, even if you accept that only 8 percent of Esformes' patients were inappropriate based on the suspect diagnosis codes, and then applied that same percentage to Larkin Hospital billing for Esformes patients, the loss is over $50 million ("**Larkin Hospital Billing (8 percent)**"):

| Providers | Conduct | Billed | Paid | Evidence |
|---|---|---|---|---|
| Esformes SNFs and ALFs – Credit Scenario 1 | **Oceanside Patients** | **$167,532,769** | $103,117,392 | GX1A[4] |
| Esformes SNFs and ALFs – Credit Scenario 2 | **Psychiatric Patients** | **$67,796,102** | $36,838,565 | DE1354, Ex. 2[5] |

---

[3] Furthermore, Esformes is prohibited by the Guidelines from receiving credit for services ordered by: 1) Arnaldo Carmouze under Luis Cabrera's Medicare number because Carmouze was not a physician and could not order the services himself; or 2) Dagoberta De La Vega under George Michel's Medicare number because De La Vega's number was suspended by Medicare (Barcha Tr. at 2/13/19 at 236).  See U.S.S.G. § 2B1.1 cmt. n.3(F)(v) (providing that there shall be "no credit" for "services [that] were fraudulently rendered to the victim by persons falsely posing as a licensed professional.").

[4] There was ample evidence about the deplorable conditions at Oceanside, including from cooperating witnesses (Frank Palacios, Odette Barcha, Gabriel Delgado), a former employee (Eddie Bellew), and patients (R.B., R.D., and S.J.), and recordings of Esformes alerting Oceanside to bus psychiatric patients out before an AHCA inspection.

[5] This amounts to roughly 8 percent of the overall billing at the Esformes SNFs.  This is a conservative estimate of loss, in light of testimony from Nurse Ada Ginarte who testified that approximately 10 to 15 percent of the patients she saw at the SNF where she worked (Harmony) were able bodied and did not need appear to require SNF services. (Ginarte Tr. 3/4/19 at 226; Ginatre Tr. at 3/7/19 at 52; Palacios, Tr. 2/13/19 at 33-34).

| Ancillary Providers | Ancillary Provider Billing (no credit) | $63,043,142 | $35,354,811 | GX6H |
|---|---|---|---|---|
| Larkin Hospital | Larkin Hospital Billing (8 percent) | $52,371,177 | $7,490,560 | GX1256-1260, 1480 |

Crediting Esformes for services rendered under any combination of these scenarios still results in a Guidelines range of the statutory maximum for the crimes of conviction. Simply put, however this Court comes at it, his Guidelines range if properly calculated easily comports with the Government's overall recommendation of at least 30 years' imprisonment.[6]

**F.     Similarly Situated Defendants Have Received Significant Sentences.**

**1.     Similarly Situated Defendants Have Received Sentences of 24 Years and Above.**

In formulating its ultimate sentencing recommendation in this case, the Government has carefully considered sentences for similarly situated defendants. Courts have imposed lengthy sentences from roughly 25 years' imprisonment and above for significant fraud schemes in this District:

- *United States v. Moran*, 778 F.3d 942, 957 (11th Cir. 2015) (affirming a 30-year sentence and 25-year sentence, respectively, for the CEO and manager of a fraudulent partial hospitalization program ("PHP") fraud that resulted in fraudulent Medicare billings between $7 and $20 million);

- *United States v. Kallen-Zury*, 629 Fed. App'x 894, 912 (11th Cir. 2015) (rejecting defendant's argument that her 25-year sentence for running a fraudulent PHP that resulted in losses of over $67 million to the government was unconstitutionally excessive);

- *United States v. Cladek*, 579 Fed. App'x 962, 970-71 (11th Cir. 2014) (affirming defendant's 30-year sentence for wire fraud, mail fraud, and conspiracy causing losses between $50 and 69 million, where defendant sold investors fixed-interest notes allegedly secured by auto loans, but instead funneled the funds into her personal accounts to pay for her multimillion-dollar homes);

---

[6] As discussed below, even if the Guidelines range calculated to be anything less than 360 months' imprisonment, the Court should vary upward from that Guidelines range.

11

- *United States v. Duran*, 620 F. App'x 687, 690 (11th Cir. 2013) (affirming Lawrence Duran's 50-year sentence and Mary Valera's 35-year sentence for using a fraudulent PHP to bill Medicare for patients, including Esformes' patients, for services that did not occur, were not needed, or resulted from kickbacks);

- *United States v. Hill*, 643 F.3d 807, 884-85 (11th Cir. 2011) (affirming reasonableness of defendant's 28-year sentence for bank fraud and conspiracy to commit bank and wire fraud in mortgage fraud scheme that caused more than $38 million in direct losses);

- *United States v. Masferrer*, 514 F.3d 1158, 1160-61, 1165 (11th Cir. 2008) (affirming defendant's 30-year sentence for bank and securities fraud resulting in between $20 and $40 million in losses, where defendant was the Chairman and CEO of a bank that knowingly hid losses and made material misrepresentations to auditors, federal regulators, and investors); and

- *United States v. Schwarz*, No. 4:16-cr-10039 (S.D. Fla. 2017) (D.E. 204 at 27, 59-61) (Moore, J.) (sentencing defendant to 40 years in prison for bank fraud, conspiracy to commit bank fraud, and tax violations in connection with Ponzi scheme causing at least $170 million in losses).

