UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

16-CR-20549-SCOLA/OTAZO-REYES

UNITED STATES OF AMERICA

vs.

PHILIP ESFORMES

_____/

**ESFORMES'S SENTENCING MEMORANDUM
AND REQUEST FOR A VARIANCE/DEPARTURE**

We submit this memorandum on behalf of Philip Esformes, to urge the Court to impose a sentence measured in years, not decades, so that this humbled and broken man can have a chance at redemption. Mr. Esformes intends to make a personal plea to the Court at sentencing, evidencing his contrition, regret, remorse, and acceptance of responsibility for conduct about which this Court heard during the trial.

We propose a sentence, whether by departure or variance, that will accomplish through incarceration the harsh punishment that society seeks, but that does not amount to the kind of crushing sentence that so many judges, scholars, and even the President of the United States, feel are excessive and profoundly unjust.

We have invited Rabbi Sholom Lipskar of Chabad's Aleph Institute to address the Court about his personal observations of Mr. Esformes over the last 37 months. He will inform the Court of a new initiative by Aleph in collaboration with South

Florida Behavioral Health Network ("Thriving Mind"). He will propose a sentence that combines a significant period of custodial incarceration with full-time, pro bono, community service as part of supervised release, through which the Court can achieve all the goals of sentencing, including punishment, rehabilitation and retribution.[1]

By way of comparison, Gabriel Delgado, who was convicted of money laundering (just like Mr. Esformes) and was Mr. Esformes's self-proclaimed 50/50 partner, was facing a guideline range of 97-121 months under his plea agreement with the government, ***before consideration of his acceptance of responsibility and cooperation against Mr. Esformes***. Initially Gabriel was sentenced to serve 55 months, which sentence was ultimately reduced to 36 months after he testified against Mr. Esformes. Gabriel Delgado has completed the incarceration portion of his sentence.

A sentence for Mr. Esformes of 120 months incarceration followed by 5,000 hours of community service during 3 years of supervised release would represent a much harsher sentence for Mr. Esformes—more than triple the 36-month custodial

---

[1] In advance of sentencing, we invite the Court to view the 13-minute informational video that features Aleph's Rabbi Lipskar, Thriving Mind's President Dr. Newcomer, and defendant's father Morris Esformes, so that the court is acquainted with these organizations and their work. https://www.thrivingmind.org/thriving-mind-and-aleph-institute/.

sentence served by Gabriel Delgado—and still longer than the 110-month custodial sentence imposed upon Guillermo Delgado, who was convicted and sentenced for drug dealing. (It appears that, for strategic reasons, the government is delaying the filing of a motion to reduce Guillermo's sentence until this Court imposes sentence upon Mr. Esformes.) And the punishment would continue insofar as Mr. Esformes would be laboring full-time, pro bono, as a community servant to discharge his 5,000-hour obligation over the course of the period of court-imposed supervised release. The combination would produce an effective total sentence tantamount to 13 years, the last three of which could be under the strictures of home confinement as a special condition of supervised release.

## 18 U.S.C. § 3553(a) SENTENCING FACTORS

### (a)(1) Nature and Circumstances of the Offense and
### the History and Characteristics of the Defendant

The Court sat through two-months of trial, so it is intimately familiar with the nature and circumstances of the tried offenses. But the Court does not yet have a complete picture of the history and characteristics of the man who was on trial.

As echoed by the more than one hundred letter-writers,[2] including **Isaac Weiss**, Mr. Esformes and his family "have been the single door to knock on when our community, an organization, school, or individual was in need. Not simply

---

[2] Mr. Esformes will submit to the Court tomorrow under separate cover all of the letters in support of Mr. Esformes.

writing a check and sending someone on their way, they take a personal interest and get involved on the most intimate level. Without question, our community would not be where we are today without their commitment and support." (Isaac Weiss). The overwhelming response from employees, Rabbis, family members, and friends, who wrote letters to the Court in support of Mr. Esformes, describe a man whose life has been driven by helping those in need, by giving a hand to someone who was suffering, and by becoming a mantra of good for his community. Although each letter highlights a different part of Mr. Esformes, the common thread among them is Mr. Esformes's loyal, kind, and compassionate being – his devotion and love for his children and his family, his benevolence and kindness to friends and strangers alike, his respect for his employees whether at the Esformes facilities or at home, and his lifetime of helping people with no fanfare, never seeking honor or credit even when it would have been justly deserved.

