# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 03, 2023

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

FILED BY_____ JE _____D.C.

Apr 3, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Appeal Number:  19-13838-AA  ; 19-14874 -AA
Case Style: USA v. Philip Esformes
District Court Docket No: 1:16-cr-20549-RNS-1

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Clerk's Office Phone Numbers
General Information:             404-335-6100    Attorney Admissions: 404-335-6122
New / Before Briefing Cases:     404-335-6135    Capital Cases:          404-335-6200
Cases in Briefing / After Opinion: 404-335-6130  CM/ECF Help Desk:  404-335-6125
Cases Set for Oral Argument:     404-335-6141

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————————

No. 19-13838

————————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PHILIP ESFORMES,

Defendant-Appellant.

————————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cr-20549-RNS-1

————————————————————

2                                                      19-13838

_____

No. 19-14874

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PHILIP ESFORMES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cr-20549-RNS-1

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion is-
sued on this date in this appeal is entered as the judgment of this
Court.

Entered: January 6, 2023

For the Court: DAVID J. SMITH, Clerk of Court

[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 19-13838

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PHILIP ESFORMES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cr-20549-RNS-1

_____

2                    Opinion of the Court                    19-13838

_____

No. 19-14874

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PHILIP ESFORMES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cr-20549-RNS-1

_____

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, and GRANT, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

Philip Esformes challenges his convictions of healthcare fraud, illegal kickbacks, and money laundering and the related restitution award and forfeiture judgment. After Esformes filed this

appeal, President Trump commuted his sentence of imprisonment and rendered any challenge to it moot. In his remaining challenges, Esformes argues that his indictment should have been dismissed because of prosecutorial misconduct, that the district court errone-ously admitted expert opinion testimony against him, that the ad-missible evidence against him was insufficient to sustain his convic-tions, and that the restitution award and forfeiture judgment should be vacated. We affirm.

## I. BACKGROUND

Philip Esformes owned and operated the "Esformes Net-work"—several medical facilities in Miami-Dade County, Florida. The Network included "skilled nursing facilities," residential med-ical facilities that provided services performed by nurses, such as physical therapy or the operation of sensitive medical devices. Medicare or Medicaid will pay for a stay at a skilled nursing facility only if the patient receives medical certification that the admission is necessary and if the patient spent at least three days in an acute-care hospital immediately before admission.

After a grand jury indicted two of his associates, Gabriel and Guillermo Delgado, Esformes entered into a joint-defense agree-ment with the Delgados. The government later added a drug charge to Guillermo Delgado's indictment that threatened a signif-icantly higher term of imprisonment. Esformes then "offered to pay a significant sum of money to [Guillermo] Delgado so that he could flee the United States and avoid prosecution in the United States." The Delgados signed a sealed plea agreement, began

recording their conversations with Esformes, and passed along to the government multiple recordings, including some that involved conversations between Esformes and his attorneys.

The following year, an indictment charged that Esformes and others conspired to use the Network to defraud Medicare and Medicaid of millions of dollars. The indictment alleged that Esformes bribed doctors at local hospitals to refer patients to his skilled nursing facilities who did not need that care and that his Network provided unnecessary and expensive medical services to those patients and fraudulently inflated bills with services that the facilities did not provide. It further alleged that the conspirators split their ill-gotten gains with referring doctors and bribed state officials to gain advance notice of otherwise random inspections. And it alleged that they laundered the proceeds of their crimes by various means, including paying "[f]emale [c]ompanion[s,]" providing "limousine services" to Esformes, and bribing a University of Pennsylvania basketball coach to aid the admission of Esformes's son.

The Federal Bureau of Investigation promptly executed a search warrant for Esformes's Eden Gardens medical facility to "seiz[e] . . . business records related to the health-care fraud investigation of Esformes." The government knew beforehand that Norman Ginsparg, an Illinois-licensed attorney who worked with Esformes, had an office at Eden Gardens. And a member of Esformes's defense team warned the agents that there were privileged materials at Eden Gardens.

The government established a "taint protocol" to identify privileged documents found in the search and to keep the prosecution team from seeing them. It chose agents who were not otherwise involved in the investigation to conduct the search. But these measures failed.

As the government now admits, "the agents conducting the search did not receive sufficient instructions on how to treat or identify potentially privileged materials[,]" and they passed on to the prosecution team a substantial portion—at least a hundred—of the privileged documents.

The prosecution team started to review the Eden Gardens materials before prosecutors confirmed that the materials were not privileged and before Esformes received copies of the seized documents. No prosecutor raised any privilege concerns until over four months after the Eden Gardens search, when Assistant United States Attorney Elizabeth Young received the scanned version of the documents and encountered a memorandum with a law firm's header at the top. But at that point because of other disputes with Esformes's counsel, Young had known about potential privilege issues for more than a month. And as the district court pointed out, when she encountered the obviously privileged document in December, she did not consult with either Esformes's defense team or the district court.

The prosecutors not only reviewed privileged documents but also tried to use them against Esformes before trial on two occasions. First, the government presented privileged documents to

Norman Ginsparg, one of Esformes's alleged co-conspirators, in an unsuccessful attempt to convince him to cooperate with the government. And second, prosecutors interviewed one of Ginsparg's assistants about the same privileged documents at length to determine whether they incriminated Esformes. As the district court found, the prosecutors' "myopic view of Ginsparg as a criminal and not an attorney skewed their reaction to, and blurred their ability to see, the potential for privilege" in these documents.