Notably, none of these defendants committed white collar fraud and then also bribed a state regulator, bribed a college basketball coach, and tried to get their co-conspirators out of the country. Neither this District nor this country has seen a defendant like Philip Esformes.

### 2.     The Cooperating Witnesses Are Not Similarly Situated Defendants.

Esformes has repeatedly tried to characterize the Delgado Brothers as similarly situated defendants and that his sentence should therefore mirror Gabriel Delgado's sentence (55 months) or Guillermo Delgado's sentence (110 months). But the Delgado Brothers are not similarly situated to Esformes.

First and most obviously, they chose to plead guilty rather than to go to trial. At the time they pleaded guilty, the Delgado Brothers received a downward adjustment when calculating their advisory Guidelines' ranges as a result of the cooperation.[7] The Eleventh Circuit has repeatedly held that defendants who cooperate with the Government and enter a written plea agreement are

---

[7] Gabriel Delgado subsequently received a second reduction in his sentence, which ultimately resulted in a sentence of 36 months.

not similarly situated to a defendant who provides no assistance to the Government and proceeds to trial. *See, e.g., United States v. Williams*, 526 F.3d 1312, 1323-24 (11th Cir. 2008). There is thus no unwarranted disparity under Section 3553(a) even when the sentence the cooperating defendant receives is "substantially shorter." *Id.* at 1323. *See also United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015); *United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009). The Delgado Brothers, Nelson Salazar, Bertha Blanco, Frank Palacios, and Odette Barcha cooperated, testified, and are therefore not similarly situated to Esformes.

Further, Esformes' co-conspirators pleaded guilty to a small part of his scheme and thus are not similarly situated to him because of that fact. For example, the Delgado Brothers only pleaded guilty to the fraud at Morales Pharmacy, and their Guidelines were only based on that fraud. Nelson Salazar only pleaded guilty to the fraud at American Therapeutic Corporation and his Guidelines were only based at the fraud at that PHP. It was only as a result of their cooperation, in conjunction with other evidence, that the Government was able to know about the breadth and scope of Esformes' scheme. As a result of the cooperation of the Delgado Brothers and Salazar, Esformes was charged Esformes with additional conduct, including fraud at: the SNFs, Larkin Hospital, Chrysalis Center Inc., Greater Miami Behavior Health Lighthouse CMHC of North Dade, Finlay Clinical Laboratory, Mobile Quality Diagnostic, Ultra Mobile X-Ray, Rembrandt Mobile Diagnostics, New Image Diagnostics, Nursing Unlimited 2000, St. Judge Health Care, Tender Touch Home Health, RX Care Pharmacy, Pharmco, Wellness RX, Budget Drugs, Martha Bofill, and Physician Specialty Group. The Delgado Brothers and Salazar were not convicted of this conduct, having provided information about this additional fraud as part of their cooperation.

Moreover, Esformes' bribery of the state nursing home regulator was unknown to the Government before the Delgado Brothers recorded him doing it. This bribery scheme played no

13

role in furthering the fraud at ATC, Larkin Hospital, or Morales Pharmacy, or in any of the other conduct the cooperating witnesses were convicted of committing. In a similar vein, none of the cooperating witnesses who testified at trial bribed Allen to get a family member into the University of Pennsylvania.[8] Further, Esformes made more money than any of the cooperating witnesses ($38 million), and was the clear top of the criminal enterprise. *See* Tr. 2/20/19 at 52 (Gabriel Delgado). Finally, Esformes was the only one convicted of obstructing justice, and the only one who thumbed his nose at two civil settlements with the Department of Justice. Esformes' punishment should obviously not be mitigated by the fact that other defendants accepted responsibility, showed remorse, and did not persist in seeking to buy their way out from under the law and flaunt justice in United States District Courts.

### G.     Restitution

The sentence imposed in this case should include an order of restitution to Medicare and Medicaid in the amount of $207,474,897. *See* DE1372 (the Government filed a separate motion asking for a forfeiture money judgment). This amount equals the amount Esformes' SNFs and ALFs were paid by Medicare and Medicaid after he falsely certified that he was not paying or receiving kickbacks.

### **CONCLUSION**

Esformes did more than steal taxpayer dollars to fund a lavish lifestyle. He tried to buy justice, in United States District Courts, and in every sphere. This Court's sentence must reflect the fact that judicial and regulatory systems mean nothing to Esformes. It is time for Philip Esformes to be held accountable for the crimes he committed, and for others in this District and elsewhere to know that fraud, bribery, and disrespect for the law will not be tolerated. For all of

---

[8] As determined in the PSI, Esformes' Guidelines for his conviction on Count 32 alone are 41 to 51 months, pursuant to § 2C1.1(a)(2), because the value of the bribes he paid Allen were over $150,000.

the foregoing the reasons, this Court should impose a sentence of at least 30 years' imprisonment, along with forfeiture, restitution, a period of supervised release, and a special assessment.

Dated:  September 9, 2019                           Respectfully submitted,

ROBERT ZINK, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY


*/s/ Elizabeth Young*
Elizabeth Young (FL Bar #A5501858)
James V. Hayes
Trial Attorneys
Allan Medina
Acting Chief
Elizabeth.Young@usdoj.gov
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 262-7650


## CERTIFICATE OF SERVICE

I hereby certify that, on September 9, 2019, a true and correct copy of the foregoing was filed and served on all counsel of record via the CM/ECF system.

/s/ *Elizabeth Young*
Trial Attorney