The nursing homes and ALFs that Mr. Esformes operated delivered much needed care to a wide population of patients and residents in Miami-Dade County. As his employees describe, Mr. Esformes made sure everyone who worked at the facilities understood that patient care was the first priority, and that every resident was entitled to live in a clean home-like environment. **Ronald Pearson** states in his letter that Mr. Esformes would always tell his employees that the SNFs and the ALFs were home to those who resided there: "[Mr. Esformes] reminded us often that the

residents are home and that we're the guest, so we should treat them as such."

**Nancy Rosenberg Given**, who worked for Mr. Esformes for fifteen years, observed a man who "was devoted to his resident population. He cared for the mentally ill who are so often forgotten about in our society. He ensured that they had the best possible quality of life. He made that a priority for all of us who worked with him. He saw past a person's mental illness and understood that each person was an individual who needed to be respected and loved."

To Mr. Esformes, his employees were more than just the people who worked for him. **Francisco Quintana** describes how "I was a young single father with no education really and I was headed nowhere fast.  My future was not bright and I had no plans. I just knew that I wanted more for my son and myself. Meeting and working with Philip was my saving grace, he took me under his wing and gave me more opportunities than I ever thought possible  He was my mentor and my friend. Today I am a Nursing Home Administrator. . . He helped so many people achieve their dreams, he helped people become nurses and administrators, when residents at Oceanside wanted to get married he made their wedding possible, when his employees had deaths in their families he would help with the funerals and when my youngest son was born and had complications and had to remain in NICU for over a month Philip called me daily to see how he was doing and arranged for me to have whatever time I needed off so that I can be with my family."

Another employee, **Ana Bovo**, describes how "I was just starting my Masters Degree at Barry University" when an important test was scheduled at the same time as an inspection of the Esformes facilities where she worked.  "I was very distraught, thinking that I was going to fail my class. At the time I was a working mom with three young daughters and was feeling overwhelmed at the thought of failing my class. Philip saw me very upset and personally contacted my professor to see if he would excuse me."  The professor said No.  Still, Mr. Esformes "was kind enough to excuse me so I could take my test." Despite needing her at work for the inspection, Mr. Esformes recognized that taking the test was more important and granted Ms. Bovo the time.  In 2005, Ms. Bovo's "husband became very ill and was hospitalized for over a month . . . I could not leave his bedside. At no time did Philip deduct my pay or any of my paid leave."  Then, in 2009, "my father was diagnosed with leukemia and died in December . . . Philip again paid for any time I took off and did not deduct my pay."

Mr. Esformes's charity was abundant and touched many lives, in big and small ways. **Nereyda Lopez** worked at Harmony for many years. In her letter, she describes how "when my brother suddenly passed away, my family and I were not financially prepared to endure the cost of a funeral, thanks to Philip my brother had a dignified funeral . . . After my brother's passing, my son was a victim of a terrible crime. My son was shot in the back and was taken to the hospital in grave condition,

the first person that went to my side at the hospital was Philip, he prayed with me and went into the ICU to my son's side and prayed with him as well. Philip told me that anything I needed he was there for me."

Employees like **Carla Bontemps** have also described Philip's "love for his staff and compassion for his residents are like no other operator . . . ." The Director of Nursing at North Dade Nursing and Rehabilitation, Carla describes how "there has not been a time when I have asked for something that I felt would improve the quality of life for our residents that [Mr. Esformes] hasn't provided. He also makes sure that the staff has the necessary equipment and supplies to perform their work at the highest level possible. He visits the facility on a weekly basis to ensure this in person. He walks the entire building himself pointing out anything he feels needs correcting or improvement and makes sure that it is corrected. This is the dedication to the care of the residents that he has exhibited at every interaction I have had with him."

**Aneta Mihale,** the bookkeeper of various Esformes nursing homes, describes how Mr. Esformes "is very dedicated to his residents, family & employee's [sic] and [a]lways made sure his residents are provided with excellent care and service. Always made sure they were taken care of. His residents and their care always came first . . . The residents love him. The community loves him. His friends & family love him. There are not a lot of people like this in this world and this is what we need

more of. His dedication to the residents who entered his nursing homes was always #1. They always received the best care, always treated everyone like family."

**Jackie Zapata**, who worked at Oceanside, recounted that "[o]n July 15, 2015, my sister committed suicide at 38 yrs of age, and Philip reached out to me in a way that made me forever in his debt. He called me and told me whatever you need, as much time as you need, anything I can do, you just let me know." Two years later, "[i]n 2007, he paid for my schooling to become a Licensed Practical Nurse, with no hesitation, because he was very pro people bettering themselves, and achieving lifelong goals. I saw him a countless times give money from his pockets to any of the residents that asked him for any money. He [would] just stick his hand in his pocket, and whatever bill came out, was what he gave, no questions asked."