Esformes moved to dismiss the indictment and to disqualify Young and other prosecutors due to their violations of his attorney-client and attorney work-product privileges. A magistrate judge found prosecutorial misconduct and even a bad-faith "attempt[] to obfuscate the record" of that misconduct. The magistrate judge accordingly recommended suppressing the fruits of these intrusions on privilege. But the magistrate judge recommended that the district court reject Esformes's request to dismiss the indictment or to disqualify members of the prosecution team. The magistrate judge reasoned that after the privileged materials were suppressed, Esformes would not be further prejudiced: the recordings of privileged communications were evidence primarily for a count of the indictment that had been dismissed; no charges resulted from the privileged documents seized at Eden Gardens; and no privileged materials would be introduced at trial to prejudice Esformes. The district court found that the conversations between the Delgados and Esformes were not privileged and modified the suppression order to cover only the conversations between Esformes and his

attorneys, but the district court otherwise adopted the magistrate judge's proposed remedies and rationale.

Although the district court agreed with the magistrate judge that the prosecutors committed misconduct, it rejected the magistrate judge's finding of bad faith and dishonesty. During a hearing on the magistrate judge's report and recommendation, the district court granted three prosecutors leave to be represented by private counsel to urge the district court to reverse those findings. The district court "f[ound] that it [was] unnecessary to adopt the Magistrate Judge's credibility determinations" and criticisms of the prosecution team's "'attempts to obfuscate the record,' . . . particularly given the adverse consequences of such findings to the careers of the prosecutors." Those credibility assessments played no role in the magistrate judge's determination of the proper remedy; only the prejudice to Esformes mattered. But the district court still affirmatively rejected the magistrate judge's findings. The district court accepted the prosecutors' explanation that they were confused, not mendacious, about the scope of Esformes's invocations of privilege. It found it implausible that a prosecution team that tried, however incompetently, to maintain privilege protections would take the risk of fabricating a justification for its actions after the fact.

At Esformes's two-month trial, prosecutors presented three types of evidence material to this appeal. First, Esformes's co-conspirators, including Gabriel Delgado, testified about the conspiracy, its means, and their roles in it. Second, the prosecutors

presented summary testimony from Michael Petron, who identified various transactions in Esformes's financial records as bribes, kickbacks, and efforts to conceal illegal proceeds. Third, Dr. David Cifu testified as an expert witness to explain how skilled nursing facilities work; what type of patients are suitable for stays in them; and how Medicare and Medicaid treat stays in skilled nursing facilities.

Dr. Cifu serves as the Chairman of the Department of Physical Medicine and Rehabilitation and as the Executive Director of the Center for Rehabilitation Sciences and Engineering at Virginia Commonwealth University. He has decades of experience with skilled nursing facilities. Dr. Cifu explained the "continuum of services" between acute-care hospitalization and less intense forms of care, such as skilled nursing facilities, and he reviewed hypothetical case studies of skilled-nursing-facility patients.

Dr. Cifu testified that ordinarily, young, able-bodied psychiatric patients are poor fits for skilled nursing facilities. He testified that, in his thirty years of experience, he did not remember a single patient "who just had behavioral issues who was in a [skilled nursing facility]." He similarly could not recall a single patient at the five skilled nursing facilities at which he had worked who was admitted from a psychiatric hospital. Prosecutors used this testimony to support their argument that Esformes's patients who were admitted to skilled nursing facilities for psychiatric reasons had been admitted for illegitimate reasons in violation of Medicare and Medicaid guidelines.

After it allowed Dr. Cifu to testify, the district court admitted his expert opinions over Esformes's objection under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court evaluated Dr. Cifu's qualifications, methodology, and helpfulness to the jury, *see* FED. R. EVID. 702, and found him qualified to inform the jury about care in skilled nursing facilities and the criteria for entering them "based upon his education, training, and experience." It acknowledged that Dr. Cifu "didn't do any testing" to support his conclusions but still found his testimony reliable because "some people by education and training can give testimony in an area" despite not relying on precise scientific methods. And it found that "his testimony was helpful to the jury in understanding the relationship between how [skilled nursing facilities] work, how patients come in and out of [skilled nursing facilities], [and] what types of treatment are generally required in a [skilled nursing facility]" and that it "help[ed] them understand the relationship between the Medicare rules and regulations and guidelines as they pertain to [skilled nursing facilities] and other rehabilitation facilities." The district court also overruled Esformes's objection that the pretrial disclosures about Dr. Cifu were insufficient or misleading. It remarked that "there might be a case somewhere where defense has received more information about [an expert witness] before a trial, but I haven't seen one in my career."

Esformes contended that Dr. Cifu was not qualified to testify about whether psychiatric patients are commonly or properly admitted to skilled nursing facilities. Dr. Cifu admitted on cross-

examination that he was not familiar with the procedures required by Florida law that were supposed to guarantee that no one enter a skilled nursing facility without medical necessity. *See* Fla. Admin. Code Ann. r. 59G-1.040. The district court rejected Esformes's arguments, but it instructed the jury that "under appropriate circumstances psychiatric patients are eligible for coverage for skilled nursing facility services under both Medicare and Medicaid."