Friends and family like **Isaac Knopf** describe Mr. Esformes as "someone that leads by example . . .  Philip is a person that seeks out ways he can assist others, he does not wait for opportunities to knock on his door. Philip's acts of kindness are not prejudice against anyone. The positive impact Philip had on my life is almost impossible to describe . . . Philip's desire to help others burns in his heart. Starting a food pantry for the poor, delivering packages to needy families when he was kid, donating basketball uniforms because a random student requested of him, attending school meetings, and arranging necessities to be delivered to people he's never met are some examples of the things that used to consume Philip's days."

**Doni Cohen** is one of Mr. Esformes's "oldest and dearest friends." They grew up together in Chicago and their families have been very close for more than 40 years. Mr. Esformes "faced quite a bit of adversity growing up, but found a way to overcome and persevere even in the face of immense personal obstacles. Philip is competitive. He is intense. He is aggressive. He doesn't like to lose. He is uber motivated to succeed. And, with all of that, there is another side to Phillip which many people don't see or understand. Unbeknownst to many, under his hard charging exterior, lies a kind, caring, supportive, and generous soul . . . My brother was terminally ill and spent many months at Children's Memorial Hospital. Many times when at our house it was Philip who helped change my brother's IV bags, helped carry him up to his bed off the bathroom floor when he was too weak, and it was Philip he brought him his spittoon when he had to throw up quickly and could not make it to the toilet in time."

For **Thomas Hahn**, his relationship with Mr. Esformes "changed about six years ago when I was approached by an acquaintance for financial help for a late middle-age woman whom I did not know, who had lost her husband a year prior." Mr. Hahn raised some funds to help this woman, but was significantly short. He reached out to Mr. Esformes, seeking help for a stranger. "Mr. Esformes seemed truly interested in the plight of this woman he had never met or heard of before. He asked me how much we had raised and said he would match the total of the amount.

It was a large sum of money! Moreover, he volunteered to speak with people he knew at one of the Jewish social agencies my friend was dealing with, to ensure that the lady's case would get appropriate attention . . . Mr. Esformes had only one condition for his contribution. We were not to disclose it to anyone and that definitely included the beneficiary." For Mr. Esformes, helping this person in need was "clearly not made for any [other] reasons but out of a sincere desire to help and to act on his feelings of caring and compassion for another human being; in this case, a complete stranger. This all bespeaks Mr. Esformes to be a man of true character, sincere generosity and genuine compassion for others. I know only of a few, vanishingly small number of people who would've acted the same way he did."

**Sharon Ciment** has experienced Mr. Esformes's charity and love for children in need: "He was always the advocate not only for his own children, but the less fortunate, those that were shunned by others.  He made sure there was a place for them at his table, made sure they were always invited to his home.  Welcoming them, and being protective of them as well."  Ms. Ciment describes how "I myself have seen Philip Esformes go before a tuition panel and plead and beg for admission for 3 students who were not allowed entry into a school because of financial setbacks. I have seen him sit at beside the bed of a friend felled by a stroke, praying and comforting the family. This is the father who would coach his children's teams, making sure that no child would be left behind because of his lack of skills.  He has

always been the champion of the less skilled and less fortunate."

Perhaps the most poignant letter was **Moshe Behar**'s, who rather than live in sorrow for his predicament, praises God for allowing him life to see his children marry and flourish.  "[T]he person whom will be standing before you on the day of his sentencing is the same man who, not once but twice, swept into my life like an angel and gave me another opportunity at life. My name is Moshe Behar and I'm a paraplegic. I was in a horrible accident while riding my bicycle back in 2006 which almost took my life and since then, I've had to live my life in a wheelchair. Unable to take care of myself, unable to provide for my family. But a few years before that horrible accident, I was a strong, hardworking family man with a wonderful wife and three beautiful young children. And I had fallen on some hard times. After an unfortunate business venture did not go so well for me, I found myself in serious financial troubles and felt like I had no way out. That year, I prayed like I had never prayed before. And when I least expected it, an angel came into my life by the name of Philip Esformes. This man did not know me. This man did not owe me. Yet, he offered me, a complete stranger, an opportunity to get back on my feet and take care of the one thing that was most important to me; my family."

Today, Mr. Behar works and provides for his family thanks to Mr. Esformes. "Philip made a commitment to support me and my family so that I did not have to worry and could focus on my recovery full time. Thanks in part to him, I was able

to live to see my daughter's wedding day in 2017 and today I am blessed to be a grandfather to a beautiful baby girl. Philip will never be forgotten by me and I will be forever indebted to the acts of tremendous kindness this man has shown me and my family."