The jury convicted Esformes on 20 counts. Esformes was convicted of one count of conspiracy to defraud the United States and to pay and receive healthcare kickbacks, two counts of receiving kickbacks, four counts of paying kickbacks, one count of conspiracy to commit money laundering, nine counts of money laundering, one count of conspiracy to commit federal program bribery, one count of conspiracy to commit federal program bribery and honest services wire fraud, and one count of obstruction of justice. The jury failed to reach a verdict with respect to the six remaining counts, and the government has stated that it intends to retry Esformes on those counts.

The district court sentenced Esformes to 240 months of imprisonment and three years of supervised release. It also awarded approximately $5.5 million in restitution payments based on its "highly conservative estimate" of the federal government's loss owing to Esformes's crimes and the estimated costs of his imprisonment and supervised release. The district court derived the loss figure—the same figure it used for the purpose of calculating Esformes's prison sentence—from defense counsel's suggestion that

only one percent of the services for which Esformes billed Medi-
care and Medicaid were skilled nursing facility services to non-el-
derly psychiatric patients. The district court also ordered that Es-
formes forfeit $38.7 million because it calculated that sum of
money was "equal in value to the property traceable to the prop-
erty involved in [Esformes's] money laundering offenses." *See* 18
U.S.C. § 982(a)(1). That figure came from the summary witness,
Petron, who estimated that Esformes personally profited that
much from the Esformes Network. In a special verdict, the jury had
previously found some of Esformes's specific pieces of property—
worth much less than $38.7 million—to be forfeitable. *See* FED. R.
CRIM. P. 32.2(b)(5).

After Esformes filed his appeal, then-President Donald
Trump commuted Esformes's term of imprisonment to time
served but "le[ft] intact and in effect the remaining three-year term
of supervised release with all its conditions, the unpaid balance of
his . . . restitution obligation, if any, and all other components of
the sentence." The Bureau of Prisons released Esformes from cus-
tody, and we allowed the parties to file supplemental briefs to "dis-
cuss[] the impact, if any, of the presidential commutation of [Es-
formes's] sentence on this appeal."

## II. STANDARDS OF REVIEW

We decide jurisdictional issues *de novo. United States v.
Lopez*, 562 F.3d 1309, 1311 (11th Cir. 2009). We review decisions
not to dismiss an indictment and to admit expert opinion testimony
for abuse of discretion. *United States v. Davis*, 708 F.3d 1216, 1221

(11th Cir. 2013); *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc). "A district court abuses its discretion when it applies an incorrect legal standard, relies on clearly erroneous factual findings, or commits a clear error of judgment." *United States v. $70,670.00 in U.S. Currency*, 929 F.3d 1293, 1300 (11th Cir. 2019). We review a denial of a motion for acquittal for insufficient evidence *de novo*, "view[ing] the evidence in the light most favorable to the government." *United States v. Almanzar*, 634 F.3d 1214, 1221 (11th Cir. 2011). Finally, when reviewing the restitution award and forfeiture judgment, we review factual findings for clear error and questions of law *de novo*. *United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013); *United States v. Kennedy*, 201 F.3d 1324, 1329 (11th Cir. 2000).

## III. DISCUSSION

We divide our discussion into five parts. First, we explain that the presidential commutation renders Esformes's appeal of his prison sentence moot but does not otherwise affect his appeal. Second, we explain that the district court did not abuse its discretion when it declined to dismiss the indictment or to disqualify the prosecutors due to misconduct. Third, we affirm the admission of Dr. Cifu's expert-opinion testimony. Fourth, we affirm the restitution amount as not clearly erroneous. And fifth, we hold that there was sufficient evidence for the jury to convict Esformes of money laundering and that the forfeiture judgment based on money laundering was lawfully calculated.

### A. The Commutation of Esformes's Prison Sentence Renders His Appeal of that Sentence Moot.

Esformes contends that the commutation of his prison sentence renders his appeal of that sentence moot, bars retrial if this Court vacates any of his convictions, and "bars any attempt to further prosecute [him] on [c]ount [o]ne, the hung count" of conspiracy to commit healthcare fraud and wire fraud. We agree—as does the government—with his first contention, and we need not address the second because we are not vacating any of his convictions. So, we need only address his last argument.

Esformes argues that the President's grant of clemency bars further prosecution on at least count one, on which the jury failed to reach a verdict. Esformes interprets the clemency warrant as "intended to end [his] incarceration, precluding any further prosecution for the conduct at issue in this case." Because count one is an indictment for the same conduct as the counts of conviction, he argues that a new trial on that count would violate the terms of the clemency warrant, the Double Jeopardy Clause, and his due process right to be free from vindictive prosecution.

We cannot reach the merits of this argument because the hung counts were not the basis of a final judgment. With limited exceptions not relevant here, we review only final judgments. 28 U.S.C. § 1291. "Final judgment in a criminal case means sentence. The sentence is the judgment." *Berman v. United States*, 302 U.S. 211, 212 (1937); *see also United States v. Tovar-Rico*, 61 F.3d 1529, 1536 (11th Cir. 1995); *United States v. Kaufmann*, 951 F.2d 793, 794

(7th Cir. 1992) ("The judgment is obviously not final as to counts of the indictment which remain outstanding."). The hung counts against Esformes were not part of the basis of his sentence, so they are not part of any judgment we have jurisdiction to review.