Whether it's all the "instances of Philip helping people with their car payments, catching up with a delinquent mortgage, unpaid medical bills and educational expenses," **Fred Berkovits**, or "providing advice, a shoulder to cry on, . . . packing boxes in a cold warehouse to be delivered to the poor, . . . making deliveries before the Holidays to those less fortunate, . . ." **Joseph Knopf**, Mr. Esformes's "generosity and care for his fellow man was boundless."   Indeed, "[t]hose moments were what he lived for. It was his purpose."  *Id.*

As the Court reads these letters, with stories told in choked voices, deep with emotion and boundless appreciation, the Court perhaps will better understand why everyone says that the Philip Esformes the Court listened to in Court is not the true man who stands before the Court for sentencing. Mr. Esformes is a man who has helped others live with dignity, who has empowered friends and strangers alike to embrace self-worth, whether through his legendary philanthropy and boundless generosity, or by sharing his love for life and his fellow man. As Rabbi **Ranan Robinson** says in his letter, "[t]he saying in the [Esformes] family was, 'If you have two slices of bread, you give away one to someone in need. If you only have one,

then you cut i[t] in half!'"

The Talmud states that "words that stem from the heart, enter the heart." **Ira Reifer**. The letters addressed to the Court stem from the heart of everyone whose life has been touched by Philip Esformes.

(a)(2)(A) Need for the Sentence to Reflect the Seriousness of the Offense, <u>Promote Respect for the Law, and Provide Just Punishment</u>

A sentence not exceeding ten years of incarceration followed by supervised release, including thousands of hours of community service (some or all of which while under home confinement), is life-altering "just" punishment that will account for the seriousness of the offense and promote respect for the law.

The court in *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012), approved of the lower court's reasoning that there is inherent punishment to a person who is forced into the criminal justice system for the first time:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

The stress, fear, and shame of being a defendant in a criminal case—coupled with 37 months of pretrial detention—have had a deep psychological impact on Mr. Esformes. For the rest of his life, he will carry the social stigma of being a convicted felon. Moreover, Mr. Esformes's conduct and convictions have had permanent

emotional and psychological consequences for his children. The appropriateness of the proposed sentence is supported by Mr. Esformes's acknowledgment and acceptance of responsibility for his misconduct, as he will express personally to the Court at the time of sentencing. He will express his sincere desire to make amends for his bad behavior.

<u>(a)(2)(B) Need for Sentence to Afford Adequate Deterrence</u>

Research studies show that the severity of punishment does not have as much of a general deterrent effect on crime as the certainty of being apprehended and punished. The Sentencing Project, a national non-profit organization engaged in research and advocacy on criminal justice policy issues, published the following findings:[3]

- Research to date generally indicates that increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits.[4]

- The Institute of Criminology at Cambridge University was commissioned by the British Home Office to conduct a review of research on major studies of deterrence. Their 1999 report concluded that ". . . studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."[5]

---

[3] Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT (Nov. 2010), available at http://www.sentencingproject.org/doc/deterrence%20briefing%20.pdf.

[4] *Id.* at 1.

[5] *Id.* at 4.

- Daniel Nagin and Greg Pogarsky, leading scholars on deterrence, conclude that "punishment certainty is far more consistently found to deter crime than punishment severity, and the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences."[6]

There are courts that have rejected the view that the sentencing goal of general deterrence can only be achieved by imposing a custodial sentence. In *United States v. Prosperi*, 686 F.3d at 34, the defendants were convicted after a jury trial of conspiracy to commit mail fraud and make false statements on a highway project, conspiracy to defraud the United States, eighty-three counts of making, and aiding and abetting the making of, a false statement on a highway project, and fifty counts of mail fraud, and aiding and abetting mail fraud. The defendants' guidelines range was 87 to 108 months of incarceration. *Id.* at 39. After considering the § 3553(a) factors, the district court sentenced the defendants to six months of home monitoring, three years of probation, and 1,000 hours of community service. *Id.* at 41. In affirming the variance, the First Circuit noted that the district court "rejected the view that the interest in general deterrence could only be served by incarceration." *Id.* On the issue of deterrence, the district court stated:

> There is one benefit, and only one, that I see in this case to incarceration, and that is the sanction of deterrence that an incarcerated sentence would pose for others. Beyond that, society's interest in incarceration as opposed to atonement does not weigh heavily. There is no risk of recidivism on the part of either of these defendants. Incarceration will incur a large cost to taxpayers, and an even larger personal cost in Mr. Prosperi's case to his ill wife and, to some degree,

---

[6] *Id.*

to Mr. Stevenson's family, as I recognize that they both play important roles as caregivers and caretakers in their families.