### B. The District Court Properly Declined to Dismiss the Indictment or Disqualify the Prosecution Team.

The parties agree that prosecutors engaged in misconduct, but Esformes argues that the district court should have either dismissed the indictment or disqualified the prosecutors instead of only suppressing the improperly obtained evidence. The government contends that Esformes failed to prove "demonstrable prejudice" from the intrusion on his privilege when the suppression orders are considered, so dismissal of the indictment or disqualification of the prosecution team would have been improper. We agree with the government.

"Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States[,]" *United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983), but "absent demonstrable prejudice, dismissal [is] plainly inappropriate as a remedy" for the violation of attorney-client privilege, *United States v. Ofshe*, 817 F.2d 1508, 1515 (11th Cir. 1987). Without demonstrable prejudice, dismissal of an indictment is inappropriate "in the case of even the most egregious prosecutorial misconduct." *United States v. Merlino*, 595 F.2d 1016, 1018 (5th Cir. 1979) (discussing a violation of *Brady v. Maryland*, 373 U.S. 83 (1963)). Instead, the remedy should ordinarily be limited to

preventing the prosecution from using illegally obtained evidence against the defendant. *Cf. United States v. Morrison*, 449 U.S. 361, 364–65 (1981).

Esformes and his supporting *amici curiae* suggest that we should *presume* prejudice here. Esformes invokes our sister circuit's burden-shifting approach to assess prejudice: the Ninth Circuit requires that the government make an affirmative showing of harmlessness if the prosecutors deliberately violated a defendant's privilege and obtained information about the defendant's trial strategy. *See United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003). But Esformes did not explain *why* we should adopt this novel approach in his opening brief, and even if we considered his arguments or those of his *amici*, his suggested approach would be foreclosed by precedent.

Our Court has explained that the prejudice that can warrant a dismissal of indictment must be "demonstrable," not presumed based on a constitutional violation. *Ofshe*, 817 F.2d at 1515. As our predecessor circuit stated, "there is no *per se* rule requiring dismissal of the indictment as the sanction for the intrusion into the attorney-client relationship by government agents." *United States v. Melvin*, 650 F.2d 641, 643 (5th Cir. Unit B Jul. 1981).

Esformes has not even attempted to satisfy his burden of proving prejudice. The district court applied the correct legal standard and found that the privilege violations did not prejudice Esformes because the privileged materials did not serve as either the basis for the charges against him or the evidence admitted at trial.

Nor did the privilege violations provide the government with any strategic advantage. Esformes has not sought to establish that this finding is clearly erroneous. Esformes also argues that the admitted recordings of his conversations with the Delgados were privileged, but we agree with the district court that these conversations were not privileged because they were not between an attorney and his client.

Esformes also challenges the decision to reject the magistrate judge's finding that the prosecutors acted in bad faith, but we decline to address this issue because it does not affect the outcome of this appeal. The district court explained that, even if it had accepted the magistrate judge's finding of bad faith, that finding would not have affected its choice of remedy. Because we affirm the finding of no prejudice, the issue of bad faith likewise cannot affect our disposition of this appeal.

## C. Assistant United States Attorney Young Did Not Have a Conflict of Interest.

Esformes also argues that prosecutor Elizabeth Young "had multiple conflicts of interest that should have disqualified her as a matter of law." He argues that she should have been disqualified because she "inject[ed] her personal interest in opposition to Esformes'[s] motions to dismiss or disqualify" and impermissibly served as both a witness and an advocate in the disqualification proceedings. We reject these arguments.

1. Young Was Not an "Interested Prosecutor."

"[F]ederal prosecutors are prohibited from representing the [g]overnment in any matter in which they, their family, or their business associates have any interest." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987) (citing 18 U.S.C. § 208(a)). The decision in *Young* "establish[ed] a categorical rule against the appointment of an interested prosecutor": such an appointment is treated as a structural error not subject to harmless-error analysis. *Id.* at 814 (plurality opinion); *see also United States v. Siegelman*, 786 F.3d 1322, 1329 (11th Cir. 2015).

Esformes argues that Young was "interested" because she had a personal, professional interest in having the magistrate judge's finding of bad faith reversed. Young was represented by outside counsel at the disqualification hearing, and her counsel emphasized that "the findings as recommended by the magistrate [would] have serious ramifications to Ms. Young professionally." According to Esformes, Young "put her self-interest at the center of this controversy," and the district court wrongly took that personal interest into account when it specifically cited "the adverse consequences of [the magistrate judge's credibility] findings to the careers of the prosecutors." Because Young had a "dominant role in Esformes'[s] prosecution," Esformes maintains that her conflict of interest is enough to require vacatur of his convictions. We disagree.

Young's professional interest in avoiding sanctions from the district court did not disqualify her as an "interested prosecutor."

Every advocate has a personal, professional interest in the success of his matters. And every attorney has a strong personal interest in avoiding sanctions by a court, formal or not, because of their potential impact on an attorney's career. We recognized the magnitude of this interest in *United States v. Shaygan*, in which we held that it was a violation of prosecutors' due process rights for a court to publicly reprimand them without notice and an opportunity to be heard, including the benefit of personal legal representation. 652 F.3d 1297, 1317–18 (11th Cir. 2011). Young exercised the rights we recognized in *Shaygan* to challenge a sanction against her. A prosecutor who exercises her constitutional right to protect her professional reputation does not disqualify herself from further proceedings by that same act. If self-defense of that sort were enough to require recusal, any accused could disqualify his prosecutors by accusing them of misconduct.