*Id.* The First Circuit accepted the district court's conclusion that home confinement with community service would provide sufficient general deterrence. *Id.*

Here, of course, Mr. Esformes has already served a significant period of incarceration in a maximum security facility; he need not serve another decade in prison to achieve the goal of general deterrence.

(a)(2)(C) Need to Protect the Public from Further Crimes of the Defendant

The United States Sentencing Commission published a report setting forth statistical analysis on recidivism. *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. Sentencing Commission (May 2004).[7] According to this analysis, Mr. Esformes is a low risk of reoffending. The study showed that people are less likely to recidivate when they fall into the following categories: college graduates; those sentenced under the fraud guidelines; non-violent offenders; first time offenders; those who are employed; and non-drug users. The study also showed that recidivism rates decline relatively consistently as age increases. *Id.* at 11.

In *United States v. Clay*, 483 F.3d 739 (11th Cir. 2007), the Eleventh Circuit

---

[7]      Available    at     http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

affirmed a district court's downward variance of 122 months based on the district court's view that the defendant was not likely to re-offend. The Eleventh Circuit noted that a sentencing court is "require[d] . . . to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." *Id.* at 745. The Court acknowledged: "Clay has fundamentally changed since his offense, poses a lesser risk to the community, and does not require incapacitation for too long." Given the defendant's rehabilitation, the Eleventh Circuit concluded that the variance was appropriate. *Id.* at 746. *See also United States v. Cherry*, 487 F. 3d 366, 369-70 (6th Cir. 2007) (granting a significant downward variance from the guideline range where the defendant presented a low risk of reoffending); *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (affirming non-custodial sentence where there was no risk of recidivism).

<u>(a)(3) Kinds of Sentences Available</u>

The offenses of conviction do not carry a mandatory sentence. The Sentencing Guidelines are advisory and a guideline sentence is not presumptively reasonable. This Court has wide discretion to impose a sentence that is reasonable. Toward that end, we propose a sentence that includes a period of incarceration that satisfies the goals of punishment, retribution and deterrence, but stops short of crushing a defendant who can resume a productive life.

As the Court knows, the Esformeses are a traditional Jewish orthodox family, led by Philip's father, Rabbi Morris Esformes. Throughout his lifetime, Rabbi Esformes has been a significant contributor to many non-profit organizations, including Chabad. And through the connection to Chabad, the Aleph Institute has been an important part of the Esformeses' lives, particularly in the last 37 months while Mr. Esformes has been incarcerated.

The Aleph Institute was founded in 1981 by Rabbi Sholom Lipskar, who continues to be the Institute's Chairman today. https://aleph-institute.org/wp/. As described in his letter to Judge Lenard submitted during the bail proceedings, Rabbi Lipskar and the Aleph Institute have worked with the courts and the prison system, helping inmates through the worst time of their lives while also benefitting society at large.

The Aleph Institute provides emotional and spiritual assistance to inmates and their shattered families, offering support to defendants who are in prison or in mental institutions. Aleph has also concentrated its efforts in advancing alternative sentencing options that benefit all involved. Recently, Aleph sponsored the Alternative Sentencing Key Stakeholder Conference at George Washington Law

Center with the participation of more than 200 judges, congressmen, senators, prison officials, family counselors, and others.[8]

Once defendants are released into the community, Aleph offers programs that teach self-empowerment, life skills, and fiscal responsibility to help them reintegrate successfully. Post-release accountability programs help defendants avoid re-offending and keeps them focused on the right path. "No one alone, no one forgotten" is the Aleph motto.

Rabbi Lipskar has had more than 50 face-to-face meetings with Mr. Esformes at FDC. For hours they have prayed and studied together, and Rabbi Lipskar has counseled Mr. Esformes. Their time together has given Rabbi Lipskar a window into Mr. Esformes's transformation, from the person that the Court heard on the recordings during the trial, to the man he is now – a man who is seeking redemption and an opportunity to show that he can contribute to, rather than burden, his family and his community. In Rabbi Lipskar's view, a prison sentence that would be measured in years, not decades, followed by thousands of hours of community service as a condition of supervised release, would accomplish all the goals of punishment.

---

[8] Complete videos of the Conference, which was broadcast on CSPAN, can be viewed at http://askssummit.com; or a short 10-minute synopsis is available at www.vimeo.com/171977443.

For example, given Mr. Esformes's work history, after completing the custodial portion of his sentence, Mr. Esformes could be ordered to work full-time, pro bono, for an organization that is dedicated to helping individuals who suffer from mental illness. This is a segment of our community that is in desperate need of care, as the Court heard during the course of the trial. It is also a population that Mr. Esformes cares deeply about, and for which he provided compassionate support and treatment over the years.