### 2. Young Did Not Violate the Advocate-Witness Rule.

Esformes also argues that Young violated the rule that advocates may not testify in a case when she participated in the hearing on the motion to disqualify her, *see United States v. Hosford*, 782 F.2d 936, 938 (11th Cir. 1986), but this challenge also fails. Even if it were error for Young to have testified at the hearing before the magistrate judge, Esformes invited that error when he called her to the stand, and he cannot complain about it now. *See United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997). But apart from the invited-error bar, we would reject Esformes's argument because

Young was not a "witness" in the sense governed by the advocate-witness rule.

Esformes's objection misunderstands the advocate-witness rule. That rule responds to the concern that "the prestige or prominence of a government prosecutor's office will artificially enhance his credibility as a witness" or that "the performance of dual roles by a prosecutor might create confusion on the part of the trier of fact as to whether the prosecutor is speaking in the capacity of an advocate or of a witness." *Hosford*, 782 F.2d at 938–39 (quoting *United States v. Johnston*, 690 F.2d 638, 643 (7th Cir. 1982)). The classic case involves an advocate testifying against the defendant at trial. *See, e.g.*, *Walker v. Davis*, 840 F.2d 834, 836 (11th Cir. 1988) ("[The prosecutor and the defendant] were the only two witnesses to give testimony concerning [the defendant's] alleged confession."). Young was not testifying to the jury about the charges in the case but was instead testifying to a magistrate judge about her own investigatory work. She was not serving as both an advocate and a witness in the way that the traditional rule envisions, and so her actions were consistent with the rule's requirements.

### D. The District Court Properly Admitted Dr. Cifu and Denied Esformes's Motion for Acquittal.

Esformes argues that the district court abused its discretion when it admitted Dr. Cifu's expert testimony and that this error entitles him to acquittal or vacatur "on the counts involving healthcare services, including [c]ount [o]ne which resulted in a hung-jury." As we explained above, we lack jurisdiction to consider

his arguments with respect to count one. We reject his other arguments because the district court did not abuse its discretion when it admitted Dr. Cifu's testimony.

Esformes challenges the admission of Dr. Cifu's testimony on three grounds. First, he argues that Dr. Cifu's testimony differed so greatly from the government's pretrial disclosures that it should not have been allowed. Second, he argues that the district court erred by deferring its *Daubert* ruling until after Dr. Cifu testified. And third, he argues that the district court did not properly apply the *Daubert* factors when it admitted Dr. Cifu's testimony.

Esformes offers a skeletal argument, similar to his two objections before the district court, that "the substance of [Dr.] Cifu's trial testimony differed materially from the government's pretrial disclosures." But aside from a bare citation to the disclosures, Esformes does not support his assertion. "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). So we decline to address the merits of this contention.

Esformes's next argument is that "the district court failed to perform the gatekeeping function required by *Daubert*" when it deferred ruling on the government's *Daubert* motion until after Dr. Cifu testified. This argument relies on a supposed categorical rule that the district court must never allow the jury to hear an

expert's testimony before ruling on it. But there is no categorical rule that constrains the district court's discretion.

To protect the jury from confusion by unreliable experts, the district court must "evaluate the reliability of the testimony before allowing its admission at trial." *Frazier*, 387 F.3d at 1262. The district court has broad discretion to formulate the procedures to make that admissibility determination and is not required, for example, to conduct a separate *Daubert* hearing. *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001). Likewise, neither the Federal Rules of Evidence nor our caselaw categorically require the district court to prevent the jury from hearing evidence that has not yet been admitted. Instead, with the exception of hearings on the admissibility of confessions, "[a] great deal must be left to the discretion of the judge who will act as the interests of justice require." *See* FED. R. EVID. 104 advisory committee's note to 1972 proposed rule.

Esformes has not established that the district court abused its discretion. The district court completed its *Daubert* evaluation, as required, before it admitted Dr. Cifu's testimony. Esformes argues that the decision to defer the ruling until after the jury heard Dr. Cifu's testimony is a *per se* abuse of discretion, but there is no authority for that categorical rule of law. And Esformes fails to explain what about his trial rendered the procedure the district court employed an unreasonable exercise of discretion. And even if the district court had erred by allowing Dr. Cifu to testify before his

admission, that error would be harmless because Dr. Cifu's testimony was properly admitted. *See* FED. R. CRIM. P. 52(a).

Finally, the district court did not abuse its discretion when it admitted Dr. Cifu's expert opinion testimony. When it decides whether to admit an expert witness, the district court must determine whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact . . . to understand the evidence or to determine a fact in issue." *Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)); *see also* FED. R. EVID. 702; *Daubert*, 509 U.S. at 592–93. The district court reasonably applied this standard when it relied on Dr. Cifu's background in skilled nursing care to qualify him, did not "skip[] the methodology requirement" (as Esformes argues) when it did not require specific scientific methods for his testimony, and reasonably found the testimony helpful to the jury.