As the Court heard, Mr. Esformes would obsessively spend a substantial part of his professional time, including his Saturday nights, making rounds and visiting his facilities to ensure that residents lived in a dignified environment. Aside from the anecdotal and isolated views of three former employees and four (out of 14,000) patients, the vast majority of the trial witnesses were complimentary of the services provided at Mr. Esformes's facilities.[9] Indeed, the majority of the letters that will be submitted to the court by friends, family, and employees all emphasize the same positive attributes about Mr. Esformes: a deep love for his children, a devotion to charity and community, and a genuine commitment to the care of the residents at his facilities.

The Esformes family has been supportive of non-profit organizations that focus their efforts in the mental health space. Aleph Institute is one such

---

[9] A collection of that testimony is attached as Exhibit 1.

organization. This year, Aleph formed an alliance with the South Florida Behavioral Health Network, an organization led by Dr. John Newcomer and a board of directors that includes prominent state judges committed to alternatives for mentally ill people who would otherwise languish in the criminal justice system. Operating under the moniker "Thriving Mind," South Florida Behavioral Health Network is developing the Miami Center for Mental Health and Recovery, a center that will serve people in poverty who have been diverted from the criminal justice system and who are suffering from mental health and substance abuse disorder. Presently, Thriving Mind funds and oversees services for uninsured individuals in Miami-Dade and Monroe counties, with a total population of almost 3 million people. Nationally recognized for evidence-based successful programs, Thriving Mind works with law enforcement and the courts to decriminalize mental illness and substance use disorders, promoting access to effective, accountable, and compassionate care.

Given the direct impact Chabad and the Aleph Institute have had on Philip's life, especially in the last 37 months, Philip's father has ramped up his financial commitment to Aleph and, through Aleph, has also connected with Dr. Newcomer and Thriving Mind. In appreciation for all that Aleph has done for Mr. Esformes during his incarceration, and with a particular affinity for the work being done by Thriving Mind, Philip's dad has donated generously, if not exclusively selflessly, to both organizations consistent with his history of contributing to non-profit

organizations. It is Philip's father's hope, consistent with Aleph's 38-year mission, that the Court will hear Aleph's plea that the Court consider as an alternative to lengthy incarceration for his son, a custodial sentence of tolerable duration, followed by full-time community service as a condition of supervised release, at a non-profit organization, perhaps Thriving Mind, where pro bono help and care are desperately needed and where the contribution of time and effort can make a real impact in the lives of people suffering from drug abuse or mental illness.

For the sentencing hearing on September 12, we have invited Aleph's Rabbi Lipskar to address the Court about his observations of Mr. Esformes over the last 37 months and to urge the Court to impose a sentence that will substitute a significant portion of the custodial sentence with thousands of hours of community service under supervised release. In advance of sentencing, we invite the Court to view the 13-minute informational video that features Rabbi Lipskar, Dr. Newcomer and Morris Esformes, so that the court is acquainted with these organizations and their work. https://www.thrivingmind.org/thriving-mind-and-aleph-institute/.

### (a)(6) Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty Of Similar Conduct

The Delgado Brothers have similar records as Mr. Esformes (if not worse as to Guillermo, who pleaded guilty to distributing narcotic drugs), and they were found guilty and have admitted guilt to similar conduct. Indeed, the government's theory

of prosecution is that the Delgado brothers worked hand-in-hand with Mr. Esformes to pay bribes and kickbacks and launder those funds.

As to Gabriel Delgado, who pled guilty to a money laundering offense like the one upon which Mr. Esformes is being sentenced, the government agreed to a "TOTAL OFFENSE LEVEL – UNADJUSTED 30," *United States v. Delgado,* Case No. 14-CR-20359-JEM (DE 212:8, Plea Agreement), *i.e., before downward adjustments for acceptance of responsibility and cooperation*, with a corresponding sentencing range of 97-121 months. Despite the similarity in records and conduct, Mr. Esformes has received *twelve* upward adjustment points that the government agreed to forego as to Gabriel Delgado: +2 for obstruction, +2 for sophisticated laundering, +2 for sophisticated means, +2 for mass marketing, +4 for role. All of these adjustments could have equally applied to Gabriel and/or Guillermo Delgado under the same theories that have made them applicable to Mr. Esformes.

> *(i) Philip Esformes received an upward adjustment for obstruction of justice; Guillermo Delgado obstructed justice but did not receive the upward adjustment:*

Guillermo Delgado's PSI report established that he obstructed justice by paying one witness hush money. As Judge Martinez stated:

> THE COURT: Well, it [the PSI report] says Guillermo Delgado began paying what was construed as hush money to Carmona and his then spouse. This money kept Carmona silent for a period of time, but eventually Carmona disclosed the full and true nature of his relationship with the Delgado brothers. Carmona himself has acknowledged the

obstructive tactics employed to conceal the relationship he had with the Delgado brothers.