As to the first factor, the district court found that Dr. Cifu was qualified to speak about skilled-nursing-facility practices based on his education and experience. The district court found that he had "been a physiatrist and medical director at [skilled nursing facilities] for the last 30 years[,] . . . a professor at a medical school[,] . . . [and author of] 230 scholarly articles . . . and 30 book chapters or books on a wide range of topics." Because of that professional experience, he was "familiar with the rules, regulations, and manuals of Medicare."

19-13838                    Opinion of the Court                    23

Esformes complains that Dr. Cifu "had no experience with primary psychiatric admissions" and was unfamiliar with Florida's regulations requiring medical certification for admission to a skilled nursing facility. Those regulations, Esformes argues, undermine Dr. Cifu's testimony because Florida already has measures to prevent patients from unnecessarily entering skilled nursing facilities. *See* Fla. Admin. Code Ann. r. 59G-1.040. He also argues that Dr. Cifu misunderstood the role of Medicare regulations in governing skilled nursing facilities' operations. Esformes's arguments are misplaced.

Dr. Cifu was not offered as an expert psychiatrist or an expert in Florida state regulations. What Esformes describes as a lack of experience with psychiatric admissions was part of Dr. Cifu's testimony: in his experience, there were few to no psychiatric admissions to the kind of facilities where he worked. The government as "proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Esformes's arguments were permissible to undermine the inferences the jury might have drawn from Dr. Cifu's testimony, but those arguments do not establish that Dr. Cifu was not an expert in his field.

Second, the district court properly found that Dr. Cifu's testimony was reliable even though he "didn't do any testing" or use "scientific methods." "The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys

when it decides *whether* that expert's relevant testimony is relia-
ble." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In
some cases, an admissible expert will need rigorous scientific or sta-
tistical analysis, but *Daubert* also allows for admitting experts
whose methods are less formal, such as when an expert testifies
primarily based on experience. *See id.* at 151. The proponent of the
testimony in such a case must "explain how that experience led to
the conclusion he reached, why that experience was a sufficient ba-
sis for the opinion, and just how that experience was reliably ap-
plied to the facts of the case." *Frazier*, 387 F.3d at 1265. Dr. Cifu's
experience with skilled nursing facilities as a practitioner, adminis-
trator, and educator was both extensive and directly on point, and
he painstakingly explained the basis of his bottom-line opinions
with reference to hypothetical examples, his own personal experi-
ence with patients, and federal regulations. No more "scientific"
methodology was necessary.

Third, we affirm the ruling that Dr. Cifu's testimony was
helpful to the jury. Although Esformes asserts that the district court
"never even mentioned" this requirement, the district court, in
fact, made a specific finding on the record that the testimony was
helpful:

> I . . . think his testimony was helpful to the jury in un-
> derstanding the relationship between how [skilled
> nursing facilities] work, how patients come in and out
> of [skilled nursing facilities], what types of treatment
> are generally required in a [skilled nursing facility],

and to also help them understand the relationship be-
tween the Medicare rules and regulations and guide-
lines as they pertain to [skilled nursing facilities] and
other rehabilitation facilities.

Esformes has given us no reason to reject this finding.

Esformes's argument that he is entitled to a judgment of ac-
quittal for his "counts involving healthcare services" fails along
with his objections to Dr. Cifu's testimony. Esformes argues that,
without Dr. Cifu's allegedly inadmissible testimony and its conclu-
sion that psychiatric patients are always unsuitable for skilled-nurs-
ing-facility care, there was no reasonable basis for the jury's verdict.
But the district court did not err in admitting Dr. Cifu's testimony.
And we must presume that the jury followed the district court's
instruction that psychiatric patients may sometimes belong in
skilled nursing facilities. *See Almanzar*, 634 F.3d at 1222. Esformes
also fails to engage with the other evidence presented in his two-
month trial and falls well short of establishing that no rational jury
could have found him guilty of healthcare fraud beyond a reasona-
ble doubt. *Cf. id.* at 1221.

### E. The District Court's Restitution Order Was Not Clearly Erro-neous.

Esformes argues that the restitution order was clearly erro-
neous. He contends that the restitution order was not based on
"the amount of loss actually caused by [his] conduct" because there
was no evidence of any loss to the government at all. *United States*

*v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010) (internal quotation marks and emphasis omitted). And he argues that even if there was loss, the district court calculated it unreasonably and with reference to unreliable evidence. We disagree.

There was plenty of evidence of actual loss to the government; indeed, defrauding the government was the core of the Esformes Network conspiracy. Esformes's only argument to the contrary is that the evidence of loss came from Dr. Cifu's testimony, which was unreliable and should not have been admitted. We have already rejected that argument. Because it was reasonable for the jury to find Esformes had defrauded the government beyond a reasonable doubt, it was not clearly erroneous for the district court to find a loss to the government by a preponderance of the evidence. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it . . . ."); *see also United States v. Bradley*, 644 F.3d 1213, 1298 (11th Cir. 2011).

Nor did the district court make an "arbitrary" calculation based on an unqualified witness's testimony. Esformes criticizes the district court for relying on an unreliable former Esformes Network nurse, Ada Maxine Ginarte, to calculate the extent of the government's loss. Esformes misinterprets the record: the district court did not rely on Ginarte's testimony. Ginarte testified that *ten* percent of her patients did not belong in her facility, but the district court assumed that only *one* percent of Esformes Network patients

were improperly placed in a skilled nursing facility. The district court relied on the government's summary witness, who estimated that $4.45 million of the payments received by the Esformes Network were based on young psychiatric patients housed at skilled nursing facilities, along with Esformes's counsel's estimation that one percent of patient payments fit that description. "[A] district court may accept a reasonable estimate of the loss based on the evidence presented[,]" *United States v. Cobb*, 842 F.3d 1213, 1220 (11th Cir. 2016) (internal quotation marks omitted), and Esformes has not established that the district court's estimate based on this evidence was unreasonable.