[*Delgado* 1/20/17 Sentencing Transcript at p. 6 (DE 246)].  Delgado then threatened a second witness, Juan Dios Gomez:

> THE COURT: How do you construe the statement to Juan Dios Gomez "if you f--k me, I will hurt your family"? Doesn't that sound bad?

[*Id.* at p. 8]. Finally, during pretrial detention proceedings, Prosecutor Medina argued to Magistrate Judge O'Sullivan that Delgado had engaged in 11 acts of obstruction of justice:

> MR. MEDINA: Your Honor, the focus is the obstruction. That is the focus here. There are 11 recordings and in each meeting it is discussing don't tell the government what we did, stay silent, be quiet, don't say anything. That's what the obstruction piece is.

[*Delgado* 5/20/14 Pretrial Detention Hearing at p. 39 (DE 24)].

Nonetheless, at sentencing, the government agreed that the Court should not impose the obstruction enhancement. [*Delgado* 1/20/17 Sentencing Transcript at p. 4 (DE 246) ("Guillermo Delgado's objection to the recommendation that his sentence be increased for obstruction of justice. The government and I and the defense agree that it should not apply")].

*(ii) Philip Esformes received upward adjustments for sophisticated means and sophisticated laundering; the Delgado Brothers engaged in the same conduct the Court has deemed sophisticated means and sophisticated laundering but the government agreed to forego the upward adjustment.*

Government exhibit 529JJ was prepared by Mr. Petron and lists 37 different bank accounts that Gabriel Delgado used during the commission of his crimes and that he admitted to in his numerous debriefings by the DOJ, the FBI, and various other agencies, and in his own prosecution:



**List of Gabriel Delgado Accounts**

| # | Account Name | Bank Name | Account Number |
|---|---|---|---|
| 1 | Aida Salazar Rebull & Gabriel A Delgado LLC | Ocean Bank | x9505 |
| 2 | Aida Salazar-Rebull and Gabriel A Delgado | Bank of America | x1339 |
| 3 | Diversified Medical Group C-O Gabriel A Delgado | Ocean Bank | x5605 |
| 4 | Diversified Medical Group- Gabriel Delgado | Regions Bank | x0205 |
| 5 | Diversified Medical Group Inc | Regions Bank | x2964 |
| 6 | East Hialeah Investment Group LLC | Ocean Bank | x3305 |
| 7 | Family Rest Management LLC | Florida Community Bank | x6215 |
| 8 | Gabriel A Delgado | American Express | x2001 |
| 9 | Gabriel A Delgado | American Express | x3009 |
| 10 | Gabriel A Delgado | American Express | x4007 |
| 11 | Gabriel A Delgado | American Express | x5004 |
| 12 | Gabriel A Delgado | American Express | x6002 |
| 13 | Gabriel A Delgado | American Express | x6006 |
| 14 | Gabriel A Delgado | American Express | x7000 |
| 15 | Gabriel A Delgado or Vivian M Delgado | Regions Bank | x0979 |
| 16 | Gabriel A. Delgado | American Express | x5008 |
| 17 | Gabriel A. Delgado | Ocean Bank | x0905 |
| 18 | Gabriel A. Delgado or Vivian M Delgado | Ocean Bank | x1706 |
| 19 | Gabriel Delgado | Florida Community Bank | x2563 |

GOVERNMENT EXHIBIT
529 JJ
16-20549-CR-SCOLA

Cont. →

### List of Gabriel Delgado Accounts

| # | Account Name | Bank Name | Account Number |
|---|---|---|---|
| 20 | Gabriel Delgado or Vivan M Delgado | Ocean Bank | x4806 |
| 21 | La Covadonga Management group | BB&T Bank | x7442 |
| 22 | La Covadonga Management Group | Florida Community Bank | x6083 |
| 23 | La Covadonga Management Group | Florida Community Bank | x6094 |
| 24 | La Covadonga Management Group LLC | First Bank of Miami | x7825 |
| 25 | La Covadonga Management Group LLC | First Bank of Miami | x7833 |
| 26 | Nursing Unlimited | Bank of America | x4148 |
| 27 | Nursing Unlimited 2000 Inc. DBA Home Healthcare Network of South Florida | Florida Community Bank | x1001 |
| 28 | Preferred Providers Group Inc. | Sun Trust Bank | x2823 |
| 29 | Preferred Providers Group Inc.-Gabriel A Delgado | Regions Bank | x9959 |
| 30 | Preferred Providers Group, Inc. | Florida Community Bank | x6699 |
| 31 | St Jude Health Care Inc. | Sabadell United Bank | x4974 |
| 32 | St Jude Health Care Inc. | Sabadell United Bank | x9023 |
| 33 | St Jude Health Care Inc. | Sabadell United Bank | x9254 |
| 34 | St Jude Health Care Inc. | First Bank of Miami | x3252 |
| 35 | Superior Living LLC-Guillermo Juan Delgado | First Bank of Miami | x8600 |
| 36 | Tender Touch Home Health LLC | First Bank of Miami | x4119 |
| 37 | Ulti-Med Healthcare Consultants LLC | First Bank of Miami | x7027 |
| 38 | Ulti-Med Healthcare Consultants LLC | Sun Trust Bank | x7838 |