### *F. The District Court's Forfeiture Order Was Lawful.*

Finally, Esformes challenges the judgment of forfeiture against him. He argues that the convictions underlying the forfeiture fail as a matter of law and that the district court unconstitutionally overrode the jury's forfeiture verdict. These arguments fail.

It is a federal crime to engage in a transaction knowing that it "is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). And although "transactions [that] are engaged in for present personal benefit, and not to create the appearance of legitimate wealth," do not constitute money laundering, *United States v. Blankenship*, 382 F.3d 1110, 1130 (11th Cir. 2004) (quoting *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir.

1994)), those transactions can constitute money laundering if they are unusually structured to disguise the source of the funds, *see id.* at 1129. When a defendant is found guilty of federal money laundering, the district court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1).

1. Legally Sufficient Evidence Supported Esformes's Money-Laundering Convictions.

The government presented "substantial evidence of purposeful concealment" of the proceeds of Esformes's crimes. *See United States v. Naranjo*, 634 F.3d 1198, 1208 (11th Cir. 2011). The Delgados testified that they financed kickbacks and bribes by artificially inflating medical invoices for medical equipment that they sent to Esformes Network facilities. When the Esformes Network paid these invoices, it reimbursed the Delgados for paying kickbacks and bribes to doctors. Esformes and the Delgados "structur[ed] the transaction in a way to avoid attention" and to share the proceeds of the illegal Medicare and Medicaid payments without being detected. *See id.* (quoting *United States v. Majors*, 196 F.3d 1206, 1213 n.18 (11th Cir. 1999)). Moreover, the Delgados testified that they were the intermediaries for payments for limousines and female "companions" for Esformes and used shell accounts to facilitate Esformes's scheme to bribe the University of Pennsylvania basketball coach. The jury was entitled to rely on this evidence to find that Esformes committed money laundering.

2. Esformes's Sentence Did Not Violate the Constitution.

Esformes separately argues that the forfeiture judgment is unlawful because the district court made its own calculation of the amount of forfeiture that was different from the jury's special verdict about the forfeiture of some of Esformes's property. This argument is foreclosed by Supreme Court precedent.

When district courts assess statutorily required criminal forfeiture, they follow Rule 32.2 of the Federal Rules of Criminal Procedure. The rule contemplates two types of forfeiture determinations: a court can order forfeiture of an amount of money, or it can order the forfeiture of specific pieces of property. "If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." FED. R. CRIM. P. 32.2(b)(1)(A). Likewise, by default "the court must determine what property is subject to forfeiture under the applicable statute." *Id.* But in a jury case, either party can "request[] that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict." FED. R. CRIM. P. 32.2(b)(5)(A). The jury then "determine[s] forfeiture" via a special verdict. FED. R. CRIM. P. 32.2(b)(5)(B). But even then, the jury only determines "the forfeitability of specific property," and "a party is *not* entitled to a jury finding regarding a money judgment." *United States v. Curbelo*, 726 F.3d 1260, 1277 (11th Cir. 2013).

The district court followed Rule 32.2 to the letter. The jury returned a special verdict finding certain properties forfeitable, and the district court calculated a money judgment afterward.

The Supreme Court has already rejected the argument that this procedure violates a defendant's right to a jury trial. The Court explained in *Libretti v. United States* that "the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection." 516 U.S. 29, 49 (1995). Esformes insists that this statement was *dictum* that more recent decisions have undermined. But we rejected this exact argument in *United States v. Elbeblawy* and explained that "we must follow the case which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions." 899 F.3d 925, 941 (11th Cir. 2018) (alterations adopted) (internal quotation marks omitted).

Esformes also argues that even if judicial determination of forfeiture is not *per se* unconstitutional, it is unconstitutional if it conflicts with a previous jury verdict. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1184 (11th Cir. 2010) (explaining that the Seventh Amendment requires that courts defer to jury findings when they sit in equity). This argument is misplaced because the jury and judge answered different questions. The jury calculated the "forfeitability of specific property[,]" FED. R. CRIM. P. 32.2(b)(5)(A), but the judge calculated a lump-sum money judgment. The judge did not override the jury's verdict by providing a different answer from that provided by the jury when it was answering a different question. *Cf. United States v. Watts*, 519 U.S. 148, 155–56 (1997) (explaining that a jury's acquittal of conduct does not require that the district court at sentencing find by a preponderance of the evidence that the conduct did not occur).

19-13838                 Opinion of the Court                      31

Esformes's other constitutional challenges are even weaker. Esformes contends that the application of Rule 32.2 violated the Double Jeopardy Clause and the Eighth Amendment's prohibition of "excessive fines." U.S. CONST. amends. V, VIII. Because Esformes's Double Jeopardy argument is presented in a single sentence with a citation to a case not involving forfeiture, it is forfeited. *Sapuppo*, 739 F.3d at 681. And Esformes's excessive-fines argument fails on the merits.