During Mr. Esformes's trial, Delgado testified how he used his bank accounts to move checks and cash to pay kickbacks. Delgado testified that he tried to conceal the source of the money, and used fake contracts, leases, and independent contractor agreements in an attempt to legitimize the source of the funds. Delgado also testified that he directed his employee to inflate invoices to various Esformes facilities in order to conceal the source of funds, and then used those inflated invoices to obtain money that he later used to pay expenses and kickbacks. Delgado directed his employees on how to inflate the invoices and how to hide the excess funds he needed as expenses for various services or products.

Brother Guillermo Delgado testified how he used the bank accounts of his restaurants and other businesses to move funds between accounts, some of which

were titled in his name and others that were titled in the name of business entities or

even third parties. This can be seen from the materials obtained in the middle of trial

from government witness Michel Baldwin, who disclosed for the first time during

his cross-examination that he had obtained from the FBI Excel spreadsheets which

analyzed multiple bank accounts of the Delgados, including those in their personal

names as well as those in the names of business entities, including La Covadonga

and Family Rest.  This is a screen shot of the Delgado bank accounts that the FBI

analyzed and provided to Baldwin:



The Delgado Brothers also put businesses and real estate in the name of employees rather than in their own names and used those employees as fronts with AHCA and other regulators in an effort to conceal their true ownership of various entities.

Finally, Guillermo Delgado was debriefed by the FBI about his use of a banker over the years to help him open and close multiple accounts and move money between them in an effort to keep his own scheme going.  The FBI-302 reports can be provided to the Court for review if necessary.

*(iii) Philip Esformes received an upward adjustment for mass marketing; the Delgados did not receive this upward adjustment even though the government's theory of prosecution was that the Delgados were the marketers.*

According to the government, the Delgado Brothers and Nelson Salazar were among the people who "marketed" the Esformes Network in an effort to obtain patients. The government made similar allegations as to Odette Barcha. None of them received this upward adjustment.

*(iv) Philip Esformes received the maximum upward adjustment of +4 because he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive"; Gabriel Delgado was an organizer / leaders of a criminal activity that involved five or more participants or was otherwise extensive, but did not receive ANY role adjustment.*

Gabriel Delgado was a leader of at least (1) his sister Irene Trujillo who signed fake contracts and helped them move money, (2) Cruz Juarez who is described in

FBI-302 reports as a front for various Delgado businesses including a pharmacy, the brains of the financial operation, and someone who helped the Delgado Brothers alter documents during inspections, (3) Nohelia Juarez, who prepared the inflated invoices, (4) Jorge Juarez, who the Delgados used to put AHCA licenses under his name to conceal the Delgados's true ownership of facilities, and (5) Raymond Rodriguez, who was used to intimidate Nelson Salazar, threaten him with comments about cutting off a horse's head, and who then showed up in Court during Salazar's testimony and sat in the gallery watching Salazar testify about Salazar's actions with Gabriel Delgado.

Finally, the government contends that Gabriel Delgado was Mr. Esformes's 50/50 partner in all the activities alleged in the indictment, making Delgado subject to the enhancement also for his leadership role in extensive criminal activity as alleged by the government.

## CONCLUSION

Mr. Esformes urges the Court to impose a sentence not to exceed 120 months incarceration, followed by 5,000 hours of full-time community service during 3 years of supervised release.

Respectfully submitted,

**BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
201 South Biscayne Boulevard
Suite 1300
Miami, FL 33131
Tel: (305) 371-6421

/s/ Howard Srebnick
**HOWARD SREBNICK**
  Fla. Bar No. 919063
  HSrebnick@RoyBlack.com
**ROY BLACK**
  Fla. Bar No. 126088
  RBlack@RoyBlack.com
**JACKIE PERCZEK**
  Fla. Bar No. 0042201
  JPerczek@RoyBlack.com