The Constitution prohibits "excessive fines," including excessive forfeitures. U.S. CONST. amend. VIII; *see United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998). But "[i]f the value of the forfeited property is within the permissible range of fines under the relevant statute or sentencing guideline, the forfeiture is presumptively constitutional." *United States v. Waked Hatum*, 969 F.3d 1156, 1168 (11th Cir. 2020). The maximum fine for Esformes's money-laundering crimes is "twice the value of the property involved in the transaction." 18 U.S.C. § 1956(a)(1). And the district court found that the $38.7 million Esformes derived from the Esformes Network was "equal in value to the property traceable to the property involved in" Esformes's crimes, so Esformes could have been fined up to $77.4 million under the statute.

Esformes does not contest the $38.7 million calculation of the value of the property "involved in" his crimes, so any forfeiture under $77.4 million was presumptively constitutional. And Esformes offers no basis to rebut that presumption.

32                    Opinion of the Court                    19-13838

### IV. CONCLUSION

We **AFFIRM** Esformes's convictions, restitution award, and forfeiture judgment.

19-13838             GRANT, J., Concurring                1

GRANT, Circuit Judge, concurring:

I write separately to offer a cautionary word about Esformes's second *Daubert* argument. Because the ultimate decision to admit Dr. Cifu's expert testimony was proper, the district court did not reversibly err by deferring its admissibility ruling until after the jury had heard his testimony. But that is all the majority opinion (which I join in full) stands for on this question. As a general matter, a wait-and-see approach to admissibility for expert testimony is fraught with risk.

Expert evidence is unique in its capacity to be "both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (quotation omitted). Because an "expert's testimony often will rest upon an experience confessedly foreign in kind to the jury's own," the trial judge must separately work "to assure that the specialized testimony is reliable and relevant" and to "help the jury evaluate that foreign experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quotation omitted and alteration adopted). Consequently, a trial court "abuses its discretion by failing to act as a gatekeeper" regarding the reliability of expert testimony. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005). "The importance of *Daubert*'s gatekeeping requirement cannot be overstated." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

Esformes argues that the district court's approach to gatekeeping here was a "*per se* abuse of discretion." *See* Maj. Op.

at 21.   As the majority notes, "there is no authority for that categorical rule of law."   *Id.*   True enough.   But there is also no authority for the inverse point—that a district court can wait until the conclusion of an expert's testimony to a jury before it rules on admissibility.

Instead, precedent suggests that waiting to qualify expert witnesses until after their testimony is usually misguided.   The *Daubert* Court described the gatekeeping inquiry as a "preliminary assessment" made "at the outset" to determine what an expert is "proposing to testify" about.   *Daubert*, 509 U.S. at 592.   Our own caselaw also frames its analysis in the future tense.   A gatekeeper's role is to assess "the expert's qualifications, the reliability of the testimony, and the extent to which the testimony *will be helpful* to the trier of fact."   *United States v. Azmat*, 805 F.3d 1018, 1041 (11th Cir. 2015) (emphasis added).

It is true that the gatekeeping inquiry required under Rule 702 is "a flexible one" and that "*Daubert* hearings are not required by law or by rules of procedure."   *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 562 n.16, 564 n.21 (11th Cir. 1998) (quotation omitted).   But "discretion in choosing the manner of testing expert reliability" is not the same as "discretion to abandon the gatekeeping function" or to "perform the function inadequately."   *McClain*, 401 F.3d at 1238 n.4 (quoting *Kumho Tire Co.*, 526 U.S. at 158–59 (Scalia, J. concurring)).   A court cannot be an effective gatekeeper for witnesses who are already through the gate.

19-13838                    GRANT, J., Concurring                        3

The majority identifies a situation where admissibility hearings "must" be conducted outside the presence of a jury per Federal Rule of Evidence 104: if the hearing "involves the admissibility of a confession." Maj. Op. at 21; Fed. R. Evid. 104(c). Rule 104(c) also applies where "justice so requires." Fed. R. Evid. 104(c)(3). But the danger here was not conducting Dr. Cifu's admissibility hearing in front of the jury—it was holding that hearing after he had already testified.

To be sure, juries sometimes "inadvertently" hear inadmissible evidence, and we generally assume that they will follow an instruction to disregard it. *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993). But expert witnesses deserve extra caution. "[N]o other kind of witness is free to opine about a complicated matter without any firsthand knowledge" based on "otherwise inadmissible hearsay." *Frazier*, 387 F.3d at 1260. Here, because the expert testimony was admissible, any error about *when* it was admitted is harmless. I simply note that—more than in other evidentiary contexts—a district court's decision to permit expert testimony without first assessing its admissibility risks creating a reversible error. After all, "abdication" of a gatekeeping role is "in itself an abuse of discretion." *McClain*, 401 F.3d at 1238. In short, even if there is no "*per se*" rule compelling such a procedure in every case," treating an admissibility determination as a preliminary question to expert testimony "may often be advisable." *Watkins v. Sowders*, 449 U.S. 341, 349 (1981).

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 06, 2023

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-13838-AA   ; 19-14874 -AA
Case Style:  USA v. Philip Esformes
District Court Docket No:  1:16-cr-20549-RNS-1

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website.

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call T. L. Searcy, AA at 404-335-6130.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion